# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

| | |
|---|---|
| WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; NEW LINE PRODUCTIONS, INC., a Delaware corporation; JUDY SPERA, in her individual capacity and as the personal representative and executrix of the Estate of Lorraine Warren; and TONY SPERA, an individual,<br><br>     Plaintiffs,<br><br>v.<br><br>BEA LOYD (a.k.a. TAFFY SEALYHAM, ALI MAZUREN, J. SMITH, and JANE SMITH), an individual; METAGALAXTIC, LLC, a New Mexico limited liability company; OMNIMEDIA, LLC, a New Mexico limited liability company; COHEN GOLDBERG & SMITH, LLC, a New Mexico limited liability company; SEEKERS OF THE SUPERNATURAL, LLC, a New Mexico limited liability company; and Does 1-5,<br><br>     Defendants. | Case No. 1:20-cv-00062-JB-SCY |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
## AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs Warner Bros. Entertainment Inc., New Line Productions, Inc., Judy Spera (in her individual capacity and as the personal representative and executrix of the Estate of Lorraine Warren) and Tony Spera respectfully move the Court for partial summary judgment on Plaintiffs' claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (Count I), copyright infringement under 17 U.S.C. § 501 (Count V) and violation of rights of publicity under Connecticut law (Count VII). *See* Third Amended Complaint. (ECF No. 64).

115180384.1

## INTRODUCTION

This is a case about ownership of intellectual property rights relating to the late Ed and Lorraine Warren, a now deceased couple famous for their paranormal investigations. The rights at issue are: (1) trademarks and rights of publicity in the Ed and Lorraine Warren name and their professional name "Seekers of the Supernatural"; and (2) copyrights in their recordings of their television series "Seekers of the Supernatural." The Plaintiffs (including the Warren's daughter and sole heir) own the intellectual property rights at issue in this case.

Defendant Bea Loyd is an individual who attended lectures given by the Warrens in the 1990s and was one of many fans of the Warrens. Ms. Loyd is a former paralegal who travels the country in a caravan but has extensive experience forming hundreds of shell companies for clients using "mail drop" addresses in the US, Canada and the UK and experience with filing copyright and trademark applications. (Indeed, her address of record in this case is a mail drop service in Wyoming.) Ms. Loyd apparently put her legal skills to use beginning in around 2015 by concocting a scheme to usurp intellectual property rights owned by the Warrens and their successors by filing trademark applications for the ED AND LORRAINE WARREN name and their professional name SEEKERS OF THE SUPERNATURAL in the United States and other countries and registering copyrights in video and audio recordings and transcriptions of the Warren's Seekers of the Supernatural television series from the 1990s. Ms. Loyd formed and used multiple shell companies to accomplish her mission, used fictitious names for the officers and registered agents of the companies, and conjured up fictitious individuals from whom she allegedly acquired various rights.

While the details of Ms. Loyd's scheme and web of deception are complex (and will be fully revealed at trial), the trial can be simplified by resolving certain basic claims for which there are no genuine issues of material fact at the summary judgment stage.

First, the Plaintiffs are seeking summary judgment for trademark infringement

115180384.1

(Count I) based on their ownership of the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks and Ms. Loyd's use of the marks to create false endorsement of her audio and video recordings and transcriptions of the Warren's works.

Second, the Plaintiffs are seeking summary judgment on their claim for copyright infringement (Count V) involving the "Seekers of the Supernatural" television series. Ms. Loyd claims that she owns copyrights in the series and that she acquired the rights through a chain of title from Ed Warren to unnamed individuals to an "Ali Mazuren" and then to Ms. Loyd. However, as a matter of law, under 17 U.S.C. § 204, transfer of copyrights must be in writing and signed to be valid. Ms. Loyd had not produced any written agreements reflecting any of these alleged transfers and therefore cannot establish that she owns the copyrights. Rather, the undisputed facts demonstrate that the Plaintiffs own the copyrights in the Seekers of the Supernatural series and Ms. Loyd has infringed those copyrights by copying and distributing thousands of copies of the Plaintiffs' works.

Third, Plaintiffs are seeking summary judgment on their claim for violation of the Warren's rights of publicity, which the Plaintiffs own. There is no dispute that Ms. Loyd has exploited the Warren's name to sell recordings without permission.

Accordingly, there are no genuine issues of material fact underlying these claims and the Court should enter summary judgment in favor of the Plaintiffs.

### STATEMENTS OF FACTS ("SOF")[1]

**Background on Ed and Lorraine Warren**

1.      Ed and Lorraine Warren were paranormal investigators and authors. Ed Warren was a United States Navy veteran of World War II who became a self-taught demonologist. His wife, Lorraine Warren, was a clairvoyant and trance medium. (Declaration of Judy Spera ("J. Spera Decl.") ¶ 2.)

2.      Beginning in the 1970s, Ed and Lorraine Warren investigated and

---

[1] Some of the statements included in this section are provided for background only and are not material to Plaintiffs' motion, including some allegations made by Ms. Loyd.

researched thousands of cases of hauntings, possessions, and other paranormal activities around the world. The Warrens had numerous media appearances, speaking engagements and lectures. In addition, the Warrens authored or co-authored numerous books about the paranormal and about their work with paranormal activities. (*Id.* ¶ 3.)

3.     The Warrens have long been known as "The Seekers of the Supernatural." The Warrens began using the name in the 1970s when they toured the lecture circuit. (Id. ¶ 4.) Examples of advertisements for the Warren's lectures are provided below and additional examples are attached:

  

(J. Spera Decl., Ex. A.) The Warrens were known as the "Seekers of the Supernatural" throughout their lives and they were each referred to as one half of the "Seekers of the Supernatural" upon their deaths. (*Id.* ¶ 4, Ex. B.)

4.     The Warren's investigations and casefiles have inspired or have been adapted into books, a television series, and movies. The Warrens inspired the *Amityville Horror* series of movies beginning in the 1970s. More recently, they inspired the hugely successful *Conjuring* movie franchise, which generated more than $2 billion at the worldwide box office. That franchise includes the movies *Annabelle (2012), The Conjuring* (2013), *The Conjuring 2 (2016), Annabelle: Creation (2017) and Annabelle Comes Home (2019),* with more films in production. The latest in the series, *The*

*Conjuring 3*, was just released in theaters and on HBO Max on June 4, 2021. (*Id.* ¶ 5.)

**Background on Judy and Tony Spera**

5.      Judy Spera is the Warren's sole child. She was born in 1950. (*Id.* ¶ 1.)

6.      Judy Spera married Tony Spera in the late 1980s. Mr. Spera has been intimately involved in the Warren's work and business since the 1980s, including managing their lecture tours, moderating speaking engagements, managing public appearances, helping the Warrens run their business relationships with others, and working with book publishers and other vendors who wanted to use the Warren's intellectual property. (Declaration of Tony Spera ("T. Spera Decl.") ¶ 2.)

**"Seekers of the Supernatural" Television Series**

7.      In the 1990s, the Warrens and Tony Spera created a television series, which they titled "Seekers of the Supernatural" ("Seekers"). Much like the Warren's lectures, the television show was a series of sit-down interviews with the Warrens about their investigations and case files. Tony Spera moderated the show. (*Id.* ¶ 3.)

8.      The Warrens and Tony Spera were involved in every aspect of the creation of the Seekers series. They decided on the topic for each show. They planned dialogue to discuss specific cases of interest and questions that Mr. Spera, as the moderator, would ask the Warrens. They chose the background music, selected photographs or videos to show during the program, arranged the setting, selected guests, and oversaw the production and editing of the television series. They filmed the Seekers series in a studio in Connecticut, which is where the Warrens resided. (*Id.* ¶ 4.)

9.      The Seekers series appeared on public access television in the New England area between 1997 and 2000. (*Id.*)

10.     Tony Spera and the Warrens, as co-creators, own a U.S. copyright registration for the Seekers series. (T. Spera Decl. ¶ 5 & Ex. A.)

**The Death of the Warrens and Ownership of their Intellectual Property**

11.     Ed Warren died in 2006. Lorraine Warren inherited Ed Warren's assets,

including his intellectual property rights. (*Id.* ¶ 7.)

12.     In 2011, Lorraine Warren granted a life story option for the Warren's case files to New Line Productions, including exclusive rights to use their names and likenesses in connection with their casefiles. (*Id*. ¶ 8 & Ex. B.)

13.     Beginning around 2013, at age 86, Lorraine Warren's health was in decline. Tony and Judy began taking care of her on a constant basis, including being intimately involved with Lorraine Warren's business affairs. (*Id*. ¶ 9; *see also* J. Spera Decl. ¶ 7.) For instance, Judy Spera began to manage her mother's checkbook and handled paying all of her bills. (J. Spera Decl. ¶ 7.)

14.     Lorraine Warren died in 2019. (T. Spera Decl. ¶ 9.)

15.     In her will, apart from a vehicle bequeathed to Tony Spera, Lorraine Warren bequeathed all of her assets to Judy Spera, including any property of "whatever nature and wherever located." (*Id*. ¶ 10 & Ex. C) Ms. Loyd admits that Judy Spera is the Warren's heir. (Declaration of Michael J. McCue ("McCue Decl."), Ex. A (Loyd's Responses to Plaintiffs Requests for Admissions ("RFA") Nos. 94-95)).

**Bea Loyd**

16.     Bea Loyd first met the Warrens in 1997 or 1998. (McCue Decl., Ex. B (Deposition of Bea Loyd)("Loyd Tr.") at 266.)[2] At the time, Ms. Loyd was living in New York and she claims to have attended lectures held by the Warrens at that time in Connecticut. (*Id.*)

**Bea Loyd Claims To Own Copyrights In the Seekers series**

17.     Ms. Loyd claims she owns intellectual property rights in the Seekers series. (*See* Ex. B, Loyd Tr. 71 ("What intellectual property rights do you claim that you own relating to the Warrens? A. The 'Seekers of the Supernatural' series").)

18.     Ms. Loyd does not claim that she acquired rights in the Seekers series at the time the series was created in the 1990s but at a later date. (Ex. B, Loyd Tr. 166

---

[2] Unless otherwise stated, all exhibits are attached to the McCue Declaration.

115180384.1

(admitting she did not own the copyrights originally, but claiming that she acquired the rights later).) Indeed, Ms. Loyd did not write, produce, direct, edit, or create any episodes of the Seekers series. (Ex. A (RFA Nos. 81-85, 87).) In fact, Ms. Loyd did not attend any live tapings of the Warren's Seekers series. (Ex. B, Loyd Tr. 222.) Ms. Loyd's only alleged involvement in the Seekers series is her claim that, in or around 1998-1999, Ed Warren asked her to help get the show aired on public television in New York, which Ms. Loyd claims she did. (*Id.* 82-85.)

19.     Ms. Loyd claims that Ed Warren sold the rights to the Seekers series to "somebody else" before Ms. Loyd allegedly acquired the rights. (*Id.* 86-87.) Ms. Loyd claims that in or around 2003 or 2004, when Ed Warren was in the hospital,[3] he allegedly asked her to give a VHS copy of the show to a group of people that she met across from Central Park in New York. (*Id.* 87-88; 269-70.) Ms. Loyd was not able to provide the names of these individuals. (*Id.* 88-89.)

20.     Ms. Loyd claims the rights in the Seekers series were eventually transferred from those unidentified individuals to a person named "Ali Mazuren." (*Id.* 89.) When counsel asked Ms. Loyd how Ali Mazuren allegedly acquired the rights in the Seekers series, Ms. Loyd said that she did not know and she referred Plaintiffs' counsel to Tony Spera. (*Id.* 282-83.) Mr. Spera, who has worked with the Warrens for decades, has never heard of "Ali Mazuren" and denies that the Warrens sold any rights in the Seekers series to anyone. (T. Spera Decl. ¶ 11.) Judy Spera, the Warren's daughter, has also never heard of this person. (J. Spera Decl. ¶ 10.)

21.     Ms. Loyd claims that she purchased the rights to the Seekers series from "Ali Mazuren" in or around 2016 or 2017. (Ex. B, Loyd Tr. 148-149; 283.) According to Ms. Loyd, "Ali Mazuren" offered to sell Ms. Loyd rights in the Warren's intellectual property by offering to sell her a "box" and Ms. Loyd claims she understood that she owns whatever

---

[3] Ed Warren suffered a stroke in 2001, after which he was hospitalized and could not walk, talk, write or communicate. (T. Spera Decl. ¶ 12.) Ed Warren would have not been able to speak to Loyd or give her copies of any VHS tape. (*Id.*)

was in this "box." (*Id.* 78 ("What intellectual property rights do you believe that you acquired from Ali Mazuren, that relate to the Warrens? A. . . . whatever I got in the box and stuff"); 90-91 ("Because when Ali gave me a box, he gave me a box of a lot of stuff, and it was in that box").) According to Ms. Loyd, she agreed to pay "Ali Mazuren" the amount of $10,000 for what was inside this box. (*Id.* 278-279.) While Ms. Loyd claims she made the payment in the form of a cashier's check or money order, she has not produced any record of this payment. (*Id.* 146-49.)

22.     Ms. Loyd claims that she owns the rights in the Seekers series because one of the copyright certificates for the Seekers series was in the box. (*Id.* 186-187 ("these titles [from the Seekers series] was on a previous registration [shown to Ms. Loyd during deposition] that came to me in a box").)

23.     The following is an illustration of what Ms. Loyd claims is her chain of title for her acquisition of copyrights in the Seekers series:



(*Id.* 89-90, 148-149.)

24.     Ms. Loyd has not produced any written agreements demonstrating ***any*** of the alleged transfers of copyrights illustrated above from Ed Warren to unknown individuals to "Ali Mazuren" and then to Ms. Loyd. (*Id.* 80; 220 ("[Y]ou have not been able to put your hands on any written agreement between you and Ali Mazuren? A. At the present time, I have not been able to locate that agreement"); McCue Decl., Ex. C (Supp. Resp. to Interrog. No. 14 ("Defendant was unable to locate a written contract between Ali Mazuren and herself relating to the acquisition of rights to the Warrens intellectual property")).)

25.     Ms. Loyd also has not produced any documents or evidence of any

communications with "Ali Mazuren." (McCue Decl., Ex. A (RFA No. 121)). Nor does Ms. Loyd have any contact information for "Ali Mazuren." (Ex. B, Loyd Tr. 280-281; Ex. A (RFA nos. 123-126).)

26.     When asked for details regarding her transaction with "Ali Mazuren," Ms. Loyd claimed she met with about six individuals (none of whom were "Ali Mazuren") "in Delaware somewhere" and she handed them the money and they handed her the "box." (Ex. B, Loyd Tr. 148-51.) When asked for the names of the people Ms. Loyd met in Delaware, she claimed she could not recall. (*Id.*) When asked the current location of the box, Ms. Loyd claimed it was in someone else's storage locker, but Ms. Loyd could not remember where it was stored. (*Id.* 91.)

27.     When asked how Ms. Loyd could be sure that "Ali Mazuren" owned the rights to the Warren's intellectual property she claimed to be buying, Ms. Loyd claimed she had someone perform a "clearance." (*Id*. 279-80.) When asked for the name of the individual who did the "clearance," Ms. Loyd claimed she did not recall. (*Id*. 280.) When Plaintiffs' counsel pointed out that some of the rights Ms. Loyd claims to have purchased from "Ali Mazuren" did not identify "Ali Mazuren" as the owner on public records, Ms. Loyd claimed that she never asked and "I just trust[ed] the people who were handling things for Ali." (*Id*. 150.) Again, Ms. Loyd did not recall the names of those people. (*Id*. 149-51.)

**Bea Loyd's Use of the "Seekers of the Supernatural" Trademark**

28.     After she allegedly purchased the rights to the Seekers series from "Ali Mazuren" in 2016 or 2017, Ms. Loyd claims that she took over the online ecommerce accounts that she alleges were used by "Ali Mazuren" to sell copies of audio recordings of the Seekers series. (Ex. C (Supp. Resp. to Interrog. No. 10; *see also* Ex. A (RFA No. 107); Ex. B (Loyd Tr. 296-297 ("you do sell DVD entitled "Seekers of the Supernatural" - - A. I think so … They've already been there, so I left what was there, there"); 298 ("you took over whatever sales channels Ali Mazuren was using? A. Yes. But I don't have log-in"); 299 ("where have you been selling any works relating to the Warrens or 'Seekers of

the Supernatural' since you acquired the rights? A. Well, I left what was up…."), 300 ("I control those accounts").)

29.     Ms. Loyd admits that she sold copies of the Seekers series in the form of downloadable media, paperback books, recordings, MP3s, and scripts of the recordings. (Ex. A (RFA Nos. 360-364.) Between 2017 to 2020, Ms. Loyd claims to have sold around 5,400 copies of the Seekers series on websites CD Baby and Bookbaby. (Ex. C, Supp. Resp. to Interrog. 11; *see also* Ex. A, RFA Nos. 368). Ms. Loyd also is selling the products on Amazon, AppleBooks, Barnes and Noble, eBay, and iTunes, but Ms. Loyd has not produced records of such sales. (Ex. B, Loyd Tr. 297, 299-300, 314, 366.) Ms. Loyd sold the Seekers series products for less than $1 per copy on average. (Ex. C, Supp. Resp. to Interrog. 11.)

30.     There are instances of actual confusion among consumers as to the source of the Seeker series products sold by Ms. Loyd. (McCue Decl., Ex. D) (screenshots). For example, one person who bought a copy of the written version of the Seekers series left a review stating that "Again I feel like [Ed] and Lorraine are wonderful at what they do. I couldn't put this book down or any other book they have written or been a part of for that matter." (*Id.*) Similarly, another buyer, who was dissatisfied with Loyd's product, blamed the Warrens, claiming it was "[n]ot their best book." (*Id.*)

**The SEEKERS OF THE SUPERNATURAL Trademark**

31.     On March 16, 2020, Bea Loyd filed a trademark application with the United States Patent and Trademark Office ("USPTO") for registration of the SEEKERS OF THE SUPERNATURAL trademark for, among other things, films, movies, television, multimedia, audio books, electronic books, e-books and articles, that related to supernatural. (McCue Decl. Ex. E) (U.S. Trademark Application Serial No. 88835775).

32.     In support of this application, Ms. Loyd submitted specimens showing how she allegedly was using the SEEKERS OF THE SUPERNATURAL trademark on products. The specimens she submitted were examples of sales of audio recordings for

the Seekers series, which prominently mentioned Ed and Lorraine Warren. (McCue Decl. Ex. F) (specimen).

33.   The USPTO has suspended action on Loyd's application pending this action. (McCue Decl., Ex. G.)

**Bea Loyd Claims To Own The ED AND LORRAINE WARREN Trademark**

34.   On November 16, 2014, a now defunct UK company called Galaxtic Media filed a U.S. trademark application for the ED AND LORRAINE WARREN trademark in connection with, among other things, audio and video recordings, films and television programs, downloadable media and a series of books involving "the field of supernatural and paranormal." (McCue Decl., Ex. H.)

35.   Although the applicant was identified as "Galaxtic Media," USPTO records show that ***Ms. Loyd paid the application fee***. (McCue Decl. Ex. I.)

36.   On March 15, 2015, the USPTO informed "Galaxtic Media" that it cannot register a mark containing the name of a living individual without their consent. (McCue Decl., Ex J.) At the time, Ed Warren was dead, but Lorraine was still alive. (SOF ¶¶ 11, 14.)

37.   On August 26, 2015, "Galaxtic Media" submitted a consent form allegedly signed by Lorraine Warren to the USPTO. The consent form was undated and an incomplete and nonsensical sentence:

I consent to the use and registration by Galaxtic Media of my Lorraine Warren as a trademark and/or service mark with the.

*Lorraine R. Warren*

(McCue Decl., Ex K.)

38.   Neither Tony nor Judy Spera has heard of "Galaxtic Media" and neither had

any knowledge of Lorraine Warren signing any kind of consent form. (T. Spera Decl. ¶ 13; J. Spera Decl. ¶ 11.) To the contrary, Tony and Judy Spera knew that, in 2011, Lorraine Warren had granted exclusive rights to use Ed and Lorraine Warren's names and likenesses to New Line and Ms. Warren could not have granted the same rights again. (*Id.*)

39.    Erich Speckin, a handwriting expert, examined the consent form and compared it to nine (9) other signatures from documents known to have been executed by Lorraine Warren. (McCue Decl., Ex. L.) He found that "it is highly probable that the signature of Lorraine Warren . . . was not signed by the same individual who signed the known documents." (*Id.* at 6.)

40.    Ms. Loyd admits that she never saw Lorraine Warren sign the consent form. (Ex. B., Loyd Tr. 138-139.) However, Ms. Loyd claims that, when she was contemplating purchase rights from "Ali Mazuren" in or around 2016 or 2017, she spoke to Lorraine Warren about whether she knew "somebody was selling valid things." (*Id.* 133-137, 273) However, when counsel asked Ms. Loyd about the details of the alleged conversation, Ms. Loyd claimed she "cannot recall . . . the exact words", that she did not actually provide a copy of the consent form with the signature to Ms. Warren to confirm her signature and that she did not discuss "Galaxtic Media" with Ms. Warren. (*Id.* 138.)

41.    On February 2, 2016, relying on the alleged consent form, the USPTO issued the registration for the ED AND LORRAINE WARREN mark to "Galaxtic Media." (McCue Decl., Ex. M.)

42.    Three months later, on May 19, 2016, Galaxtic Media changed its address and name to "Metagalaxtic" with a "mail drop" address in West Vancouver, Canada, which happens to also be an address used by Ms. Loyd. (McCue Decl., Ex. N.)

43.    On August 18, 2017, Galaxtic Media purported to assign the registration for the ED AND LORRAINE WARREN trademark to Ms. Loyd. (McCue Decl., Ex. O.) Both Ms. Loyd and Galaxtic Media used the same address. (*Id.*)

115180384.1

44.     When counsel asked why Ms. Loyd was not concerned that the trademark registration she allegedly acquired was in the name of "Galactic Media" and not in the name of "Ali Mazuren" who Ms. Loyd claims was selling the rights, Ms. Loyd claimed that she didn't ask and "I just trust[ed] them." (Ex. B, Loyd Tr. 149-150.) Yet, Ms. Loyd admits that she does not know if "Ali Mazuren" was involved with "Galactic Media." (*Id.* 108.)

45.     On or about July 15, 2019, Ms. Loyd submitted a request to change the correspondence address for the registration to her own. The address she identified was the same West Vancouver address as Metagalaxtic and Galactic Media. (McCue Decl., Ex. P.)

**Ms. Loyd Claims To Have the Right To Exploit The Warren's Rights of Publicity**

46.     Ms. Loyd explained that she believed she had the right to use Ed and Lorraine Warren's names and likenesses because Ed Warren allegedly gave her permission. (Ex. B, Loyd Tr. 318.) However, Ms. Loyd claims the last time she spoke to Ed Warren was in 2003 or 2004 when he was in the hospital. (*Id.* 269-270.) Moreover, Ms. Loyd admitted that she never spoke to Ed Warren about who owned rights to use the Warren's names. (*Id.* 270.) And Ms. Loyd admitted that Ed Warren never gave her exclusive rights to use their name or likeness for commercial purposes. (*Id.* 319.)

47.     When counsel asked Ms. Loyd to specify for what specific commercial purposes Ed Warren granted her rights to use his name and likeness, Ms. Loyd said:

> He didn't say ["You can use my name and likeness for anything you want forever?"], but Ed was always giving permission. He wanted -- they wanted publicity, and they always say, "Do this, do that. It would be really nice if you can do this or that." For instance, the tapes. I would not have -- I would not be in possession or would have been in possession of any tapes or anything without Ed giving them to me and giving me permission to put it on Manhattan Network television.

(*Id.* 320.)

## ARGUMENT

Summary judgment is proper where, when drawing permissible inferences in favor of the nonmoving party, there is no genuine issue of material fact and the movant is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587-88 (1986). The Court's function at this stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986). Rule 56 further allows this Court to enter partial summary judgment, removing from trial one or more, but not all, of the claims alleged in the complaint. *See* Fed. R. Civ. P. 56(a) (providing for "partial summary judgment").

Here, Plaintiffs seek partial summary judgment on their claims for trademark infringement (Count I), copyright infringement (Count V), and violation of the rights of publicity (Count VII).

## I.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR PLAINTIFFS ON THEIR TRADEMARK INFRINGEMENT CLAIM

The Court should grant summary judgment in favor of the Plaintiffs on their claim that Ms. Loyd infringed Plaintiffs' rights in the ED AND LORRAINE WARREN and the SEEKERS OF THE SUPERNATURAL trademarks (collectively, the "Warren Trademarks").

The Lanham Act prohibits using a mark in commerce in a manner that is likely to cause confusion, mistake or deception as to an affiliation, connection, or *association* with another person. 15 U.S.C. § 1125(a) (emphasis added). The alleged unauthorized use of a celebrity's identity is a type of false association claim that is referred to as a false endorsement claim. *Amazon Inc. v. Cannondale Inc.*, No. 99 N 571, 2000 WL 1800639, at *7 (D. Colo. July 24, 2000). "Where a celebrity plaintiff asserts a false-endorsement claim, the 'mark' at issue is 'the celebrity's persona . . . .'" *Id*. A false endorsement claim exists where a defendant's conduct creates a likelihood of confusion as to whether the plaintiff is endorsing the defendant's product or service. *Id*.; *see also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("McCarthy") § 28:15 (5th ed.) ("False endorsement occurs when a celebrity's identity is [used in] connection with a product or service in such a way that consumers are likely to be misled about the celebrity's

sponsorship or approval of the product or service").

To prevail on this claim, Ms. Spera must show that she owns the Warren Trademarks and that Ms. Loyd's use of the Warren Trademarks is likely to cause confusion. In determining the likelihood of confusion, the Tenth Circuit considers the following six factors: (1) the strength or weakness of the plaintiff's mark; (2) the relation in use and manner of marketing between the goods and service which the defendant markets and those which the plaintiff markets; (3) the degree of similarity between the marks; (4) the defendant's intent in adopting its mark; (5) evidence of actual confusion; and (6) the degree of care likely to be exercised by purchasers. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999).

### A.   MS. SPERA OWNS THE WARREN TRADEMARKS

Here, there is no genuine dispute that Ed and Lorraine Warren owned rights in their names, ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL, and that those rights passed to their daughter Judy Spera upon their passing.

The Warrens used the ED AND LORRAINE WARREN mark in connection with their lectures, tours, books and television series. The Warrens also used the SEEKERS OF THE SUPERNATURAL mark to refer to themselves starting in the 1970s and continuing through the 1990s in connection with the "Seekers of the Supernatural" show. (SOF ¶¶ 3, 7.) And, upon the deaths of Ed and Lorraine Warren in 2006 and 2019, respectively, their obituaries referred to them each as one half of the "Seekers of the Supernatural." (SOF ¶ 3.)

Judy Spera succeeded to the rights in the Warren Trademarks upon the Warren's death since she was the only heir of Lorraine Warren's estate. (SOF ¶ 15.) It is well established that such rights do not cease upon death of a person, but rather pass to their estate and to the heirs. *See* McCarthy § 28:15 (5th ed.) ("If the name or image of a well-known person achieves trademark significance during life, then, like any trademark, it is property that can pass in the estate after death"); *see, e.g., Facenda v. N.F.L. Films, Inc.,*

542 F.3d 1007, 1018 (3d Cir. 2008) ("This claim is considered a trademark claim because [plaintiff] Facenda's voice is a distinctive mark, the Estate owns the mark…"); *Estate of Presley v. Russen*, 513 F. Supp. 1339 (D.N.J. 1981) (use of name of deceased performer Elvis Presley by impersonator could lead public to believe that his estate had licensed or sponsored such a performance); *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc*., 688 F. Supp. 2d 1148, 1159 (D. Nev. 2010) (musician Bob Marley's estate successfully sued third party for false endorsement for unauthorized use of an Marley image on apparel).

Accordingly, Ms. Spera has established ownership of the Warren Trademarks.

## B.     LOYD'S USE OF THE WARREN TRADEMARKS IS LIKELY TO CAUSE CONFUSION

"Likelihood of confusion is a question of fact, but one amenable to summary judgment in appropriate circumstances." *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014). Here, all of the confusion factors favor a finding of likelihood of confusion.

### 1.     The Warren Trademarks are Strong Marks

The ED AND LORRAINE WARREN and the SEEKERS OF THE SUPERNATURAL marks are strong in that the Warrens received a high level of recognition among enthusiasts of the paranormal.

In the context of a false endorsement claim, the "strength" of the mark at issue concerns "the level of recognition the celebrity enjoys." *Amazon*, 2000 WL 1800639, at *8; *citing, Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 n.1 (9th Cir. 1997) ("In a case involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona and the strength of the mark refers to the level of recognition the celebrity enjoys"). Celebrity status includes fame among a selected group of individuals. *See, e.g.*, *Amazon*, 2000 WL 1800639, at *8 (finding that while Melissa Giove "is not an instantly recognizable celebrity, she is a celebrity among mountain bike enthusiasts").

The Warren Trademarks are strong given their use by Ed and Lorraine Warren for decades in connection with their paranormal investigations and related business ventures

for decades. (SOF ¶ 3.) The uses included lectures, speaking engagements, books and a television series referring to ED AND LORRAINE WARREN and their professional name SEEKERS OF THE SUPERNATURAL. (SOF ¶¶ 3, 8.) And now, with the introduction of numerous world-famous and widely publicized films (SOF ¶ 4), the ED AND LORRAINE WARREN mark in particular has received widespread recognition.

Therefore, this factor supports a finding of confusion.

### 2.    Ms. Loyd's Products Directly Relate to the Warren's Work

Here, Ms. Loyd has used the Warren Trademarks for products that directly relate to the Warrens.

When a celebrity works in a particular field, and the defendant sells products in that field, there is sufficient relatedness to create confusion because a consumer may be confused as to the celebrity's endorsement for defendant's products. *Amazon*, 2000 WL 1800639, at *9 (finding use of name and likeness of mountain bike celebrity in defendant's mountain bike ads created close product association "because it would be reasonable for a consumer to be confused as to Ms. Giove's association with Cannondale").

Here, Ms. Loyd is selling audio and video recordings of Ed and Lorraine Warren and transcriptions of the recordings (SOF ¶¶ 28-29.) Not only do these works "relate" to the Warren's work, but these works feature the Warrens themselves. Therefore, this factor supports a finding of confusion.

### 3.    Loyd Has Used Marks Identical to the Warren Trademarks

Here, Ms. Loyd is using the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks -- the identical marks used by the Warrens. (SOF ¶¶ 28-29, 32.) In considering the likelihood of confusion, the similarity of the marks and parties is the "heart of [the] analysis." *King of the Mountain Sports,* 185 F.3d at 1090. Therefore, this factor supports a finding of confusion.

### 4.    Ms. Loyd Intended To Associate Her Products With the Warrens

Here, there is no doubt that Ms. Loyd intended to create an association between

her uses of the Warren Trademarks for products and the Warrens, because she actually used the Warren's names in connection with the products and the products were audio and video recordings of the Warrens and transcriptions of the recordings.

"Proof that a defendant chose a mark with the intent of copying plaintiff's mark, standing alone, may justify an inference of confusing similarity." *Amazon*, 2000 WL 1800639, at *10; *see also Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 941 (10th Cir. 1983) ("Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion . . . .").

In the specimen Ms. Loyd submitted to the USPTO in support of her application to register the SEEKERS OF THE SUPERNATURAL mark, she identified products that she is selling using the mark, which included recordings that identify "Ed and Lorraine Warren" and were recordings featuring their voices. (SOF ¶ 32.) Accordingly, this factor supports a finding of confusion.

### 5.   Actual Confusion Exists

The best evidence of likelihood of confusion in the marketplace is actual confusion, *Packerware Corp. v. Corning Consumer Prods. Co.*, 895 F. Supp. 1438, 1451 (D. Kan. 1995), and here, there is evidence of actual confusion. As demonstrated by product listings that are associated with Ms. Loyd, customers have left reviews that indicate that they associate the products with Ed and Lorraine Warren. (SOF ¶ 30.) Accordingly, this factor supports a finding of confusion.

### 6.   The Degree of Care Is Low Because The Products Are Inexpensive

Ms. Loyd's products were inexpensive, so consumers would not exercise much care in purchasing the products. "[B]uyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse," which increases the likelihood of confusion. *See, Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 975 (10th Cir. 2002). As Ms. Loyd's interrogatory responses demonstrate, when you divide the revenue that Ms. Loyd generated from the sale of CDs, downloadable media, and books under the ED

AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks by the number of units sold, the average price of the products was $1 per copy. (SOF ¶ 29.) Since these products were inexpensive, this factor supports a finding of confusion.

### C.   THE ALLEGED CONSENT FORM IS A RED HERRING

In this case, Ms. Loyd claims that she owns rights in the ED AND LORRAINE trademark, because she claims that she acquired the rights from "Galaxtic Media" and that "Galaxtic Media" obtained Lorraine Warren's consent to register the mark. However, there is no genuine issue of material fact that the consent was not signed by Ms. Warren but, even if it were, the consent was not valid.

#### 1.   There is no Genuine Issue of Material Fact that the Signature on the Consent Form is Not Authentic

After "Galaxtic Media" filed an application to register the ED AND LORRAINE WARREN mark with the USPTO (an application which Loyd paid for), the USPTO appropriately refused the application because the law prohibits obtaining a trademark registration for a living person without their consent. (SOF ¶ 36); *see* 15 U.S.C. § 1052(c) (no mark can issue that "[c]onsists of or comprises a name . . . . identifying a particular living individual except by his written consent"). Since Lorraine Warren was living at the time, "Galaxtic Media" had to obtain Ms. Warren's consent. "Galaxtic Media" subsequently filed an alleged written consent with the USPTO. (SOF ¶ 37.)

At the time that Ms. Warren allegedly signed the consent, she was in poor health and her daughter, Judy Spera, and her son-in-law, Tony Spera, were taking care of her and handling her business affairs. (SOF ¶ 13.) Neither Tony nor Judy Spera had ever heard of "Galaxtic Media" nor did they see their mother execute the consent form at issue. (SOF ¶ 38.) In addition, the consent document is not dated and is grammatically incorrect, nonsensical and ends in an incomplete sentence. (SOF ¶ 37.) Finally, handwriting expert Erich J. Speckin, the president of an international forensic firm specializing in handwriting analysis for over forty years, examined the signature on the consent document and determined it was "highly probable" that Ms. Warren did not sign the document. (SOF ¶

39.) Mr. Speckin compared the signature on the consent document to nine (9) other samples of documents known to have been signed by Ms. Warren. (*Id.*) Mr. Speckin found that while the sample documents were signed by the same individual, the consent document did not match and had formative, spatial and proportional differences that made it "highly probable" that the signature of Lorraine Warren on the consent document was not Ms. Warren's signature. (*Id.*)

Ms. Loyd has no evidence establishing the authenticity of the signature. Ms. Loyd admits she never actually saw Lorraine Warren sign the consent form. (SOF ¶ 40.) Ms. Loyd's only argument is that she spoke to Lorraine in 2016 or 2017 about the trademarks when Ms. Loyd was contemplating buying rights from "Ali Mazuren." (*Id.*) However, Ms. Loyd admits she did not give Lorraine Warren the consent form to confirm her signature, did not discuss "Galaxtic Media" with Lorraine, and admits that she cannot recall what Lorraine specifically said. (*Id.*)

The mere existence of a scintilla of evidence in support of the non-movant's position is insufficient to create a dispute of fact that is "genuine." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). Ms. Loyd's vague, conclusory, self-serving, and uncorroborated "memories" of her conversations with Lorraine are the types of evidence that do not create a genuine issue of material fact. *See, e.g.*, *Giuffre v. Marys Lake Lodge, LLC*, Nos. 11-CV-00028-PAB-KLM, 12-cv-00377-PAB, 2012 WL 4478806, at *3 (D. Colo. Sept. 28, 2012) ("Plaintiff relies exclusively on his own uncorroborated declarations, the latter of which qualifies his descriptions of the expeditor position. Plaintiff's declarations are insufficient to survive summary judgment"); *Costales v. Quantum Health Res., Inc.*, No. CIV. 97-0021 BB/LCS, 1998 WL 36030842, at *12 (D.N.M. Apr. 17, 1998) ("The descriptions of the two conversations with supervisor Lou Herrera are extremely vague, and plaintiff has done nothing to clarify their import. On this record, plaintiff has failed to raise an issue for the jury on any element of the retaliatory discharge cause of action").

/ / /

### 2.     Ms. Warren Did Not Have the Right to Grant Consent

Even if Ms. Warren did sign the consent form—and the evidence establishes she did not—there is no genuine issue of material fact that Ms. Warren did not have the right to grant consent to "Galactic Media" to register the ED AND LORRAINE WARREN mark. In 2011, Ms. Warren granted New Line Productions *exclusive* rights to her and her late husband's life story, including rights to use their names. (SOF ¶ 12.) Thus, she did not have the rights to convey to Galactic Media in 2015. Accordingly, even if the alleged consent in 2015 contained an authentic signature, it would be invalid.

## II.     THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR PLAINTIFFS ON THEIR COPYRIGHT INFRINGEMENT CLAIM

To prove copyright infringement, Plaintiffs must prove that: (1) they own a valid copyright, and (2) Loyd copied constituent elements of the work that are original." *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009). Because there is no genuine issue of material fact as to either of these elements, the Court should also grant summary judgment in favor of Plaintiffs on their copyright infringement claim.

### A.  PLAINTIFFS OWN COPYRIGHTS IN THE SEEKERS SERIES

#### 1.     The Speras Own a U.S. Copyright Registration and Their Claim of Authorship is Supported by Undisputed Evidence

Plaintiffs Tony and Judy Spera (as the executrix of the Warren's estate and only heir) own a U.S. copyright registration for the Seekers series. (SOF ¶ 10.) "A plaintiff's presentation of a certificate of registration from the U.S. Copyright Office usually constitutes prima facie evidence of a valid copyright and of the facts stated in the certificate." *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005).

Here, the copyright certificate states that the Warrens and Tony Spera were the authors of the Seekers series, which is supported by the facts. (SOF ¶ 10.) Indeed, the show was an extension of the Warren's decades of lectures. (SOF ¶ 7 .) The Warren's and Mr. Spera's involvement is on display in every episode, as Mr. Spera moderated the

shows and the Warrens discussed their investigations and work. (SOF ¶ 8.) Ms. Loyd has no personal knowledge to dispute these basic facts about the show's creation, as she admits she did not author the shows herself or even attend the live taping of these shows. (SOF ¶ 18.)

### 2.   Loyd Did Not Acquire Copyrights in the Seekers series

Moreover, Ms. Loyd did not acquire copyrights in the Seekers series as she claims. Under 17 U.S.C. § 204, "a transfer of copyright ownership . . . *is not valid* unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." (emphasis added). Put simply, "[t]ransfer of copyright ownership is not valid unless made in writing signed by the owner of the rights being conveyed." *Schwasinger v. Price*, 789 F. Supp. 347, 351 (D. Kan. 1992), *aff'd*, 978 F.2d 1268 (10th Cir. 1992). "As a federal matter, failure to comply with Section 204(a) invalidates the agreement, without regard to any state law or equitable principles to the contrary, without regard to whether the parties perform under the 'contract,' and regardless of whether the putative transferor has agreed orally or otherwise in a noncontract that an agreement is in force." 2 Patry on Copyright § 5:106. "*The writing requirement is absolute, admitting of no exception*." *Id.* (emphasis added).

Here, Ms. Loyd has produced no writing showing any transfers of copyright for the Seeker series. (SOF ¶ 24.) Ms. Loyd's story that she bought a "box" of items from "Ali Mazuren" containing the physical copyright certificate is legally irrelevant. (SOF ¶ 22.) Indeed, for Ms. Loyd to be able to claim copyrights in the Seekers series, she would need to provide written agreements that show the entire chain of title from Ed Warren to alleged unknown individuals to "Ali Mazuren" and then to Ms. Loyd. (SOF ¶ 23.) She has not provided any written agreements reflecting any of these alleged transfers. (SOF ¶ 24.)

Indeed, Ms. Loyd's *modus operandi* in this case has been to make fantastical claims to the rights of the deceased Warrens based on unverifiable claims of oral

agreements, handshake deals, and transactions with individuals/companies that cannot be identified or located. Unfortunately for Ms. Loyd's strategy, this is exactly why Section 204 exists. Section 204 is designed to "provide protection for the author and creator of copyrighted material against fraudulent claims of transfer." *Pamfiloff v. Giant Recs., Inc.*, 794 F. Supp. 933, 937 (N.D. Cal. 1992).

In light of the complete lack of documentation evidencing Ms. Loyd's claim to own copyrights in the Seekers series, she has no rights in the series. Accordingly, she has no defense to the copying and continued sale of the copyrighted work. As such, summary judgment is appropriate.

### B. DEFENDANT BEA LOYD ADMITTED COPYING AND DISTRIBUTION

The Copyright Act grants the owners of the copyrights in a work the exclusive rights to, among other things, reproduce and distribute copies the copyrighted works. *See* 17 U.S.C. § 106. Violation of any of the exclusive rights constitutes infringement. *See* 17 U.S.C. § 501(a); *see also MacAlmon Music, LLC v. Maurice Sklar Ministries, Inc.*, No. 13-CV-02471-PAB-CBS, 2015 WL 794328, at *4 (D. Colo. Feb. 4, 2015), *report and recommendation adopted,* No. 13-CV-02471-PAB-CBS, 2015 WL 782722 (D. Colo. Feb. 24, 2015) (finding copyright infringement when party directly copied songs to sell).

Ms. Loyd admitted in both interrogatories and her deposition that she has sold and continues to sell recordings of the Seekers series through online retailers. (SOF ¶ 28.) And, to date, she has provided records demonstrating sales of more than 5,000 units of infringing products. (*Id.*) Accordingly, Ms. Loyd's infringement of Plaintiffs' copyright in the Seekers series is undisputed.

### III.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR PLAINTIFFS ON THEIR RIGHT OF PUBLICITY CLAIM

The parties agree that Connecticut law governs Plaintiffs' right of publicity claim. (ECF No. 27 at 3.) Right of publicity, in general, "is the inherent right of every human being to control the commercial use of his or her identity." J. Thomas McCarthy, *Rights*

*of Publicity and Privacy* § 1:3 (2d ed). Connecticut law follows the Restatement (Second) Torts regarding violation of the rights of publicity. *Venturi v. Savitt, Inc.,* 191 Conn. 588, 592, 468 A.2d 933 (1983). Pursuant to the Restatement (Second), Torts § 652C: "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." *Warren v. Connecticut Cmty. for Addiction Recovery, Inc.*, No. CV095005416S, 2010 WL 4342283, at *21 (Conn. Sept. 15, 2010).

### A.   PLAINTIFFS POSSESS RIGHTS OF PUBLICITY IN ED AND LORRAINE'S NAME AND LIKENESS

One's right of publicity does not end upon death. Rather, "the overwhelming majority rule under either statute or common law is that the right of publicity is descendible property and has an unconditional postmortem duration." *Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.*, 867 F. Supp. 175, 190 (S.D.N.Y. 1994). Indeed, Connecticut has recognized a common law postmortem right of publicity . . . " 2 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 9:23 (2d ed) (*citing Jim Henson Prods.*, 867 F. Supp. at 189).

Here, Ed Warren died in 2006 and Lorraine Warren died in 2019. They only have one child, Judy Spera. (SOF ¶ 5.) According to Lorraine Warren's will, apart from a vehicle, she bequeathed everything of "whatever nature and wherever located" to Judy Spera. (SOF ¶ 15.) This includes intangible rights, like her and her late-husband's rights of publicity. *See Jim Henson Prods*, 867 F. Supp. at 190 (finding postmortem rights of publicity under Connecticut law was discernable to the heirs of Jim Henson).

Given Judy Spera is both a Plaintiff in her individual capacity and as the executor of her mother's estate, she possesses and controls the rights of publicity for Ed and Lorraine Warren in this case, subject to contractual rights granted to co-Plaintiff New Line. (SOF ¶ 15.)[4]

---

[4] The Court need not resolve whether the rights of publicity being enforced here is held by Judy Spera or New Line (through its contractual rights), as both are Plaintiffs in this case. *King Cole Partners, LP v. CD Listening Bar, Inc.*, No. SACV111557JSTANX, 2012 WL 13024683, at *4 (C.D. Cal. Mar. 28, 2012) ("While Defendants have succeeded at presenting evidence that there may be multiple co-owners of the copyrights and publicity

### B. DEFENDANT LOYD HAS EXPLOITED ED AND LORRAINE WARREN'S NAMES FOR COMMERCIAL PURPOSES

"The common form of invasion of privacy under the rule here stated is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose." Restatement (Second) of Torts § 652C (1977).

Here, Ms. Loyd has engaged in conduct that appropriates the use of Ed and Lorraine Warren's names for commercial purposes by selling products prominently featuring their names and associated fame in connection with paranormal activities. (SOF ¶¶ 28-30.)

### C. DEFENDANT LOYD DID NOT HAVE PERMISSION TO EXPLOIT ED AND LORRAINE WARREN'S NAMES

During depositions, Ms. Loyd claimed that Ed Warren gave her permission to exploit his and his wife's name for commercial purposes. (SOF ¶ 46.) However, licenses are governed by the scope of the permission given. McCarthy, *Rights of Publicity and Privacy* § 10:18 (2d ed) ("A 'nonexclusive license' is merely permission to use the licensor's identity within the area and scope defined by the license.").

Here, when counsel asked Ms. Loyd **specifically** what Ed Warren permitted Ms. Loyd to do, Ms. Loyd could only recall that Ed Warren asked her to get the Seekers series to play on television in New York. (SOF ¶ 47.) Ms. Loyd did not, however, state that Ed Warren ever gave her permission to reproduce and copies of the Seekers series for money, as she is doing now. Moreover, Ms. Loyd claims the last time she spoke to Ed Warren was in 2003 or 2004, when Ed Warren was sick and in the hospital. (SOF ¶ 46.) She claims she never spoke to him about who owned right to use the Warren's names. (*Id.*) Ed Warren died 2006. (SOF ¶ 11.) In 2017, fifteen years later, Ms. Loyd allegedly bought the rights to the Seekers series from "Ali Mazuren." (SOF ¶ 21.) Ed Warren's

---

rights at issue, they have not yet shown that the ownership claims of the Plaintiffs are in conflict with the ownership claims of non-parties…If there is any dispute between the co-owners as to their rights, that dispute is properly between the co-owners, not between a co-owner and Defendants").

115180384.1

alleged request of Ms. Loyd that she get the Seekers series on television in 2003 or 2004 cannot reasonably be construed to constitute consent to use the Ed and Lorrain Warren name to sell copies of the Seekers series 13 years later.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court enter partial summary judgment in favor of Plaintiffs for trademark infringement (Count I), copyright infringement (Count V), and violation of rights of publicity (Count VII).

Dated:  August 6, 2021

LEWIS ROCA
ROTHGERBER CHRISTIE LLP


By:  /s/ Michael J. McCue
Michael J. McCue, *Admitted Pro Hac*
Meng Zhong, *Admitted Pro Hac*
3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169
Tel: 702-949-8224
MMcCue@Lewisroca.com
MZhong@Lewisroca.com

Ross L. Crown
201 Third Street NW, Suite 500
Albuquerque, NM 87102
Tel: 505-764-5402
RCrown@Lewisroca.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of August, 2021, I served a copy of the

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING**

**MEMORANDUM OF POINTS AND AUTHORITIES** via electronic service to the

following:

> Bea Loyd
> 30 N. Gould Street, Ste. 6540
> Sheridan, WY  82801
> E-mail: bumblebea2u@gmail.com

>   /s/ Rebecca J. Contla
> An employee of Lewis Roca
> Rothgerber Christie LLP

115180384.1