## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

WARNER BROS. ENTERTAINMENT INC.;
NEW LINE PRODUCTIONS, INC.; JUDY
SPERA, in her individual capacity and as the
personal representative and executrix of the
estate of Lorraine Warren, and TONY SPERA,

        Plaintiffs,

vs.                                                                                    No. CIV 20-0062 JB/JFR

BEA LOYD a/k/a TAFFY SEALYHAM a/k/a
ALI MAZUREN a/k/a J. SMITH a/k/a JANE
SMITH; METAGALAXTIC, LLC;
OMNIMEDIA, LLC; COHEN GOLDBERG &
SMITH, LLC; SEEKERS OF THE
SUPERNATURAL, LTD.; SEEKERS OF
THE SUPERNATURAL, LLC and FNU
DOES 1-5,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

---

[1]The Court's Order, filed March 29, 2022 (Doc. 115)("Summary Judgment Order"), disposed of: (i) the Plaintiffs' Emergency Motion to Compel Deposition, filed May 19, 2021 (Doc. 48); (ii) the Plaintiffs' Motion for Partial Summary Judgment and Supporting Memorandum of Points and Authorities, filed August 6, 2021 (Doc. 81)("Plaintiffs' MSJ"); and (iii) Defendant Bea Loyd's Pretrial Motion Summary Judgment or Dismiss, filed August 17, 2021 (Doc. 91)("Loyd's MSJ"). In the Summary Judgment Order, the Court: (i) grants in part and denies in part the Plaintiffs' Emergency Motion to Compel Deposition; (ii) grants the Plaintiffs' Motion for Partial Summary Judgment and Supporting Memorandum of Points and Authorities; and (iii) denies Defendant Bea Loyd's Pretrial Motion Summary Judgment or Dismiss. <u>See</u> Summary Judgment Order at 12-13. The Court indicated that it would issue a Memorandum Opinion and Order more fully detailing its rationale for its decision. <u>See</u> Order at 1. This Memorandum Opinion and Order is the promised opinion, which also addresses the related: (i) Plaintiffs' Motion for Entry of Final Judgment and for an Award of Injunctive Relief, Damages, and Attorneys' Fees, and Motion to Voluntarily Dismiss Plaintiffs' Remaining Claims, filed

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Emergency Motion to Compel Deposition, filed May 19, 2021 (Doc. 48)("MTC"); (ii) the Plaintiffs' Motion for Partial Summary Judgment and Supporting Memorandum of Points and Authorities, filed August 6, 2021 (Doc. 81)("Plaintiffs' MSJ"); (iii) Defendant Bea Loyd's Pretrial Motion Summary Judgment or Dismiss, filed August 17, 2021 (Doc. 91)("Loyd's MSJ"); (iv) the Plaintiffs' Motion for Entry of Final Judgment and for an Award of Injunctive Relief, Damages, and Attorneys' Fees, and Motion to Voluntarily Dismiss Plaintiffs' Remaining Claims, filed September 1, 2022 (Doc. 134)("Final Judgment Motion"); (v) the Defendant's Motion to Dismiss, filed November 14, 2022 (Doc. 143)("Second MTD"); and (vi) the Defendant's Motion to Dismiss Defendants Not Served With Summons and Complaint, filed November 21, 2022 (Doc. 145)("Third MTD").[2]  The Court

---

September 1, 2022 (Doc. 134)("Final Judgment Motion"); (ii) Defendant's Motion to Dismiss, filed November 14, 2022 (Doc. 143)("Second MTD"); and (iii) Defendant's Motion to Dismiss Defendants Not Served With Summons and Complaint, filed November 21, 2022 (Doc. 145)("Third MTD").

Because this Memorandum Opinion and Order grants the Plaintiffs' MSJ, denies Loyd's MSJ, denies Loyd's Second MTD, denies Loyd's Third MTD, and grants the Plaintiffs' Final Judgment Motion, which dismisses without prejudice the Plaintiffs' remaining claims, the Court will enter a separate Final Judgment against Loyd, which, in combination with the Final Judgment for Default Judgment (dated November 8, 2022), filed November 8, 2022 (Doc. 142), disposes of this case.  See Fed. R. Civ. P. 54(b).  Accordingly, the Court will not address in detail the MTC which it granted in part and denied in part in its Summary Judgment Order.  Final Judgment's entry will dispose of the other outstanding motions, all of which are for continuances or extensions for motions of which the Court has disposed, including: (i) Loyd's Motion for Continuance, filed November 7, 2022 (Doc. 138); (ii) Loyd's Motion for Continuance 1st Amended, filed November 8, 2022 (Doc. 140); (iii) Joint Motion for Extension to File Response to Motion to Dismiss [ECF No. 143], filed November 28, 2022 (Doc. 146); (iv) Joint Motion for Extension to File Response to Motion to Dismiss [ECF No. 143], filed December 20, 2022 (Doc. 149); and (v) Joint Motion for Extension to File Reply to Response to Motion to Dismiss [ECF No. 143] and Motion to Dismiss Defendants Not Served [ECF No. 145], filed December 28, 2022 (Doc. 150).

[2]Given the overlap between Loyd's arguments in Loyd's MSJ, the Second MTD, and the Third MTD, the Court's summary judgment analysis covers Loyd's arguments in all three filings. For the reasons stated in the Court's analysis, and because the Second MTD and Third MTD are untimely, having been filed well over a year after the August 6, 2021, dispositive motions deadline, the Court denies the Second MTD and Third MTD.

held hearings on May 21, 2021, see Clerk's Minutes at 1, filed May 21, 2021 (Doc. 55), November 11, 2021, see Clerk's Minutes at 1, filed November 11, 2021 (Doc. 110), and November 8, 2022, see Clerk's Minutes at 1, filed November 8, 2022 (Doc. 141). The primary issues are: (i) whether the Plaintiffs have standing to bring their claims; (ii) whether the Court has subject-matter jurisdiction over the Plaintiffs' claims; (iii) whether the Court has personal jurisdiction over the parties; (iv) whether venue is proper in the United States District Court for the District of New Mexico; (v) whether the Plaintiffs or Loyd are entitled to summary judgment on Count I, Unfair Competition Under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (vi) whether the Plaintiffs or Loyd are entitled to summary judgment on Count V, Copyright Infringement, 17 U.S.C. §§ 501-13; (vii) whether the Plaintiffs or Loyd are entitled to summary judgment on Count VII, Violation of Common Law Right of Publicity; and (viii) whether the Plaintiffs are entitled to the relief they seek in connection with their Final Judgment Motion. The Court concludes that: (i) the Plaintiffs have standing to bring their claims; (ii) the Court has subject-matter jurisdiction over the Plaintiffs' claims; (iii) the Court has personal jurisdiction over the Defendants; (iv) venue is proper in the United States District Court for the District of New Mexico; (v) the Plaintiffs are entitled to summary judgment on Count I, Unfair Competition Under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (vi) the Plaintiffs are entitled to summary judgment on Count V, Copyright Infringement, 17 U.S.C. §§ 501-13; (vii) the Plaintiffs are entitled to summary judgment on Count VII, Violation of Common Law Right of Publicity; and (viii) the Plaintiffs are entitled to the relief they seek in the Final Judgment Motion, subject to the Court's alterations to the injunction's scope. Accordingly, the Court: (i) grants the Plaintiffs' MTC; (ii) grants the Plaintiffs' MSJ; (iii) denies Loyd's MSJ; (iv) grants the Final Judgment Motion; (v) denies the Second MTD; (vi) denies the Third MTD; and will enter separately Final Judgment against Loyd, disposing of this case.

**FACTUAL BACKGROUND**

This case arises from a dispute over intellectual property related to the life and work of the late paranormal investigators Edward Warren Miney and Lorraine Rita Moran Warren, more commonly known as Ed Warren and Lorraine Warren ("Warren IP").[3]  See Plaintiffs' MSJ at 2; Obituary of Lorraine R. Warren at 1 (dated April 20, 2019), filed August 6, 2021 (Doc. 81-3 at 6)("L. Warren Obituary")(giving the full names of the couple as "Lorraine Rita Moran Warren" and "Edward Miney Warren").[4]  The Court derives the factual background from the parties' assertions of undisputed material facts in the Plaintiffs' MSJ; Loyd's MSJ; Defendant Bea Loyd's Summary Judgement Response, filed September 3, 2021 (Doc 97)("Loyd's Response); the Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment, filed September 10, 2021 (Doc. 99)("Plaintiffs' MSJ Reply"); and the Plaintiffs' Opposition To Defendant Bea Loyd's "Pre-Trial Motion Summary Judgment Or Dismiss," filed September 13, 2021 (Doc. 100)("Plaintiffs' Response"), the exhibits attached to this briefing, and the Transcript of the

---

[3]Given the variety of disputed intangible property in this case -- trademarks, copyrights, internet domains, rights of publicity, life story rights, audio recordings, television shows, and more -- the Court uses Warren IP as a catchall term for property E. Warren and L. Warren's lives and work as ghost hunters makes valuable.  Warren IP includes copyrightable works in any medium that E. Warren and/or L. Warren authored or co-authored, the Warrens' rights of publicity, trademarks referencing the Warrens and the Seekers of the Supernatural, works which others produced based on the Warren's sleuthing into the supernatural, web domains explicitly branded with the Warrens' names or Seekers of the Supernatural, and video or audio recordings of the Warrens' lectures.  The Court does not suggest that the Plaintiffs necessarily own all Warren IP items or that all Warren IP was the Warrens' property at any point.

[4]The true order of E. Warren's first, middle, and last names is inconsistent in the record.  See L. Warren Obituary at 1 (referring to L. Warren's late husband as "Edward Miney Warren"); Plaintiffs' Third Amended Complaint ¶ 19, at 6, filed June 21, 2021 (Doc. 64)(using the name "Edward Warren Miney"); Life Story Option Purchase Contract at 2 (dated December 7, 2009, executed February 7, 2011), filed August 6, 2021 (Doc. 82-1)(referring to L. Warren as the "conservatrix of the estate of Warren E. Miney").

Oral Argument, <u>see</u> Draft Transcript of Hearing, taken November 11, 2021 ("November 11 Tr.").[5]

The Court states the undisputed material facts in the text.  <u>See</u> <u>generally</u> Fed. R. Civ. P. 56.  The

Court specifically discusses facts that are purportedly disputed, or in some cases, facts genuinely

disputed with competent evidence in the record, in the footnotes.[6]

---

[5] Defendant Loyd has not filed a reply brief in support of her Motion for Summary Judgement.

The Court's citations to the hearings' transcripts refers to the court reporter's original, unedited versions.  Any final transcript may contain slightly different page and/or line numbers.

[6]The form and substance of Loyd's MSJ and Loyd's Response present challenges to the Court's task of determining the undisputed material facts relevant to deciding these cross motions for summary judgment.  Under D.N.M.LR-Civ. 56.1(b), a movant for summary judgement "must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists. The facts must be **numbered** and must refer with particularity to those portions of the record upon which the movant relies."  D.N.M.LR-Civ. 56.1(b) (bold in original).  The Plaintiffs' MSJ complies with the rule. <u>See</u> Plaintiffs' MSJ ¶¶ 1-47, at 3-13.  Loyd's MSJ does not comply with D.N.M.LR-Civ. 56.1(b).  While Loyd titles a section "Statement of Relevant Facts," she does not number the paragraphs, and, rather than state the facts and the trademarks at issue here, she instead lists details regarding other proceedings and relating to other trademarks.  Loyd MSJ at 2-5. <u>See</u> Plaintiffs' Response at 1-2.

Similarly, the nonmovant may respond to a motion for summary judgment, and, if the nonmovant responds, must include "a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist," and may, separately, "set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be **lettered** and must refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56.1(b) (bold in original).  The consequence of noncompliance is significant: "All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b).  The Plaintiffs' Response follows these requirements in the face of Loyd's noncompliance, excerpting the portions of Loyd MSJ which contain factual assertions, raising relevant evidentiary objections, and supplementing with a correctly organized statement of additional. <u>See</u> Plaintiffs' Response at 3-6.  In Loyd's Response, Loyd does not do what the rule requires, repeating nearly verbatim her noncompliant "Statement of Relevant Facts" from her MSJ.  Loyd Response at 1-5.  Nevertheless, in an attempt to be as fair as possible to Loyd, the Court will step back from the trees and see if Loyd has pointed to, somewhere in her briefing or at the oral argument, competent evidence in the record that shows that there is a genuine issue of material fact even though she has not followed D.N.M.LR-Civ. 56.1(b)'s rules for summary judgment briefing, so as to avoid a procedural default based solely on failure to follow the rules.

1.     __The Warrens' Lives and Afterlives__.

E. Warren and L. Warren were investigators of paranormal phenomena.  See Plaintiffs'

MSJ ¶ 1, at 3 (asserting this fact); Declaration of Judy Spera ¶ 2, at 2 (dated August 6, 2021), filed

August 6, 2021 (Doc. 81-1)("J. Spera Decl.").[7]  After serving in the Navy during World War II,

E. Warren "became a self-taught demonologist."  Plaintiffs' MSJ ¶ 1, at 3 (asserting this fact); J.

Spera Decl. ¶ 2, at 2.[8]  E. Warren's wife, L. Warren, was a "clairvoyant and trance medium."

Plaintiffs' MSJ ¶ 1, at 3 (asserting this fact); J. Spera Decl. ¶ 2, at 2.[9]  In the decades following

World War II, the Warrens "investigated and researched thousands of cases of hauntings,

---

[7]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[8]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").
"Demonology is the study of demons or beliefs about demons, and the hierarchy of demons.  They may be nonhuman, separable souls, or discarnate spirits which have never inhabited a body."  Demonology, Wikipedia, https://en.wikipedia.org/wiki/Demonology (last visited October 7, 2022).

[9]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").
"Clairvoyance (from French clair 'clear', and voyance 'vision') is the hypothetical ability to gain information about an object, person, location, or physical event through extrasensory perception.  Any person who is claimed to have such ability is said to be a clairvoyant ('one who sees clearly')."  Clairvoyance, Wikipedia, https://en.wikipedia.org/wiki/Clairvoyance (last visited October 7, 2022).
"Mediumship is the practice of purportedly mediating communication between familiar spirits or spirits of the dead and living human beings. Practitioners are known as 'mediums' or 'spirit mediums.'"  Mediumship, Wikipedia, https://en.wikipedia.org/wiki/Mediumship (last visited October 7, 2022).

possessions, and other paranormal activities around the world."  Plaintiffs' MSJ ¶ 2, at 3-4

(asserting this fact); J. Spera Decl. ¶ 3, at 2.[10]

In the 1970s, the Warrens began touring on the lecture circuit, speaking to audiences about

their research into the paranormal.[11]  See Plaintiffs' MSJ ¶ 3, at 4 (asserting this fact); J. Spera

Decl. ¶ 4, at 2; Seekers of the Supernatural Ed and Lorraine Warren Flyer at 1 (dated 1989), filed

August 6, 2021 (Doc. 81-2 at 6)("1989 Flyer").[12]  In media appearances and publicity materials,

E. Warren and L. Warren are referred to as "The Warrens," "Ed and Lorraine Warren," and/or the

---

[10]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[11]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").
The Plaintiffs' MSJ dates the beginning of the Warrens' preoccupations with the occult to "the 1970s," Plaintiffs' MSJ ¶ 2, at 3, or even "the late 1970s," J. Spera Decl. ¶ 3, at 2, but the record reflects that the Warrens began seeking the supernatural earlier than the Plaintiffs suggest. According to an obituary of L. Warren that J. Spera authenticates as "true and accurate," J. Spera Decl. ¶ 4, at 2, the Warrens founded the New England Society for Psychic Research in 1952.  See Obituary of Lorraine R. Warren at 1 (dated April 20, 2019), filed August 6, 2021 (Doc. 81-3 at 6). In addition, publicity materials submitted by the Plaintiffs indicate E. Warren had begun exhibiting his paintings of haunted houses by at least 1969.  See 1989 Flyer at 2.  By 1989, publicity materials for the Warrens touted a *curriculum mortis* ranging from teaching "classes on Demonology and Paranormology at Southern Connecticut State University," involvement in "the famous Demon Murder Case in Connecticut in which a young man accused of murder pleaded innocent by reason of demonic possession," and "tracking down the much publicized 'Werewolf of London'" for an exorcism. Seekers 1989 Flyer at 2.  Based on this record, it appears that while the Warrens' interest in the paranormal began a number of years before, their branding as the "Seekers of the Supernatural" is documentable to the 1970s.  Nevertheless, because the parties do not dispute the fact in the text, the Court will consider it undisputed for the purposes of this MOO.

[12]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

"Seekers of the Supernatural."  Plaintiffs' MSJ ¶ 3, at 4 (asserting this fact); J. Spera Decl. ¶ 4, at

2.  See Issue of <u>Connecticut</u> Magazine  at 1 (dated April, 1972), filed August 6, 2021 (Doc 81-2 at

3)("<u>Connecticut</u> Magazine Issue")(April, 1972, issue of <u>Connecticut</u> Magazine featuring a cover

image of E. Warren and L. Warren in front of an ramshackle house with the title "The Warrens:

Seekers of the Supernatural."; Flyer From Bloomfield High School Event at 1 (undated), filed

August 6, 2022 (Doc 81-2 at 2)("Bloomfield High School Flyer")(Advertising the Warrens'

upcoming March, 1983, talk at a high school  with the billing "SEEKERS OF THE

SUPERNATURAL AMERICA'S TOP GHOST HUNTERS ED & LORRAINE WARREN").[13]

The couple's notoriety spread beyond Connecticut, and the Warrens spoke to paying

audiences around the country -- particularly at colleges and universities -- under the billing

"Seekers of the Supernatural."  <u>See</u> Plaintiffs MSJ ¶¶ 2-3, at 3-5 (asserting this fact); J. Spera Decl.

¶4, at 2; Ed and Lorraine Warren Seekers of the Supernatural Flyer at 1-2 (dated 1989), filed

August 6, 2021 (Doc 81-2 at 5-6)("1989 Flyer")(Publicity notice depicting the Warrens sitting in

front of a horned skull billing the Warrens as the "<u>Seekers of the Supernatural</u> *Celebrating 20*

*Years on the College Circuit*")(emphasis in original).[14]   At their lectures, the Warrens would

discuss some of the cases of reported paranormal phenomenon they had investigated, enlivened by

photographs and recordings of the relevant hauntings.  <u>See</u> Plaintiffs' MSJ ¶¶ 6-7, at 5 (asserting

---

[13]As discussed in n.6, <u>supra</u> at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[14]As discussed in n.6, <u>supra</u> at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

this fact); J. Spera Decl. ¶ 4, at 2; 1989 Flyer at 2 (cataloging "slide-illustrated programs" being offered in 1989, accompanied by "photographs and recordings of the phenomena witnessed").[15]

In addition to their in-person speaking engagements and media appearances, "the Warrens authored or co-authored numerous books about the paranormal and about their work with paranormal activities."  Plaintiffs' MSJ ¶ 2, at 4 (asserting this fact).  See J. Spera Decl. ¶ 3, at 2.[16] Other writers and filmmakers have also drawn upon the Warrens' accounts of the occult; their "investigations and casefiles have inspired or have been adapted into books, a television series, and movies."  Plaintiffs' MSJ ¶ 4, at 4 (asserting this fact).  See J. Spera Decl. ¶ 5, at 2.[17]  In particular, the Warrens gained widespread fame for their association with a famous house haunting dubbed The Amityville Horror, the source for a 1976 bestselling book and 1979 blockbuster movie

---

[15]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[16]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[17] As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

The Plaintiffs reference the Warrens "casefiles," Plaintiffs' MSJ ¶ 4, at 4, or "case files," Plaintiffs' MSJ ¶ 7, at 5, but do not explicitly define the term, see Plaintiffs' MSJ ¶ 4, at 4, id. ¶ 7, at 5.  Based on a review of the record, the Court understands the Warrens' case files to be the notes, interviews, photographs, and other records that the Warrens used to document their paranormal investigations, organized by individual hauntings, possessions, apparitions, and other cases of unexplained phenomena.  See New Line Prod. v. Tony DeRosa-Grund, JAMS Arbitration No. 1210031019 at 5 (dated February 4, 2015), filed September 1, 2021 (Doc. 99-2 at 2)(excerpting an agreement regarding the Warrens' library of "approximately 8,000 case files" and explaining what those case files would include).  The case files -- like their supernatural subject matter  -- are both corporeal (the physical documents) and intangible (various Warren IP).

of the same name.  See Plaintiffs' MSJ ¶ 4, at 4 (asserting this fact); J. Spera Decl. ¶ 5, at 2; 1989

Flyer at 2 ("The Warrens most celebrated case involved their role as chief investigators of the

haunting on Long Island that became the subject of a number one best selling book and movie,

*The Amityville Horror*.").[18]

In 1950, E. Warren and L. Warren had a daughter, Judy.  See Plaintiffs' MSJ ¶ 5, at 5

(asserting this fact); J. Spera Decl. ¶¶ 1-2, at 1-2.[19]  Judy is the Warrens' only child.  See Plaintiffs'

MSJ ¶ 5, at 5 (asserting this fact); J. Spera Decl. ¶¶ 1-2, at 1-2.[20]  In the 1980s, Judy married

Antonio Spera, known as Tony.  See Plaintiffs' MSJ ¶ 6, at 5 (asserting this fact); Declaration of

Tony Spera ¶ 2, at 1-2 (dated August 6, 2021), filed August 6, 2022 (Doc. 81)("T. Spera Decl.);

Last Will and Testament of Lorraine R. Warren a/k/a Lorraine R. Miney at 2 (dated January 15,

2008), filed August 6, 2021 (Doc. 81-7)(naming L. Warren's son-in-law as "Antonio L.

---

[18]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[19]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, the record reflects Loyd's agreement with this fact.  See Defendant Bea Loyd's Amended Response to First Set of Requests for Admissions, No. 91, at 4 (dated July 8, 2021), filed August 6, 2021 (Doc. 81-9)("Loyd's Admissions")(admitting that J. Spera is the Warrens' daughter).

[20]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, the record reflects Loyd's agreement with this fact.  See Loyd's Admissions Nos. 89-91, at 4 (admitting that J. Spera is the Warrens' daughter and disclaiming knowledge of whether the Warrens had any other children**)**.

Spera")("L. Warren's Will").[21]   J. Spera and T. Spera have been "intimately involved in the Warrens' work and business since the 1980s, including managing their lecture tours, moderating speaking engagements, managing public appearances, helping the Warrens run their business relationships with others, and working with book publishers and other vendors who wanted to use the Warrens' intellectual property."   Plaintiffs' MSJ ¶ 6, at 5 (asserting this fact); T. Spera Decl. ¶ 2, at 1-2.[22]

In the 1990s, the Warrens and their son-in-law, T. Spera, "created a television series, which they titled 'Seekers of the Supernatural.'" Plaintiffs' MSJ ¶ 7, at 5(asserting this fact).  See T. Spera Decl. ¶ 3, at 2.[23]  The Seekers of the Supernatural television show was similar in format to the illustrated lectures the Warrens had been giving for decades, with moderator T. Spera interviewing the Warrens about their paranormal investigations and case files.  See Plaintiffs' MSJ

---

[21]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). Moreover, the record reflects Loyd's agreement with this fact.  See Loyd's Admissions No. 92, at 4 (admitting that T. Spera is the Warrens' son-in-law).

[22]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). Moreover, the record reflects Loyd's agreement with this fact.  See Loyd's Admissions No. 93 at 4 (admitting that T. Spera worked with the Warrens).

[23]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

¶ 7, at 5 (asserting this fact); T. Spera Decl. ¶ 3, at 2.[24]  The Warrens and T. Spera

> decided on the topic for each show. They planned dialogue to discuss specific cases
> of interest and questions that Mr. Spera, as the moderator, would ask the Warrens.
> They chose the background music, selected photographs or videos to show during
> the program, arranged the setting, selected guests, and oversaw the production and
> editing of the television series.

Plaintiffs' MSJ ¶ 8, at 5 (asserting this fact).  See T. Spera Decl. ¶ 4, at 2.[25]  The show was filmed

in Connecticut, where the Warrens lived, and aired "on public access television in the New

England area between 1997 and 2000."  Plaintiffs' MSJ ¶ 8, at 5 (asserting this fact).  See T. Spera

Decl. ¶ 4, at 2.[26]  A United States Copyright Registration, No. PAu 3-769-603, lists E. Warren, L.

Warren, and T. Spera as the authors of the Seekers of the Supernatural television series.  See

Plaintiffs' MSJ ¶ 10, at 5(asserting this fact); T. Spera Decl. ¶ 5, at 2; United States Copyright

Registration No. PAu 3-769-603 (effective date of registration February 10, 2015) at 1-3, filed

August 6, 2021 (Doc. 81-5)("Spera Seekers Copyright Registration")(listing the titles of 24

episodes of the "SEEKERS OF THE SUPERNATURAL," giving 1998 as the year of completion,

and stating "**Copyright Office notes**: Basis for registration: unpublished collection." (bold in

---

[24]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[25]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[26]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

original)).[27]

### 2. __The Warrens' Deaths and The Conjuring's Birth__.

E. Warren's health deteriorated following a stroke in 2001.  See Plaintiffs' MSJ n.3, at 7

(asserting this fact); T. Spera Decl. ¶ 6, at 2.[28]  E. Warren died in 2006.  See Plaintiffs' MSJ ¶ 11,

at 5 (asserting this fact); T. Spera Decl. ¶ 7, at 2; Obituary of Ed Warren, filed August 6, 2021

(Doc. 81-3 at 3)("E. Warren Obituary).[29]  E. Warren died intestate, with his property passing to

his wife L. Warren.  See Plaintiffs' MSJ ¶ 11, at 5(asserting this fact); T. Spera Decl. ¶ 7, at 2.[30]

In 2011, L. Warren "granted a life story option for the Warren's case files to New Line

Productions, [31] including exclusive rights to use their names and likenesses in connection with

---

[27]Loyd concedes that the Spera Seekers Copyright Registration exists.  See Draft Transcript of Hearing at 44:22-25, (taken November 21, 2021)(Loyd)("Their copyright is not the first copyright. Their copyright is in 2015.  I have permission to publish material under the 2014 … copyright.").  The Court find undisputed the fact that T. Spera sought and received in 2015 a copyright registration for the Seekers of the Supernatural series.  The dispute which party has superior claims to Seekers of the Supernatural series is at the core of this case and is discussed in the Analysis section.

[28]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[29]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[30]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[31]Plaintiff New Line Productions, Inc. ("New Line") is a well-known player in the film business.  See Third Amended Complaint ¶ 5, at 3, filed June 21, 2021 (Doc. 64).

their casefiles." Plaintiffs' MSJ ¶ 12, at 6. See T. Spera Decl. ¶ 8 at 4; Life Story Option Purchase

Contract (dated December 7, 2009, executed February 7, 2011), filed August 6, 2021 (Doc. 82-

1)("Option Contract").[32]  The Warrens' lives and work inspired the 2013 film The Conjuring.  See

Plaintiffs' MSJ ¶ 4, at 4 (asserting this fact); J. Spera Decl. ¶ 5, at 2.[33]  The Conjuring spawned a

_____

      A pioneer in the horror genre, New Line is widely known for the iconic "A Nightmare on Elm Street," "Final Destination" and "Blade" franchises. In 2013, New Line released the global blockbuster "The Conjuring" which launched a horror universe that includes the hit films for "Annabelle" and "The Nun." The seven films have earned more than $2 billion worldwide, making it the highest-grossing horror franchise of all time.

Motion Pictures Division -- New Line Cinema, Warner Bros. Entertainment, Inc. https://www.warnerbros.com/company/divisions/motion-pictures (last accessed November 7, 2022).  See Third Amended Complaint ¶ 6, at 3.  New Line is a subsidiary of Plaintiff Warner Bros. Entertainment Inc. ("Warner Bros.").  See Plaintiffs' Second Amended Certificate of Interested Parties at 1, filed July 15, 2021 (Doc. 126).  Warner Bros. is a subsidiary of the publicly traded media conglomerate Warner Bros. Discovery, Inc.  See the Plaintiffs' Second Amended Certificate of Interested Parties at 1-2.

   [32]The Plaintiffs filed a partially redacted copy of the Option Contract under seal with leave of the Court.  See Plaintiffs' Motion to File Exhibit Under Seal to its Motion for Partial Summary Judgement at 1-2, filed August 6, 2021 (Doc. 83).  Loyd did not oppose the motion, and the court granted the motion in its Order, filed December 2, 2021 (Doc. 111).  As the Plaintiffs did not redact the portions of their briefing which reference the Option Contract, the Court will not redact the portions of this MOO which reference the Option Contract.
     As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute the fact that L. Warren and New Line entered into the Option Contract, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Loyd purports to dispute the validity or scope of the rights which L. Warren still possessed and could transfer validly to New Line.  See Loyd's MSJ at 5.  A discussion of those contentions follows in the next paragraph of the text and its footnotes.

   [33]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

"hugely successful" franchise, with its multiple sequels and spin-offs grossing "more than $2 billion at the worldwide box office."  Plaintiffs' MSJ ¶ 4, at 4 (asserting this fact).  See J. Spera Decl. ¶ 5, at 2.[34]

L. Warren's health began to decline in 2013, when she was eighty-six years old.  See Plaintiffs' MSJ ¶ 13, at 6 (asserting this fact); J. Spera Decl. ¶ 7, at 2.[35]  During this last phase of L. Warren's life, T. Spera and J. Spera "began taking care of her on a constant basis, including being intimately involved with Lorraine Warren's business affairs," with J. Spera "managing her mother's checkbook and . . . paying all of her bills."  Plaintiffs' MSJ ¶ 13, at 6 (asserting this fact). See J. Spera Decl. ¶ 7, at 2-3.[36]

During this period, another set of disputes over Warren IP played out in a variety of legal forums.  In Loyd's MSJ and Loyd's Response to Plaintiffs, Loyd devotes the sections she labels "Statement of Relevant Facts" to a series of lawsuits and arbitrations principally involving Warner Bros., New Line, and an independent film producer named Tony DeRosa-Grund ("DeRosa-Grund Disputes").  Loyd's MSJ at 3-5; Loyd's Response at 2-5.  See Plaintiffs' MSJ Reply at 3-5,

---

[34]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute the fact that L. Warren and New Line entered into the Option Contract, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[35]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[36]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Plaintiffs' Response at 3-6; Supplemental Declaration of Michael J. McCue in Support of Plaintiffs' Motion for Partial Summary Judgment ¶¶ 2-15, at 2-4 (dated September 10, 2021), filed September 10, 2021 (Doc. 99-1)("McCue Decl."); New Line Prod. v. Tony DeRosa-Grund, JAMS[37] Arbitration No. 1210031019 at 5 (dated February 4, 2015)(Friedman, Arb.), filed September 1, 2021 (Doc. 99-2 at 2)("JAMS Award").[38] At the core of the DeRosa-Grund Disputes

_____

[37] Formerly known as Judicial Arbitration and Mediation Services, "JAMS is the world's largest private alternative dispute resolution (ADR) provider." About Us, JAMS, https://www.jamsadr.com/about/ (last visited November 9, 2022).

[38] As discussed in n.6, supra at 5, it is challenging to state the undisputed material facts regarding the DeRosa-Grund Disputes given the parties' noncompliance with D.N.M.LR-Civ. 56.1(b). D.N.M.LR-Civ. 56.1(b) requires (i) a motion for summary judgement to include a "**numbered**" list of undisputed material facts; (ii) a response to a motion for summary judgment to respond to disputed facts by number and organize any additional facts in a "**lettered**" list; and (iii) a reply to a motion for summary judgement to respond to the nonmovant's facts by "**letter**." D.N.M.LR-Civ. 56.1(b) (emphasis in original).

Loyd's MSJ and Loyd's Response each organize a section entitled "Statement of Relevant Facts" regarding the DeRosa-Grund lawsuits in a narrative format rather than numbered or lettered format, respectively. See Plaintiffs' Reply at 3-5, Plaintiffs' Response, at 3-6. The Plaintiffs' Response and the Plaintiffs' Reply respond to Loyd's discussion of the DeRosa-Grund Disputes in a narrative format. Plaintiffs' Reply at 3-5, Plaintiffs' Response at 3-5. The Plaintiffs' Response includes a section labeled the "Plaintiffs' Statement of Additional Facts ('SAF') that Are Material to Resolution of Loyd's Motion." Plaintiffs' Response at 5-6. These "Additional Facts" are numbered 1-5 rather than lettered and almost mostly contain discussions of what the "DeRosa-Grund Disputes did not involve . . . ." Plaintiffs' Response at 5-6. The McCue Decl. is evidence in the record regarding what the DeRosa-Grund Disputes involve; the McCue Decl. is based on McCue's "personal knowledge or review of court filings and other public records attached." McCue Decl. ¶ 1, at 1. See McCue Decl. ¶¶ 2-14, at 2-5 (summarizing the various DeRosa-Grund disputes and attaching copies of relevant filings). Loyd has not responded to the Plaintiffs' Statement of Additional Facts or otherwise filed a reply as D.N.M.LR-Civ. 56.1(b) requires. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). Nevertheless, in an attempt to be as fair as possible to Loyd, the Court will step back from the trees and see if Loyd has pointed to, somewhere in her briefing or at the oral argument, competent evidence in the record that show that there is a genuine issue of material fact even though she has not followed D.N.M.LR-Civ. for summary judgment briefing, so as to avoid a procedural default based solely on failure to follow the rules. In fairness to Loyd, who places significant emphasis on the DeRosa-Grund Disputes in her briefing, the Court also has reviewed carefully those filings from the DeRosa-Grund Disputes that the parties have submitted as exhibits.

are intellectual property rights related to The Conjuring, its sequels, and associated pieces of

Warren IP, with Warner Bros. and New Line firing the opening salvo via a JAMS Arbitration

proceeding, New Line Prod. v. Tony DeRosa-Grund.  See Plaintiffs' Response at 3-6 (asserting

this fact); McCue Decl. ¶¶ 2-15, at 2-4; JAMS Award at 1-32.[39]  In the JAMS Award, the arbitrator

---

[39]As discussed in n.38, supra at 16, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). Moreover, the record reflects Loyd's agreement with this fact.  See Loyd's MSJ at 4 (admitting that a JAMS arbitrator found that DeRosa-Grund breached an agreement with New Line when he applied for a trademark for "The Conjuring").

Loyd purports to dispute the scope of the intellectual property rights at issue in the DeRosa-Grund Disputes and their corresponding effect on this case.  See Loyd's MSJ at 5 (asserting that, "[a]fter three (3) years of litigation [resolving the DeRosa-Grund Disputes], it is clear that Ed and Lorraine Warren sold 100% of their rights to the Warren's [sic] intellectual property rights. Thus, Plaintiffs do not have rights in the Ed and Lorraine Warren Trademark, and therefore, no standing to bring this lawsuit").  See also Loyd's Response at 8 (repeating her assertions about the Warrens selling "100% of their rights," but revising the number of "years of litigation" to be "[f]our (4)" (in the heading) and "eight (8)" (in the body of the text).  Loyd also charges that the Plaintiffs "knowingly, deliberately, and intentionally lied" by omitting information about the DeRosa-Grund Disputes. Loyd's MSJ at 2; Loyd's Response at 3.

The Plaintiffs challenge Loyd's characterization of the DeRosa-Grund Disputes and assert that the "Plaintiffs did not lie about anything because the DeRosa-Grund Disputes did not involve the intellectual property at issue in this case."  Plaintiffs' Response at 3 (citing the McCue Decl. at 3-5).  The Court reviews the facts regarding the DeRosa-Grund Disputes based on the documents in these cases which the parties have attached to their briefing and concludes that there is no dispute regarding the content of the DeRosa-Grund Disputes.

In 2009 DeRosa-Grund, an independent film producer from Texas who had known the Warrens and sought to create a film based on their lives, approached New Line with a proposal that became The Conjuring.  See JAMS Award at 4, McCue Decl. ¶¶ 3-4, at 2.  In a series of agreements DeRosa-Grund and his entities surrendered to New Line any claims to (i) "'that certain screenplay entitled "The Conjuring"'"; (ii) any rights DeRosa-Grund or his entities had in the Warrens' case files; (iii) any rights DeRosa-Grund or his entities had in "'the entire life stories of Ed and Lorraine Warren'"; and (iv) any rights to Warren IP which DeRosa-Grund or his entities acquired going forward.  JAMS Award at 5 (quoting the "Option Quitclaim Agreement" between DeRosa-Grund and New Line, the "relevant parts" of which are excerpted at JAMS Award 5-9). See McCue Decl. ¶¶ 3-4, at 2; JAMS Award at 26-27.  In 2010, New Line became worried about a "significant cloud of title . . . posing a significant risks to its investment" after "Gary Barkin, an

---

held: "'Any rights acquired by DeRosa-Grund under the [purported agreements between DeRosa-Grund and the Warrens] are the sole property of New Line under the Agreements [between DeRosa-Grund and New Line].'"   Plaintiffs' Response ¶ 5, at 6 (quoting JAMS Award at 27)(asserting this fact).  See McCue Decl. ¶ 6 at 2-3; JAMS Award at 26-27.[40]  Moreover, the DeRosa-Grund Disputes do not involve the Warren IP at issue in Plaintiffs' MSJ: (i) the copyrights

---

Attorney representing Lorraine Warren, informed New Line that Warren had reviewed the purported . . . [agreement regarding the Warren's IP rights] between De-Rosa Grund and her and confirmed that her signatures were falsified."  JAMS Award at 12-13.  To resolve this issue, New Line signed the Option Agreement with L. Warren in 2011, backdated to 2009, to acquire the Warren IP rights directly.  See JAMS Award at 12-13; Plaintiffs' MSJ ¶ 12, at 6; T. Spera Decl. ¶ 8, at 4.

In 2013, New Line brought the arbitration after DeRosa-Grund "clearly breached" his agreements with New Line by filing trademark applications for "The Conjuring."  JAMS Award at 24.  See JAMS Award at 14-1; McCue Decl. ¶¶ 5-6, at 2.  "While the arbitration was pending, Mr. DeRosa-Grund filed a series of 'vexatious' and 'fraudulent' lawsuits against New Line."  McCue Decl. ¶ 7 at 3 (quoting In re Tony DeRosa-Grund, 544 B.R. 339 at 384 (Bankr. S.D. Tex. 2016)).  These included five civil lawsuits in the United States District Court for the Southern District of Texas, a collateral action in the United States Bankruptcy Court for the Southern District of Texas, and funding a lawsuit brought in the United States District Court for the Eastern District of Virginia by Gerald Brittle, an author who had collaborated with the Warrens on a book called The Demonologist.  See Plaintiffs' Response at 3-4; McCue Decl. ¶¶ 8-14, at 3-5 (giving details on each case).  None of these lawsuits disturbed the JAMS Award: all of DeRosa-Grund's lawsuits were dismissed see McCue Decl. ¶¶ 7-13, at 3-4, while the lawsuit filed by Brittle in the Eastern District of Virginia eventually settled and was resolved with a final judgment stipulating that Brittle's claims did not have merit, see McCue Decl. ¶14, at 5.

Loyd uses documents from the DeRosa-Grund Disputes to purport to dispute a variety of the facts across a wide range of issues and support her legal arguments.  The Court will discuss those purported disputes where relevant in other portions of this MOO.

[40]As discussed in n.38, supra at 16, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  Moreover, the record reflects Loyd's agreement with this fact.  See Loyd's MSJ at 7 (admitting that "DeRosa-Grund sold/lost the rights to the Warren's intellectual property rights in the JAMS Arbitration Final Award . . .to Warner Bros. Entertainment Inc. and New Line Productions, Inc.").

As discussed in n.38, supra at 17-18, none of the other lawsuits in the DeRosa-Grund Disputes disturbed the JAMS Award.

to the <u>Seekers of the Supernatural</u> show; (ii) the ED AND LORRAINE WARREN or SEEKERS

OF THE SUPERNATURAL TRADEMARKS; (iii) internet domains related to those trademarks;

and (iv) the Warrens' rights of publicity.  See Plaintiffs' Response ¶¶ 1-5, at 5-6 (asserting this

fact).[41]

      L. Warren died in 2019.  <u>See</u> Plaintiffs' MSJ ¶ 14, at 5 (asserting this fact); T. Spera Decl.

¶ 9, at 2; L. Warren Obituary at 1; Loyd's Response to Plaintiffs at 4 (admitting this fact).  In both

E. Warren and L. Warren's obituaries, the decedents "are referred to as one half of the 'Seekers of

the Supernatural.'"  Plaintiffs' MSJ ¶ 3, at 5 (asserting this fact); J. Spera Decl. ¶ 4, at 2.[42]  L.

Warren's Will names J. Spera as the personal representative and executrix of her estate.  <u>See</u>

Plaintiffs' MSJ ¶ 15, at 3 (asserting this fact); L. Warren's Will at 2.[43]  J. Spera is also the primary

beneficiary under L Warren's will; aside from a vintage Chevrolet bequeathed to T. Spera, L

Warren "bequeathed all her assets, including any property of 'whatever nature and wherever

---

[41]As discussed in n.38, <u>supra</u> at 16, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

    As discussed in n.39, <u>supra</u> at 17-18, Loyd's purported dispute of the issues involved in the DeRosa-Grund Disputes does not have support in the record.

[42] <u>See</u> E. Warren Obituary at 1 (describing E. Warren as "half of the husband and wife team of Ed and Lorraine Warren, Seekers of the Supernatural."); L. Warren Obituary at 1 (describing L. Warren as "half of the husband and wife team of Ed and Lorraine Warren, Seekers of the Supernatural.").

    As discussed in n.6, <u>supra</u> at 5, Loyd does not mention, controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[43]As discussed in n.6, <u>supra</u> at 5, Loyd does not mention, controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

located'" to her daughter, J. Spera.  Plaintiffs' MSJ ¶ 15, at 6 (asserting this fact).  See T. Spera

Decl. ¶ 9, at 3; L. Warren's Will at 2.[44]

_____

[44]While Loyd admits that J. Spera was L. Warren's heir, see Loyd's Admissions Nos. 94-95, at 4, Loyd purports to dispute that J. Spera's inheritance includes the disputed Warren IP, see Loyd's MSJ at 5.  Loyd makes three arguments in support of this position.  First, during her oral argument at the November 11, 2021, Hearing, Loyd alleged that L. Warren, "prior to her death, had put everything in trust. And when she died, just the things left outside the trust was inherited" by J. Spera via L. Warren's Will.  November 11 Tr. at 34:13-16 (Loyd).  This argument does not constitute a dispute of fact because Loyd does not point to any evidence in the record regarding L. Warren's purported trust.

Second, she argues that the Warrens transferred their intellectual property rights to DeRosa-Grund during their lives, leaving nothing for J. Speara to inherit.  See Loyd's MSJ at 5 As discussed in nn.39-42, supra at 16-19, (i) the DeRosa-Grund disputes did not involve the Warren IP at issue in this case; and (ii) Warner Bros. and New Line now possess any Warren I.P rights DeRosa-Grund may have received.  See Plaintiffs' Response ¶¶ 1-5, at 5-6.  While Loyd's MSJ argues that none of the Plaintiffs have the relevant Warren IP rights, see Loyd's MSJ at 5, to the extent that Loyd purports to dispute which Plaintiffs hold which rights (J. Spera personally, the estate of L. Warren, New Line or Warner Bros.), that issue is not before the Court.  Moreover, nothing in the record support's Loyd's contention that J. Spera's inheritance specifically excluded the Warren IP at issue in this case, and certainly not the "100%" that Loyd purports the Warrens alienated. Loyd MSJ at 5.

Third, Loyd argues that: (i) records that J. Spera submitted to the Connecticut probate court inventorying L. Warren's estate are the authoritative record of what J. Spera inherited; (ii) that these records do not refer to the disputed Warren IP; and (iii) therefore, J. Spera did not inherit the disputed Warren IP.  See Loyd's Response at 16-17; Inventory of Estate of Lorraine Warren PC-440 (dated September 24, 2019), lodged with the Court September 16, 2021 ("Probate Inventory").  Alongside this argument, Loyd informed the Court that she was seeking to have L. Warren's Connecticut probate proceedings re-opened, see Notice of Petition to Reopen Lorraine R. Warren ("Decedent") Estate and Qualify the Fiduciary has Been Filed With the Connecticut Probate Court (See Exhibit A) at 1-2, filed August 7, 2021 (Doc. 84), but that "no action" was required of the Court on this matter, November 11 Tr. at 62:23(Loyd).

The Plaintiffs provide a sworn declaration from J. Spera, averring that she "inherited all of [L. Warren's] property, including [the Warrens'] intellectual property rights such as their life story, their case files, publishing rights in their case files, their rights of publicity, and trademark rights in the Ed and Lorraine Warren mark and in the Seekers of the Supernatural mark."  Declaration of Judy Spera ¶ 3, at 1 (dated June 8, 2021), filed June 8, 2021 (Doc. 58-9).  As for the Probate Inventory, the Plaintiffs argue that omitting an item from a Connecticut probate court's inventory does not in itself have legal effect.  See Response to Defendant's Notice of Petition to Reopen Probate Proceeding at 2, filed September 1, 2021 (Doc. 95)(citing Lenge v. Goldfarb, 363 A.2d 110, 114 (Conn. 1975), and Dickman v. Generis, 845 A.2d 448, 491-492 (Conn. Super. Ct. 2004)).

**3.**     __Loyd's Relationship With the Warrens__.

Loyd met the Warrens in 1997 or 1998.  See Plaintiffs' MSJ ¶ 16, at 6 (asserting this fact).[45]

At the time, Loyd lived in New York and would travel to Connecticut to attend the Warrens'

lectures and classes.  See Plaintiffs' MSJ ¶ 16, at 6 (asserting this fact).[46]  This period was the

same timeframe during which the Warrens and T. Spera were creating the __Seekers of the__

_____

Loyd does not cite to any authority for the proposition that omitting an item from the Probate Inventory constitutes surrendering or disclaiming it.  Accordingly, the Court concludes that there is no genuine dispute regarding the fact that J. Spera is L. Warren's heir and that her inheritance includes the Warren IP rights which L. Warren held at the time of her death.  To the extent there are legal disputes what those rights include, the Court will address these issues in the Analysis section.

[45]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, the record reflects Loyd's agreement with this fact.  See Deposition of Bea Loyd at 266:10 (taken May 26, 2021), filed August 6, 2021 (Doc 81-10)("Loyd Depo.")(testifying that Loyd first met the Warrens in 1997 or 1998).

[46]The Plaintiffs write: "At that time, Loyd was living in New York and she claims to have attended lectures held by the Warrens at that time in Connecticut."  Plaintiffs' MSJ ¶ 16 at 6 (emphasis added).  The inclusion of Loyd's "allegations" here and elsewhere in the Plaintiffs' Statement of Facts "are provided for background only," Plaintiffs' MSJ at 3 n.1, but mixing disputed and undisputed facts  -- even within the same sentence -- makes the Court's task of determining the undisputed material facts more challenging.  Combined with Loyd's noncompliance with D.N.M.LR-Civ. 56.1(b)'s requirements, "this set of facts on both sides is very difficult to work with."  November 11 Tr. at 10:7-11:20 (Court).  Accordingly, in reviewing the portion of Plaintiffs' facts which refer to the "fact that [Loyd] contends" something, November 11 Tr. at 11:5-6 (McCue), the Court will examine the competent evidence in the record to see if the facts are undisputed and discuss the remaining allegations in more appropriate sections of this MOO.

In this instance, the Plaintiffs cite to Loyd's sworn deposition testimony, in which she discusses how she "started going to the Warrens' classes every week" where she met T. Spera, who collected the attendance fee the Warrens charged.  Loyd Depo. at 266:1-17(Loyd).  Beyond labeling her attendance at the Warren's events as a "claim," Plaintiffs' MSJ ¶ 16, at 6; Plaintiffs do not otherwise dispute Loyd's testimony here.  Accordingly, the Court deems the fact that Loyd attended classes which the Warrens held to be undisputed.

Supernatural series, but Loyd "did not write, produce, direct, edit or create any episodes" of the show.  Plaintiffs' MSJ ¶ 18, at 7 (asserting this fact).[47]  Loyd also did not attend any of the shows' tapings.  See Plaintiffs' MSJ ¶ 18, at 7 (asserting this fact).[48]  E. Warren gave Loyd VHS tapes of the Seekers of the Supernatural series and asked her to facilitate airing it on a New York public-access cable-television channel, Manhattan Neighborhood Network.  See Plaintiffs' MSJ ¶ 18, at 7 (asserting that Loyd testified to this fact in her deposition); Deposition of Bea Loyd at 84:9-21 (taken May 26, 2021), filed August 6, 2021 (Doc 81-10)("Loyd Depo.")(Loyd).[49]  The

_____

[47]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, the record reflects Loyd's agreement with this fact.  See Loyd's Responses Nos. 80-87 at 3-4 (admitting that Loyd did not appear in, author, write, produce, direct, edit or create any episodes of Seekers of the Supernatural).

[48]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, the record reflects Loyd's agreement with this fact.  See Loyd Depo. at 222:4-7 (McCue, Loyd)(testifying that Loyd did not attend any tapings of the Seekers of the Supernatural show).

[49]The Plaintiffs' statement of facts here refers to Loyd's "alleg[ations]" and "claims." Plaintiffs' MSJ ¶ 18, at 7 ("Ms. Loyd's only alleged involvement in the Seekers series is her claim that, in or around 1998-1999, Ed Warren asked her to help get the show aired on public television in New York, which Ms. Loyd claims she did.").  As discussed in n.6, supra at 5, the Court reviews the record for competent evidence to determine whether the statement Loyd made in the Loyd Depo. is an undisputed assertion.
    Here, Loyd asserts in her statement of facts that the Warrens asked her "to assist them in getting publicity. They both provided Defendant with exclusive interviews to publish for publicity purposes."  Loyd MSJ at 4.  See Plaintiffs' Response at 4.  Loyd testifies in the Loyd Depo. that the Warrens gave her tapes of the Seekers of the Supernatural series in order for the videos to be widely seen and generate publicity, "because it's from the publicity that they got a lot of their additional speaking arrangements.  So Ed Warren came to me and asked me if I would get it on television in New York City, so that's how that came about."  Loyd Depo. at 84:9-21 (Loyd).

Warrens did not give Loyd exclusive rights to use their names or likenesses for commercial purposes.  See Plaintiffs' MSJ ¶ 47, at 13(asserting this fact).[50]

### 4.  **Loyd's Sale of Warren IP.**

Loyd has sold Warren IP in various media through accounts on several e-commerce

---

Loyd also testifies that her status as a New York resident of the area which the Manhattan Neighborhood Network served meant that she had the ability to obtain public access airtime, see Loyd Depo. at 86:8-10 (Loyd), and that she had succeeded in bringing the Seekers of the Supernatural to air on the Manhattan Neighborhood Network, see Loyd Depo. at 85:5-6 (McCue, Loyd).  Loyd does not base her claims to intellectual property rights in the Seekers of the Supernatural series or the Seekers of the Supernatural trademark on her role securing airtime on the Manhattan Neighborhood Network, instead pointing to a later transaction with a party she identifies as Ali Mazuren as the source of her claimed rights.  See Loyd Depo. at 86:10-15 (McCue, Loyd).  In Loyd's MSJ, she characterizes E. Warren furnishing her with the Seekers of the Supernatural tapes, his request for her help getting the show aired in New York, and her acceptance as a "favor," rather than a commercial transaction.  Loyd's MSJ at 17.

Loyd's sworn testimony comports with the Plaintiffs' assertion that Seekers of the Supernatural aired on multiple public access television channels around New England.  See Plaintiffs' MSJ ¶ 8, at 5.  Loyd's testimony that the Warrens sought her because of the Manhattan Neighborhood Network's allotment of airtime to local residents like her, see Loyd Depo. at 86:8-10 (Loyd), comports with New York State's laws governing public-access cable-channels.  See N.Y. Comp. Codes R. & Regs. tit. 16, § 895.4(a) (specifying that public-access channels are for "noncommercial use" and defining "local use" as "use by residents of the State of New York").  Accordingly, the Court deems undisputed that E. Warren supplied B. Loyd with tapes of the Seekers of the Supernatural Series with the aim of airing the show on New York public-access television.

[50]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, the record reflects Loyd's agreement with this fact.  See Loyd Depo. at 319:18-22 (testifying that the Warrens "never told me they gave me an exclusive")(McCue, Loyd).  Loyd does assert that E. Warren gave her "exclusive interviews to publish for the purpose of obtaining publicity," and that E. Warren "never revoked his permission to use his name, voice, or images for publicity purposes."  Loyd's MSJ at 17.  Regarding L. Warren, Loyd contends that "Lorraine gave Defendant Loyd an interview for the purpose the purpose [sic] of Defendants [sic] Loyd using the article in an article, book and posting on YouTube and the Internet for publicity," and that "L[.] Warren [n]ever revoked her permission to use her name, voice or images for publicity purposes."  Loyd's MSJ at 17.  However, any rights specifically related to these promotional interviews are not at issue in this litigation.

platforms.  See Plaintiffs' MSJ ¶¶ 28-29, at 9-10 (asserting this fact).[51]  Specifically, Loyd has sold

content derived from the Seekers of the Supernatural series "in the form of downloadable media,

paperback books, recordings, MP3s,[52] and scripts of the recordings." Plaintiffs' MSJ ¶ 29, at 10

(asserting this fact).[53]   Between 2017-2020, Loyd sold thousands of copies of the Warren IP

products via the websites CDBaby.com, BookBaby.com, and Apple Books.  See Plaintiffs' MSJ

---

[51]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, the record reflects Loyd's agreement with this fact.  See Defendant Bea Loyd's Supplemental Response to Interrogatories, No. 10, at 6-8 (dated February 12, 2021), filed August 6, 2021 (Doc. 81-11)("Loyd's Interrogatory Responses")(asserting that, "around 2017," Loyd "purchased intellectual property rights" in the Seekers of the Supernatural series along with accounts on multiple ecommerce platforms selling those materials, which Loyd "took over" from the previous owner); Loyd Depo. at 297:21-298:5 (testifying that Loyd took control of all sales channels used by the previous owner, retained the listings for the Seekers of the Supernatural products and Warren IP products being sold on those account and continued to sell those products)(Loyd, McCue).

[52]MP3 (or Mp3):

is the most pervasive audio coding format for storage of music on PC platforms, and transmission of music over the Internet. Mp3 has created a new class of consumer electronics devices named after it, the mp3 player. It is found on almost all CD and DVD players and in an increasing number of car stereo systems.

B. Grill & S. Quackenbush, MPEG-2 Audio, Motion Picture Expert Group (October 2005), https://mpeg.chiariglione.org/standards/mpeg-2/audio.

[53]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, the record reflects Loyd's agreement with this fact.  See Loyd's Admissions Nos. 360-364, at 10-11 (admitting that Loyd has sold products derived from the Seekers of the Supernatural series as downloadable media, paperback books, recordings, MP3s, and electronic books).

¶ 29, at 10 (asserting this fact).[54]  Loyd sells these products "for less than $1 per copy on average."

Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact).[55]

"There are instances of actual confusion among consumers as to the source" of these

products.   Plaintiffs' MSJ ¶ 30, at 10 (asserting this fact).   See Goodreads.com page for

Conversations With Ed and Lorraine Warren at 1 (dated July 28, 2016), filed August 6, 2021 (Doc

81-12 at 3)(satisfied consumer of Loyd's book)(giving it an "A+" and leaving a review indicating

that she associates it with the Warrens: "I feel like [E]d and Lorraine Warren are wonderful at what

they do.  I couldn't put this book down or any other book they have written or been a part of for

that matter."); Goodreads.com page for Mysterious Places: Ed and Lorraine Warren: Mysterious

---

[54]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, Loyd admits to selling material from the Seekers of the Supernatural series on these three platforms.  See Loyd's Admissions Nos. 366, 368-69, at 11 (admitting to selling materials from the Seekers of the Supernatural television series on Apple Books, CDBaby.com, and BookBaby.com); Loyd's Interrogatory Responses No. 11, at 9 (providing 2017-2020 sales figures from Apple Books, CDBaby.Com, and BookBaby.com).  The Plaintiffs tally Loyd's reported sales as "around 5,400" units, Plaintiffs' MSJ ¶ 29, at 10, but the Court tallies the numbers that Loyd provides and arrives at a number about a third higher, around 7,200 units sold, see Loyd's Interrogatory Responses No. 11, at 6.  The Plaintiffs also assert that Loyd uses additional online marketplaces to sell items of Warren IP -- Amazon.com, BarnesandNoble.com, and eBay.com.  See Plaintiffs' MSJ ¶ 29, at 10.  Loyd represents that she has lost the login credentials and the ability to access those three accounts.  See Loyd's Interrogatory Responses No. 11, at 6.  Accordingly the fact that Loyd sold thousands of products based on the Seekers of the Supernatural series on Apple Books, CDBaby.com, and BookBaby.com is undisputed.

[55]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Dividing Loyd's tallies of "units sold" by reported "revenue generated," Loyd's Interrogatory Responses No. 11, at 6, confirms the Plaintiffs' assertion that the average sale price of Loyd's products is less than one dollar per unit.

<u>Places</u> at 1, filed August 6, 2021 (Doc 81-12 at 3)(dissatisfied reader)(leaving a one-star review:

"Not their best book.  It's a collection of radio shows transcriptions regarding places supposedly

haunted and the meaning of certain phenomena but it lacks any critical analysis about those places

and experiences.").[56]

_____

[56]As discussed in n.6, <u>supra</u> at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

In Loyd's MSJ, outside the section entitled "Statement of Relevant Facts," she purports to dispute that consumers are confused, asserting that "[t]he Defendants used 'Ed and Lorraine Warren' and 'Seekers of the Supernatural;' since at least 2005 without any confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods."  Loyd's MSJ at 7.  Loyd cites as evidence for this assertion eBay reviews for two accounts selling products of Warren IP.  <u>See</u> eBay.com Member Page for nycleaning (undated), filed August 17, 2021 (Doc. 91-7)(appearing to show customer feedback from eBay purchasers of Warren IP products)("eBay 1"); eBay.com Member Page for edanlorrainewarren (undated), filed August 17, 2021 (Doc. 91-8)(appearing to show customer feedback from eBay purchasers of Warren IP products)("eBay 2").

The Plaintiffs respond to Loyd by arguing (i) that the exhibits are unauthenticated evidence inadmissible for summary judgment under Fed. R. Civ. P. 56(c)(1); (ii) the reviews themselves are inadmissible hearsay; and (iii) even if considered on their merits, several reviews actually evince consumer confusion.  <u>See</u> Plaintiffs' Response at 7-8.

First, the Plaintiffs' Declaration of Michael J. McCue in Support of Plaintiffs' Motion for Partial Summary Judgment at Opposition to Defendant Bea Loyd's "Pre-Trial Motion Summary Judgement or Dismiss" ¶ 6, at 2, filed August 6, 2021 (Doc. 81-8)(authenticating the Goodreads.com reviews as true and accurate copies), authenticates the online reviews evincing consumer confusion. Loyd's does not attach her exhibits to a declaration or affidavit authenticating them, "which appear to be screenshots of eBay accounts with consumer feedback. [These exhibits are not] . . . authenticated, rendering them inadmissible on summary judgment."  Plaintiffs' Response at 8 (citing Fed. R. Civ. P. 56(c)(1); <u>Angell v. Shell Oil Co.</u>, No. 03-CV-318 JCH/RLP, 2006 WL 8444182, at *3 (D.N.M. June 5, 2006)(Herrera, J.)(striking all exhibits supporting summary judgment that were not attached to an affidavit)).  While the Court, in consideration of Loyd's status as a pro se defendant, construes liberally Loyd's motion papers opposing the Plaintiffs' MSJ, when it comes to her own motions, where Loyd bears the burdens of production and persuasion, the Court should not "assume the role of advocate for the pro se litigant." <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991).  Accordingly, Loyd's noncompliance with Fed. R. Civ. P. 56(c)(1)'s requirements means her evidence is inadmissible.  Even if the court were to consider eBay 1 and eBay 2, the reviews are out-of-court statements being presented for the truth

5.      **The SEEKERS OF THE SUPERNATURAL Trademark.**

On March 16, 2020, Loyd filed an application with the United States Patent and Trademark Office ("USPTO"), seeking a trademark for SEEKERS OF THE SUPERNATURAL. Plaintiffs' MSJ ¶ 31, at 10 (asserting this fact). See U.S. Trademark Application Serial No. 88835775 at 2-3 (application date September 11, 2020), filed August 6, 2021 (Doc. 81-13)(listing "Bea Loyd" as the "Owner Name" for the mark SEEKERS OF THE SUPERNATURAL)("Seekers Trademark Application").[57] The Seekers Trademark Application seeks the trademark "for, among other things, films, movies, television, multimedia, audio books, electronic books, e-books and articles," on topics "related to the supernatural." Plaintiffs' MSJ ¶ 31, at 10 (asserting this fact). See Seekers Trademark Application at 2.[58] Loyd submitted specimens in support of her Seekers Trademark

_____

of the matter asserted -- i.e. that these consumers are not confused -- and thus is inadmissible hearsay. See Plaintiffs' Response at 8 (citing Fed. R. Evid. 801, 802 and Loussier v. Universal Music Grp., Inc., Case No. 02 CIV. 2447(KMW), 2005 WL 5644421, at *4 (S.D.N.Y. July 14, 2005)("The printouts from the eBay website are inadmissible hearsay, because they constitute out of-court statements being offered to prove that the mix tapes were being sold.")). Even if the Court were to admit eBay 1 and eBay 2 and consider them on the merits, the reviews themselves in fact indicate that consumers associate the source of the product with the Warrens and are further evidence of confusion. See Plaintiffs' Response at 8; eBay 2 at 2(eBay reviewer writing "great dvd, love the Warrens!"); eBay 2 at 3 (eBay reviewer writing "Great CD a must have for Warren Fans!"). Accordingly, the Court concludes there is no dispute of fact that there is actual consumer confusion regarding Loyd's products.

[57]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[58]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Application.  See Plaintiffs' MSJ ¶ 32, at 10-11 (asserting this fact);[59] Specimens attached to U.S.

Trademark Application Serial No. 88835775, filed August 6, 20212 (Doc 81.-14)("Specimens").[60]

Loyd's Specimens include a collection of screenshots displaying audio and video copies of Seekers

of the Supernatural for sale in various marketplaces, each of which "prominently mentioned Ed

and Lorraine Warren" in their packaging and title.  Plaintiffs' MSJ ¶ 32, at 10-11 (asserting this

fact).  See Specimens at 2-10.[61]  As of June 16, 2021, the USPTO has "suspended action on Loyd's

application pending" the resolution of this civil case. Plaintiffs' MSJ ¶ 33, at 11 (asserting this

fact).  See Motion to Suspend Granted at 1 (dated June 6, 2021), filed August 6, 2021, Trademark

---

[59] For trademark applications based on the use of a mark in commerce, the USPTO requires applicants to provide "specimens":

> A specimen is a sample of your trademark as used in commerce. It is real-life evidence of how you are actually using your trademark in the marketplace with the goods or services in your application or registration maintenance filing. It's what consumers see when they are considering whether to purchase the goods or services you provide in connection with your trademark.
> For goods, a specimen shows your trademark as actually used in commerce with your existing goods in a way that directly associates the trademark with the goods. For example, a specimen could be . . . a website displaying your trademark where your goods can be purchased or ordered."

What is a specimen?, United States Patent and Trademark Office, https://www.uspto.gov/trademarks/laws/specimen-refusal-and-how-overcome-refusal (last accessed November 1, 2022).

[60]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[61]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Trial and Appeal Board Proceeding No. 91264735 (Doc. 81-15)("Suspension Order").[62]

6.      **The ED AND LORRAINE WARREN Trademark.**

On November 16, 2014, a United Kingdom corporation named "Galaxtic Media" filed an application with the USPTO, seeking a trademark for ED AND LORRAINE WARREN." Plaintiffs' MSJ ¶ 34, at 11 (asserting this fact).  See U.S. Trademark Application Serial No. 8645587 at 2-4, filed August 6, 2021 (Doc. 81-16)(Listing the original registrant as "Galaxtic Media," a corporation organized in the United Kingdom)("Warren Trademark Application").[63] The Warren Trademark Application seeks to use the "Ed and Lorraine Warren" trademark for products "featuring supernatural and paranormal," including a series of books, audio and video recordings, downloadable films and television programs, MP3 files, and other similar electronic media.  Plaintiffs' MSJ ¶ 34 at 11 (asserting this fact).  See Warren Trademark Application at 2. Although the Warren Trademark Application was made in Galaxtic Media's name, the USPTO's records show that Loyd paid the $550.00 application fee.  See Plaintiffs' MSJ ¶ 35, at 11 (asserting this fact); Letter from Dorothy G. Campbell to Meng Zhong at 4 (dated May 10, 2021), filed August 6, 2021 (Doc. 81-17)("Campbell-Zhong Letter").[64]  Galaxtic Media is "now defunct . . . ."

---

[62]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[63] As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[64]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Plaintiffs' MSJ ¶ 34, at 11 (asserting this fact).  See Galactic Media, Company No. 8669639,

Companies                                House,                                https://find-and-update.company-

information.service.gov.uk/company/08669639 (last accessed November 2, 2022)("Galaxtic

Media Companies House Record")(public record of Companies House, the United Kingdom's

registrar, listing Galaxtic Media's "Company status" as "Dissolved" and date of dissolution as "12

April 2016").[65]

The USPTO responded to this application by informing Galaxtic Media that registering a

trademark featuring the name of a living person requires the person's consent.  See Plaintiffs' MSJ

¶ 36, at 11 (asserting this fact); Email from Carol A. Spils to Galaxtic Media at 2-3 (dated March

15, 2015), filed August 6, 2021 (Doc.81-18).  At the time, E. Warren was deceased, but L. Warren

was living under J. Spera and T. Spera's care.  See Plaintiffs' MSJ ¶ 36, at 11 (asserting this fact);

T. Spera Decl. ¶¶ 7-9, at 2.[66]  In response, "[o]n August 26, 2015, 'Galaxtic Media' submitted a

consent form allegedly signed by Lorraine Warren to the USPTO. The consent form was undated

and an incomplete and nonsensical sentence: ['I consent to the use and registration by Galaxtic

Media of my Lorraine Warren as a trademark and/or service mark with the.']" (sic).

---

[65]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact,
specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.
Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material
facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[66]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact,
specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.
Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material
facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

I consent to the use and registration by Galactic Media of my Lorraine Warren as a trademark and/or service mark with the.

Plaintiffs' MSJ ¶ 37, at 11 (asserting this fact).  See Response to Office Action at 3-5 (dated August 26, 2015), filed August 6, 2021 (Doc. 81-19)("Consent Form").[67]

Loyd did not see L. Warren sign the Consent Form.  See Plaintiffs' MSJ ¶ 40, at 12 (asserting this fact).[68]  J. Spera and T. Spera never have heard of a company named Galactic Media, and have no knowledge of L. Warren signing a Consent Form of this nature while L. Warren was under their care.  See Plaintiffs' MSJ ¶ 38, at 11-12 (asserting this fact); J. Spera Decl. ¶ 11, at 3; T. Spera Decl. ¶ 13, at 3-4.[69]  "To the contrary, Tony and Judy Spera knew that, in 2011, Lorraine Warren had granted exclusive rights to use Ed and Lorraine Warren's names and likenesses to New

_____

[67]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[68]As discussed in n.6, supra at 5, Loyd does not controvert or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). Moreover, the record reflects Loyd's agreement with this fact.  See Loyd Depo. at 138:16-139:7 (testifying that she did not see L. Warren sign the Consent Form and that she was not involved in obtaining L. Warren's signature for the Consent Form)(McCue, Loyd).

[69]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Line and Ms. Warren could not have granted the same rights again."  Plaintiffs' MSJ ¶ 38, at 11-

12 (asserting this fact).  See J. Spera Decl. ¶ 11, at 3; T. Spera Decl. ¶ 13, at 3-4.[70]

---

[70]Loyd purports to dispute the Plaintiffs' assertion that L. Warren's signature on the Consent Form is forged.  See Loyd's Response at 5-8; November 11 Tr. at 33:17-23 (Loyd).  As discussed in n.6, supra at 5, in an attempt to be as fair as possible to Loyd and to avoid a procedural default based solely on failure to follow the rules, the Court will step back from the trees and see if Loyd has pointed to, somewhere in her briefing or at the oral argument, competent evidence in the record that shows that there is a genuine issue of material fact even though she has not followed D.N.M.LR-Civ. 56.1(b)'s rules for summary judgment briefing.  See D.N.M.LR-Civ.56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Rule 56(c) of the Federal Rules of Civil Procedure sets out the requirements for a party to genuinely dispute a material fact.

> (c)   Procedures.
>
> (1)   Supporting Factual Positions. A party asserting that a fact . . . is genuinely disputed must support the assertion by:
>
> (A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Rule 56(c)(3) clarifies that the Court is not limited only to the materials the parties cite in their motion papers, but is empowered to look at the record as a whole.  See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.")

In Loyd's Response, she purports to dispute that the signature is forged by accusing L. Warren of having a "Fraudulent Modus Operandi" of signing business deals and then subsequently asserting that her signature was forged.  Loyd's Response at 5-8.  Loyd further contends that J. Spera and T. Spera have "learned to use the Fraudulent Modus Operandi scheme themselves . . . ." Loyd's Response at 5.  In support of her assertion that L. Warren had such a modus operandi, Loyd points to documents from the DeRosa-Grund disputes.  See Loyd's Response at 5-8. The Plaintiffs respond that the DeRosa-Grund disputes "did not result in any finding that was adverse to Ms. Warren of the Plaintiffs." Plaintiffs' Reply at 5 (citing to the McCue Decl. and JAMS Award).

There is another line of argument which Loyd advances, but is absent from Loyd's MSJ,

Loyd's Response, and her oral arguments: that L. Warren personally represented that her signature on the Consent Form is authentic.  In her Answer, Loyd asserts an affirmative argument that L. Warren's signature is authentic. <u>See</u> Responses to the Claims in the Second Amended Complaint, Affirmative Defense 25, at 8, filed April 24, 2020 (Doc. 20)("Lorraine deliberately, knowingly and intentionally signed the trademark form to . . . get the 'Ed and Lorraine Warren' trademark."). Loyd does not make this argument in her MSJ briefing, but the Plaintiffs point to competent evidence of a dispute.  <u>See</u> Plaintiffs' MSJ ¶ 40, at 12.  In the Plaintiffs' MSJ, the Statement of Facts discusses Loyd's deposition testimony regarding the Consent Form and includes Loyd Depo. excerpts.  <u>See</u> Plaintiffs' MSJ ¶ 40, at 12.  In the Loyd Depo., Loyd asserts that, while she did not see L. Warren sign the Consent Form and was not involved in creating the Consent Form, <u>see</u> Plaintiffs' MSJ ¶ 40, at 12; Loyd Depo. at 138:16-139:7 (McCue, Loyd), in a telephone conversation she had with L. Warren, "Lorraine told me this was her signature," Loyd Depo. at 133:1-134:7 (McCue, Loyd).

After reading carefully Loyd's MSJ. Loyd's Response and listening to her oral arguments, the Court concludes that (i) competent evidence in the record does not support Loyd's argument regarding a purported modus operandi of L. Warren fraudulently disclaiming her signature; (ii) the record contradicts Loyd's argument that the Plaintiffs cannot produce admissible evidence to support their claim that the Consent Form's signature is a forgery; (iii) while Loyd does not cite specifically it in her MSJ briefing, the Court, pursuant to rule 56(c)(3), considers sworn testimony from the Loyd. Depo., which she also references in her Answer, asserting that L. Warren confirmed the signature's authenticity in a telephone conversation with Loyd; (iv) accordingly, the Court concludes that there is a competent evidence of a genuine dispute of fact regarding the Consent Form's Signature's authenticity.

As an initial matter, the USPTO's acceptance of the Consent Form does not in itself constitute any evidence of the signature's authenticity: "[S]imply because the USPTO issued the registration for the ED AND LORRAINE WARREN mark tells us nothing as to whether the consent was actually signed by Lorraine Warren."  Expert Report of Ed Timberlake ¶ 65, at 18 (dated May 6, 2021), filed September 13, 2021 (Doc. 100-14)(stating, based on twenty years of experience and expertise in trademark and copyright law, that the USPTO does not conduct independent analysis into consent form signatures in cases such as this).

The Court has reviewed Loyd's arguments and proffered evidence and finds that they do not substantiate Loyd's allegations of the Warrens or the Plaintiffs have a fraudulent modus operandi or have committed the "fraud on the court," which Loyd alleges.  Loyd's Response at 2. Loyd excerpts portions from a sworn declaration that the author Gerald Brittle submitted in the DeRosa-Grund JAMS arbitration.  <u>See</u> Loyd's Response at 6; Declaration of Gerald Brittle ¶¶ 16-18, at 4 (dated November 3, 2014), lodged with the Court on September 16, 2021, posted to public docket on November 17, 2022 (Doc. 144-3)("Brittle Decl.").  In the Brittle Decl., Brittle alleges that "L. Warren will say or do almost anything to improve her financial situation over others -- even going so far as to deny the existence of valid contracts and agreements when she sees an opportunity to personally make more money . . . ."  Brittle Decl. ¶ 16, at 4.  <u>See</u> Loyd's Response at 6.  Loyd includes a second excerpt from the Brittle Decl., where "Brittle shares another time Lorraine used the Fraudulent Modus Operandi scheme to get out of a contract she signed."  Loyd

Decl. at 7 (citing Brittle Decl. ¶¶ 16-18, at 6-7)(alleging that L. Warren initially disavowed a contract with another party after which "Mrs. Warren was forced to recant when confronted with the truth").  Loyd also recounts that Brittle filed suit related to these claims against L. Warren, Warner Bros., and New Line.  See Loyd's Response at 6.  Loyd reports that Brittle settled this lawsuit, see Loyd's Response at 6, but omits that, in this settlement agreement, the parties agreed that Brittle's claims were meritless, see Stipulated Final Judgment ¶¶ 12-21, at 6-8 (dated March 2, 2018), filed September 10, 2021 (Doc. 99-15).  Given this resolution, Brittle's allegations do not support Loyd's arguments.

Additionally, Loyd excerpts a portion of the JAMS Award, in which "Gary Barkin, an attorney representing Lorraine Warren, informed New Line that Warren had reviewed the purported [agreements between her and DeRosa-Grund] and confirmed that her signatures were falsified."  JAMS Award at 12-13;  Loyd's Response at 7-8.  Loyd does not cite, however, to any evidence that shows that L. Warren's signatures on these agreements between her and De-Rosa Grund are genuine.  Indeed, the JAMS arbitrator found that "Barkin seemed objective and has no apparent stake in the outcome of this matter," but found DeRosa-Grund "lacked[ed] credibility." JAMS Award at 21-22.  Accordingly, Loyd's proffered evidence from the DeRosa-Grund Disputes does not support her allegations of L. Warren's modus operandi, and does not create a genuine dispute regarding the authenticity of her signature on the Consent Form.

Moreover, the Plaintiffs argue that "Loyd's argument is . . . inadmissible character evidence under Rule 404, which provides that other acts or wrongs are not admissible to prove a person acted 'in accordance with the character.'"  Plaintiffs' Reply at 5 (quoting Fed. R. Evid. 404(b)).  See Stephen A. Saltzburg, Michael M. Martin, Daniel J. Capra & Jessica Berch, Federal Rules of Evidence Manual § 404.03[f] (12th ed. 2022)(citing civil cases prohibiting evidence of prior bad acts to prove propensity).  "In other words, one cannot present evidence the relevance of which is based on the forbidden inference: that a person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too." State ex rel. Balderas v. Real Estate Law Ctr., P.C., 409 F. Supp. 3d 1122, 1152 (D.N.M. 2019)(Browning, J.).  Here, Loyd explicitly makes that forbidden inference: "Just as Lorraine is claiming she did not sign certain documents with Defendants, Lorraine claimed her signature on the DeRosa-Grund was forged . . . ."  Loyd's Response at 17.  "'Moreover, proof of a 'modus operandi' is only relevant when there is an issue regarding the defendant's identity.'"  Plaintiffs' Reply at 5 (quoting Chavez v. City of Albuquerque, 402 F.3d 1039, 1046 (10th Cir. 2005)(in case alleging police officer used excessive force by ordering his dog to bite a suspect, rule 404(b) barred allegations that officer previously had used excessive force by deploying the dog, and modus operandi was inapplicable where there was no issue regarding the officer's identity).  The Court agrees that Loyd's arguments about a modus operandi are inadmissible character evidence offered for the improper purpose that she or the Speras disclaimed signatures in the past and can be assumed to be alleging forgery of a signature again here. See State ex rel. Balderas v. Real Estate Law Ctr., P.C., 409 F. Supp. 3d at 1152.  Accordingly, Loyd's modus operandi argument does not meet her burden under rule 56(c)(1)(A) to show a genuine fact dispute by citing to materials in the record.

Next, in Loyd's MSJ, she asserts that the "Plaintiffs cannot prove Decedent [L. Warren] did not sign the permission form, giving permission for the Trademark to be registered because

they waited until after she died to make a claim." Loyd's MSJ at 11. She repeated that line of argument at the oral argument. See November 10 Tr. at 34:17-23 (Loyd). Loyd does not provide any caselaw or authority for this assertion, and accepting the principle would lead to the conclusion that decedents' signatures cannot be challenged in court. Moreover, the Plaintiffs have produced admissible evidence that the signature is a forgery in the form of expert testimony. "'[I]t is highly probable'" that L. Warren's signature on the Consent Form "'was not signed by the same individual'" who signed other documents known to be signed by L. Warren. Plaintiffs' MSJ ¶ 39, at 12 (quoting Expert Report of Erich J. Speckin at 6 (dated May 5, 2021), filed August 6, 2021 (Doc. 81-20)("Speckin Report")). See Speckin Report at 1-6 (examining the Consent Form alongside nine other contemporaneous documents known to be signed by L. Warren, noting that the Consent Form signature's incongruous angle, letterforms, and proportions as compared to the known signatures, and observing a "retouching, or added stroke" in the "R" middle initial, "a classic sign of forgery" not present in L. Warren's other signatures and "a sign of a deliberate attempt to go back and try to make the signature look more pictorially like a genuine signature," and concluding "to a reasonable degree of scientific certainty" based on his twenty-eight years in the field of forensic document analysis that L. Warren did not sign the Consent Form). Accordingly, the Court concludes that Loyd does not show that the materials supporting the Plaintiffs' MSJ are inadequate or that they are otherwise unable to prove that the signature was forged and thus does not demonstrate the existence of a genuine issue of material fact. See Fed. R. Civ. P. 56(c)(1)(B).

Regarding L. Warren's purported admission that her signature on the Consent Form was authentic, the Court concludes that, although this is an out-of-court-statement made for the truth of the matter asserted, because J. Spera is, in part, filing suit in her capacity as the personal representative of L. Warren and executrix of L. Warren's Estate, this statement falls within rule 801(d)(2)(a) of the Federal Rules of Evidence, which makes statements of party opponents non-hearsay. See Fed. R. Evid. 801(d)(2)(A); Phillips v. Grady Cty. Bd. of Cty. Comm'rs, 92 F. App'x 692, 696 (10th Cir. 2004)(reasoning that "a decedent, 'through his estate, is a party to [an] action,' so that the decedent's statements 'are a classic example of an admission'" under rule 801(d)(2)(A)(quoting Estate of Shafer v. Commissioner, 749 F.2d 1216, 1220 (6th Cir. 1984)(alteration in Phillips v. Grady Cty. Bd. of Cty. Comm'rs)). The Plaintiffs discount Loyd's deposition testimony:

> However, when counsel asked Ms. Loyd about the details of the alleged conversation, Ms. Loyd claimed she "cannot recall . . . the exact words", that she did not actually provide a copy of the consent form with the signature to Ms. Warren to confirm her signature and that she did not discuss "Galaxtic Media" with Ms. Warren.

Plaintiffs' MSJ ¶ 40, at 12 (citing Loyd Depo. at 138:1-23 (McCue, Loyd)). Because a rational finder of fact could choose to overlook these inconsistencies and credit Loyd's testimony, these arguments go to Loyd's credibility, which is an issue for the finder of fact to resolve and not for the Court when evaluating a motion for summary judgment. The Plaintiffs also argue that, because

After receiving the Consent Form, on February 2, 2016, the USPTO issued Galactic Media the trademark registration for ED AND LORRAINE WARREN.  Plaintiffs' MSJ ¶ 41, at 12 (asserting this fact); Trademark Registration No. 4,894,285 at 2 (dated February 2, 2016), filed August 6, 2021 (Doc. 81-21).[71]  Subsequently, on May 19, 2016, Galactic Media filed a change of address form with the USPTO regarding the Warren Trademark, changing the name of the company to "Metagalaxtic Inc" and listing a new mailing address in West Vancouver, Canada. Plaintiffs' MSJ ¶ 42, at 12 (asserting this fact).  See Change of Correspondence Address at 1 (dated

---

L. Warren previously had granted rights to New Line, even an authentic Consent Form would not be able to grant those rights a second time.  This argument presents a question of law that goes to the materiality of the fact, which is more appropriately discussed in the Analysis section.

Loyd, in her MSJ briefing and oral argument has not responded with or cited to any facts regarding her purported conversation with L. Warren.  On the other hand, there is a dispute when the Court looks at a line of argument and fact that Loyd makes in her pleadings.  Accordingly, the Court will not deal with Loyd's failure to respond properly by considering the fact of L. Warren's signature's inauthenticity disputed for the purposes of the motion.  See Fed. R. Civ. P. 56(e)("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for the purposes of the motion.").

No one suggests that there is any more evidence regarding L. Warren's signature's authenticity, so the present record is all that a judge or jury would hear at trial.  Looking at the record as a whole, however, Loyd's sworn testimony regarding L. Warren authenticating her signature is sufficient evidence for a rational trier of fact to conclude that the signature is authentic. Accordingly, pursuant to rule 56(e), the Court concludes that Loyd's arguments and her testimony rise beyond a mere scintilla of evidence and constitutes a genuine issue of fact regarding the Consent Form's signature.  The Court does not, however, presume that this issue of fact, though genuinely disputed, constitutes a "material" fact for the purposes of summary judgment.  Fed. R. Civ. P. 56(a).  For reasons that will be discussed in the Analysis section, even assuming L. Warren's Consent Form signature is authentic, this fact is not material as a matter of law and therefore does not create a genuine issue for trial.

[71]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

May 19, 2016), filed August 6, 2021 (Doc. 81-22 at 2).[72]  On August 18, 2017, "Galaxctic Media purported to assign the registration for the ED AND LORRAINE WARREN trademark to Ms. Loyd." Plaintiffs' MSJ ¶ 43, at 12 (asserting this fact).  See Trademark Assignment at 1 (executed August 14, 2017, recorded August 18, 2017), filed August 6, 2021 (Doc. 81-23 at 2).  In the Trademark Assignment, Loyd listed her address as the same West Vancouver address that Metagalaxtic and Galactic Media used.  See Plaintiffs' MSJ ¶ 43, at 12 (asserting this fact); Trademark Assignment at 1.[73]  After L. Warren's death in 2019, Loyd requested that the USPTO reissue the Warren Trademark in Loyd's name and amend the trademark to show that L. Warren is not a living person, once again using this same West Vancouver address for correspondence. See Plaintiffs' MSJ ¶ 45, at 13 (asserting this fact); Section 7 Request Form at 1 (dated July 15, 2019), filed August 6, 2021 (Doc. 81-24 at 5).[74]

---

[72]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[73]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). Moreover, the record reflects Loyd's agreement with this fact.  See Answer to Third Amended Complaint at 3, filed July 21, 2021 (Doc. 67)(admitting Loyd has used this same West Vancouver mailing address).

[74]As discussed in n.6, supra at 5, Loyd does not mention, controvert, or dispute this fact, specifically or otherwise, and the Court finds no competent evidence in the record to dispute it. Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

## PROCEDURAL BACKGROUND

The Plaintiffs filed their original Complaint on January 21, 2020, alleging ten counts.  See Complaint, filed January 21, 2020, ¶¶ 1-4 at 1-4, (Doc. 1)("Original Complaint"); id ¶¶ 58-110, at 14-20.  The Plaintiffs filed the operative Third Amended Complaint on June 21, 2021 (Doc. 64).[75] The Third Amended Complaint lists additional copyright registration and trademark applications that Loyd made after the initial filing of this lawsuit.  See Third Amended Complaint ¶¶ 43-44(a), at 12-14.  Loyd answered the Third Amended Complaint, pro se.  See Bea Loyd's Answer to Plaintiffs' Third Amended Complaint, filed July 12, 2021 (Doc. 67)("Answer to Third Amended Complaint").[76]

The Plaintiffs and Loyd proceeded to discovery.  See Scheduling Order at 1-2, filed January 25, 2021 (Doc. 40). Because of problems scheduling Loyd's deposition, the Plaintiffs filed their MTC.  See MTC at 1-6.  The Court held a hearing on the MTC on May 21, 2021.  See Clerk's Minutes at 1, filed May 21, 2021 (Doc. 55).  The Court granted the MTC.  See Order at 2-3; Draft Transcript of Hearing at 8:16-9:18 (taken May 21, 2021)(Court, Loyd)("May 21 Tr.").[77]  On May

---

[75]The Plaintiffs exercised their right to amend and filed their First Amended Complaint on April 2, 2020 (Doc. 17).  See First Amended Complaint, filed April 2, 2022 (Doc. 17).  Plaintiffs then moved for leave of the Court to further amend their complaint to supplement it with new allegations of Loyd's post-filing infringement of Warren-related intellectual property.  See Plaintiffs' Motion for Leave to File a Second Amended Complaint at 2, filed September 22, 2020 (Doc. 32).  At a hearing on May 21, 2021, counsel for Plaintiffs informed the court that they had identified "two additional trademark applications" made by Loyd, and would "need to file a Third [Amended] Complaint.  Clerk's Minutes at 2, filed May 21, 2021 (Doc. 55). The Court granted Plaintiffs leave to so amend.  See Clerk's Minutes at 2, filed May 21, 2021 (Doc. 55).

[76]None of the four Defendant LLCs -- Metagalaxtic, LLC; Seekers of the Supernatural, LLC; Cohen Goldberg & Smith, LLC; and Omnimedia, LLC -- have responded or otherwise participated in this action.  See Plaintiffs' Request for Clerk's Entry of Default at 1-3, filed July 27, 2022 (Doc. 129).

[77]The Court's citations to the hearing's transcript refers to the court reporter's original, unedited versions.  Any final transcript may contain slightly different page and/or line numbers.

26, 2021, Plaintiffs deposed Loyd. <u>See</u> Draft Transcript of Hearing at 2:23-3:3 (taken June 23, 2021)(Court, McCue)("June 23 Tr.");[78] Loyd Depo. Tr. at 1.

After discovery closed, the Plaintiffs filed the Plaintiffs' MSJ on three of their claims: (i) "trademark infringement (Count I) based on their ownership of the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks and Ms. Loyd's use of the marks to create false endorsement of her audio and video recordings and transcriptions of the Warren['s] works";   (ii) "copyright infringement (Count V) involving the 'Seekers of the Supernatural' television series"; and (iii) "violation of the Warren's rights of publicity [(Count VIII)]," stemming from Loyd's commercial usage of the Warrens' names, images and likenesses.  Plaintiffs' MSJ at 2-3.  On August 17, 2021, Loyd filed Loyd's MSJ, in which Loyd "move[s] for summary judgment on all of the claims in the Complaint . . . ."  Loyd's MSJ at 1.  On September 3, 2021, Loyd filed a response opposing Plaintiffs' MSJ.  <u>See</u> Loyd's Response at 1-18. On September 10, 2021, the Plaintiffs replied in further support of the Plaintiffs' MSJ, <u>see</u> Plaintiffs' MSJ Reply at 1-13, and on September 13, 2021, the Plaintiffs responded to Loyd's MSJ, <u>see</u> Plaintiffs' Response at 1-23. Loyd has not filed a reply in further support of her MSJ.[79]  The Court held a hearing on the Plaintiffs' MSJ and Loyd's MSJ on November 11, 2021. <u>see</u> Clerk's Minutes at 1, filed November 11, 2021 (Doc. 110).  The Court issued Summary Judgment Order on March 29, 2022, (i) granting

---

[78]The Court's citations to the hearings' transcripts refers to the court reporter's original, unedited versions.  Any final transcript may contain slightly different page and/or line numbers.

[79]As discussed in n.6, <u>supra</u> at 5, Loyd's motion papers regarding the cross-motions for summary judgment for summary judgement papers do not conform to D.N.M.LR-Civ. 56.1(a)'s requirements.  <u>See</u> n.6, <u>supra</u> at 5.  In consideration of her status as a pro se defendant and the Court's aversion to procedural defaults based solely on failure to follow the rules, the Court is stepping back to look beyond the cross-MSJ briefing and consider the record as a whole. Accordingly, this procedural history section discusses the universe of filings and hearings where Loyd has made admissible arguments in support of her MSJ and in opposition to Plaintiffs' MSJ.

in part and denying in part the MTC; (ii) granting the Plaintiffs' MSJ; and (iii) denying Loyd's

MSJ.  See Summary Judgment Order at 12.  The Court addresses this case's procedural history in

greater detail below.

### 1.    The Original and First Amended Complaints.

On January 21, 2020, the Plaintiffs filed a ten-count complaint, accusing the Defendants of

a "fraudulent scheme to usurp Plaintiffs' intellectual property rights relating to the late Ed and

Lorraine Warren, a couple famous for their paranormal investigations."  Original Complaint ¶ 1,

at 1.  The Plaintiffs name Loyd as "the apparent architect of the Defendants' illegal enterprise."

Original Complaint ¶ 2, at 2.  The Original Complaint accuses Loyd of

> trying to steal and exploit Plaintiffs' intellectual property through a series of
> unlawful acts.  Upon information and belief, Ms. Loyd engaged in these unlawful
> acts under her own name, through various aliases that she contrived (including
> 'Taffy Sealyham,' 'Ali Mazuren,' 'Jane Smith,' and 'J. Smith'), and through
> various shell entities that she formed (the five entities that are named as
> defendants).

Original Complaint ¶ 2, at 2.  The Original Complaint identifies six entities -- rather than five --

as Loyd's alleged "alter ego[s]" and "the alter ego[s] of one another."  Original Complaint ¶ 16, at

4-5.  These six Defendants include four New Mexico LLCs: (i) "Cohen Goldberg and Smith LLC,"

Original Complaint ¶ 10, at 4; (ii) "Metagalaxtic, LLC," Original Complaint ¶ 12, at 4; (iii)

"Omnimedia, LLC," Original Complaint ¶ 13 at 4; and (iv) "Seekers of the Supernatural LLC,"

Original Complaint ¶ 14, at 4; as well as two corporations organized under the law of the United

Kingdom: (v) "Galaxtic Media Ltd.," Original Complaint ¶ 11, at 4; and (vi) "Seekers of the

Supernatural Ltd.," Original Complaint ¶ 15, at 4.

The Plaintiffs list five categories of unlawful actions taken by the Defendants:

(a) fraudulently registering the Warrens' personal names -- ED AND LORRAINE
WARREN -- as a federal trademark, supported by false statements made under
penalty of perjury to the United States Government and an apparently forged

written consent from Lorraine Warren; (b) fraudulently registering copyrights using content from the Warrens' *Seekers of the Supernatural* television series with the United States Copyright Office; (c) registering the Warrens' names and the *Seekers of the Supernatural* mark as domain names with the bad faith intent to profit from the domains; (d) using the Warrens' names and likenesses for commercial purposes in blatant violation of their rights of publicity; and (e) selling infringing copies of the Warrens' works through multiple websites.

Original Complaint ¶ 3, at 2.  Based on these alleged infringements of the Warrens' intellectual property rights, the Plaintiffs' Original Complaint contains ten counts: (i) Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (ii) Cancellation of Federal Trademark Registration under the Lanham Act, 15 U.S.C. § 1064; (iii) Cybersquatting under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c), for the web domain "edandlorrainewarren.com"; (iv) Cybersquatting under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c) for the web domain "seekersofthesupernatural.com"; (v) Copyright Infringement, 17 U.S.C. §§ 501-13; (vi) Cancellation of Copyright Registrations; (vii) Violation of Common Law Right of Publicity; (viii) Common Law Trademark Infringement; (ix) Common Law Unfair Competition; and (x) Tortious Interference with Prospective Economic Advantage.  The Plaintiffs' Original Complaint seeks a number of remedies: "[I]njunctive relief, cancellation of the fraudulent trademark registration and copyright registrations, transfer of the domain names, a seizure and destruction order, an impoundment order, damages (including punitive damages), and attorneys' fees and costs against each of the Defendants."  Original Complaint ¶ 4, at 2-3.

Before any response by Loyd, the Plaintiffs amended the Original Complaint, pursuant to rule 15 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 15.  <u>See</u> the Plaintiffs' First Amended Complaint at 1-23.  The First Amended Complaint made two notable changes to the Original Complaint.  First, the First Amended Complaint removes the two United Kingdom based

corporate Defendants, Galaxtic Media Ltd., and Seekers of the Supernatural Ltd.   Compare
Original Complaint ¶¶ 10-16, at 4-5 with First Amended Complaint ¶¶ 10-16, at 4-5.   Second, the
First Amended Complaint adds an additional set of allegations that the Defendants are
"fraudulently registering or applying to register the ED AND LORRAINE WARREN mark in
Australia, Canada, and the European Union."   First Amended Complaint ¶ 3, at 2.

### 2.      The Plaintiffs' MTC.

The Plaintiffs filed their MTC on May 19, 2021, moving the Court for an order compelling
Loyd to appear for her deposition on May 26, 2021, in Chicago.   See MTC at 1.   Alternatively, the
Plaintiffs request that Loyd provide three alternative dates and locations in major cities when she
will be available between June 22 through July 9, 2021, and that the Plaintiffs' discovery deadline
be extended another forty-five days beyond the deposition.   See MTC at 1.   The Plaintiffs argue
that they properly noticed Loyd fourteen days before the deposition under rule 30 of the Federal
Rules of Civil Procedure and allowed her to pick the date and location.   See MTC at 5.   The
Plaintiffs argue that, because Loyd "refused to provide any other definitive date or location where
she would be available for a deposition, and she refused to confer with Plaintiffs' counsel regarding
alternative dates," Loyd should appear on May 26, 2021, as originally scheduled.   MTC at 5.

In the alternative, the Plaintiffs request that Loyd provide them three alternative dates and
locations, and that the discovery deadline be extended for another forty-five days after the
deposition.   See MTC at 5.   The Plaintiffs emphasize that they need time after the deposition to
conduct "follow-up discovery."   MTC at 6.   The Plaintiffs also request that Loyd not be permitted
to "benefit from her own delay" by conducting additional discovery beyond the June 21, 2021,
cutoff date.   MTC at 6.   The Plaintiffs propose a new discovery deadline for themselves of August
5, 2021, with a cutoff deadline for discovery motions by August 27, 2021, and a deadline of

September 6, 2021, for pre-trial motions.  See MTC at 6.  The Plaintiffs propose that Loyd adhere

to the current deadlines of June 21, 2021, for discovery, July 12, 2021, for discovery motions, and

July 20, 2021, for pre-trial motions.  See MTC at 6.

### 3.   Loyd's Response to the MTC.

Loyd responded on May 20, 2021.  See Defendant's Response to Emergency Motion to

Compel Deposition, filed May 20, 2021 (Doc. 52)("Response to MTC").  Loyd states that she

"lives in a van" and "travels with a caravan."  Response to MTC at 2.  She asserts that she is no

longer in the Chicago area "and therefore cannot make the May 26, 2021 date."  Response to MTC

at 2.  Loyd states that she confirmed on April 27, 2021, that "the last week in May 27, 2021 is the

best date," but received no response until May 11, 2021, when Loyd received the formal notice of

deposition.  Response to MTC at 2.  Loyd further complains that the deposition was scheduled in

downtown Chicago, against her wishes and request.  See Response to MTC at 2.

### 4.   Loyd's "Counter-Motion."

Loyd includes in her Response a "Counter-motion to Compel Attorney to Prove They Have

Authority to Represent Plaintiffs."  Response to MTC at 2.  Loyd states that "[o]n or about

Thursday, November 5. 2021 at Response to MTC, Plaintiffs' attorney Michael McCue and

Defendant Bea Loyd had a meet and confer."  Response to MTC at 2-3 (punctuation in original).

Loyd alleges that T. and J. Spera told her that "they were not suing her, they did not hire Mr.

McCue to sue her and allegedly Tony and Judy Spera did not know who he was," and that, at this

meeting Mr. McCue told Loyd that he had not yet spoken to J. and T. Spera.  Response to MTC at

3.  Loyd repeats concerns which she raised in the JSR that "Judy and Tony Spera are not the people

behind this lawsuit . . ." and "did not hire and they are not paying the law firm who filed this

lawsuit," nor did they "have any input in the spurious allegations the law firm made in this

- 43 -

lawsuit." Response to MTC at 3 (quoting JSR at 5).  Loyd contends that

> the law firm is working for a third party who have provided them with spurious allegations and this lawsuit, allegedly filed without Tony and Judy Spera['s] knowledge or input, is designed to intimidate, badger harass, coerce and flat out assault defendant's character to extort her legal right to 'Seekers of the Supernatural' and the trademark 'Ed and Lorraine Warren' and other intellectual properties.

Response to MTC at 3 (quoting JSR at 5).  Loyd requests that the Court "compel Mr. McCue to

prove his firm has authority to represent plaintiffs Tony And Judy Spera."  Response to MTC at

3.  Loyd also then requests that the Court dismiss the Complaint for "lack of venue" under rule

12(b)(3) of the Federal Rules of Civil Procedure and argues that the Court does not have personal

jurisdiction over her.  Response to MTC at 4.  Loyd requests that the Court transfer the case to the

United States District Court for the District of Connecticut, because "a couple of elements, tortious

interference with a contract and copyright infringement, have been litigated in the District of

Connecticut; over 90% of the alleged activities in the Complaint took place in Connecticut; and

Plaintiffs Tony and Judy Spera are domicile[d] in Connecticut."  Response to MTC at 4.

**5.      The May, 2021, Hearing.**

The Court held a hearing on the Motion on May 21, 2021, the day after Loyd filed her

Response to MTC.  See Clerk's Minutes at 1, filed May 21, 2021 (Doc. 55).  The Court first asked

about the principals' citizenship, "in case federal claims go away for some reason," May 21 Tr. at

3:15-16 (Court), and asked the Plaintiffs to provide the citizenship of each of the principals in the

limited liability companies named in the lawsuit, see May 21 Tr. at 4:7-9 (Court).  The Court asked

Loyd where she and her caravan were located at present, and she responded that she was in

Mississippi.  See May 21 Tr. at 5:14-17 (Court, Loyd).  Loyd indicated that she wanted to have an

attorney present for her deposition, even though she was appearing pro se.  See May 21 Tr. at 6:6-

10 (Loyd).  The Court ordered the deposition for 9:00 a.m. on Wednesday, May 26, 2021, in

Jackson, Mississippi, at a law firm of the Plaintiffs' choosing.  See May 21 Tr. at 9:6-17 (Court);

id. at 10:25-11:2 (Court).  After granting the Plaintiffs' request to file a Third Amended Complaint,

the Court ordered a further hearing for June 23, 2021, to discuss Loyd's "counter-motion," May

21 Tr. at 17:3-16 (Court).  See id. at 18:4-12 (Court).

      **6.**      **The Plaintiffs' Response to Loyd's Counter-Motion.**

On June 8, 2021, the Plaintiffs responded to the "countermotion" in Loyd's Response.  See

Plaintiffs' Response to Defendant's Countermotion to Compel and Motion to Dismiss [ECF No.

52] at 1, filed June 8, 2021 (Doc. 58)("Plaintiffs' Response").  The Plaintiffs address the merits of

Loyd's "countermotion" even though, according to the Plaintiffs, it "is not a procedurally proper

counter motion to Plaintiffs' motion to compel Ms. Loyd's deposition and is arguably untimely."

Plaintiffs' Response at 2.  The Plaintiffs argue that Loyd has no authority to challenge the

representation of J. and T. Spera by the Plaintiffs' counsel, and that there is "no legal support for

such a request."  Plaintiffs' Response at 2 (citing Wilmington Sav. Fund Soc'y, FSB v. Hutchins,

No. CV 18-0346 JCH/JHR, 2021 WL 1158179, at *9 (D.N.M. Mar. 27, 2021)(Ritter, J.)).  Further,

the Plaintiffs argue that allegations "that an attorney acted without authority 'must be clearly

substantiated by adequate proof,'" which Loyd has not provided.   Plaintiffs' Response at 2

(quoting Thomas v. Colo. Tr. Deed Funds, Inc., 366 F.2d 136, 139 (10th Cir. 1966)).  The Plaintiffs

state that J. and T. Spera have an entertainment attorney, Mr. Gary Barkin, who is in contact with

the Plaintiffs' litigation counsel in this case, and that Mr. Barkin issued a cease-and-desist letter to

Loyd before the Plaintiffs' filed their suit.  See Plaintiffs' Response at 2-3.  The Plaintiffs submit

signed declarations from J. and T. Spera acknowledging counsel's authority to act on their behalf

in this case.  See Plaintiffs' Response at 3; Declaration of Judy Spera at 1 (dated June 8, 2021),

filed June 8, 2021 (Doc. 58-9); Declaration of Tony Spera at 1 (dated June 8, 2021), filed June 8,

2021 (Doc. 58-10).

Next, the Plaintiffs argue that venue is proper in the United States District Court for the District of New Mexico, because "a substantial part of the events or omissions giving rise to the claims occurred" in New Mexico.  Plaintiffs' Response at 4.  See Plaintiffs' Response at 3.  The Plaintiffs argue that the infringement of the Plaintiffs' intellectual property rights happened in New Mexico, because "the business entities involved in the scheme . . . are each formed under laws of the State of New Mexico."  Plaintiffs' Response at 4.  The Plaintiffs then respond to Loyd's argument that they lack standing "based on a probate inventory listing she obtained through a 'subpoena' to Lorraine Warren's estate attorneys."  Plaintiffs' Response at 4 (no citation for quotation).  The Plaintiffs argue that, "[b]ecause Defendant is citing matters outside the pleadings, the court must treat her request to 'dismiss' as a motion for summary judgment."  Plaintiffs' Response at 4 (no citation for quotation)(citing Fed. R. Civ. Proc. 12(d)).  The Plaintiffs continue that "[s]ummary judgment is only proper if Defendant Loyd can show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Plaintiffs' Response at 5 (quoting Fed. R. Civ. Proc. 56(a)).  The Plaintiffs counter Loyd's argument that J. Spera admitted the trademark rights did not transfer to her when she "did not list the Ed and Lorraine Warren trademarks in the probate inventory," by stating that L. Warren "bequeathed everything she owned of 'whatever nature and wherever located'" to J. Spera.  Plaintiffs' Response at 5 (quoting Last Will and Testament of Lorraine R. Warren a/k/a Lorraine R. Miney at 1 (dated January 15, 2008), filed June 8, 2021 (Doc. 58-6)("L. Warren Will")).  The Plaintiffs assert that "Judy Spera specifically disputes any claim that she is not the heir to her late parents' intellectual property rights, including any trademark rights in their names."  Plaintiffs' Response at 5.  The Plaintiffs also state that the "inventory specifically lists royalty payments from

book publishers . . . and movie studios . . ." which came "from the licenses and contracts that provided the right to use and create derivative works from the life stories of Ed and Lorraine Warren . . . ," Plaintiffs' Response at 5-6, and that L. Warren did not list a trademark registration in the probate inventory, because she "did not own a trademark registration for her name" when she died, Plaintiffs' Response at 6.  Finally, the Plaintiffs argue that their claims are not time barred because, overlooking the procedural and substantive defects in Loyd's motion, the Plaintiffs filed this suit only four months after they learned about Loyd's infringing conduct.  See Plaintiffs' Response at 7.

      **7.**      **The June, 2021, Hearing.**

      The Court held a hearing on June 23, 2021.  See Clerk's Minutes at 1, filed June 23, 2021 (Doc. 80).  The Court first confirmed with the parties that Loyd's deposition was taken successfully, as the Court ordered.  See June 23 Tr. at 3:13 (Court, McCue).  Next, the Court raised the jurisdiction issue and expressed "concern[] that we don't know a whole lot about these entities." June 23 Tr. at 3:19-20 (Court).  The Plaintiffs' counsel stated that "we believe these four entities were [--] are [--] shell entities with nominees as the incorporators so that we have not been able to find any information about them," but "we believe Ms. Loyd who has a background of forming shell entities in her years as a paralegal . . . formed them and she's operated through them." June 23 Tr. at 4:4-7 (McCue).  Although the Plaintiffs deposed Loyd about these entities, Loyd "does not recall which entities she formed for herself or what entities she formed for her client[s] . . . ," June 23 Tr. at 4: 21-23 (McCue), and "was not able to provide any contact information [on] anyone," June 23 Tr. at 5:3-5 (McCue).  The Court then questioned Loyd about who the organizers of the listed LLCs are, and Loyd stated that she does not remember who they were.  See June 23 Tr. at 6:3-7 (Loyd, Court).  The Plaintiffs next asserted that these are "just

entities that she formed to commit various acts alleged in the complaints" based on their observation that (i) they could not find any information about the entities, (ii) Loyd had previous experience forming entities in her career as a paralegal, and (iii) all four entities were dissolved this year.  June 23 Tr. at 6:23-25 (McCue).  See June 23 Tr. at 6:11-18 (McCue).

The Court next addressed Loyd's request that the Plaintiffs' attorneys "prove they have authority to . . . represent plaintiffs Tony and Judy [Spera] . . . ."  June 23 Tr. at 7:7-9 (Court).  The Court noted that the Plaintiffs attached to the Plaintiffs' Response two declarations -- from J. Spera and T. Spera -- indicating that they authorize counsel from Lewis Roca Rothgerber Christie LLP, including Mr. Michael McCue, Mr. Ross Crown, and Mr. Meng Zhong to represent them.  See June 23 Tr. at 8:19-9:9 (Court)(citing Declaration of Judy Spera at 1 (dated June 8, 2021), filed June 8, 2021 (Doc. 58-9); Declaration of Tony Spera at 1 (dated June 8, 2021), filed June 8, 2021 (Doc. 58-10)).  The Court stated that those "affidavits or declarations under oath just put an end to the fact that the law firm and the three lawyers that are representing the plaintiffs have the authority to represent Tony and Judy Spera."  June 23 Tr. at 9:9-14 (Court).  Loyd then countered that the signature on the J. Spera Decl. "doesn't match the signature that was signed on the documents for the probate court," June 23 Tr. at 9:20-22 (Loyd), and asked the Court to compare J. Spera's signature from the J. Spera Decl. with that from Exhibit B attached to the Plaintiffs' Response, see June 23 Tr. at 10:19-11:7 (Loyd, Court).  The Court responded: "So I'm looking at Exhibit B . . . [ -- ] plaintiffs' initial disclosures [ -- ] which are just signed by the attorneys.  So I'm not seeing any signature by the Speras that I can compare it with."  June 23 Tr. at 11:5-9 (Court).  The Court stated that, although the Plaintiffs may not have proven the issue to Loyd's satisfaction, "I'm not sure what more we can really require of them other than they produced these two affidavits."  June 23 Tr. at 10:8-11 (Court).  Mr. McCue then spoke, stating:

As an officer of the Court I represent to the Court that I represent all the plaintiffs, including Tony Spera, and Judy Spera[;] we have been communicating with the regarding this case and their counsel with their personal counsel [Gary Barkin]. They didn't teach me in law school how to address issues with somebody questioning whether you are actually representing your clients or in this case Ms. Loyd has actually accused us in her papers [of] steal][ing] [the] identities [of] Judy and Tony Spera[,] but I can assure the Court that we represent them and I think it's Ms. Loyd's burden to prove otherwise.

June 23 Tr. at 11:20-12:7 (McCue).  Loyd responded by stating that:

when the thing first started I brought this up at the meet and confer with Mr. McCue. Allegedly Tony and Judy said they did not hire them, they did not know them, they were not their attorneys.  So I'm just going to go with what was said at the very beginning of this.  What transpired later, I don't know anything about that.

June 23 Tr. at 12:15-21 (Loyd).  The Court then stated it was inclined to deny Loyd's motion because "we now have proof from the attorneys that they represent the Speras . . . ,"  June 23 Tr. at 12:22-25 (Court), but added that "[i]f something develops down the road, we can take another look at it," June 23 Tr. at 13:3-5 (Court).

The Court next took up Loyd's motion that New Mexico is an improper venue and that the Court should transfer venue to Connecticut because "[ninety-five percent] of everything that happened [was] in Connecticut."  June 23 Tr. at 14:9-10 (Loyd).  Loyd stated that "I have never been to New Mexico.  I don't live there.  I have no connection with New Mexico."  June 23 Tr. at 14:13-15 (Loyd).  The Plaintiffs responded that Loyd improperly raised venue in her motion, but addressed her motion on the merits nevertheless.  See June 23 Tr. at 14:20-23 (McCue).  The Plaintiffs asserted that, in a motion to dismiss, "all factual conflicts are generally construed in favor of the plaintiff," and that the infringement of intellectual property rights occurred in New Mexico because four of the defendant entities were formed under the laws of New Mexico and "apparently engaged in their tortious conduct in New Mexico."  June 23 Tr. at 15:3-14 (McCue).  Although the entities are now dissolved, they "were dissolved just a few months [ago]," and, "[u]nder New

Mexico law[,] you can file suit against a dissolved LLC up to three years [after] the dissolution."
June 23 Tr. at 15:16-19 (McCue).  The Plaintiffs argued that they would not be able to get personal
jurisdiction over the defendant entities in Connecticut, even though J. Spera and T. Spera reside
there, and that they would have preferred to file the lawsuit in Connecticut.  See June 23 Tr. at
15:24-16:4 (McCue).  The Plaintiffs stated that, although "a lot of the production of the works at
issue, the original production in the 1990s occurred in Connecticut," the basis of their claim arose
in New Mexico, where the infringement of the intellectual property rights took place.  June 23 Tr.
at 16:6-11 (McCue).  The Plaintiffs continued that "the infringement occurred really [in] New
Mexico [by] entities controlled by Ms. Loyd even from outside [the] State of New Mexico or
wherever she traveled . . . ."  June 23 Tr. at 16: 11-14 (McCue).

> Loyd responded that,
>
> I do not control those entities.  I've [never] controlled those entities, and yes the
> production took place first in Connecticut, but then later on . . . Warren sold all the
> rights he had to <u>Seekers of the Supernatural</u> and when Ed Warren sold his rights [a]
> person who bought his rights did everything in Spain.

June 23 Tr. at 16:18-24 (Loyd).  Loyd continued, "it's not clear whether or not Ed Warren actually
owned the rights at all, because everything was done at a particular Connecticut studio and they
had a production staff in Connecticut who worked on this.  But Ed Warren sold his rights before
he died."  June 23 Tr. at 16:24-17:4 (Loyd).  The Court indicated that it would neither dismiss nor
transfer the case, because "the plaintiffs have made a showing as to why they brought it here and
these LLCs that I'm trying to figure out do appear to be New Mexico corporations so something
happened in this state . . . [f]or those corporations to[] exist."  June 23 Tr. at 17:5-15 (Court).

> Next, the Court invited Loyd to discuss her standing motion.  See June 23 Tr. at 18:16-18
(Court).  Loyd responded that

the[] [defendants] lack standing because I haven't done anything to hurt anybody . . . I purchased the rights in 2017.  People have been confusing these productions, recordings, ebooks, paperback books since 2000 I think . . . ."

June 23 Tr. at 17:19-25 (Loyd).  Loyd stated that the probate case

was open in Connecticut prior to this lawsuit[,] [when] Judy had to list all the interests she had.  She had to put it down[] . . . what she was claiming, what she was inheriting . . . she did noy put any of this down when she had a chance.  She had a chance to amend this, to bring in the items that are . . . included in[] the lawsuit.  She [had] [a] year and two months to do that.  She never amended the lawsuit to bring in, amended the [probate] to say, ["]I have this property too, I inherited this from my mother.["]  She's never had anything negative or bad to say about this.  And all of a sudden I'm getting sued.  It['s] like Judy is in both ways, she's saying ["]oh, I inherited from my mother[,"] and then in her reply from Mr. Zhong he said . . . she didn't have a trademark.  If she didn't have a trademark, I don't understand why she's suing me.

June 23 Tr. at 18:6-18:22 (Loyd).  Loyd asserted that J. Spera is not suing her, but rather a "third party . . . behind this[,] manipulating everything . . . [ -- ] Gary Barkin."  June 23 Tr. at 18:25-19:3 (Loyd).  The Plaintiffs responded that Loyd's "claim that she didn't do anything wrong . . . is a factual issue not related to standing."  June 23 Tr. at 19:16-19 (McCue).  The Plaintiffs summarized what they believed Loyd's standing argument: "Ms. Loyd claims that Judy Spera . . . does not have standing because she did not allegedly inherit any trademarks from [her mother, Lorraine] Warren," because "the trademarks were not listed in the probate inventory sheet."  June 23 Tr. at 19:21-25 (McCue).  The Plaintiffs reasoned that intellectual property rights are not tangible assets and, therefore, would not have appeared in the probate inventory of tangible assets, and that L. Warren's will expressly leaves everything she owns to J. Spera, with the exception of one vehicle.  See June 23 Tr. at 20:1-9 (McCue)(citing L. Warren Will at 1).  The Plaintiffs added that Connecticut case law establishes that, "if there are any questionable assets in the inventory of a probate report[,] that's not binding on adverse claimants, nor is the failure to[] [list an asset] an

obstacle to bringing an action to claim that asset."   June 23 Tr. at 20:15-24 (McCue)(citing Dickman v. Generis, 48 Conn. Supp. 380, 386 (2004)).

The Plaintiffs next addressed Loyd's argument that L. Warren did not own a trademark: "Ms. Loyd is confusing the trademark registration with trademark rights.  There was no trademark registration for the Ed and Lorraine Warren trademark owned by the [Plaintiffs]," and J. and T. Spera were blocked from obtaining a trademark registration because of Loyd's actions, but trademark rights in Ed and Lorraine Warren "exist apart from the registration."  June 23 Tr. at 21:2-14 (McCue).  Loyd responded that J. and T. Spera had a Connecticut attorney who handled the probate for L. Warren, and that Mr. McCue and the other attorneys in this case have never spoken to her.  See Tr. at 23:15 (Loyd).  Loyd also questioned Mr. McCue's ability to interpret Connecticut State law, "since he doesn't practice Connecticut probate law," and questioned the Plaintiffs' assertion that E. Warren and L. Warren owned the trademark in their name.  June 23 Tr. at 23:5-13 (Loyd).  The Court stated that it was inclined to deny Loyd's motion to dismiss, because the "two individuals and two corporations that [are] suing here have standing."  June 23 Tr. at 24:15-18 (Court).

The Court next invited the parties to address Loyd's statute-of-limitations argument.  Loyd did not offer anything due to problems with her computer, but stated that she will "deal with it in the third amended complaint."  June 23 Tr. at 25:2-7 (Loyd).  The Plaintiffs reiterated that they only learned about the infringing conduct in 2019, and that the 2014 cease-and-desist letter was sent by Mr. Barkin to a different entity; after the letter was sent, the Plaintiffs believed that the infringing conduct had stopped, until they learned in 2019 that it had not, and then filed this suit shortly afterwards.  See June 23 Tr. at 25:13-24 (McCue).  The Plaintiffs urged the Court to not rule on any factual issues arising from Loyd's motion, because those would be more appropriately

addressed at trial.  See June 23 Tr. at 26: 10-15 (McCue).  Loyd then argued that the first cease-and-desist letter came in 2009, and that T. Spera "had knowledge of a lot of things in 2009."  June 23 Tr. at 26:24-25 (Loyd).  See June 23 Tr. at 26:20-21 (Loyd).  Loyd claimed that a "person" responded to the 2009 cease-and-desist letter with "I bought rights, I'm not infringing.  I purchased theses rights from Ed Warren."  June 23 Tr. at 27:1-3 (Loyd).  Loyd claimed that T. Spera and the executor of E. Warren's estate "acknowledged that [the person] had rights."  June 23 Tr. at 27:8 (Loyd).  Loyd then claimed that, when Mr. Barkin got involved in 2014, "that's when things started getting iffy," and that "Gary Barkin offered to buy my rights.  When I said no, I don't want to sell my rights[,] he said something [along] the line[s] of 'well, you have no evidence that you got those rights.'"  June 23 Tr. at 27: 19-28:1 (Loyd).  Loyd argued that the Plaintiffs had notice, therefore, in 2009 and not 2018.  See June 23 Tr. at 28:4-6 (Loyd).

### 8.    The Plaintiffs' MSJ.

Following the close of discovery, the Plaintiffs moved for summary judgement against Loyd on three of their claims.  See Plaintiffs' MSJ at 1-2.  The Plaintiffs assert that, "[w]hile the details of Ms. Loyd's scheme and web of deception are complex (and will be fully revealed at trial), the trial can be simplified by resolving certain basic claims for which there are no genuine issues of material fact at the summary judgment stage."  Plaintiffs' MSJ at 2.  The three claims the on which Plaintiffs seeks summary judgement on are "trademark infringement (Count I), copyright infringement (Count V), and violation of rights of publicity (Count VII)."  Plaintiffs' MSJ at 26.

On Count I, the Plaintiffs seek summary judgement for trademark infringement based on "their ownership of the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks and Ms. Loyd's use of the marks to create false endorsement of her audio and video recordings and transcriptions of the Warren works."   Plaintiffs' MSJ at 3

(collectively referring to the two trademarks as the "Warren Trademarks").  The Plaintiffs bring their claim under the Lanham Act, 15 U.S.C. § 1125, which establishes a federal cause of action against any person who is "using a mark in commerce in a manner that is likely to cause confusion, mistake or deception as to an affiliation, connection, or *association* with another person." Plaintiffs' MSJ at 14 (citing 15 U.S.C. § 1125(a) (emphasis in Plaintiffs' MSJ)).  According to the Plaintiffs, when the allegation is the unauthorized use of a celebrity's identity or persona for commercial purposes, as with the Warren Trademarks, this contention is referred to as a "false endorsement claim."  Plaintiffs' MSJ at 14.  According to the Plaintiffs, false endorsement "'occurs when a celebrity's identity is [used in] connection with a product or service in such a way that consumers are likely to be misled about the celebrity's sponsorship or approval of the product or service.'"  Plaintiffs' MSJ at 14-15 (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 28:15 (5th ed.)(alteration in Plaintiffs' MSJ, but not in McCarthy)).   To prove their claim, the Plaintiffs assert, they must show: (i) that J. Spera owns the Warren Trademarks; and (ii) Loyd's use of the Warren Trademarks "is likely to cause confusion." Plaintiffs' MSJ at 15.  On the first prong, the Plaintiffs assert that there is "no genuine dispute" that the Warrens owned these rights during their lifetimes based on their branding of "their lectures, tours, books and television series" as "ED AND LORRAINE WARREN" and the "SEEKERS OF THE SUPERNATURAL."  Plaintiffs' MSJ at 15 (citing Plaintiffs' MSJ ¶ 3, at 4, id. ¶ 7, at 5). The Plaintiffs argue it is "well established" that, after a well-known person's death, trademark rights in their names and likenesses pass to their estate and heirs.  Plaintiffs' MSJ at 15-16.  The Plaintiffs support their argument by citing to cases where federal courts have found similar trademark rights to have survived a celebrity's death and allowed the estates to bring false endorsement claims.  See Plaintiffs' MSJ at 15-16 (citing Facenda v. N.F.L. Films, Inc., 542 F.3d

1007, 1018 (3d Cir. 2008)(involving estate of National Football League announcer "John Facenda, a Philadelphia broadcasting legend," suing promoters of Madden NFL football videogame for unauthorized use of his "distinctive voice"); Estate of Presley v. Russen, 513 F. Supp. 1339 (D.N.J. 1981)(involving Elvis Presley's estate suing Elvis impersonator); Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc., 688 F. Supp. 2d 1148, 1159 (D. Nev. 2010)(Pro, J.)(involving musician Bob Marley's estate suing t-shirt seller)).   Here, the Plaintiffs assert, upon L. Warren's death, the Warren Trademark rights passed to her heir and executor, J. Spera.   See Plaintiffs' MSJ at 15.

On the second prong, whether "Loyd's use of the Warren Trademarks is likely to cause confusion" amongst consumers, the Plaintiffs rely on the six-factor test that the Tenth Circuit outlines in King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1089 (10th Cir. 1999):

> (1) the strength or weakness of the plaintiff's mark; (2) the relation in use and manner of marketing between the goods and service which the defendant markets and those which the plaintiff markets; (3) the degree of similarity between the marks; (4) the defendant's intent in adopting its mark; (5) evidence of actual confusion; and (6) the degree of care likely to be exercised by purchasers.

Plaintiffs' MSJ at 15 (citing King of the Mountain Sports v. Chrysler, 185 F.3d at 1089).   The Plaintiffs also note that, while "'[l]ikelihood of confusion is a question of fact,'" the claim is still "'amenable to summary judgment in appropriate circumstances.'"   Plaintiffs' MSJ at 16 (quoting Hornady Mfg. Co., Inc. v. Doubletap, Inc., 746 F.3d 995, 1001 (10th Cir. 2014)).

Here, the Plaintiffs argue, all six confusion factors weigh in their favor and merit summary judgment.   First, according to the Plaintiffs, the Warren's cult following among fans of the occult makes the Warren Trademarks strong marks.   See Plaintiffs' MSJ at 16-17 (citing Amazon Inc. v. Cannondale Inc., No. 99 N 571, 2000 WL 1800639, at *8 (D. Colo. July 24, 2000)(Nottingham, J.)(finding that mountain biker's name was a strong mark where, even if she "is not an instantly

recognizable celebrity, she is a celebrity among mountain bike enthusiasts.")).  Second, according to the Plaintiffs, Loyd is using the Warren Trademarks to "sell works directly related to the Warrens" -- works that "feature the Warrens themselves."  Plaintiffs' MSJ at 17.  Third, according to the Plaintiffs, Loyd is using "identical marks" to those the Warrens used: ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL.  Plaintiffs' MSJ at 17.  Fourth, according to the Plaintiffs, "there is no doubt that Ms. Loyd intended to create an association between her uses of the Warren Trademarks . . . .  and the Warrens, because she actually used the Warren's names in connection with . . . audio and video recordings of the Warrens and transcriptions of the recordings."  Plaintiffs' MSJ at 17-18.  Fifth, according to the Plaintiffs, "there is evidence of actual confusion" based on "reviews that indicate [Loyd's customers] associate the products with Ed and Lorraine Warren."  Plaintiffs' MSJ at 18 (citing Plaintiffs' MSJ ¶ 30, at 10).  Sixth, according to the Plaintiffs, given that consumers "'typically exercise little care in the selection of inexpensive items,'" Loyd's products' low prices make confusion likely.  Plaintiffs' MSJ at 18-19 (quoting Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964, 975 (10th Cir. 2002)).

The Plaintiffs next address Loyd's claimed rights in the ED AND LORRAINE WARREN trademark, which is premised on her assertion "that she acquired the rights from 'Galactic Media' and that 'Galactic Media' obtained Lorraine Warren's consent to register the mark."  Plaintiffs' MSJ at 19.  The Plaintiffs assert that "there is no genuine issue of material fact that the [Consent Form] was not signed by Ms. Warren but, even if it were, the consent was not valid."  Plaintiffs' MSJ at 19.  Regarding the signature's authenticity, the Plaintiffs note that, in 2015, the time the Consent Form was submitted to the USPTO, J. Spera and T. Spera were caring for an ailing L. Warren and managing her business affairs, yet neither of them "had ever heard of 'Galactic Media[,]' nor did they see" L. Warren sign the Consent Form.  Plaintiffs' MSJ at 19.  They also

note that the Consent Form "is not dated and is grammatically incorrect, nonsensical and ends in

an incomplete sentence."  Plaintiffs' MSJ at 19.[80]  The Plaintiffs also relay the Speckin Report's

conclusions that, based on forensic handwriting analysis, it is "'highly probable'" that L. Warren

did not sign the Consent Form.  Plaintiffs' MSJ at 19 (quoting Speckin Report at 6).  The Plaintiffs

contrast this to the dearth of evidence supporting the signature's authenticity:

> Ms. Loyd has no evidence establishing the authenticity of the signature. Ms. Loyd
> admits she never actually saw Lorraine Warren sign the consent form. (SOF ¶ 40.)
> Ms. Loyd's only argument is that she spoke to Lorraine in 2016 or 2017 about the
> trademarks when Ms. Loyd was contemplating buying rights from "Ali Mazuren."
> (Id.) However, Ms. Loyd admits she did not give Lorraine Warren the consent form
> to confirm her signature, did not discuss "Galaxtic Media" with Lorraine, and
> admits that she cannot recall what Lorraine specifically said. (Id.)

Plaintiffs' MSJ at 20.  The Plaintiffs characterize this evidence as a "mere . . . scintilla of

evidence . . . [, which] is insufficient to create a dispute of fact that is 'genuine.'" Plaintiffs' MSJ

at 20 (quoting Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005)). In support of their

argument that "Loyd's vague, conclusory, self-serving, and uncorroborated 'memories' of her

conversations with Lorraine are the types of evidence that do not create a genuine issue of material

fact," the Plaintiffs cite to Giuffre v. Marys Lake Lodge, LLC, Nos. 11-CV-00028-PAB-KLM,

12-cv-00377-PAB, 2012 WL 4478806, at *3 (D. Colo. Sept. 28, 2012)(Brimmer, J.), and Costales

v. Quantum Health Res., Inc., No. CIV. 97-0021 BB/LCS, 1998 WL 36030842, at *12 (D.N.M.

April 17, 1998)(Black, J.), as instances where courts found no material dispute of fact in the face

of a party's unclear or uncorroborated testimony and granted summary judgment.  Plaintiffs' MSJ

at 20.

The Plaintiffs further argue that, even if her signature on the Consent Form were authentic,

---

[80]As reproduced supra at p. 31, the sentence above the Consent Form's signature reads: "I consent to the use and registration by Galactic Media of my Lorraine Warren as a trademark and/or service mark with the."  Consent Form at 5.

it would be "invalid."  Plaintiffs' MSJ at 21.  Because L. Warren already had granted New Line in

2011, "*exclusive* rights to her and her late husband's life story, including rights to use their names,"

L. Warren "did not have the rights to convey to Galaxtic Media in 2015." Plaintiffs' MSJ at 21

(emphasis is Plaintiffs' MSJ).  See Plaintiffs' MSJ ¶ 12, at 6 (citing T. Spera Decl. ¶ 8, at 4).

Next, the Plaintiffs seek summary judgment on Count V for copyright infringement

regarding Loyd's distribution of the Seekers of the Supernatural television series that the Warrens

and T. Spera created in the 1990s.  See Plaintiffs' MSJ at 3.  The Plaintiffs assert that Loyd has

"infringed those copyrights by copying and distributing thousands of copies of the Plaintiffs'

works."  Plaintiffs' MSJ at 3.  According to the Plaintiffs, the owners of a copyright have "the

exclusive rights to . . . reproduce and distribute" copies of the works.  Plaintiffs' MSJ at 23 (citing

17 U.S.C. § 106).  According to the Plaintiffs, "[v]iolation of any of the exclusive rights constitutes

infringement."  Plaintiffs' MSJ at 23 (citing 17 U.S.C. § 501(a)).  Citing to La Resolana Architects,

PA v. Reno, Inc., 555 F.3d 1171, 1177 (10th Cir. 2009), the Plaintiffs assert that there is no genuine

issue of material fact regarding the copyright infringement claim's two elements: that the Plaintiffs

own a valid copyright in the Seekers of the Supernatural series, and that Loyd infringed things by

copying and selling copies of the shows.  Plaintiffs' MSJ at 21.

On proof of their ownership, the Plaintiffs refer to the Spera Seekers Copyright

Registration, which lists T. Spera, L. Warren, and E. Warren as the authors of the Seekers of the

Supernatural television series, as "'prima facie evidence of a valid copyright.'" Plaintiffs' MSJ at

21 (quoting Palladium Music, Inc. v. EatSleepMusic, Inc., 398 F.3d 1193, 1196 (10th Cir. 2005)).

The Plaintiffs further support their claim of ownership by noting the Warrens' and T. Spera's

thorough involvement in creating the show, J. Spera's succession to her parent's rights as their heir

and L. Warren's executor, and Loyd's lack of involvement in creating show.  Plaintiffs' MSJ at

21-22.  The Plaintiffs summarize Loyd's competing assertion of right to copyright ownership in the Seekers of the Supernatural series: "Loyd claims that she owns copyrights in the series and that she acquired the rights through a chain of title from Ed Warren to unnamed individuals to an 'Ali Mazuren' and then to Ms. Loyd." Plaintiffs' MSJ at 3.  The Plaintiffs argue that "as a matter of law, under 17 U.S.C. § 204, transfer of copyrights must be in writing and signed to be valid." Plaintiffs' MSJ at 3.

> Under 17 U.S.C. § 204, "a transfer of copyright ownership . . . **is not valid** unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." (emphasis added).  Put simply, "[t]ransfer of copyright ownership is not valid unless made in writing signed by the owner of the rights being conveyed." *Schwasinger v. Price*, 789 F. Supp. 347, 351 (D. Kan. 1992), *aff'd*, 978 F.2d 1268 (10th Cir. 1992).  "As a federal matter, failure to comply with Section 204(a) invalidates the agreement, without regard to any state law or equitable principles to the contrary, without regard to whether the parties perform under the 'contract,' and regardless of whether the putative transferor has agreed orally or otherwise in a noncontract that an agreement is in force." 2 Patry on Copyright § 5:106.  "**The writing requirement is absolute, admitting of no exception.**"  *Id*. (emphasis added).

Plaintiffs' MSJ at 22 (alterations and bold in Plaintiffs' MSJ).  Accordingly, the Plaintiffs argue that, with Loyd not having produced written assignments necessary to establish a valid chain of title from the Warrens through to the person she claims to have acquired the rights from, Ali Mazuren, Loyd's "story that she bought a 'box' of items from 'Ali Mazuren' containing the physical copyright certificate is legally irrelevant," Plaintiffs' MSJ at 22 (quoting Plaintiffs' MSJ ¶¶ 18-27, at 6-9 (summarizing Loyd's deposition testimony regarding her purported acquisition of rights to the Seekers of the Supernatural series from Mazuren in or around 2016-2017)).  The Plaintiffs also emphasize that the statute's writing requirements squarely address the facts at hand:

> Ms. Loyd's *modus operandi* in this case has been to make fantastical claims to the rights of the deceased Warrens based on unverifiable claims of oral agreements, handshake deals, and transactions with individuals/companies that cannot be identified or located.  Unfortunately for Ms. Loyd's strategy, this is exactly why

> Section 204 exists.  Section 204 is designed to "provide protection for the author
> and creator of copyrighted material against fraudulent claims of transfer."
> *Pamfiloff v. Giant Recs., Inc.*, 794 F. Supp. 933, 937 (N.D. Cal. 1992).

Plaintiffs MSJ at 22-23.  As for this second element of infringement, copying the <u>Seekers of the</u>

<u>Supernatural</u> shows, the Plaintiffs contend that "Loyd admitted in both interrogatories and her

deposition that she has sold and continues to sell recordings of the Seekers series through online

retailers."  Plaintiffs' MSJ at 23.  <u>See</u> Loyd's Interrogatory Responses, No. 10, at 6-10; Loyd Depo.

at 297:21-298:5 (Loyd, McCue).  The Plaintiffs argue: "Accordingly, Ms. Loyd's infringement of

Plaintiffs' copyright in the Seekers series is undisputed."  Plaintiffs' MSJ at 23.

Regarding the third and final claim on which Plaintiffs move for summary judgment,

violation of the Warrens' rights of publicity (Count VII), the Plaintiffs assert that "Loyd has

exploited the Warren[s'] name[s] to sell recordings without permission."   According to the

Plaintiffs "[r]ight of publicity, in general, 'is the inherent right of every human being to control the

commercial use of his or her identity.'"  Plaintiffs' MSJ at 23 (quoting 1 J. Thomas McCarthy &

Roger E. Schechter, <u>Rights of Publicity and Privacy</u> § 1:3 (2d ed.)("<u>McCarthy on Publicity</u>")).

According to the Plaintiffs, "the parties agree that Connecticut law governs Plaintiffs' right of

publicity claim."  Plaintiffs' MSJ at 23.  <u>See</u> JSR at 3 ("The parties further stipulate and agree that

the law governing this case is: . . . Connecticut state law with respect to the rights of publicity

claim . . . .").  The Plaintiffs assert that, under Connecticut State law, the Warrens' rights of

publicity survive despite their deaths.  <u>See</u> Plaintiffs' MSJ at 24.  As authority for this conclusion,

they rely upon <u>Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.</u>, 867 F. Supp. 175

(S.D.N.Y. 1994)(Preska, J.), in which the federal district court predicted that the Supreme Court

of Connecticut would allow Muppets[81] creator Jim Henson's heirs to sue for infringement of his

rights of publicity.  Plaintiffs' MSJ at 24 (citing Jim Henson Prods. v. John T. Brady & Assocs.,

867 F. Supp. at 189-190; 2 McCarthy on Publicity § 9:23 (discussing Jim Henson Prods. v. John

T. Brady & Assocs.)).  The Plaintiffs assert that J. Spera "in her individual capacity [as heir] and

as the executor of her mother's estate, . . . possesses and controls the rights of publicity for Ed and

Lorraine Warren in this case, subject to contractual rights granted to co-Plaintiff New Line."

Plaintiffs' MSJ at 24.  The Plaintiffs further argue that summary judgment is appropriate even

without fully tracing the post-mortem path of the ghost hunters' rights of publicity:

> The Court need not resolve whether the rights of publicity being enforced
> here is held by Judy Spera or New Line (through its contractual rights), as both are
> Plaintiffs in this case.  *King Cole Partners, LP v. CD Listening Bar, Inc.*, No.
> SACV111557JSTANX, 2012 WL 13024683, at *4 (C.D. Cal. Mar. 28, 2012)
> ("While Defendants have succeeded at presenting evidence that there may be
> multiple co-owners of the copyrights and publicity rights at issue, they have not yet
> shown that the ownership claims of the Plaintiffs are in conflict with the ownership
> claims of non-parties . . . .  If there is any dispute between the co-owners as to their
> rights, that dispute is properly between the co-owners, not between a co-owner and
> Defendants").

Plaintiffs' MSJ n.4, at 24-25 (alterations in Plaintiffs' MSJ).  Loyd, the Plaintiffs continue,

exploited the Warrens' names for commercial purposes when selling her products, and claimed at

the Loyd Depo. that E. Warren gave her permission to use the Warrens' names when he gave her

copies of the Seekers of the Supernatural television series to air on public access television in New

York City.  See Plaintiffs' MSJ at 25; Loyd Depo. at 318:3-320:24 (Loyd, McCue).  The Plaintiffs

argue that this grant of permission was a non-exclusive license limited in "'area and scope'" to the

tapes' public broadcasting, Plaintiffs' MSJ at 25 (quoting 2 McCarthy on Publicity § 10:18), which

---

[81]A Muppet is a "member[] of the family of puppets created by Jim and Jane Henson" as
part of their "puppet-based entertainment empire."  Jim Henson Prods. v. John T. Brady & Assocs.,
867 F. Supp. at 178.

"cannot be reasonable construed to constitute consent" for Loyd to use the names more than a decade later to in selling copies of the Seekers of the Supernatural television show, Plaintiffs' MSJ at 25.  Accordingly, the Plaintiffs argue, Loyd's use of the Warrens' names is unauthorized, and summary judgment is merited on this claim for violation of rights of publicity (Count VII), as well as their trademark (Count I) and copyright claims (Count V).  Plaintiffs' MSJ at 26.

**9.   Loyd's MSJ.**

In Loyd's MSJ, Loyd "move[s][82] for summary judgment on all" ten of the Plaintiffs' claims.  Loyd's MSJ at 1.  Loyd frames the Plaintiffs' case as "a calculated, well-organized, and well planned 'Unconscionable' fraud scheme by . . . [the Plaintiffs] and each and every one of their attorneys . . . to commit fraud on the court and Defendant, Bea Loyd . . . by knowingly, deliberately, intentionally and egregiously misrepresenting and concealing relevant facts in the District of New Mexico Court system."  Loyd's MSJ at 2.  According to Loyd, "[t]he unmistakable reality here is that Ed Warren and his wife Lorraine Warren ('Decedent') sold the Warren's life story, resulting in several years of litigation centered around who truly owned the [Warrens']

---

[82]In Loyd's MSJ and Loyd's Response, she switches between writing on her behalf and writing on a larger group of Defendants' behalf -- sometimes within the space of the same sentence.  Compare Loyd's MSJ at 1 ("Defendant Bea Loyd, move [sic] for summary judgment on all of the claims in the Complaint . . . ."), with id. at 6 ("The Defendants denies [sic] infringing the trademark and unfairly competing and contends they have a registered trademark for specific goods . . . .").  Loyd is the sole Defendant who has appeared in this case.  None of the four Defendant LLCs have responded or otherwise participated in this action.  See Plaintiffs' Request for Clerk's Entry of Default at 1-3, filed July 27, 2022 (Doc. 129).  Accordingly, the Clerk of the Court, "pursuant to the requirements of Rule 55(a)" of the Federal Rules of Civil Procedure, entered default against the four Defendant LLCs.  Clerk's Entry of Default at 1, filed July 28, 2022 (Doc. 130).  See Fed. R. Civ. P. 55(a).  .  Because Loyd appears pro se, is not an attorney, and thus only can represent herself, the Court will read her legal arguments in the singular, and refer to the "Defendants" only where the Court understands Loyd to be making an argument grounded in her assertion that she is a successor in interest to earlier seller or sellers of Warren IP, or where it is germane to her arguments.  See Loyd's MSJ at 7 (alleging that "Defendants used 'Ed and Lorraine Warren' and 'Seekers Of The Supernatural' since at least 2005").

intellectual property rights . . . ."  Loyd's MSJ at 2.  Loyd details these assertions in the section

that she labels her Statement of Relevant Facts.  See Loyd's MSJ at 2-5 (discussing some of the

litigation between New Line and independent film producer DeRosa-Grund regarding rights in the

The Conjuring film and its sequels).[83]  Loyd makes several arguments based on her reading of the

DeRosa-Grund disputes.  First, she argues that this previous litigation "illustrate[s] that there was

never an application for the 'Ed and Lorraine Warren Trademark' by Plaintiffs Judy and Tony

Spera."  Loyd's MSJ at 4.  Next, Loyd asserts that, while the Plaintiffs acquired several trademarks

related to The Conjuring, none of these trademarks have a "'First Use' date [which] precedes

Defendants [sic] 'First Use' and not a single Trademark includes paperback books, MP3s,

Audiobooks, etc."  Loyd's MSJ at 5.  Third, Loyd asserts:

### Conclusion after three (3) years of litigation

> After three (3) years of litigation, it is clear that Ed and Lorraine Warren
> sold 100% of their rights to the Warren's intellectual property rights.  Thus,
> Plaintiffs do not have rights in the Ed and Lorraine Warren Trademark, and
> therefore, no standing to bring this lawsuit against Defendants.

Loyd's MSJ at 5 (bold in Loyd's MSJ).  While this paragraph refers to one specific trademark,

Loyd repeats her argument about the Plaintiffs' purported lack of standing for each of the ten

counts besides Count VI, Cancellation of Copyright Registrations, arguing that the "Plaintiffs do

not have standing to bring this action because Plaintiff Judy Spera's mother; the Decedent, sold all

rights to their life story and all intellectual property rights to Tony DeRosa-Grund.  DeRosa-Grund

sold/lost the rights to the Warren's intellectual property rights . . . ."  Loyd's MSJ at 7; id. at 9; id.

at 10-11; id. at 12; id. at 14; id. at 15-16; id. at 17-18; id. at 20; id. at 22 (repeating this argument).

---

[83]The Court has discussed the facts underlying this litigation, referred to collectively as the
DeRosa-Grund Disputes, in its Factual Background section.  See supra at 15-19.  In this section,
the Court will discuss legal Loyd's arguments based in the DeRosa-Grund Disputes.

In addition to her assertions about the DeRosa-Grund disputes and their significance, Loyd makes four additional assertions in her fact section about matters specific to this case.  First, she asserts that Mr. Barkin, L. Warren's attorney, "had first hand knowledge [that the Warren IP] . . . was being used by Defendants because he sent a cease-and-desist letter on or about November 5, 2014."  Loyd's MSJ at 3 (citing Letter from Gary M. Barkin to Omnimedia LLC and Cohen Goldberg & Smith LLC (dated November 5, 2014), filed August 17, 2021 (Doc. 91-1)("Barkin Letter 1"); Letter from Gary M. Barkin to Omnimedia Publishing LLC (dated November 5, 2014), filed August 17, 2021 (Doc. 91-2)("Barkin Letter 2")).  Second, Loyd asserts that the Warrens

> asked defendants to assist them in getting publicity.  They both provided Defendants with exclusive interviews to publish for publicity purposes.  Ed Warren provided Defendants with an exclusive interview about the doll Annabelle before he died.  Lorraine Warren provided Defendant, Bea Loyd with an exclusive interview on February 28, 2009.  Defendants and Decedent were also working on a new book, which was an update on the Warren cases.

Loyd's MSJ at 3-4.[84]  Third, Loyd asserts that T. Spera "sent Defendants a cease-and-desist letter on or about February 3, 2009," but that he "recanted his cease and desist demands."  Loyd's MSJ at 4 (citing Screenshots of YouTube.com Messages Associated with Warrenology User Account (dated February 3-7, 2009), filed August 17, 2021 (Doc 91-3)("YouTube Messages")).[85]  Fourth, Loyd contends that a person named "Harrison Smith," whom she identifies as "the executor of Ed

---

[84]The Court interprets Loyd's distinction in this paragraph between the "Defendants" in the plural and "Defendant Bea Loyd" to mean that she is asserting (i) that the Warrens asked additional Defendants besides herself to help them secure publicity and (ii) that, before her death, L. Warren was collaborating on a book with one or more of the Defendants, which may or may not have included Loyd.  Loyd's MSJ at 3-4.

[85]Loyd attaches as exhibits to her MSJ a series of images purporting to show communications exchanged in 2009 via YouTube.  See YouTube Messages at 1-9.  These messages are out of court statements that Loyd seeks to admit for the truth of the matter asserted, with no hearsay exception applying.  In addition, they are unauthenticated, incomplete, and completely unverifiable.  They also, by Loyd's own account, date from 2009, eight years prior to her purported purchase of the business from Mazuren.

Warren's Will" communicated with one of Loyd's asserted predecessors in interest and, after speaking with L. Warren, "confirmed that Defendants had acquired the right to the Seekers Of The Supernatural from Ed Warren." Loyd's MSJ at 4 (citing to YouTube Messages (no pincite given)).

Loyd moves for summary judgment on Count I, Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). See Loyd's MSJ at 5-10; Third Amended Complaint ¶¶ 65-70, at 19-20 (alleging that (i) the "Plaintiffs own common law trademark rights in the ED AND LORRAINE WARREN mark and the SEEKERS OF THE SUPERNATURAL mark"; (ii) the Defendants' use of these marks will confuse consumers in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (iii) "this Court would be justified in asserting extraterritorial jurisdiction" over analogous foreign registrations). In addition to repeating her argument about the Plaintiffs' purported lack of standing to bring this claim, Loyd makes further arguments in support of her motion: (i) that the "statutes of limitations" and the "doctrine of laches" time-bar the Plaintiffs' claim; (ii) that the Warrens and their representatives authorized her use; (iii) that consumers are not confused; and (iv) that the Plaintiffs cannot prove the necessary elements of their claim. See Loyd's MSJ at 7. Loyd also argues that the Court cannot apply the Lanham Act extraterritorially to foreign trademarks. See Loyd's MSJ at 6; id. at 8-10.

Loyd moves for summary judgment on Count II, Cancellation of Federal Trademark Registration under the Lanham Act, 15 U.S.C. § 1064. See Loyd's MSJ at 10-11. See also Third Amended Complaint ¶¶ 71-74, at 20 (alleging that (i) the Plaintiffs own "common law trademark rights in the ED AND LORRAINE WARREN MARK"; (ii) the Defendants registered this mark "by making false and material representations of fact in the trademark application with the intent to deceive the USPTO"; and (iii) the Defendants' "fraudulent registration" has injured the Plaintiffs). According to Loyd, (i) the ED AND LORRAINE WARREN mark's registration does

not injure the Plaintiffs; (ii) the Plaintiffs "cannot prove" that L. Warren "did not sign the [Consent Form], because they waited until after she died to make a claim"; (iii) L. Warren "never challenged her signature on the [Consent Form]"; (iv) the Plaintiffs' delay in bringing suit makes the claim "barred under the doctrine of laches"; and (v) the "Defendants did not knowingly make any false statements, [or] material representation of fact in connection with their application [for the ED AND LORRAINE WARREN mark]." Loyd's MSJ at 11.

Loyd moves for summary judgment on Count III and Count IV, Cybersquatting under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c). See Loyd's MSJ at 11-14. See also Third Amended Complaint ¶¶ 75-88, at 21-22 (alleging that (i) the Defendants control web domain names which are confusingly similar to the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks; and (ii) the Defendants registered these domain names in bad faith). In addition to repeating her argument about the Plaintiffs' purported lack of standing to bring this claim, Loyd asserts that the "Defendants [sic] does not own the Warren Domain Names and has never owned the Warren Domain Names." Loyd's MSJ at 12; id. at 13.

Loyd also moves for summary judgment on Count V, Copyright Infringement, 17 U.S.C. § 501. See Loyd's MSJ at 14-16. See also Third Amended Complaint ¶¶ 89-96, at 22-23 (alleging (i) T. Spera and J. Spera "own a valid United States copyright registration (No. Pau 3-769-603) for audio-visual recordings of the 'Seekers of the Supernatural' television series"; (ii) the Estate of L. Warren and New Line own a valid United States copyright registration (No. TX0000628075) for the textual work, "The Demonologist, the Extraordinary Career of Ed and Lorraine Warren"; and (iii) the Defendants are infringing these copyrights by distributing copies of material derived from these works). In addition to repeating her argument about the Plaintiffs' purported lack of standing to bring this claim, Loyd makes further arguments in support of her motion. First, she

asserts that the Plaintiffs had knowledge of the alleged infringement in 2014, see Loyd's MSJ at 15 (citing Barkin Letter 1; Barkin Letter 2), the statute of limitations time bars the Plaintiffs' claims, see Loyd's MSJ at 15 (citing 17 U.S.C. § 507(b)).   Second, Loyd contends that the Plaintiffs cannot prove that they have a valid copyright, or that there are substantial similarities between Plaintiffs' copyrighted works and the works that the Defendants distributed.  See Loyd's MSJ at 15.

Loyd also moves for summary judgment on Count VI, Cancellation of Copyright Registrations.  See Loyd's MSJ at 16.  See also Third Amended Complaint ¶¶ 97-100, at 23-24 (alleging that Loyd obtained copyright registrations "under the names Taffy Sealyham, Ali Mazuren, and/or J. Smith"; (ii) that these copyright applications "were false and fraudulent in that Defendants were not the authors or authorized copyright claimants for the works"; and, therefore, (iii) these copyright registrations "are subject to cancellation by order of the Court pursuant to the Compendium of U.S. Copyright Office Practices 1807.4(E)").  Loyd does not repeat directly her argument that the Plaintiffs lack standing to bring this claim, but she asserts that a "cancellation under [Compendium of U.S. Copyright Office Practices] 1807.4 . . . can only be done by (1) the U.S. Copyright Office acting on its own initiative; (2) copyright claimant or (3) the claimant's duly authorized agent," and that the Plaintiffs do not fall into any of these categories.  Loyd's MSJ at 16.

Loyd also moves for summary judgment on Count VII, Violation of Common Law Right of Publicity. See Loyd's MSJ at 16-19.  See also Third Amended Complaint ¶¶ 101-104, at 24 (alleging that (i) the Plaintiffs succeeded to the Warren's "rights of publicity in their names, images and likenesses"; and (ii) the Defendants have violated the Warrens' rights of publicity by using their "names, images and likenesses for commercial purposes and otherwise without the consent

of the Plaintiffs"). In addition to repeating her argument about the Plaintiffs' purported lack of standing to bring this claim, Loyd argues that she had permission to use the Warrens' rights of publicity. See Loyd's MSJ at 17. Regarding E. Warren, Loyd contends that he "approached Defendants [sic] Loyd and asked her if she would, as a favor, get their show, 'Seekers of the Supernatural' on the Manhattan Neighborhood Network cable channel in New York, NY for publicity." Loyd's MSJ at 17. She further asserts that E. Warren gave her "exclusive interviews to publish for the purpose of obtaining publicity," and that E. Warren "never revoked his permission to use his name, voice, or images for publicity purposes." Loyd's MSJ at 17. Regarding L. Warren, Loyd contends that "Lorraine gave Defendant Loyd an interview for the purpose the purpose [sic] of Defendants [sic] Loyd using the article in an article, book and posting on YouTube and the Internet for publicity," and that "L[.] Warren [n]ever revoked her permission to use her name, voice or images for publicity purposes." Loyd's MSJ at 17. Loyd also asserts that the "statutes of limitations to bring action has passed and laches [sic]." Loyd's MSJ at 18.

Loyd also moves for summary judgment on Count VIII, Common Law Trademark infringement. See Loyd's MSJ at 18-19. See also Third Amended Complaint ¶¶ 105-107, at 24 (asserting that the "Defendants' use of the ED AND LORRAINE WARREN and the SEEKERS OF THE SUPERNATURAL marks is likely to confuse consumers . . . and constitutes trademark infringement under the common law"). In addition to repeating her argument about the Plaintiffs' purported lack of standing to bring this claim, see Loyd's MSJ at 18, Loyd asserts that the "Defendants have a Trademark whose 'First Use' date precedes Plaintiffs['] 'First Use' date," Loyd's MSJ at 19.

Loyd also moves for summary judgment on Count IX, Common Law Unfair Competition. See Loyd's MSJ at 19-20. See also Third Amended Complaint ¶¶ 108-109, at 25 (alleging that

the "Defendants' use of the ED AND LORRAINE WARREN and the SEEKERS OF THE SUPERNATURAL marks constitutes false designation of origin and unfair competition in violation of the common law").  In addition to repeating her argument about the Plaintiffs' purported lack of standing to bring this claim, Loyd makes further arguments in support of her motion.  See Loyd's MSJ at 19-20.  First, Loyd "contends Plaintiffs are not domicile [sic] in New Mexico and they don't have a relationship with New Mexico.  Furthermore, Defendants are not domicile in New Mexico and Defendant Bea Loyd has never been to New Mexico."  Loyd's MSJ at 19.  Next, Loyd asserts that the "statues of limitations" and the "doctrine of latches" time-bar the complaint.  Loyd's MSJ at 19.  Third, Loyd also asserts that the Plaintiffs are unable to prove "whether Defendants competed with them in any way."  Loyd's MSJ at 19.  Specifically, Loyd asserts that the Plaintiffs cannot prove that they used the Warren IP marks in commerce before the Defendants used the marks or that their products are same as the Defendants' products.  See Loyd's MSJ at 19-20.

Finally, Loyd moves for summary judgment on Count X, Tortious Interference with Prospective Economic Advantage.  See Loyd's MSJ at 20-22.  See also Third Amended Complaint ¶¶ 111-118, at 25 (alleging that (i) the Plaintiffs have "economic relationship with third parties for the sale of books and other works base on the Warrens' *Seekers of the Supernatural Series*"); (ii) these relationships "carried the probability of future economic benefit to the Plaintiffs"; (iii) the Defendants knew of these relationships; and (iv) the Defendants' wrongful acts were the "direct and proximate cause" of disruptions to  these economic relationships.  In addition to repeating her argument about the Plaintiffs' purported lack of standing to bring this claim, Loyd contends that the Plaintiffs "cannot establish the Defendants either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur

as a result of the conduct."  Loyd's MSJ at 21.

> 10. **Loyd's Response in Opposition to Plaintiffs' MSJ.**

On September 3, 2021, Loyd filed her opposition to the Plaintiffs' MSJ.  See Loyd's Response at 1-18.  Much of Loyd's response is copied verbatim from Loyd's MSJ.  Compare Loyd's MSJ at 2, with Loyd's Response at 2 (repeating her allegations that the Plaintiffs are committing "fraud on the court and Defendant, Bea Loyd"); Loyd's MSJ at 2-5, with Loyd's Response at 2-5 (repeating her assertions regarding the DeRosa-Grund Disputes and her arguments that they deprive the Plaintiffs of standing).  Loyd also alleges that the Speras and the Warrens have a "Fraudulent Modus Operandi" of falsely claiming not to have signed contracts.  Loyd's Response at 5-8.[86]  In addition to repeating her arguments that DeRosa-Grund Disputes deprive the Plaintiffs standing to bring their claims, Loyd makes arguments to support her assertion that "[t]riable issues of fact exist with regard to all three claims upon which the Plaintiffs seek Summary Judgment."  Loyd's Response at 1-2.  See id. at 8-10 (opposing the Plaintiffs' MSJ on Copyright Infringement claim); id. at 11-16 (opposing the Plaintiffs' MSJ on Violation of Common Law Right of Publicity claim) id. at 16-18 (making arguments regarding the Plaintiffs' Common Law Trademark Infringement claim).

On the Copyright Infringement claim, Loyd advances two arguments in Opposition to the Plaintiffs' MSJ.  First, she contends that the action for copyright infringement is time-barred.  See Loyd's Response at 9-10.  Second, she contends that the "Defendants are selling products under a valid copyright registration number PA 1-929-774," which was registered several months before the Plaintiffs registered their competing copyright.  Loyd's Response at 8-10.  See United States

---

[86]The Court has discussed the facts regarding this alleged "Fraudulent Modus Operandi" in its Factual Background section.  Supra at 32-36 n.70.

Copyright Office Abstract for PA0001929774 (dated November 18, 2014) at 1-2, filed June 21, 2021 (Doc. 64-7 at 2).  Loyd contends that, because the Plaintiffs' copyright registration for the <u>Seekers of the Supernatural</u> series and her copyright registration for the <u>Seekers of the Supernatural</u> series do not have "the exact same Title and Content," her actions do not constitute infringement.  Loyd's Response at 8-10.

In support of her argument that the Plaintiffs' copyright infringement claims are time-barred, Loyd cites to the Copyright Act, 17 U.S.C. § 507, which has a three-year statute of limitations.  <u>See</u> 17 U.S.C. § 507 ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued.").  Loyd calculates this three-year period as beginning either in February 2009, the apparent date of a message sent to the YouTube user Warrenology regarding that account's posting of Seekers of the Supernatural videos and other Warren IP, <u>see</u> Loyd's Response at 9; or, alternatively, to November, 2014, when L. Warren's attorney Mr. Barkin sent cease-and-desist letters to Corporate Defendants in this matter, <u>see</u> Loyd's Response at 9; Barkin Letter 1 at 1-2; Barkin Letter 2 at 1-2.  Loyd asserts that both of these messages constitute knowledge of infringement -- and therefore Plaintiffs' claims' accrual -- outside the three-year period the Copyright Act specifies for specified for infringement actions.  <u>See</u> Loyd's Response at 9.

Second, Loyd asserts that differences between her copyright registration and the Plaintiffs' copyright registration mean that she is not infringing their copyright.  <u>See</u> Loyd's Response at 8-10.  In support of her argument, Loyd contends that there are several differences between her copyright registration and the Plaintiffs' copyright registration: (i) the "Defendant's copyright is for the 'Entire motion picture and soundtrack'.  Plaintiffs' copyright is just for 'Entire motion picture'"; (ii) the "Plaintiffs' 'Title of Work' is 'Seekers Of The Supernatural', while Defendants'

'Title of Work' is Warren's Collection"; (iii) the "Plaintiffs do not have a 'Previous or Alternate Title', while Defendants have a 'Previous or Alternate Title' which is 'Seekers Of The Supernatural'"; (iv) the "Plaintiffs' copyright beg[ins] with a PAu. This mean[s] their copyright is for unpublished works . . . . Defendant's works, conversely, are published and sold in commerce"; and (v) "Plaintiffs have twenty-four (24) titles, while Defendants have twenty-nine (29) titles." Loyd's Response at 9-10. Given these differences, Loyd asserts, the Plaintiffs' copyright "is not related, in any manner, to the videos sold by Defendants." Loyd's Response at 9-10.

Turning to the Plaintiffs' claim for Violation of Common Law Right of Publicity, Loyd does not repeat the line of argument that she advanced in her MSJ, where she sought summary judgment on this claim based on E. Warren and L. Warren's purported grant of permission to Loyd to use their names and likenesses. See Loyd's MSJ at 17. In Loyd's Response, she fleshes out her argument that the Plaintiffs are time-barred from bringing this claim. See Loyd's MSJ at 18; Loyd's Response at 11-16. In Loyd's Response, she traces her claim of rights not to the Warrens directly but indirectly from a person she identifies as "Ali Mazuren." Loyd's MSJ at 18. Loyd contends that Mazuren received rights from E. Warren and L. Warren "sometime before 2000." Loyd's Response at 2. Loyd further asserts that, in 2009, after E. Warren's death, L. Warren and a representative of E. Warren's estate reaffirmed to Mazuren that he possessed these rights, see Loyd's Response at 11-16, and that, "sometime in 2017," L. Warren affirmed to Loyd that Mazuren owned these rights and that Loyd purchased these rights in good faith and for value, see Loyd's MSJ at 15. She asserts that the Plaintiffs' claims are subject to Connecticut's six-year statute-of-limitation's period, which began to run in 2009. In support of these contentions, Loyd attaches and excerpts screenshots of messages that she asserts were exchanged between a YouTube

user whom she identifies as Mazuren and a person who appears to identify himself as Harrison Smith, an associate of the Warrens.  Loyd's Response at 11-12.  Specifically, Loyd asserts that the messages establish that L. Warren and T. Spera had notice in 2009 of the <u>Seekers of the Supernatural</u> videos being posted on YouTube and the seekersofthesupernatural.com domain name, and they ratified Mazuren's use and Loyd's subsequent purchase of this business.  <u>See</u> Loyd's Response at 11-16.

Loyd also makes arguments in opposition to the Plaintiffs' claim for Count VIII: Common Law Trademark Infringement.  <u>See</u> Loyd's Response at 15-18.  The Plaintiffs in fact move for summary judgment on a different trademark infringement claim, Count I for Unfair Competition under the Lanham Act, 15 U.S.C. § 1114.  <u>See</u> Plaintiffs' Reply at 11.  In addition to her lack of standing argument, some of Loyd's arguments regarding common-law trademark infringement fairly are read to apply the Plaintiffs' statutory claim.  First, Loyd contends that the Plaintiffs cannot prove that they are the owners of a valid trademark, citing to the DeRosa-Grund disputes and the absence of a trademark being listed in L. Warren's Probate Inventory.  <u>See</u> Loyd's Response at 16-17.  Next, she contends that the "Defendants have a Trademark whose 'First Use' date precedes [the] Plaintiffs['] 'First Use' date, if they have one."  Loyd's Response at 17.

Finally, Loyd asserts that there "is a genuine question of standing in the New Mexico Court."  Loyd's Response at 17.  In support of this contention, Loyd asserts that (i) the "Plaintiffs Judy and Tony Spera claim they did not file this lawsuit, never spoke to the attorneys and they are not paying for this lawsuit"; (ii) the Speras are "domicile[d] in Connecticut and ha[ve] never lived in New Mexico"; (iii) "Defendant Bea Loyd does not live and has never visited the state of New Mexico"; and (iv) the four Corporate Defendants "were all formed in 2004 to 2005.  Lorraine did not signed [sic] the first agreement until late 2009.  These companies have nothing to do with this

case.  Defendants believe these companies are listed on this lawsuit to give Plaintiffs standing in

the New Mexico court."  Loyd's Response at 17-18.

       **11.**      <u>**The Plaintiffs' Reply in Support of their MSJ**</u>.

On September 10, 2021, the Plaintiffs filed a Reply in support of their motion for partial

summary judgment.  <u>See</u> Plaintiffs' Reply at 1-11.  The Plaintiffs contend:

> Rather than address Plaintiffs' motion for summary judgment head-on, Ms. Loyd's
> response is filled with wild and unsupported accusations of an alleged scheme by
> Plaintiffs to commit fraud on the Court and a series of unsupported, confusing, and
> legally irrelevant arguments based on inadmissible evidence.  Simply put, Ms. Loyd
> has failed to identify any genuine issue of material fact underlying Plaintiffs' claims
> or provide any basis for avoiding entry of partial summary judgment against her.

Plaintiffs' Reply at 2.  As a "threshold matter," the Plaintiffs argue that, under D.N.M.LR-Civ.

56.1(b), because Loyd "did not identify which, if any, material facts she is disputing nor did she

cite to portions of the record on which she relies," the Plaintiffs' statement of facts contained in

the Plaintiffs' MSJ is "'deemed undisputed.'"  Plaintiffs' Reply at 1-3 (quoting D.N.M.LR-Civ.

56.1(b)).  Citing as authority <u>Ross v. Balderas</u>, No. 16-CV-01121 PJK/SMV, 2017 WL 2972726,

at *1 (D.N.M. Mar. 16, 2017)(Kelly, J.), the Plaintiffs contend that this provision of D.N.M.LR-

Civ. 56.1(b) applies with equal force to pro se parties.  Plaintiffs' Reply at 2.  Furthermore, the

Plaintiffs argue that Loyd is more adept than most pro se litigants, because she "is a trained

paralegal and she has demonstrated at least a rudimentary ability to conduct research and draft

pleadings."  Plaintiffs' Reply at 2-3.

Next, the Plaintiffs argue that Loyd's statement of relevant facts is inadmissible and

irrelevant.  <u>See</u> Plaintiffs' Reply at 3-5.  The Plaintiffs contend that "the Court should not consider"

the factual allegations in Loyd's Response, because she did not "letter each such fact and cite to

the portions of the record upon which [she] relies."  Plaintiffs' Reply at 3.  The Plaintiffs cite as

authority for their contention D.N.M.LR-Civ 56.1 and "Fed. R. Civ. Proc. 56(c)(1) ('A party

asserting [ ] a fact . . . must support the assertion by citing to particular parts of materials in the record . . . .').”  Plaintiffs' Reply at 3 (alterations in Plaintiffs' Reply).  Turning to the substance of Loyd's asserted facts, the Plaintiffs argue that Loyd's contentions about the DeRosa-Grund disputes are “not relevant to this lawsuit,” because the DeRosa-Grund disputes do not relate to the specific Warren IP at issue in this case and, moreover, these Disputes were resolved in New Line's favor.  Plaintiffs' Reply at 3-5.  Regarding Loyd's allegations that the Warrens and the Plaintiffs have a “'Fraudulent Modus Operandi,'” Plaintiffs' Reply at 5 (quoting Loyd's Response at 5-8), the Plaintiffs argue that this allegation is inadmissible character evidence under rule 404(b) of the Federal Rules of Evidence, Plaintiffs' Reply at 5.  See Fed. R. Evid. 404(b) (“Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.”).  Citing <u>Chavez v. City of Albuquerque</u>, 402 F.3d 1039, 1046 (10th Cir. 2005), they also argue that modus operandi evidence can only be used where there is an issue of mistaken identity, which is not the case here. <u>See</u> Plaintiffs' Reply at 5.

The Plaintiffs then turn to the three claims on which they seek Summary Judgment: Trademark Infringement, Copyright Infringement, and Violation of the Right of Publicity.  <u>See</u> Plaintiffs' Reply at 5-12.  On each of these claims, the Plaintiffs assert that, because Loyd does not comply with D.N.M.LR-Civ. 56.1(b), the Plaintiffs' facts are undisputed.  <u>See</u> Plaintiffs' Reply at 5-6; <u>id.</u> at 6; <u>id.</u> at 7.  The Plaintiffs first argue in further support of summary judgement on their trademark claim.  <u>See</u> Plaintiffs' Reply at 5-6.  The Plaintiffs argue that their undisputed facts establish “both elements of their trademark infringement claim: (i) the Plaintiffs own the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks; and (ii) Ms. Loyd's use of the marks is likely to cause confusion.”  Plaintiffs' Reply at 5 (citing to Plaintiffs'

MSJ at 14-19).  Turning to the arguments in Loyd's Response, the Plaintiffs note:

> Ms. Loyd did not oppose Plaintiffs' Motion for Summary Judgment with respect to Count I for federal unfair competition.  However, Ms. Loyd's response includes arguments on Count VIII for common law trademark infringement, even though Plaintiffs did not move for summary judgment that count.  Ms. Loyd's failure to respond to summary judgment on Count I operates as waiver.  Nevertheless, Plaintiffs address her arguments in response to Count VIII as if they were directed to Count I.

Plaintiffs' Reply at 5 n.2.  The Plaintiffs identify two arguments in Loyd's common-law trademark infringement section, but contend that they are "irrelevant arguments based on inadmissible evidence, which is not sufficient to avoid summary judgement."  Plaintiffs' Reply at 6.  First, the Plaintiffs reemphasize that the DeRosa-Grund Disputes, contrary to Loyd's contentions, do not deprive the Plaintiffs of standing.  See Plaintiffs' Reply at 6; Loyd's Response at 16.  Second, the Plaintiffs address Loyd's argument "that she used the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks before Plaintiffs."  Plaintiffs' Reply at 6 (citing Loyd's Response at 17).  The Plaintiffs counter that "it is incredible that Ms. Loyd is claiming that she used the Warrens' names and television series title *before the Warrens themselves*."  Plaintiffs' Response at 6 (emphasis in original).  The Plaintiffs argue that they "submitted undisputed evidence that Ed and Lorraine Warren had been using these marks since the 1970s," and contend that Loyd "offers no evidence" to support her claim of prior use.  Plaintiffs' Response at 6.

The Plaintiffs next address Loyd's arguments regarding their Copyright Infringement claim.  See Plaintiffs' Reply at 6-10.  The Plaintiffs maintain that they have evinced facts "supporting both elements of their copyright infringement: they own valid copyrights in the Seekers Series and Ms. Loyd infringed their copyrights."  Plaintiffs' Reply at 6 (citing Plaintiffs' MSJ at 21-23).  Again, the Plaintiffs argue that Loyd's noncompliance with D.N.M.LR-Civ. 56.1(b) leaves their version of the facts "undisputed."  Plaintiffs' Reply at 6.  The Plaintiffs then

address Loyd's opposition to their motion.  See Plaintiffs' Reply at 7-10.  Regarding Loyd's

argument that the Plaintiffs' copyright claim is time-barred by a three-year statute of limitations,

see Loyd's Response at 9, the Plaintiffs contend that "Loyd's argument is wrong for several

fundamental reasons," Plaintiffs' Reply at 7.  The Plaintiffs argue that (i) the statute of limitations

is an affirmative defense and, thus, Loyd bears the burden of proof, see Plaintiffs' Reply at 7 (citing

Koch v. Shell Oil Co., 52 F.3d 878, 880 (10th Cir. 1995)); and (ii), because "Loyd did not provide

any citation to the record to support her statute of limitations defense," the Court should deny

Loyd's defense, Plaintiffs' Reply at 7.  The Plaintiffs then respond to the arguments Loyd proffers

in support of her statute-of-limitations argument, that "cease and desist notices from Plaintiffs'

counsel in 2009 and 2014 demonstrate that the Plaintiffs knew of copyright infringement more

than three years prior to filing this lawsuit in 2020."  Plaintiffs' Reply at 7-8 (citing Loyd's

Response at 9).  Regarding the purported 2009 cease-and-desist notices, the Plaintiffs assert that

Loyd does not properly authenticate these online messages, "and thus [they] must be stricken."

Plaintiffs' Reply at 7 (citing Angell v. Shell Oil Co., No. 03-CV-318 JCH/RLP, 2006 WL 8444182,

at *3 (D.N.M. June 5, 2006)(Herrera, J.)).  Next, the Plaintiffs assert that these 2009 and 2014

messages were not directed towards Loyd, who asserts that she acquired the rights years

afterwards.  Plaintiffs' Reply at 7.  "It is legally impossible for Plaintiffs' infringement claims

against Ms. Loyd to be time-barred based on prior infringement by other third parties and *before*

Ms. Loyd allegedly began the infringing conduct."  Plaintiffs Reply at 7 (emphasis in original).

> Third and most importantly, although the Copyright Act has a three-year statute of limitations, 17 U.S.C. § 507, even if some acts of infringement occurred outside the statute of limitations, an action may still be brought for all acts that occurred within the three years preceding the filing of the suit.

Plaintiffs' Reply at 7-8 (citing Diversey v. Schmidly, 738 F.3d 1196, 1201 (10th Cir. 2013); In re

Indep. Servs. Org. Antitrust Litig., 964 F. Supp. 1469, 1478 (D. Kan. 1997)(O'Connor, J.)).

Accordingly, the Plaintiffs argue that, even if their copyright infringement claim first accrued outside more than three years before they filed this lawsuit in 2020, Loyd would still be liable for infringement she committed in the three years before the Plaintiffs filed suit.  See Plaintiffs' Reply at 8.

The Plaintiffs then contest Loyd's next argument that Loyd's Copyright Registration legitimates her selling copies of the Seekers of the Supernatural Series, and that differences between Loyd's Copyright Registration and the Spera Copyright Registration refute the Plaintiffs' infringement claim.  See Plaintiffs' Reply at 8-10; Loyd's Response at 9-10.  The Plaintiffs characterize Loyd's argument as "confusing and irrelevant," and instead frame the legal issue as "whether Ms. Loyd is selling any episodes of the Seekers Series covered by the Plaintiffs' Registration and the answer is indisputably yes."  Plaintiffs' Reply at 8.  The Plaintiffs draw the Court's attention to Loyd's admissions that she sold copies of all of the episodes of the Seekers Series and that the Plaintiffs' registration covered many of the episodes.  See Plaintiffs' Reply at 8-9.  The Plaintiffs clarify that the titles used for Loyd's copyright registration for the Seekers of the Supernatural episodes differ from the titles the Plaintiffs used for the same works.  See Plaintiffs' Reply at 8-9 n.5.  Whatever the titles used, the Plaintiffs maintain that Loyd's admissions indicate that she has infringed the Plaintiffs' copyright.  See Plaintiffs' Reply at 9. Citing ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc., No. CV 16-54 (EGS)(DAR), 2020 WL 1905132, at *17 (D.D.C. April 17, 2020)(Sullivan, J.), and Woods v. Universal City Studios, Inc., 920 F. Supp. 62, 64 (S.D.N.Y. 1996)(Cedarbaum, J.), the Plaintiffs assert that, if any work in a collective work is infringed, the holder of the copyright for the collective work can bring an action for infringement.  See Plaintiffs' Reply at 9.  The Plaintiffs target Loyd's argument that her having registered a copyright for the Seekers Series provides a

"safe harbor" from liability for copyright infringement.  Plaintiffs' Reply at 10.  The Plaintiffs maintain that Loyd's arguments are faulty as a matter of law, because "Loyd has no valid rights in any copyrights in the Seekers Series as a matter of law, because she has not produced any writing that shows a chain of title from the undisputed authors of the Seekers Series (the Warrens and Tony Spera) to Ms. Loyd."  Plaintiffs' Reply at 10.  The Plaintiffs contend the Loyd Registration is irrelevant, because a copyright is created instantaneously with the creation of a work, and not at the moment of registration, and emphasize that a copyright registration that relies on false statements cannot be used to block the registrant from liability for copyright infringement.  See Plaintiffs' Reply at 10.

The Plaintiffs conclude their Reply with further arguments on their right-of-publicity claim.  See Plaintiffs' Reply at 10-12.  The first deficiency that they identify in Loyd's arguments on the right-of-publicity claim is her lack of citations to the record, which the Plaintiffs contend serves as independent grounds for the Court to reject her arguments.  See Plaintiffs' Reply at 10.  Next, the Plaintiffs turn to Loyd's presentation of the facts.  See Plaintiffs' Reply at 11.  The Plaintiffs emphasize that Loyd does not dispute that J. Spera owns the Warrens' rights of publicity, but instead avows that she received permission to use them.  See Plaintiffs' Reply at 11.  The Plaintiffs characterize Loyd's contention that she has permission to use the Warrens' rights of publicity as meritless, because: (i) any permission Loyd received from E. Warren was granted in 2003 or 2004 at the latest; and (ii) the only permission Loyd remembered receiving was to assist in getting the Seeker Series on television in New York.  See Plaintiffs' Reply at 11.  The Plaintiffs summarized:

> There is no evidence that Ed Warren gave Ms. Loyd permission to exploit the Warrens' name and likeness to sell copies of the Seekers Series in the early 2000s (when they allegedly last spoke) or that such permission would last indefinitely to 2016 or 2017 and later when Ms. Loyd apparently began selling copies of the

Seekers Series.

See Plaintiffs' Reply at 11.  Regarding Loyd's allegations that Smith and L. Warren provided permission to Loyd to use the Warrens' rights of publicity, the Plaintiffs urged the court to strike the online messages Loyd submitted as evidence on the grounds that they are unauthenticated and inadmissible hearsay.  See Plaintiffs' Reply at 11.  Finally, the Plaintiffs characterize Loyd's contentions that she did not receive commercial advantage and that the Plaintiffs did not suffer injury as a result of Loyd's actions in connection with the Warrens' rights of publicity as conclusory and incorrect.  See Plaintiffs' Reply at 11.

### 12.    The Plaintiffs' Response in Opposition to Loyd's MSJ.

On September 13, 2021, the Plaintiffs filed their opposition to Loyd's MSJ.  See Plaintiffs' Response at 1-24.  The Plaintiffs' Response first discusses the deficiencies in Loyd's MSJ as a whole.  See Plaintiffs' Response at 1-3.  The Plaintiffs argue that Loyd's MSJ does not comply with D.N.M.LR-Civ 56.1(b)'s requirements because its Statement of Relevant Facts (i) is composed of facts about the DeRosa-Grund dispute that are irrelevant to this case and (ii) neglects to number the facts or cite to the record with the specificity rule 56 requires.  See Plaintiffs' Response at 1-2.  The Plaintiffs maintain that these two deficiencies are sufficient grounds, alone, to deny Loyd's MSJ.  See Plaintiffs' Response at 2.  The Plaintiffs cite Angell v. Shell Oil Co., No. 03-CV-318 JCH/RLP, 2006 WL 8444182, at *3 (D.N.M. June 5, 2006)(Herrera, J.), as support for their contention that Loyd's submission of exhibits without authenticating declarations or affidavits makes her evidence inadmissible, and presents another basis for denying Loyd's MSJ. See Plaintiffs' Response at 2-3.

The Plaintiffs identify the material facts in Loyd's MSJ which they assert are disputed, as D.N.M.LR-Civ 56.1(b) contemplates.  See Plaintiffs' Response at 3-5.  Among other topics, the

facts in contention relate to: (i) whether the Warren IP was at issue in the DeRosa-Grund dispute; (ii) whether a cease-and-desist letter Mr. Barkin, the Warren's attorney, sent in 2014 indicates that the Plaintiffs had knowledge of Loyd's use of the Warren IP; (iii) whether the Warrens provided permission to Loyd to assist them in getting publicity and whether the Loyd-B. Warren interview is relevant or admissible; (iv) whether individuals connected to the Warrens, including T. Spera and Mr. Smith, sent the YouTube Messages to the Defendants, and whether the YouTube Messages indicate that the Defendants acquired the rights to Seekers of the Supernatural; (v) whether J. Spera and T. Spera filed a trademark application for the ED AND LORRAINE WARREN mark; (vi) whether one of Loyd's facts that the Plaintiffs characterize as "unintelligible" is relevant or submitted with sufficient citation to the record; and (vii) whether the Warrens sold their rights to the Warren IP and, therefore, whether the Plaintiffs have standing in this case.  Plaintiffs' Response at 3-5.

The Plaintiffs submit a statement of additional facts they assert are material to the resolution of Loyd's MSJ, each relating to the DeRosa-Grund Disputes.  See Plaintiffs' Response at 5-6.  Specifically, the Plaintiffs submit (i) that the DeRosa-Grund Disputes did not involve claims about the Warren IP and (ii) that the DeRosa-Grund disputes resulted in the holding that New Line owns any rights DeRosa-Grund acquired from the Warrens, a fact which the Plaintiffs indicate Loyd "appears to acknowledge . . . in her motion."  Plaintiffs' Response at 5-6.

In addition, the Plaintiffs present specific arguments why the Court should deny summary judgment on all ten counts on which Loyd moves.  See Plaintiffs' Response at 6-22.  On Count I, for unfair competition under the Lanham Act, the Plaintiffs dispute Loyd's argument that the Plaintiffs lack standing.  See Plaintiffs' Response at 6-7.  The Plaintiffs assert that, ignoring rule 56's requirements, Loyd submits no evidence in support of her contention that L. Warren sold the

Warren IP to DeRosa-Grund, and, in any event, any intellectual property rights the Warrens might have transferred to DeRosa-Grund are now the property of New Line, which the Plaintiffs assert Loyd concedes.  See Plaintiffs' Response at 6-7.  The Plaintiffs also dispute Loyd's argument that a statute of limitations and laches bar the Plaintiffs' Lanham Act claim.  See Plaintiffs' Response at 7.   The Plaintiffs cite Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 678 n.15 (2014)(Ginsburg, J.), to support the assertion that no statute of limitations governs the Lanham Act.  See Plaintiffs' Response at 7.  The Plaintiffs maintain that Loyd's argument that laches bars the unfair competition claim is conclusory, finds no support in the record, and therefore fails to meet the requirements of rule 56.  See Plaintiffs' Response at 7.  The Plaintiffs dispute Loyd's contention that L. Warren gave her permission to use the Warren IP on the grounds that Loyd's submitted evidence for that fact is unauthenticated and inadmissible hearsay.  See Plaintiffs' Response at 7.  Next, the Plaintiffs contest Loyd's argument that the Defendants have been using the Warren IP since 2005 without confusion, an assertion for which the Plaintiffs argue that Loyd relies on unauthenticated, inadmissible hearsay in the form of screenshots of eBay.com accounts with customer reviews.  See Plaintiffs' Response at 7-8.  In any event, the Plaintiffs contend, the customer reviews are irrelevant, because they do not identify the seller of the Warren products, i.e., whether Loyd or someone else, and therefore cannot be used to determine whether there was confusion in connection with Loyd's use of the Warren IP.  See Plaintiffs' Response at 8.  The Plaintiffs criticize Loyd's use of conclusory arguments that the Plaintiffs lack sufficient evidence to prevail on their unfair competition claim, and point the Court to Aicher v. Access Corr., Civ. No. 2:15-00552 JB/SCY, 2017 WL 8944040, at *7 (D.N.M. August 28, 2017)(Yarbrough, M.J.), to indicate Loyd's proof is insufficient under rule 56.  See Plaintiffs' Response at 8-9.  The Plaintiffs reiterated their theory regarding the chain of title for the ED AND LORRAINE

WARREN mark.  See Plaintiffs' Response at 9.  The Plaintiffs assert that they are under no duty to prove that the Plaintiffs sell the same products as Loyd, because they are proceeding on a theory of false affiliation and association.  See Plaintiffs' Response at 9.  Finally, the Plaintiffs respond to Loyd's arguments regarding extraterritorial application of the Lanham Act, pointing to Hetronic Int'l, Inc. v. Hetronic Germany GmbH, 10 F.4th 1016 (10th Cir. 2021), cert. granted sub nom. Abitron Austria GmbH v. Hetronic Int'l Inc., 143 S. Ct. 398 (2022), to support their assertion that the Lanham Act is applicable to Loyd as an American citizen living in the United States, even when her offending conduct takes place abroad.  See Plaintiffs' Response at 10-11.

On Count II, for cancellation of federal trademark registration, the Plaintiffs first contest Loyd's argument that they lack standing on the same grounds on which they contested the standing argument for Count I.  See Plaintiffs' Response at 12.  The Plaintiffs also maintain that Loyd errs in her contention that cancellation of a trademark requires proof of harm; in any event, however, the Plaintiffs maintain that Loyd's registration has harmed the Plaintiffs.  See Plaintiffs' Response at 12.  The Plaintiffs (i) characterize Loyd's arguments regarding the existence of a consent form permitting Galactic Media to register the ED AND LORRAINE WARREN mark as conclusory and lacking support from admissible evidence and (ii) maintain that Loyd's assertion contradicts undisputed evidence that L. Warren never signed the consent form.  See Plaintiffs' Response at 13.  The Plaintiffs conclude that, because L. Warren never signed the consent form, Loyd cannot argue that laches bars the cancellation of federal trademark registration claim.  See Plaintiffs' Response at 13-14.  The Plaintiffs state that Loyd fails to provide admissible evidence to support her conclusory assertion that the Defendants made no false representations in submitting the application for the ED AND LORRAINE WARREN mark, and that, in any event, the record reflects multiple false representations that justify cancellation of any mark.  See Plaintiffs'

Response at 14.

On Counts III and IV, for cybersquatting under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c), the Plaintiffs present a unified argument to address both claims because of the similarity of the arguments that Loyd offers in response to them. See Plaintiffs' Response at 15. First, the Plaintiffs contend there is a genuine issue of material fact whether Loyd registered and operates the edandlorrainewarren.com and seekersofthesupernatural.com domain names. See Plaintiffs' Response at 15. Although Counts III and IV address registration and use of a wider range of domain names, the Plaintiffs offered arguments only regarding edandlorrainewarren.com and seekersofthesupernatural.com, because they are the two domain names for which Loyd submits evidence. See Plaintiffs' Response at 15 n.7. The Plaintiffs allege that, like the other exhibits Loyd provides, the exhibits submitted in support of Loyd's arguments about the cybersquatting claims are unauthenticated and inadmissible hearsay. See Plaintiffs' Response at 15. The Plaintiffs argue that, even if Loyd's exhibits are admissible, they do not prove the identify the domain names' owner, because "whoever purchased these domain names can input any information they want into the 'bill to' address to hide their identity." Plaintiffs' Response at 15. In addition, the Plaintiffs note that there are discrepancies in the registrant details listed in Loyd's exhibits, including: (i) in her GoDaddy.com Receipt (dated September 3, 2008), filed August 17, 2021 (Doc. 91-9)("GoDaddy.com Receipt"), the use of an address in "Tampania," Italy, a place that does not exist, with a Denver, Colorado telephone number; and (ii) in her DomainsPricedRight Receipt (dated March 19, 2006), filed August 17, 2021 (Doc. 91-11)("DomainsPricedRight.com Receipt"), the use of an address in Rezzato, Italy, with an incorrect post code, 25126. See Plaintiffs' Response at 15. The Plaintiffs also point to "credible evidence from independent sources . . . that Ms. Loyd purchased these domain names,

not some unknown companies in Italy." Plaintiffs' Response at 16.  First, the Plaintiffs submit the

fact that Loyd had copies of the receipts for the domain names as an indication that she purchased

or knew the purchaser of the domain names.  See Plaintiffs' Response at 16.  Second, the Plaintiffs

point to the fact that, after serving a third-party subpoena for which they received a response dated

April 20, 2021, they learned that the registrant of the domain names used a New Orleans,

Louisiana, IP address that matches the one Loyd uses in her USPTO filings.  See Plaintiffs'

Response at 16.  Further, the Plaintiffs indicate that the domain name registrant uses the email

address cohengoldbergandsmithllc@gmail.com -- the same email address associated with the other

domain names associated with Loyd, i.e., bealoyd.com, bumblebea.com, bea-loyd.com, and

cligo.com.  See Plaintiffs' Response at 16.  Finally, on both factual and legal grounds, the Plaintiffs

dispute Loyd's contention that her alleged conduct cannot constitute cybersquatting.  See

Plaintiffs' Response at 17-18.  Once again, the Plaintiffs object to Loyd's use of unauthenticated

and inadmissible hearsay, this time in the form of Loyd's Photograph of a Book, filed August 17,

2021 (Doc. 91-10)("Book Photo").  See Plaintiffs' Response at 17.  In any event, the Plaintiffs

maintain that the Book Photo indicates that the domain names are in use.  See Plaintiffs' Response

at 17.  The Plaintiffs invoke Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 680 (9th Cir. 2005),

to assert that registration or use of a domain name falls within the ambit of the Anticybersquatting

Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A).  See Plaintiffs' Response at 17-18.

On Count V, for copyright infringement, the Plaintiffs contend that Loyd's arguments rely

on conclusory statements that do not meet rule 56's requirements.  See Plaintiffs' Response at 18.

The Plaintiffs proceed to summarize their copyright claim: (i) the Plaintiffs submit an authenticated

version of a copyright registration with the Plaintiffs' MSJ; and (ii) "Loyd outright admits she is

selling copies of episodes of the Seekers Series in her discovery responses."  Plaintiffs' Response

at 18.  Accordingly, the Plaintiffs argue, Loyd's "copying was substantial and the works were substantially similar."  Plaintiffs' Response at 18.  Next, the Plaintiffs address Loyd's argument that a three-year statute of limitations bars the Plaintiffs' copyright claim, because the Plaintiffs sent a cease-and-desist letter in 2014, which Loyd presents as proof of their knowledge of the alleged infringement.  See Plaintiffs' Response at 18-19.  The Plaintiffs state that, because Loyd was not the recipient of the 2014 cease-and-desist letter, and because Loyd did not commence her infringement until after her purported acquisition of the rights in 2016 or 2017, "it is legally impossible for Plaintiffs' infringement claims against Ms. Loyd to be time-barred based on prior infringement by other third parties and before Ms. Loyd allegedly began the infringing conduct." Plaintiffs' Response at 19.  Further, invoking Diversey v. Schmidly, 738 F.3d at 1201, and In re Indep. Servs. Org. Antitrust Litig., 964 F. Supp. 1469, 1478 (D. Kan. 1997)(O'Connor, J), the Plaintiffs assert that, "even if some acts of infringement occurred outside the statute of limitations, an action may be brought for all acts that occurred within the three years preceding the filing of the suit."  Plaintiffs' Response at 19.  Because Loyd admits to selling copies of the Seekers Series in the three years preceding this case, the Plaintiffs argue, the three-year statute of limitations would not protect Loyd from liability under the Copyright Act, even if the Plaintiffs had known of her infringement before the statute of limitations.  See Plaintiffs' Response at 19.  Finally, the Plaintiffs counter Loyd's argument that the Plaintiffs lack standing for their copyright claim, because of the DeRosa-Grund Disputes, by emphasizing that the Seekers Series and its copyright were not at issue in the De-Rosa Grund Disputes, and, in any event, the DeRosa-Grund Disputes resulted in New Line owning any rights to Warren IP which DeRosa-Grund might have acquired. See Plaintiffs' Response at 19.

On Count VI, for cancellation of copyright registrations, the Plaintiffs urge the Court to

deny Loyd summary judgment, because her argument that only the U.S. Copyright Office -- not the Court -- has the power to cancel a copyright registration, is unavailing.  See Plaintiffs' Response at 20.  The Plaintiffs emphasize that the Court can order Loyd to cancel the registrations that she maintains, including for the Seekers Series copyrights and copyright registrations the Plaintiffs are seeking to cancel.  See Plaintiffs' Response at 20.

On Count VII, for violation of the right of publicity, the Plaintiffs attack Loyd's arguments on factual grounds.  See Plaintiffs' Response at 20-21.  Specifically, the Plaintiffs dispute Loyd's assertion that the Warrens gave her permission to use their right of publicity.  See Plaintiffs' Response at 20.  The Plaintiffs maintain that, contrary to Loyd's assertion that E. Warren gave her permission to use his name and likeness in 2003 or in 2004, the record indicates that "Loyd could only recall that Ed Warren asked her to help get the Seekers Series air time on television in New York" and that there is "no evidence that Ed Warren gave Ms. Loyd permission to exploit the Warrens' name and likeness to sell copies of the Seekers Series in the early 2000s (when they allegedly last spoke) or that such permission would last indefinitely to 2016 or 2017 and later when Ms. Loyd apparently began selling copies of the Seekers Series."  Plaintiffs' Response at 20-21.  Further, the Plaintiffs contest Loyd's assertion that the Warrens gave her "exclusive interviews to publish for purposes of publicity" on the basis that Loyd does not provide any support for this allegation sufficient to satisfy rule 56.  Plaintiffs' Response at 21.  The Plaintiffs emphasize that they do not sue Loyd for selling copies of the interview which she discusses, but rather for selling materials related to the Seekers Series and Deliver Us From Evil, a book about the Warrens' case files.  See Plaintiffs' Response at 21.  The Plaintiffs attack Loyd's contention that DeRosa-Grund acquired the Warrens' rights of publicity as "nonsensical" and characterize Loyd's assertion that a statute of limitations bars the right of publicity claim as conclusory.  Plaintiffs' Response at 21

nn.9-10.

On Count VIII, for common-law trademark infringement, the Plaintiffs again dispute Loyd's assertion that DeRosa-Grund acquired the trademarks at issue in this case and reiterate that, even if he had, those trademarks would now belong to New Line as a result of the resolution of the DeRosa-Grund Disputes.  See Plaintiffs' Response at 21.  The Plaintiffs also maintain that Loyd's contention that her use of the trademarks predates the Plaintiffs' use is incorrect, because the Warrens had used the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks since the 1970s, and Loyd admits that her purported purchase of the marks did not occur until 2016-2017.  See Plaintiffs' Response at 21.

On Count IX, for common-law unfair competition, the Plaintiffs state that Loyd's arguments are "nothing more than barebones recitals of the element without supporting evidence or even explanation as to why the argument merits summary judgment," and that, therefore, Loyd fails to meet her burden at summary judgment under rule 56.  Plaintiffs' Response at 22.  The Plaintiffs also urge the Court to deny reject Loyd's repeated argument that venue in the District of New Mexico is improper and treat her request to transfer the case to Connecticut as moot, as the Court has already heard it.  See Plaintiffs' Response at 22.

On Count X, for interference with prospective economic advantage, the Plaintiffs indicate that Loyd's sole argument is one that reappears from her arguments on other claims, i.e., that DeRosa-Grund acquired the rights at issue and that, therefore, she is entitled to summary judgment. See Plaintiffs' Response at 22.  The Plaintiffs maintain that the DeRosa-Grund Disputes do not involve the Plaintiffs' interference of prospective economic advantage claim against Loyd and request that the Court deny Loyd summary judgment on that claim.  See Plaintiffs' Response at 22.

13.    __The November, 2021, Hearing__.

The Court held an omnibus hearing on November 10, 2021. See Clerk's Minutes at 1, filed November 10, 2021 (Doc 110). The Court noted that there were a "number of motions" before it and offered The Plaintiffs' the opportunity to begin with arguments on the summary judgment motions. Draft Transcript of Hearing at 3:1-12 (taken November 10, 2021)("November 10 Tr.")(Court, McCue).[87] The Plaintiffs distributed to the parties and the Court a slide deck presentation outlining their arguments. See November 10 Tr. at 4:2-6 (McCue); PowerPoint Presentation (dated November 11, 2021), filed November 11, 2021 (Doc. 110-1). The Plaintiffs first explained why they are moving for partial rather than full summary judgment: some of the Plaintiffs' claims are "more complicated," and moving for partial summary judgment on three of the claims "will substantially narrow the issues for trial and perhaps promote settlement." November 10 Tr. at 4:10-18. The Plaintiffs, noting that Loyd had not disputed the statement of facts in Plaintiffs' MSJ, began with a factual background, explaining that the case concerns intellectual property rights relating to the paranormal investigators E. Warren and L. Warren, who "investigated thousands of cases" during their decades-long careers before E. Warren died in 2006 and L. Warren died in 2019. November 10 Tr. at 4:19-5:7 (McCue). The Plaintiffs next introduced the other two principal members of the "cast of characters on the plaintiff's side": the Warrens' "only child, J[.] Spera," and her husband, T. Spera, who had "worked with the Warrens' business for several decades, since the 1980s." November 10 Tr. at 5:7-12 (McCue). The Plaintiffs asserted that the Warrens were known during their careers as the "Seekers of the Supernatural," supporting this point with images as part of the slideshow of a 1973 magazine cover and a 1983 poster where

---

[87]The Court's citations to the hearing's transcript refers to the court reporter's original, unedited versions. Any final transcript may contain slightly different page and/or line numbers.

the Warrens are associated with that phrase, and referencing the J. Spera Decl. and additional materials filed as exhibits demonstrating the Warrens' use of the moniker. November 10 Tr. at 5:13-25 (McCue). The Plaintiffs next demonstrated that the Warrens and T. Spera "created a television series in the 1990s, known as 'The Seekers of the Supernatural' series. The series was a collection of interviews with the [Warrens] conducted by their son-in-law, Tony Spera." November 10 Tr. at 6:1-5 (McCue). The Plaintiffs displayed a still image from the first episode, depicting T. Spera sitting across from the Warrens, and noted that they had lodged a CD containing additional full episodes with the Court. See November 10 Tr. at 6:5-10 (McCue). The Plaintiffs then discussed some of the films have others created about the Warrens' investigations: The Amityville Horror series beginning in the 1970s, and, following the 2011 Option Contract between L. Warren and New Line in which L. Warren "licensed the Warrens' life stories, and granted New Line exclusive rights to use the Ed and Lorraine Warren name," the first installment of The Conjuring movie series that Warner Brothers and New Line produced for release in 2013. November 10 Tr. at 6:11-7:3 (McCue).

The Plaintiffs then moved to the "critical issue[]" of "who owns the rights in the Warrens' names, Ed and Lorraine Warren, and the Seekers of the Supernatural name." November 10 Tr. at 7:4-7 (McCue). The Plaintiffs sketched out their history of the chain of title: (i) the Warrens had owned their names and the Seekers of the Supernatural name during their lives; (ii) When E. Warren died without a will in 2006, L. Warren "succeeded to his rights" and became "the sole owner of those names"; (iii) in the 2011 Option Contract, L. Warren granted exclusive rights to New Line, but "maintained ownership"; and (iv) when L. Warren died in 2019, J. Spera was her sole heir. November 10 Tr. at 7:4-17 (McCue).

The Plaintiffs then discussed their allegations about Loyd, identified as "a fan of the

Warrens," who "claims that she has acquired intellectual property rights relating to the Warrens,"

and has sought to trademark and copyright registrations for these claimed rights.  November 10

Tr. at 7:18-8:5 (McCue).  Out of the Plaintiffs' "various intellectual property claims against Ms.

Loyd," the Plaintiffs summarized the three counts they sought summary judgement on:

> [Count 1, F]alse endorsement under the Lanham Act.  And the nature of that violation is Ms. Loyd's use of the Ed and Lorraine Warren and Seekers of the Supernatural names to sell products.
>
> Count 4 for copyright infringement, based on Ms. Loyd's reproduction and distribution of copies of the Seekers of the Supernatural television series.
>
> And then Count 7, violation of the right of publicity under Connecticut law. Ms. Loyd used the Warrens names and likeness in commerce.

November 10 Tr. at 8:8-17 (McCue).

The Plaintiffs then turned to the "47 undisputed facts," that they laid out in their MSJ brief,

arguing that Loyd "did not specifically controvert any of those facts.  Under [D.N.M.LR-Civ.]

56.1(b), the facts are deemed undisputed since they were not specifically controverted."

November 10 Tr. at 8:18-23 (McCue).  Plaintiffs cited as support the Court's ruling in Ross v.

Balderas, 2017 WL 2972726, at *1, where a district court applied D.N.M.LR-Civ 56.1(b) to pro se

litigants.  See November 10 Tr. at 8:24-9:1 (McCue).  The Court responded that "the reality is that

Ms. Loyd is contesting almost all your facts; right?  I mean, the reality is that she's not -- whether

she did it right, or not, she doesn't agree with almost any of your facts."  November 10 Tr. at 9:7-

11 (Court).  The Court noted further, "this set of facts on both sides is very difficult to work with,

because the Plaintiffs" included not just events which they assert to have actually occurred, but

also some of Loyd's claims and Plaintiffs' arguments against those claims.  November 10 Tr. at

9:14-10:20 (Court, McCue).  The Court observed that, in light of Loyd's failure to dispute properly

the Plaintiffs' facts, "it's going to be really hard for the Court to figure out what the undisputed

facts are, because nobody really did them the way that I think the rules contemplate."  November 10 Tr. at 10:13-20 (Court).  Plaintiffs sought to allay the Court's concerns whether Loyd truly failed to dispute the Plaintiffs' asserted facts by providing "clarifications" about each of the three MSJ claims.  November 10 Tr. at 11:2-14 (McCue, Court).

First, regarding the Lanham Act claim, Plaintiffs asserted that (i) "there is no dispute that Ed and Lorraine Warren own rights in their names in the 1970s, the 1980s, the 1990s, the 2000s"; (ii) the rights in the Ed and Lorraine Warren and Seekers of the Supernatural name went to L. Warren upon E. Warren's death, and then to J. Spera upon L. Warren's death; and (iii) Loyd's only factual assertion clouding that chain of title is that Lorraine conveyed certain rights to film producer DeRosa-Grund, which begat a "series of lawsuits" and left L. Warren without the relevant intellectual property rights at the time of her death.  November 10 Tr. at 11:15-13:19 (Court, McCue).  The Plaintiffs avowed that

> the DeRosa-Grund dispute did not involve use or ownership of the Ed and Lorraine Warren name or the Seekers of the Supernatural name.  That dispute involved The Conjuring name.  So Ms. Loyd's argument that DeRosa-Grund is relevant and disrupts the chain of title that we're relying on is completely false, demonstrably false.  She got it wrong.  Those lawsuits had nothing to do with the Ed and Lorraine Warren name or the Seekers of the Supernatural name.

November 10 Tr. at 13:20-14:4 (McCue).  The Court expressed concern that the "significant" factual issues might make it "difficult to resolve almost anything before trial."  November 10 Tr. at 14:17-22 (Court).  The Plaintiffs responded by conceding that, while there are "other claims" with "factual disputes," the Lanham Act claim does not have these problems. November 10 Tr. at 15:1-14 (McCue).

Turning to the copyright infringement claim, the Plaintiffs outlined the two elements: "that Plaintiffs own copyrights in the Seekers of the Supernatural television series, and that Ms. Loyd copied and distributed copies of those works."  November 10 Tr. at 15:15-20 (McCue).  On

the first element, the Plaintiffs stated that the Warrens and T. Spera created the television series,

and thereby "automatically acquired rights, copyrights in the Seekers of the Supernatural series at

the time it was created in the 1990s.  They later obtained a copyright registration for some of the

episodes of the show."  November 10 Tr. at 15:21-16:14 (McCue).  Citing Loyd's deposition

testimony and admissions, the Plaintiffs related that Loyd does not claim any intellectual property

rights stemming from any participation in creating the television series.  See November 10 Tr. at

16:3-6 (McCue).  Rather, the Plaintiffs diagrammed her chain of title as beginning with E. Warren,

who allegedly

> conveyed rights in the copyrights in the Seekers of the Supernatural series to
> unknown individuals in New York, who she cannot identify, who then, she claims,
> transferred the copyrights to unknown individuals, who then allegedly conveyed
> rights to someone by the name of Ali Mazuren.  And Ms. Loyd claims that she
> acquired the copyrights in the Seekers of the Supernatural series from Ali Mazuren.

November 10 Tr. at 16:23-17:10 (McCue).  The Plaintiffs argued that "Loyd has failed to produce

any written assignments required to establish that she owns copyrights in the Seekers of the

Supernatural.  And that's fatal to her argument as a matter of black letter law."  November 10 Tr.

at 17:11-15 (McCue).  The Court queried what authority established this requirement, to which

Plaintiffs replied

> Your Honor, it's 17 USC Section 204.  And I've quoted it directly in the
> slide.  And it is an absolute rule.  There are no exceptions.  If you don't have a
> written assignment of ownership of copyrighted works -- rights and copyrighted
> works, signed by the owner of the right, it's invalid.

November 10 Tr. at 17:24-18:4 (McCue).  The Court noted that Loyd had sworn she had a written

assignment that she was unable to currently produce, and asked the Plaintiffs how that should be

evaluated at the summary judgment stage.  See November 10 Tr. at 18:5-16 (Court).  The Plaintiffs

responded that, even if Loyd produced a written assignment from Mazuren, that would be legally

insufficient: "She still has to prove the chain of title from the original copyright owners.  She

hasn't."  November 10 Tr. at 18:17-19:8.  Sketching out Loyd's purported chain of title for the

Seekers of the Supernatural copyright, the Plaintiffs argue that Loyd is unable to document any of

the purported transfers in between the Warrens creation of the show in the 1990s and Loyd's

transaction with Mazuren in 2016 or 2017, and that this is "fatal" to her claim.  November 10 Tr.

at 18:17-19:9 (McCue).  The Plaintiffs emphasized that Loyd testified only about the existence of

a written assignment and that she did not provide any details about it.  See November 10 Tr. at

19:9-12 (McCue).  Further, the Plaintiffs maintained that Mazuren was a "fictitious person," that

Mazuren's existence or non-existence is an issue for trial, and that, to prove the existence of an

assignment, Loyd "has to have written transfers in every step of the chain . . . [and that] just

testifying that she has it for one step is not enough."  November 10 Tr. at 19:12-18 (McCue).

Concluding their arguments regarding the copyright infringement claim, the Plaintiffs emphasized

that Loyd "has no ability to meet the statutory requirement" and that the Court should enter

summary judgment in Plaintiffs' favor.  November 10 Tr. at 19:19-22 (McCue).

        Next, the Plaintiffs elaborated their arguments why the Court should grant them summary

judgment on their claim for violation of common-law right of publicity, i.e., Count VII, which they

asserted Connecticut State law governs, because the Warrens were Connecticut residents.  See

November 10 Tr. at 20:1-9 (McCue).  The Plaintiffs noted that, in most States, the right of publicity

survives death.  See November 10 Tr. at 20:10-11 (McCue).  The Plaintiffs cited a case from the

United States District Court for the Southern District of New York interpreting Connecticut law,

see Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. 175 (S.D.N.Y.

1994)(Preska, J.), to support the assertion that "Connecticut would recognize postmortem rights

of publicity."  November 10 Tr. at 20:11-15 (McCue).

        Turning to the facts underlying the right-of-publicity claim, the Plaintiffs discussed the

chain of title for the Warrens' rights of publicity.  See November 10 Tr. at 20:18-25 (McCue).  The Plaintiffs emphasized that "there is no dispute that Ed and Lorraine Warren owned the rights in their own names and likenesses."  November 10 Tr. at 20:18-20 (McCue).  The Plaintiffs proceeded to spell out the chain of title as follows: "Ed's rights[] would have passed to Lorraine when he died, and both of their rights would have passed on to Judy Spera when Lorraine died.  And Judy Spera is the beneficiary under a will for all of Lorraine Warren's assets except for a vehicle."  November 10 Tr. at 20:21-25 (McCue).

The Plaintiffs addressed what they characterized as Loyd's "only argument . . . in opposition to" their assertions regarding the chain of title for the Warrens' rights of publicity, i.e., the "claim[] that Ed Warren gave [Loyd] permission to use his name for commercial purposes in 2003 or 2004."  November 10 Tr. at 21:1-4 (McCue).  The Plaintiffs summarized the Loyd Depo. testimony about the permission that Loyd alleges E. Warren provided: "She said that Ed asked her to get the Seekers of the Supernatural Series on public TV in New York.  She did not testify that Ed Warren told her that she could reproduce and sell copies of the Seekers of the Supernatural series, as she's now doing 18 years later."  November 10 Tr. at 21:6-11 (McCue).  The Plaintiffs continued, assessing the Loyd Depo.: "Therefore, even by her own testimony she has not established . . . that she owns rights in the Ed and Lorraine Warren name or that Ed Warren gave her permission to make copies and sell them, as she is doing now 18 years later."  November 10 Tr. at 21:11-15 (McCue).

The Plaintiffs then asserted that, even if E. Warren gave Loyd permission, the permission would be in the form of a license that J. Spera, as owner of the Warren IP, would be free to revoke.  See November 10 Tr. at 21:16-21 (McCue).  Indeed, the Plaintiffs contend that J. Spera "did revoke[,] effectively, any permission granted to Ms. Loyd."  November 10 Tr. at 19-21 (McCue).

The Plaintiffs maintained that Loyd "is not contesting . . . that our facts are incorrect," but is instead arguing that E. Warren gave her the rights of publicity at issue in 2003 or 2004, which action she is using to "justify what she's doing now, which is copying and selling copies of the Seekers of the Supernatural series."  November 10 Tr. at 21:22-22:3 (McCue).  The Plaintiffs insisted that there are no disputed facts regarding the right-of-publicity claim and that, even if Loyd's allegations are taken as true, her contentions are "insufficient to create a genuine issue of material fact."  November 10 Tr. at 22:3-9 (McCue).  Although the Plaintiffs conceded that there are factual disputes in this case, they maintained that there are no factual disputes relating to the claims for which they seek summary judgment.  See November 10 Tr. at 22:12-17.

The Plaintiffs supplemented their argument by invoking three cases regarding the standard by which courts determine whether a genuine dispute of material fact exists for purposes of summary judgment: (i) Garrison v. Gambro, 428 F.3d 933 (10th Cir. 2005); (ii) Giuffre v. Marys Lake Lodge, LLC, Nos. 11-CV-00028-PAB-KLM, 12-cv-00377-PAB, 2012 WL 4478806 (D. Colo. September 28, 2012)(Brimmer, J.); and (iii) Costales v. Quantum Health Res., Inc., No. CIV. 97-0021 BB/LCS, 1998 WL 36030842 (D.N.M. April 17, 1998)(Black, J.).  See November 10 Tr. at 22:18-23:18 (McCue).  When discussing this case law, the Plaintiffs asserted that Loyd's "declarations are vague, conclusory, self-serving, uncorroborated memories of her alleged conversations with Lorraine Warren and others, and are the types of evidence that do not create a genuine issue of fact."  November 10 Tr. at 22:24-23:3 (McCue).  The Plaintiffs also stressed that Loyd "has not provided any documents of any kind that support any of her arguments."  November 10 Tr. at 23:20-22 (McCue).  The Plaintiffs drew attention to Loyd's not providing contact information for third parties whom she alleges have knowledge of the facts at issue, including, specifically, Mazuren.  See November 10 Tr. at 23:22-24:1 (McCue).  The Plaintiffs indicated that

they have been unsuccessful in locating Mazuren, despite having retained investigators to determine her whereabouts.  See November 10 Tr. at 24:2-3 (McCue).  Concluding their arguments, the Plaintiffs stated: "If the standard is someone can submit a declaration . . . disputing whatever they want without any level of detail, reliance on any documents, . . . or any evidence at all, . . . we believe[,] in the Tenth Circuit[,] that's insufficient to avoid summary judgment." November 10 Tr. at 24:5-10 (McCue).

Next, the Court permitted Loyd to make her arguments in response to the Plaintiffs' Motion for Partial Summary Judgment.  See November 10 Tr. at 24:16-23 (Court).  Loyd began by contending, regarding the copyrights, that "the statute of limitation has expired" and that the Plaintiffs "must bring their action within three years of discovery."  November 10 Tr. at 24:25-25:3 (Loyd).  Loyd also contended that she presents evidence that, in 2009, "Tony Spera, or the executor Harrison[,] contacted Ali [Mazuren], or somebody in association with Seekers of the Supernatural.  They were using the name Warrenology."  November 10 Tr. at 25:4-9 (Loyd).  Loyd's other allegations included: (i) that the Plaintiffs "have been giving me wrong information"; (ii) that "Warrenology is Tony Spera"; (iii) that "Lorraine Warren had a trust."  November 10 Tr. at. 25:11-18 (Loyd).

Loyd then proceeded to make allegations about the chain of title for the copyright for Seekers of the Supernatural.  See November 10 Tr. at 25:19-26:23 (Loyd).  First, Loyd alleged that the Plaintiffs contacted Mazuren in 2009 and "referred to the copyright for Seekers of the Supernatural," and that Mazuren "or the person running the website" responded: "We bought these rights from Ed Warren."  November 10 Tr. at 25:19-25 (Loyd).  Second, Loyd alleged: "There was an agreement made between the parties, so there is something in writing.  It comes from a messages [sic] over the YouTube website in the form of email.  So from 2009, up until 2020, everything was

okay.  Nobody disputed the . . . transfer from Ed Warren to some other party."  November 10 Tr. at 26:1-6 (Loyd).  Loyd contended that "there is a written trail where the Warrens, especially Tony Spera," permitted Mazuren to "sell products under Ed and Lorraine Warren and Seekers of the Supernatural."  November 10 Tr. at 26:13-18.  Third, Loyd alleged that, under the purported agreement, products were sold, and that she "bought an ongoing business" named "Seekers of the Supernatural, LLC," a name that Loyd stated she did not keep after allegedly purchasing the business.  November 10 Tr. at 26:9-12 (Loyd).  Finally, Loyd alleged the existence, "in 2004, 2005, 2006, and so on," of a page on eBay.com called "Ed and Lorraine Warren" on which Seekers of the Supernatural products were sold.  November 10 Tr. at 26:19-23 (Loyd).

Loyd accused the Plaintiffs of "not being truthful with the Court" and stated that her purported predecessor, and not she, sold the Warrens' products on eBay, with the Warrens' permission.  November 10 Tr. at 26:24-27:3 (Loyd).  Loyd alleged that L. Warren "knew everything" about the sales and "knew exactly who the person [was] . . . who was selling the Seekers of the Supernatural products."  November 10 Tr. at 27:3-9 (Loyd).  Specifically, as proof of L. Warren's knowledge, Loyd referenced a chain of messages involving Smith, whom she claims said: "I spoke to Lorraine Warren."  November 10 Tr. at 27:3-6 (Loyd).  Loyd indicated that she believes Smith "is still around" and "participated in previous lawsuits regarding this matter."  November 10 Tr. at 27:9-12 (Loyd).  Loyd also pointed to the existence of cease-and-desist letters that Mr. Barkin, the Warrens' attorney, allegedly sent to various people, including on November 5, 2014, and, in one instance, to someone named Cohen, as an indication that the Warrens "had complete knowledge of everything back in 2009, definitely 2014."  November 10 Tr. at 27:15-28:1 (Loyd).  Loyd also alleged the existence of additional messages "showing that Lorraine Warren and Tony and Harrison Smith also had conversations with other people,"

including one in which "someone is saying: . . . you're selling products without giving Lorraine Warren a commission."   November 10 Tr. at 28:1-7 (Loyd).   Loyd concluded her arguments regarding the copyright claims by asserting that a three-year statute of limitations had expired on the Plaintiffs' copyright claims.   See November 10 Tr. at 28:10-15 (Loyd).

Loyd began her arguments regarding the right-of-publicity claim by reiterating her assertion that "[t]here was specific knowledge that Ed Warren gave rights," and contended that Smith, whom Loyd alleged was executor of E. Warren's estate, gave permission to Mazuren or "whoever was selling products . . . to continue to sell the product," and that he "referred linking the Warrens' website to their website."   November 10 Tr. at 28:22-29:5 (Loyd).   Loyd proceeded to describe an interview she conducted with L. Warren during which she contended that L. Warren gave her permission to use her likeness and voice.   See November 10 Tr. at 29:10-18 (Loyd).   Loyd alleged that L. Warren promoted a Warren IP product that Loyd sold on Amazon.com and encouraged people to listen to the Loyd-L. Warren interview.   See November 10 Tr. at 29:18-25 (Loyd).   Loyd insisted that the Warren IP products appeared on Amazon.com as early as 2000 and on eBay.com as early as 2006, and that the Warrens, including T. Spera, were aware of that fact. See November 10 Tr. at 30:1-4 (Loyd).   Loyd maintained that nobody revoked the permission to use the Warren IP until after L. Warren's death.   See November 10 Tr. at 30:13-17 (Loyd).

Loyd proceeded to make her arguments in opposition to the Plaintiffs' common-law trademark infringement claim, although the Plaintiffs are not seeking summary judgment on that claim.   See November 10 Tr. at 31:8-22 (Loyd); id. at 39:10-14 (McCue).   In addition to the repeated assertion that the Plaintiffs were aware of websites selling Warren IP goods as early as 2009, Loyd's allegations include: (i) that the Plaintiffs "have not shown where they sold products anywhere"; (ii) that "the product was first sold in Spain"; and (iii) that "Seekers of the

Supernatural, the business, was located in Canary Islands, Spain." November 10 Tr. at 31:9-16 (Loyd). Loyd argued that the Warrens did not have an exclusive trademark to <u>Seekers of the Supernatural</u>, because individuals or entities in Spain "have their own common law trademark." November 10 Tr. at 31:18-32:4 (Loyd).

Next, Loyd addressed the question of documentation of ownership of Warren IP. <u>See</u> November 10 Tr. at 32:16-33:4 (Loyd). In this argument, Loyd alleged that "there is no documentation that Judy Spera or anybody else in the Spera family has ever sold products under Seekers of the Supernatural," but "Ali [Mazuren], the person I acquired my rights from, . . . they have documentation going back to 1998, where they have marketed that product." November 10 Tr. at 32:16-21 (Loyd). Further, Loyd alleged that the Plaintiffs have no documentation indicating their ownership of the Warren IP. <u>See</u> November 10 Tr. at 33:2-4 (Loyd).

At the conclusion of her arguments, in addition to asserting that the Plaintiffs are not entitled to summary judgment on their claims, Loyd listed a series of grievances directed at the Plaintiffs and urged the Court to reopen discovery and permit her to file a counterclaim. <u>See</u> November 10 Tr. at 33:5-34:18 (Loyd).

Following Loyd's arguments, the Court permitted the Plaintiffs to make additional statements in support of its Motion for Summary Judgment. <u>See</u> November 10 Tr. at 34:24-25 (Court). The Plaintiffs confirmed that, though Loyd has submitted exhibits in opposition to their Motion for Summary Judgment, she has not filed any declarations to support her exhibits. <u>See</u> November 10 Tr. at 35:6-13 (McCue). Accordingly, the Plaintiffs concluded that Loyd did not rely on any sworn testimony in opposing their Motion for Summary Judgment. <u>See</u> November 10 Tr. at 35:14-16 (McCue). The Plaintiffs indicated that they identified, on a document-by-document basis, why each of the documents Loyd submitted is inadmissible, is therefore

inappropriate for consideration, and do not defeat the Plaintiffs' MSJ.  See November 10 Tr. at
35:23-25 (McCue).

Next, the Plaintiffs addressed Loyd's allegation that there is evidence of a written transfer
of copyrights from Mazuren to Loyd.  See November 10 Tr. at 36:1-18 (McCue).  The Plaintiffs
directed the Court to Loyd's discovery responses, see Exhibit C to Plaintiffs' MSJ[88] at 7 (dated
February 12, 2021), filed August 6, 2021 (Doc. 81-11), in which Loyd states that she was "without
sufficient knowledge to affirmatively state that there was a written agreement relating to
acquisition of the rights at issue from Ali Mazuren."  November 10 Tr. at 36:3-8 (McCue).  In
summary, the Plaintiffs stated: "In addition to the fact that she cannot produce any written fact of
transfers in any of the chain of title, and has not said any of them exist, she cannot prevail in
establishing any chain of title for copyright infringement."  November 10 Tr. at 36:13-18 (McCue).

Next, the Plaintiffs addressed Loyd's argument that a three-year statute of limitations bars
their copyright claims.  See November 10 Tr. at 36:19-37:22 (McCue).  The Plaintiffs argued that
Loyd's evidence of the Plaintiffs' knowledge of copyright infringement, i.e., cease-and-desist
letters sent to individuals other than Loyd, is irrelevant for statute-of-limitations purposes, because
those communications are evidence of knowledge of other entities' infringement, and not of
Loyd's infringement.  See November 10 Tr. at 37:2-15 (McCue).  Accordingly, the Plaintiffs
maintained that, on the question of the statute of limitations for the copyright claims, Loyd's
argument is incorrect as a matter of law.  See November 10 Tr. at 37:10-11 (McCue).  Further, the
Plaintiffs directed the Court to Diversey v. Schmidly, 738 F.3d 1196 (10th Cir. 2013), to support
the proposition that "acts of infringement outside the statute of limitations may be brought for all

_____

[88]Because Loyd's discovery responses dated February 12, 2021 are untitled, they are
referenced as "Exhibit C to Plaintiffs' MSJ," i.e., the form in which the Plaintiffs filed them.

acts that occurred within the three years preceding the filing of the suit . . . ."  November 10 Tr. at 37:16-20 (McCue).

In relation to the right-of-publicity claim, the Plaintiffs disputed Loyd's assertions that: (i) Smith was the executor of E. Warren's estate; and (ii) Smith provided third parties permission to sell the Warrens' merchandise in 2009.  See November 10 Tr. at 37:23-38:11 (McCue).  The Plaintiffs maintained that Loyd provides no evidence for either assertion.  See November 10 Tr. at 37:23-38:4 (McCue).  In addition, the Plaintiffs alleged that Smith was not the executor of E. Warren's estate and that E. Warren died intestate.  See November 10 Tr. at 38:4-5 (McCue).  In addition, the Plaintiffs maintained that, even if Smith had given permission to a third party to sell the Warrens' merchandise in 2009, this arrangement would not entitle Loyd to sell merchandise using the Warrens' names.  See November 10 Tr. at 38:7-11 (McCue).

Further, the Plaintiffs took issue with Loyd's assertion that L. Warren gave her permission to sell the Warrens' products, which the Plaintiffs distinguish from being granted the right to "do publicity" for L. Warren.  November 10 Tr. at 38:12-18 (McCue).  The Plaintiffs submitted that, even if L. Warren had given permission to Loyd to sell the Warrens' products, J. Spera, as successor to the Warrens' rights of publicity, would be free to revoke that permission.  See November 10 Tr. at 38:18-21 (McCue).  The Plaintiffs insisted that Loyd "is not attacking ownership of the rights," but only alleging that she received permission to sell the Warrens' products.  November 10 Tr. at 38:21-25 (McCue).

The Plaintiffs concluded by addressing a few remaining topics that Loyd raised in her arguments.  See November 10 Tr. at 39:10-40:25 (McCue).  First, the Plaintiffs alerted the Court that Loyd makes arguments relating to their common-law trademark claim, even though the Plaintiffs are not moving for summary judgment on that claim.  See November 10 Tr. at 39:10-21

(McCue).  The Plaintiffs emphasized that, because they were moving for summary judgment on a right-of-publicity claim rather than on a trademark claim, they do not "need to show use of the rights of publicity," because individuals "have the right to control [their] names and likeness[es] for commercial purposes," without "hav[ing] to actually exploit it [themselves]."  November 10 Tr. at 39:21-40:2 (McCue).  The Plaintiffs disputed Loyd's allegation that they had denied her access to documents and stated that Loyd never sought discovery from them, although the Plaintiffs later clarified that Loyd served discovery to which the Plaintiffs responded, but Loyd never filed a motion to compel.  See November 10 Tr. at 40:5-12 (McCue); id. at 46:3-8 (McCue).  The Plaintiffs maintained that Loyd's requests to reopen discovery and assert counterclaims are untimely and that they oppose those requests.  See November 10 Tr. at 40:12-25 (McCue).  Finally, the Plaintiffs summarized their arguments:

> [F]or the three claims that we brought summary judgment on, [Loyd] was obligated to specifically controvert the facts that we relied on.  She did not.  She did not in her briefs.  She did not submit any declarations in opposition.  She submitted some documents that were not authenticated, but are really irrelevant.  And even to the extent we believe what she's saying in her briefs, which is not admissible evidence for defeating summary judgment based on the case law I cited, . . . just openly disputing through generalities, disputed facts is not sufficient under Tenth Circuit law to defeat summary judgment.

November 10 Tr. at 41:7-19 (McCue).

The Court allowed Loyd to make additional arguments.  See November 10 Tr. at 41:25-42:1 (Court).  Loyd informed the Court that she served discovery on the Plaintiffs and alleged that the Plaintiffs' responses are deficient.  See November 10 Tr. at 42:2-10 (Loyd).  Loyd also emphasized that she discovered new information about other lawsuits involving the Plaintiffs, and about facts related to this case late in the litigation and after the close of discovery.  See November 10 Tr. at 42:11-44:4 (Loyd).  Loyd also reiterated her accusation that the Plaintiffs' discovery responses are inadequate and her request that discovery be reopened.  See November 10 Tr. at

44:4-17 (Loyd).   Continuing her arguments, Loyd contends that her copyright predates the Plaintiffs' copyright and that, therefore, no infringement occurred.  See November 10 Tr. at 44:22-45:3 (Loyd).  Loyd concluded by urging the Court to deny the Plaintiffs' MSJ so the case could proceed to trial.  See November 10 Tr. at 45:9-17 (Loyd).

The Court gave the Plaintiffs the opportunity to make the last arguments regarding their MSJ.  See November 10 Tr. at 45:21-25 (Court).  The Plaintiffs corrected their miscommunication from earlier in the hearing that Loyd had not served any discovery and clarified that Loyd served discovery on the Plaintiffs, the Plaintiffs responded, there was "no followup" from Loyd, and Loyd never filed a motion to compel.  November 10 Tr. at 46:3-7 (McCue).  The Plaintiffs asserted that Loyd's argument that her copyright predates the Plaintiffs' copyright based on the date of registration is incorrect, because copyright protections arise when a work is created, and, therefore, Loyd's alleged copyright registration would not invalidate the Plaintiffs' copyright stemming from the Warrens' creation of the works at issue.  See November 10 Tr. at 46:9-47:4 (McCue).  Closing their arguments, the Plaintiffs questioned: "Can [Loyd] establish an entire chain of title through written conveyances from the Warrens to her?"  November 10 Tr. at 47:5-8 (McCue).   The Plaintiffs concluded that Loyd could not establish that chain of title.  See November 10 Tr. at 47:8 (McCue).

The Court informed the parties that it would take the Plaintiffs' MSJ under advisement, and that it would next hear arguments on Loyd's MSJ.  See November 10 Tr. at 47:12-17 (Court).  Loyd commenced her arguments by arguing that "Lorraine and Ed Warren did not in their lifetime revoke any permission given" to Loyd, and emphasized that Loyd had an agreement with the Warrens, and not with J. Spera.  November 10 Tr. at 47:21-48:4 (Loyd).  Loyd then argued that the Plaintiffs lack standing, because "Lorraine [Warren] sold all of [her] rights" in exchange for

royalties that J. Spera ultimately received.  November 10 Tr. at 48:5-12 (Loyd).  Returning to her argument that a three-year statute of limitations bars the Plaintiffs' copyright claims, Loyd emphasized that Seekers of the Supernatural "has been produced and sold in commerce since 1998."  November 10 Tr. at 48:18-19 (Loyd).  Further, Loyd argued: "There is no confusion. Because the products have been sold.  Nobody has ever confused who was selling what.  They've been sold on eBay, sold on Barnes and Noble, sold on Amazon.com, and sold other places, and nobody has ever confused the titles."  November 10 Tr. at 49:1-6 (Loyd).  Further, Loyd added: "Lorraine would promote the products."  November 10 Tr. at 49:8-9 (Loyd).

Loyd asserted that she "acquired an ongoing business" for which products were originally produced and sold in Spain, so the Plaintiffs "cannot claim that there is infringement in the country where a business was set up."  November 10 Tr. at 49:14-23 (Loyd).  Regarding the domain names at issue in the case, Loyd represents that she does not own or associate with any of them, and she insisted they belong to individuals located outside the United States, including in Italy.  See November 10 Tr. at 50:2-15 (Loyd).  Loyd accused the Plaintiffs of making "fraudulent allegations" against her regarding ownership of or association with the domain names at issue in the case.  November 10 Tr. at 50:10-17 (Loyd).

Loyd then repeated her contention that she holds a valid copyright issued November 18, 2014.  See November 10 Tr.  at 51:1-2 (Loyd).  Loyd maintained that "at no time did Lorraine Warren bar use of the copyright" and that "she never made any complaints" about its use, even though "her attorney had the information since November 2014."  November 10 Tr. at 51:8-11 (Loyd).  Loyd alleged that an unspecified "they" never informed Warner Brothers or New Line in negotiations about the existence of copyrights relating to the Warrens and The Conjuring. November 10 Tr. at 51:15-21 (Loyd).

Loyd restated her argument that a three-year statute of limitations bars the Plaintiffs' copyright claims, because the Plaintiffs were aware of the sale of the products at issue, but "never complained, never said anything about it."   November 10 Tr. at 51:22-52:8 (Loyd).   Loyd differentiated author Gerald Brittle from the Plaintiffs as someone "who actually would have a claim" for copyright infringement, because "several of those stories involve the book of Gerald Brittle," and noted that he never filed a claim.  November 10 Tr. at 52:8-16 (Loyd).  Further, Loyd argued, because "Warner Brothers and New Line later bought the Warrens' rights of all their stories . . . . , Judy and Tony [Spera], Brittle, they no longer have rights.  They don't have any claims for this."  November 10 Tr. at 52:17-21 (Loyd).  Loyd also argued that the Plaintiffs are "not authorized under any law" to cancel the copyrights at issue in this case.  November 10 Tr. at 53:4-5 (Loyd).

Loyd concluded her arguments with a range of allegations and assertions regarding a number of the Plaintiffs' claims.  See November 10 Tr. at 53:6-54:23 (Loyd).  Loyd argued that the Speras have no rights under New Mexico State common law, because they are domiciled in Connecticut.  See November 10 Tr. at 53:7-10 (Loyd); id. at 53:21-24 (Loyd).  Loyd also disputed the Plaintiffs' assertion that Harrison was not the executor of E. Warren's will and indicated her interest in calling Harrison to testify at trial.  See November 10 Tr. at 53:14-19 (Loyd).  Finally, Loyd denied that there is any merit to the Plaintiffs' unfair competition and tortious interference claims.  See November 10 Tr. at 54:7-23 (Loyd).

The Court then permitted the Plaintiffs to make arguments in response to Loyd's MSJ.  See November 10 Tr. at 55:6-7 (Court).  The Plaintiffs opened their arguments by reiterating their contention that the "vast majority" of Loyd's arguments are "conclusory and/or boilerplate" and lack "complete context," and that Loyd does not support her case with "any admissible evidence

whatsoever."  November 10 Tr. at 55:17-21 (Zhong).  The Plaintiffs emphasized that Loyd does not submit any of her exhibits with accompanying affidavits or declarations, thereby making the exhibits inadmissible.  See November 10 Tr. at 55:22-25 (Zhong).  Focusing further on evidentiary problems, the Plaintiffs pointed the Court to "massive hearsay issues and other substantive issues that . . . cannot be cured as a matter of law" in Loyd's exhibits.  November 10 Tr. at 56:1-4 (Zhong).

The Plaintiffs then indicated they would raise specific issues with Loyd's MSJ.  See November 10 Tr. at 56:10-12 (Zhong).  First, the Plaintiffs targeted Loyd's argument "about how the plaintiffs don't own intellectual property rights, because they sold it to . . . DeRosa-Grund." November 10 Tr. at 56:18-21 (Zhong).  The Plaintiffs stated that the DeRosa-Grund Disputes have no connection to the Warren IP and are irrelevant to this case.  See November 10 Tr. at 57:5-17 (Zhong).   The Plaintiffs maintained that the irrelevance of the DeRosa-Grund Disputes "makes . . . the vast majority of Ms. Loyd's arguments completely irrelevant."  November 10 Tr. at 57:19-23 (Zhong).   Second, the Plaintiffs reiterated their belief that Loyd does not submit admissible evidence in connection with Loyd's MSJ, that "[n]ot one of her exhibits is authenticated," and that "[a]ll of her motions have major hearsay problems."  November 10 Tr. at 57:24-58:7 (Zhong).  Third, the Plaintiffs noted that Loyd's MSJ relies on incorrect legal citations, including regarding statutes of limitations.  See November 10 Tr. at 58:13-17 (Zhong).  Fourth, the Plaintiffs drew attention to inconsistencies in the labeling of the exhibits to Loyd's MSJ and indicated that Loyd's MSJ is missing its Exhibit C.  See November 10 Tr. at 59:1-21 (Zhong). Finally, the Plaintiffs indicated their willingness to discuss Loyd's Notice of Petition to Reopen Lorraine R. Warren ("Decedent") Estate and Qualify the Fiduciary Has Been Filed With the Connecticut Probate Court (See Exhibit A) (dated August 7, 2021), filed August 7, 2021 (Doc. 84)("Petition to Reopen"), and their understanding that Loyd had already filed a probate

action in Connecticut.  See November 10 Tr. at 60:10-19 (Zhong).

The Court permitted Loyd to make additional arguments in support of Loyd's MSJ.  See November 10 Tr. at 61:7-8 (Court).  Loyd responded to the Plaintiffs' contentions regarding inconsistencies in the presentation of the exhibits to Loyd's MSJ, including by indicating that the Exhibit C that the Plaintiffs deemed missing is a compact disk containing Loyd's interview with L. Warren that Loyd lodged with the Court.  See November 10 Tr. at 61:9-20 (Loyd).  Loyd insisted that the facts of the DeRosa-Grund Disputes are relevant to this case and noted that DeRosa-Grund "sold the property, he sold his rights to New Line and Warner Brothers," an arbitration ensued, and, therefore, Loyd was "still discovering things."  November 10 Tr. at 61:24-62:2 (Loyd).  Loyd contended that she was "defending against a made-up lawsuit of things that are coming after [the Warrens] died . . . .  But they never said any of these things during Lorraine or Ed Warren's lifetime."  November 10 Tr. at 62:7-11 (Loyd).  On questioning from the Court, Loyd confirmed that she was not seeking any action from the Court in connection with her Petition to Reopen.  See November 10 Tr. at 62:15-23 (Loyd); id. at 63:22-64:3 (Court, Loyd).  Loyd argued that "the New Mexico court has no standing" and that "[e]verything should go through Connecticut."  November 10 Tr. at 62:25-63:2 (Loyd).  In reference to discovery, Loyd repeated her accusation that the Plaintiffs "hide things" from her.  November 10 Tr. at 63:8-11 (Loyd).

After Loyd's arguments, the Court offered the parties the opportunity to raise any additional issues they might have before hearing's conclusion.  See November 10 Tr. at 64:7-13 (Court).  The Plaintiffs alerted the Court that Loyd had not filed a response to the Plaintiffs' Motion to File Exhibit Under Seal to Its Motion For Summary Judgment (dated August 6, 2021), filed August 6, 2021 (Doc. 82)("Motion to Seal").  See November 10 Tr. at 65:15-19 (Zhong).  When the Court questioned Loyd whether she had an objected to that Motion, Loyd stated that she does

on the grounds that she "ha[s] a right to see the full document because plaintiffs have been omitting things from me . . . ." November 10 Tr. at 66:1-3 (Zhong).  The Court explained that, if it were to permit the document to be sealed, Loyd would be able to see it in its entirety, though the public would not.  See November 10 Tr. at 66:10-17 (Court).  Loyd expressed dissatisfaction with how the Plaintiffs had produced redacted documents.  See November 10 Tr. at 66:19-67:3 (Loyd).  The Court granted the Plaintiffs' Motion to Seal.  See November 10 Tr. at 67:7-8 (Court).

The Court offered to set a trial date for the parties based on their timing preferences, and indicated it would rule on the Plaintiffs' MSJ and Loyd's MSJ before trial.  See November 10 Tr. at 68:6-23 (Court, McCue).  Loyd asserted that, in addition, she would like to file a motion to reopen discovery and a motion for leave to file a counterclaim.  See November 10 Tr. at 70:4-9 (Loyd).  Before concluding the summary judgment hearing, the Court indicated that Loyd is welcome to file her proposed motions.  See November 10 Tr. at 70:10-11 (Court).

### 14.    Procedural History Following the November, 2021, Hearing.

Following the November 10, 2021 hearing on the parties' motions for summary judgment, the Court issued an Order on March 29, 2022, that disposed of: (i) the Plaintiffs' MTC; (ii) the Plaintiffs' MSJ; and (iii) Loyd's MSJ.  See Summary Judgment Order.  In the Summary Judgment Order, the Court: (i) granted in part and denied in part the Plaintiffs' MTC; (ii) granted the Plaintiffs' MSJ; and (iii) denied Loyd's MSJ.  See Summary Judgment Order at 12.  Regarding the Plaintiffs' MTC, the Court stated that deposing Loyd, the only named individual defendant, is within discovery's proper scope.  See Summary Judgment Order at 2-3.  Regarding the claims on which the Plaintiffs moved for summary judgment, the Court noted that, while the Plaintiffs supported their position on all three counts with credible evidence, Loyd's MSJ did not comply with rule 56's requirements or demonstrate the existence of a genuine issue of material fact.  See

Summary Judgment Order at 4-5.  The Court stated that there was no genuine dispute that J. Spera owns the ED AND LORRAINE WARREN and SEEKRS OF THE SUPERNATURAL trademarks, or that Loyd's use of the marks created causes confusion in violation of the Lanham Act, and granted the Plaintiffs summary judgment on their Lanham Act claim.  See Summary Judgment Order at 5-7.  In granting summary judgment to the Plaintiffs on their Copyright Act claim, the Court stated that there is no genuine dispute that the Plaintiffs own the Seekers of the Supernatural copyright, or that Loyd admits to selling Seekers of the Supernatural products online.  See Summary Judgment Order at 7-9.  Regarding the Plaintiffs' right-of-publicity claim, the Court stated that Loyd exceeded the scope of any permission E. Warren might have given her to use the Warrens' names for commercial purposes, and granted summary judgment to the Plaintiffs.  See Summary Judgment Order at 9-11.  Finally, the Court denied Loyd's MSJ in its entirety, including for its non-compliance with rule 56's requirements, a non-compliance that Loyd's status as a pro se party does not excuse.  See Summary Judgment Order at 11-12.

The Court held a pretrial conference on July 13, 2022.  See Clerk's Minutes, filed July 13, 2022 (Doc. 131).  During the pretrial conference, the Plaintiffs indicated their intent to dismiss voluntarily the seven claims on which they did not move for summary judgment, because they believed they could receive sufficient relief on the claims on which they moved for -- and were granted -- summary judgment.  See Draft Transcript of Hearing at 5:2-13 (taken July 13, 2022)(McCue)("July 13 Tr.").[89]  The Plaintiffs stated that they intended to request (i) a permanent injunction, (ii) statutory damages, and (iii) attorneys' fees against Loyd in connection with the claims on which they were granted summary judgment, and maintained that there is no need for

---

[89]The Court's citations to the hearing's transcript refers to the court reporter's original, unedited versions.  Any final transcript may contain slightly different page and/or line numbers.

the Court to make findings or hold a trial on the requested relief, because there are no factual issues bearing on the relief's issuance, and the requested remedies are available as relief for the claims on which the Court granted summary judgment. See July 13 Tr. at 6:18-7:16 (Court, McCue).

On July 27, 2022, the Plaintiffs filed a Request for Clerk's Entry of Default requesting an entry of default against the following Defendants: Metagalaxtic, LLC; Omnimedia, LLC; Cohen Goldberg & Smith, LLC; and Seekers of the Supernatural, LLC for failure to plead or otherwise defend, and the Court granted the requested default on July 28, 2022. See Request for Clerk's Entry of Default (dated July 27, 2022), filed July 27, 2022 (Doc. 129); Clerk's Minutes, filed July 27, 2022 (Doc. 130). On August 4, 2022, the Court granted the parties' Joint Motion to Vacate Pretrial Conference and Trial Setting, thereby vacating the bench trial that had been set for August 8, 2022. See Order, filed August 4, 2022 (Doc. 132).

On September 1, 2022, the Plaintiffs filed a Motion for Entry of Final Judgment and For an Award of Injunctive Relief, Damages, and Attorneys' Fees, and Motion to Voluntarily Dismiss Plaintiffs' Remaining Claims. See Motion for Entry of Final Judgment and For an Award of Injunctive Relief, Damages, and Attorneys' Fees, and Motion to Voluntarily Dismiss Plaintiffs' Remaining Claims, filed September 1, 2022 (Doc. 134)("Final Judgment Motion"). In the Final Judgment Motion, the Plaintiffs request entry of a Final Judgment, given that they prevailed against Loyd on Count I (trademark infringement), Count V (copyright infringement), and Count VII (violation of rights of publicity), i.e., the claims on which they moved for summary judgment. See Final Judgment Motion at 17. The Final Judgment Motion, as reflected in its attached [Proposed] Final Judgment Against Defendant Bea Loyd, filed September 1, 2022 (Doc. 134-5)("Proposed FJ"), requests that the Court issue a permanent, worldwide injunction: (i) ordering Loyd to stop infringing the Seekers of the Supernatural copyright, cancel her copyright

registrations for Seekers of the Supernatural, and cease to possess her copies of Seekers of the Supernatural series; (ii) ordering Loyd to stop infringing the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks, cancel her international registrations of the marks, and cease to possess items bearing the marks; and (iii) ordering Loyd to stop using E. Warren and L. Warren's names or likenesses for commercial purposes.[90]  See Proposed FJ ¶¶ 1-3, at 2-6.  Additionally, the Plaintiffs request that the Court, pursuant to 15 U.S.C. § 1119, order the USPTO to cancel or to deny Loyd's registrations for the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks.  See Proposed FJ at 5.  Finally, the Plaintiffs request an award of $150,000.00 in statutory damages under 17 U.S.C. § 504, as well as fees and costs under 15 U.S.C. § 1117 and 17 U.S.C. § 505.  See Proposed FJ at 4.  The Final Judgment Motion states:

> If the Court were to grant Plaintiffs a permanent injunction and damages (and attorneys' fees) on these claims, Plaintiffs can obtain most of the relief they are seeking in this case without the need to proceed to trial on their remaining claims. Accordingly, if the Court grants this relief, Plaintiffs further request an order voluntarily dismissing their remaining claims without prejudice.  Plaintiffs are concurrently moving for default judgment against the remaining defendants.

Final Judgment Motion at 2 (footnotes omitted).

As noted in the Final Judgment Motion, on September 1, 2022, the Plaintiffs also filed a Motion for Default Judgment and Motion to Voluntarily Dismiss Plaintiffs' Remaining Claims. See Motion for Default Judgment and Motion to Voluntarily Dismiss Plaintiffs' Remaining Claims, filed September 1, 2022 (Doc. 135)("Default Judgment Motion").  In the Default Judgment Motion, the Plaintiffs request the entry of a default judgment on Count I (trademark

---

[90]In addition, the Plaintiffs request that Loyd be required to file a status report within thirty days of the final judgment's entry addressing her compliance with the permanent injunction.  See Proposed FJ ¶ 3, at 4.

infringement), Count V (copyright infringement), and Count VII (violation of rights of publicity),

i.e., the claims on which they moved for summary judgment and request a final judgment against

Metagalaxtic, LLC; Omnimedia, LLC; Cohen Goldberg & Smith; and Seekers of the Supernatural.

See Default Judgment Motion at 11.  The Default Judgment Motion requests that the Court grant:

(i) a permanent, worldwide injunction against Metagalaxtic, LLC; Omnimedia, LLC; Cohen

Goldberg & Smith, LLC; and Seekers of the Supernatural, LLC; (ii) statutory damages in the

amount of $150,000 for willful copyright infringement pursuant to 17 U.S.C. § 504; and (iii) fees

and costs under 15 U.S.C. § 1117.  See Default Judgment Motion at 4-11.  Regarding the potential

voluntary dismissal of the Plaintiffs' remaining claims, the Default Judgment Motion states that,

> in the event the Court grants the non-monetary relief requested in Sections I-IV, Plaintiffs request dismissal of the following claims without prejudice: Cancellation of Federal Trademark Registration under the Lanham Act, 15 U.S.C. § 1064 (Count (II), Cybersquatting under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c) (Counts III and IV); Cancellation of Copyright Registrations (Count VI); Common Law Trademark Infringement (Count VIII); Common Law Unfair Competition (Count IX); and Tortious Interference with Prospective Economic Advantage (Count X).

Default Judgment Motion at 11.

The Court held a hearing on the Final Judgment Motion and the Default Judgment Motion

on November 8, 2022, which Loyd did not attend.  See Clerk's Minutes at 1, filed November 8,

2022 (Doc. 141)("November 8 Clerk's Minutes").  The Court entered the Plaintiffs' proposed

Final Judgment for Default Judgment on November 8, 2022, against Defendants Metagalaxtic,

LLC, Omnimedia, LLC, Cohen Goldberg & Smith, LLC, and Seekers of the Supernatural, LLC.

See Final Judgment for Default Judgment (dated November 8, 2022), filed November 8, 2022

(Doc. 142)("Defaulting Defendants FJ").  In the Defaulting Defendants FJ, the Court states:

> Therefore, the Court hereby enters final judgment against Defaulting Defendants for Lanham Act, 15 U.S.C. § 1114 (Count I), copyright infringement under 17 U.S.C. § 501 (Count V), and violation of rights of publicity under

Connecticut law (Count VII).

Accordingly, a permanent injunction is entered against Defaulting Defendants enjoining them and their agents, servants, employees, attorneys, and her [sic] successors, and assigns, and all those acting in active concert or participation with any of them from:

1.     Directly or indirectly infringing, or causing, enabling, facilitating, encouraging, promoting and inducing or participating in the infringement of, copyrights in the Seekers of the Supernatural television series (as defined in ECF No. 81 at 5), including, but not limited to reproducing, preparing derivative works of, distributing of, filing copyright applications, maintaining copyright registration, or enforcing copyright registrations covering the Seekers of the Supernatural television series.

2.     Directly or indirectly infringing the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks or any mark that is confusingly similar thereto in any manner anywhere in the world, including but not limited to, utilizing the marks in domain names, and filing for, maintaining, or enforcing any trademark registrations for the marks in foreign countries.

3.     Directly or indirectly using Ed and Lorraine Warrens' [sic] names and likenesses for commercial purposes.

Additionally, pursuant to 17 U.S.C. § 504, the Court hereby enters statutory damages against Defaulting Defendants, jointly and severally, for $150,000.

Finally, pursuant to 15 U.S.C. § 1117 and 17 U.S.C. § 505, the Court hereby awards Plaintiffs their fees and costs.  Plaintiffs shall file their motion for fees and costs within 30 days of this Order.  D.N.M.LR-Civ-54.1-54.5.

Further, pursuant to Federal Rule of Civil Procedure 41(a)(2), and upon Plaintiffs' request, the Court hereby dismisses without prejudice the following remaining claims: Cancellation of Federal Trademark Registration under the Lanham Act, 15 U.S.C. § 1064 (Count II); Cybersquatting under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c) (Counts III and IV); Cancellation of Copyright Registrations (Count VI); Common Law Trademark Infringement (Count VIII); Common Law Unfair Competition (Count IX); and Tortious Interference with Prospective Economic Advantage (Count X) against the Defaulting Defendants.

With no additional remaining claims to adjudicate in this matter, the Court enters this judgment as a Final Judgment against the Defaulting Defendants.

Defaulting Defendants FJ at 2-3.

On November 25, 2022, Loyd sent the Opposition to Final Judgment Against Defendant Bea Loyd (undated), filed August 15, 2023 (Doc. 154-2)("Final Judgment Opposition"), to the Court via its proposed text email inbox, but did not file it, despite that she has filing authority as a party and has filed items throughout this case.  See Email from Loyd to Proposed Text Inbox at 1 (dated November 25, 2022), filed August 15, 2023 (Doc. 154-1).  The Final Judgment Opposition is a procedural oddity, in that Loyd used the Plaintiffs' Proposed FJ as a base and altered its text to make her arguments in opposition to the Final Judgment Motion.  See Final Judgment Opposition at 1-6.  Given that the Final Judgment Opposition is based on the Plaintiffs' Proposed FJ -- which the Plaintiffs submitted as an exhibit to their Final Judgment Motion with a blank signature line for the Court to affix its signature -- it does not contain Loyd's signature, but instead a blank signature line for the Court.  See Final Judgment Opposition at 6.  Nonetheless, given that Loyd is pro se and styles the Final Judgment Opposition as an opposition, the Court treats the Final Judgment Opposition as a response to the Final Judgment Motion.

In the Final Judgment Opposition, Loyd restates a number of arguments she has made throughout the litigation, including at summary judgment, in support of her contention that the Plaintiffs are not entitled for a final judgment.  See Final Judgment Opposition at 2-6.  Loyd maintains that "[t]en (10) out of eleven (11) Defendants were not served with the summons and complaint," and that she "maintains her opposition to this complaint in New Mexico Courts" because of: (i) lack of subject matter and personal jurisdiction; (ii) improper venue; (iii) insufficient process and service of process; (iv) failure to state a claim; and (v) lack of standing.  Final Judgment Opposition at 2.  Loyd makes a series of arguments against a permanent injunction's entry, including that: (i) "Loyd rescinded the contract that gave her rights to a turnkey business that sold audiobooks, books, eBooks, MP3 recordings, videos and other products," and

that "[a]ll assets she received when she purchased the business were . . . returned to the sellers or destroyed"; (ii) Loyd does not "own or control" various copyrights at issue in the case, and "Loyd is not the alias of anyone who registered those copyrights"; (iii) the "ED AND LORRAINE WARREN trademark has been cancelled," and the "SEEKERS OF THE SUPERNATURAL trademark was never issued"; and (iv) "Loyd no longer own[s]" various international registrations "because they were part of the contract recission."  Final Judgment Opposition at 2-4.  The Final Judgment Opposition states that, "[p]ursuant to the Court's authority under 15 U.S.C. § 1119, this Court orders the Director of the United States Patent and Trademark Office to hereby cancel or deny" the ED AND LORRAINE WARREN mark (registration number 4894285).  Final Judgment Opposition at 4.  Further, the Final Judgment Opposition states: "Pursuant to 17 U.S.C. § 504, the Court hereby enters statutory damages against Defendant Loyd for $0."  Final Judgment Opposition at 4.  In support of her contention that the Plaintiffs are not entitled to statutory damages, Loyd states: (i) "any infringement, if any, was innocent.  Defendant purchased a turnkey business that had a Federal Registered Trademark"; (ii) the "Defendant has not infringed on any applicable trademarks"; (iii) "Bea Loyd did not cause Plaintiff's damages[;] Defendant purchased a turnkey business setup by one or all of the 10 Defendants . . . [;] Plaintiffs have not divided the proposed damages to other ten (10) defendants"; (iv) "[t]he claims . . . are barred . . . because [of] other unnamed parties' use of the same marks at issue"; (v) "Loyd is not liable for the acts of others over whom she has no control"; (vi) the Defendants did not knowingly and intentionally infringe upon Plaintiffs' rights in the "Ed and Lorraine Warren" mark, and the "Plaintiffs are not entitled to relief because registration of the "Ed and Lorraine Warren" mark would cause no additional injury to Plaintiffs"; (vii) "Plaintiffs are not entitled to relief because the USPTO has determined their use of the mark did not qualify for a trademark"; (viii) the Plaintiffs "failed to use reasonable

means to prevent alleged damage and failed to use reasonable means to mitigate their damages"; (ix) the "Plaintiff's [sic] alleged damages are speculative"; (x) "any remedies are limited to the extent that there is an overlapping or duplicative recovery pursuant to the various claims for any alleged single wrong"; (xi) "there has been no loss or damage in any amount"; and (xii) "Plaintiffs did not suffer any damages or economic loss."  Final Judgment Opposition at 4-6.

After discussing damages, the Final Judgment Opposition turns to fees and costs, dismissing the Plaintiffs' remaining claims, and whether final judgment should be entered. Regarding fees and costs, the Final Judgment Opposition states: "Pursuant to 15 U.S.C. § 1117 and 17 U.S.C. § 505, the Court hereby awards Plaintiffs their fees and costs.  Plaintiffs shall file their motion for fees and costs within 30 days of this Order."  Final Judgment Opposition at 6. Next, the Final Judgment Opposition states that, "pursuant to Federal Rule of Civil Procedure 41(a)(2), and upon Plaintiffs' request, the Court hereby dismisses without prejudice" the Plaintiffs' Counts II, III, IV, VI, VIII, IX, and X.  Final Judgment Opposition at 6.  The Final Judgment Opposition concludes: "With several outstanding motions and several remaining claims to adjudicate in this matter, the Court does not enter this judgment as a Final Judgment."  Final Judgment Opposition at 6.

In addition to her Final Judgment Opposition, Loyd filed the Second MTD, in which she requests that "the court dismiss all claims in the Complaint for lack of subject matter jurisdiction, personal jurisdiction, improper venue, insufficient process, insufficient service of process, and lack of standing."  Second MTD at 1.  On November 21, 2022, Loyd followed the Loyd MTD with a Motion to Dismiss Defendants Not Served With Summons and Complaint, in which she moved the Court to dismiss parties she identified as "Galactic Media LTD" and "Seekers of the Supernatural LTD."  Third MTD at 1.  The Plaintiffs oppose the Second MTD and Third MTD.

<u>See</u> Plaintiffs' Opposition to Defendant Bea Loyd's Motion to Dismiss, filed December 5, 2022 (Doc. 147)("Second MTD Response"); Plaintiffs' Opposition to Defendant Bea Loyd's "Motion to Dismiss Defendants Not Served with Summons and Complaint," filed December 5, 2022 (Doc. 148)("Third MTD Response").   In opposition to the Second MTD, the Plaintiffs make the following arguments: (i) Loyd's objections to personal jurisdiction are untimely and waived; (ii) Loyd lacks standing to object to personal jurisdiction for other Defendants; (iii) Loyd's argument regarding mootness as to the cancellation of the ED AND LORRAINE WARREN mark is without merit; and (iv) the summary judgment record's evidence that the Plaintiffs have standing defeats Loyd's standing arguments.   <u>See</u> Second MTD Response at 1-10.   In opposition to the Third MTD, the Plaintiffs make the following arguments: (i) the Third MTD is untimely; (ii) rule 12 of the Federal Rules of Civil Procedure bars Loyd from filing piecemeal motions; (iii) the Court cannot dismiss parties that were never named as defendants in the case; and (iv) the Plaintiffs have not made any misrepresentations to the Court, contrary to Loyd's allegations.   <u>See</u> Third MTD Response at 1-6.   On January 4, 2023, Loyd filed a Response to Plaintiffs Opposition Motion to Dismiss, filed January 4, 2023 (Doc. 151)("MTD Reply"), in which she restates her arguments and requests that the Court dismiss the Third Amended Complaint, and that the Plaintiffs "be sanctioned for filing a Complaint rife with lies and mistruths."   MTD Reply at 21.

## <u>LAW REGARDING PRO SE LITIGANTS</u>

When a party proceeds pro se, a court construes his or her pleadings liberally and holds them "to a less stringent standard than [that applied to] formal pleadings drafted by lawyers."   <u>Hall v. Bellmon</u>, 935 F.2d at 1110.   "[I]f the Court can reasonably read the pleadings to state a valid claim on which [the plaintiff] could prevail, it should do so despite [his or her] failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction,

or his unfamiliarity with pleading requirements." Hall v. Bellmon, 935 F.2d at 1110.  The Court

will not, however, "assume the role of advocate for the pro se litigant." Hall v. Bellmon, 935 F.2d

at 1110.  "[P]ro se status does not excuse the obligation of any litigant to comply with the

fundamental requirements of the Federal Rules of Civil and Appellate Procedure." Ogden v. San

Juan Cty., 32 F.3d 452, 455 (10th Cir. 1994).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's

case.'" Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M.

2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th

Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Schs.)).  See Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the
> moving party must satisfy its burden of production in one of two ways: by putting
> evidence into the record that affirmatively disproves an element of the nonmoving
> party's case, or by directing the court's attention to the fact that the non-moving
> party lacks evidence on an element of its claim, "since a complete failure of proof
> concerning an essential element of the nonmoving party's case necessarily renders
> all other facts immaterial." Celotex, 477 U.S. at 323-25.  On those issues for which
> it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings
> and designate specific facts to make a showing sufficient to establish the existence
> of an element essential to his case in order to survive summary judgment." Cardoso
> v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets
> omitted).

Plustwik v. Voss of Nor. ASA, No. 11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9,

2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial,

that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[91]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mech. Sols., LLC v. Northland Piping, Inc., 184 F.3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  184 F.3d at 1075-78. The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by

---

[91]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

pointing out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party

opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).  To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat. Bank of Ariz.

v.] Cities Service,[] 391 U.S. [253], 288-[89] . . . .   If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . (per curiam), or is not significantly probative, Cities Service, . . . at 290 . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Fourth, the court cannot decide any credibility issues.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that

summary judgment is appropriate where video evidence clearly contradicted the plaintiff's version

of the facts.  See 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir.

2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).

Parties may allege new claims in motions for summary judgment. See Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991). When a party raises a new claim in a motion for summary judgment, a court treats the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated:

> [a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quoting 4 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1219, at 94 (4th ed. 2021)). While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING VENUE

"Venue is defined as the appropriate district court in which to file an action." Whiting v. Hogan, 855 F. Supp. 1266, 1282 (D.N.M. 2012)(Browning, J.)(citing NLRB v. Line, 50 F.3d 311, 314 (5th Cir. 1995)). The purpose of venue is to assure that lawsuits are filed in appropriately convenient courts for the matters raised and for the parties involved in the action. See Leroy v. Great W. United Corp., 443 U.S. 173, 185 (1979). Venue should not be confused with subject-matter jurisdiction, see Wachovia Bank v. Schmidt, 546 U.S. 303, 315-16 (2006), or with personal

jurisdiction, see Leroy v. Great W. United Corp., 443 U.S. 173, 185 (1979)("The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum.").  "To the extent that they are relevant, the laws relating to venue give added protection to defendants beyond those that are provided by the statutory and constitutional prerequisites of personal jurisdiction."  14D C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3801, at 15 (3d ed. 2007).

The federal venue provision allows a plaintiff to file in: (i) "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; (ii) "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or, (iii) "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b).  See Res. Assocs. Grant Writing & Evaluation Servs., Inc. v. Southampton Union Free Sch. Dist., 193 F. Supp. 3d 1200, 1226 (D.N.M. 2016)(Browning, J.).

Rule 12(b)(3) of the Federal Rules of Civil Procedure allows a defendant to assert, by motion, that the court into which the plaintiff has hailed him or her is an improper venue to entertain the plaintiff's claims.  See Fed. R. Civ. P. 12(b)(3).  Rules 12(g) and 12(h), however, provide that, if a party does not raise its objection to venue in its responsive pleading or in its first rule 12(b) motion, it waives the objection and accepts the plaintiff's chosen venue.  See Fed. R. Civ. P. 12(h)(1) ("A party waives any defense listed in Rule 12(b)(2)-(5) by (A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or (B) failing to either: (i) make it by

motion under this rule; or (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.").

The Court has adjudicated a number of cases involving whether venue in the United States District Court for the District of New Mexico is proper.  In <u>Applied Capital, Inc. v. Gibson</u>, 2007 WL 5689323 (D.N.M. September 30, 2007)(Browning, J.), the Court concluded that venue was proper when the defendant made fraudulent representations via mail, facsimile transmissions, and telephone calls to a plaintiff located in the District of New Mexico.  <u>See</u> 2007 WL 5689323, at *15-16.   In <u>Whiting v. Hogan</u>, 855 F. Supp. 2d 1266 (D.N.M. 2012)(Browning, J.), a case involving a motor vehicle accident, the Court concluded that venue in the District of New Mexico was improper when no defendant was a resident of New Mexico and the accident at issue took place in Arizona.  <u>See</u> 855 F. Supp. 2d at 1286–87.  In <u>Navajo Health Found.--Sage Mem'l Hosp., Inc. v. Burwell</u>, 86 F. Supp. 3d 1211 (D.N.M. 2015)(Browning, J.), a case a hospital brought against federal officials, the Court concluded that: (i) venue in the District of New Mexico was proper under 28 U.S.C. § 1391(e)(1)(A), because one of the federal official-defendants was resident in New Mexico, <u>see</u> 86 F. Supp. 3d at 1237; and (ii) venue in the District of New Mexico was improper under 28 U.S.C. § 1391(e)(1)(B), because of the plaintiff's "lack of allegations or evidence indicating that a substantial part of the events or omissions giving rise to [the plaintiff's] claims occurred in New Mexico," 86 F. Supp. 3d at 1248.  In <u>State ex rel. Balderas v. Real Est. L. Ctr., P.C.</u>, 430 F. Supp. 3d 900 (D.N.M. 2019)(Browning, J.), the Court concluded that venue in the District of New Mexico was proper because twenty-three New Mexico residents who owned property in New Mexico paid for the defendant's services at issue in the litigation and signed contracts fort those services in New Mexico.  <u>See</u> 430 F. Supp. 3d at 926-27.

## LAW REGARDING TRANSFER OF VENUE

In 1948, Congress enacted the federal change-of-venue statute, codified at 28 U.S.C. § 1404, to allow a district court to transfer an action filed in a proper, although not necessarily convenient, venue to a more convenient district.  See 28 U.S.C. § 1404.  That statute provides, in pertinent part: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or division to which all parties have consented."  28 U.S.C. § 1404(a).  Section 1404(a) affords a district court broad discretion to adjudicate motions to transfer based on a case-by-case review of convenience and fairness.  See Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1167 (10th Cir. 2010); Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1516 (10th Cir. 1991).  "Recognizing that what is convenient for one litigant may not be convenient for the other, the Supreme Court has taught that section 1404(a) 'is intended to place discretion in the district court to adjudicate motions for transfer according to [a] . . . case-by-case consideration of convenience and fairness.'"  Res. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d 973, 977 (7th Cir. 2010)(quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)).  "The statutory language guides the court's evaluation of the particular circumstances of each case and is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice."  Res. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977. The statute permits a "flexible and individualized analysis," and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations.  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29.  In considering a motion to transfer, a court weighs the following discretionary factors:

> the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of

> witnesses; the cost of making the necessary proof; questions as to the enforceability
> of a judgment if one is obtained; relative advantages and obstacles to a fair trial;
> difficulties that may arise from congested dockets; the possibility of the existence
> of questions arising in the area of conflict of laws; the advantage of having a local
> court determine questions of local law; and, all other considerations of a practical
> nature that make a trial easy, expeditious and economical.

Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1167.   See Tex. Gulf Sulphur v. Ritter, 371 F.2d 145, 147 (10th Cir. 1967)(stating the factors that courts consider in making a venue determination under § 1404(a)).

Section 1406 of the United States Code's Title 28 permits transfer to cure a venue defect. It provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).  Although both § 1404(a) and § 1406(a) "were broadly designed to allow transfer instead of dismissal, § 1406(a) provides for transfer from forums in which venue is wrongly or improperly laid." Van Dusen v. Barrack, 376 U.S. 612, 634 (1964).  Section 1631 addresses transfer to cure want of jurisdiction and provides that, when a

> court finds that there is a want of jurisdiction, the court shall, if it is in the interest
> of justice, transfer such action or appeal to any other such court in which the action
> could have been brought at the time it was filed or noticed, and the action or appeal
> shall proceed as if it had been filed in or noticed for the court to which it was
> transferred on the date upon which it was actually filed in or noticed for the court
> from which it was transferred.

28 U.S.C. § 1631.  The Tenth Circuit has held that 28 U.S.C. § 1631 is "specifically designed for cases transferred from one federal court to another for lack of jurisdiction," and that it "served to simplify the process and streamline its application." Ross v. Colo. Outward Bound Sch., Inc., 822 F.2d 1524, 1527 (10th Cir. 1987).  The Tenth Circuit also has held that, although many courts have interpreted § 1406(a) to permit transfer where personal jurisdiction is lacking, the enactment of §

- 129 -

1631 makes such a "strained" construction "no longer necessary." Viernow v. Euripides Devel. Corp., 157 F.3d 785, 793 (10th Cir. 1998).

The "interest of justice" is a separate element of the transfer analysis that relates to the court system's efficient administration. Van Dusen v. Barrack, 376 U.S. at 626-27. "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." Res. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citing Van Dusen v. Barrack, 376 U.S. at 645; Chicago, Rock Island & Pacific R.R. Co. v. Igoe, 220 F.2d 299, 303 (7th Cir. 1955); Allied Van Lines, Inc. v. Aaron Transfer & Storage, Inc., 200 F. Supp. 2d 941, 946 (N.D. Ill. 2002)(Castillo, J.); Hanley v. Omarc, Inc., 6 F. Supp. 2d 770, 777 (N.D. Ill. 1998)(Alesia, J.)).   In some circumstances, "[t]he interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." Res. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citing Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220-21 (7th Cir. 1986)).   The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action. Driggers v. Clark, 422 F. App'x 747, 749-50 (10th Cir. 2011)(unpublished) (citing Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006)).[92]

--------

[92]Driggers v. Clark is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

The Court previously has granted motions to transfer.  See, e.g., Montoya v. Fin. Fed. Credit, Inc., 872 F. Supp. 2d 1251, 1281 (D.N.M. May 30, 2012)(Browning, J.).  In Montoya v. Financial Federal Credit, Inc., the Court transferred the case under 28 U.S.C. § 1406(a), because (i) "there [were] potential statute-of-limitations problems for the Plaintiffs if the Court were to dismiss their case"; (ii) "there [was] no indication that the Plaintiffs filed their Complaint in this forum to harass" the Defendants; and (iii) the Plaintiffs were not forum shopping.  Montoya v. Fin. Fed. Credit, Inc., 872 F. Supp. 2d at 1281-82.  The Court also has denied motions to transfer.  See, e.g., Navajo Health Found.-Sage Hosp., Inc. v. Burwell, 86 F. Supp. 3d 1211, 1248-51 (D.N.M. 2015)(Browning, J.).  In Navajo Health Found.-Sage Hosp., Inc. v. Burwell, the Court weighed the § 1404(a) factors and concluded that transfer was inappropriate, in large part, because "the parties' convenience, the witnesses' convenience, and the location of physical evidence" weighed "heavily against transfer."  86 F. Supp. 3d at 1250.  In that case, the evidence and the parties were located more closely to Albuquerque, New Mexico, than to Phoenix, Arizona -- the forum that the

---

In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Driggers v. Clark, Estate of Cummings v. United States, 651 F. App'x 822 (10th Cir. 2016), Hargrave v. Chief Asian, LLC, 479 F. App'x 827 (10th Cir. 2012), Marcus Food Co. v. DiPanfilo, No. CIV 10-3285, 2011 WL 5084997 (10th Cir. 2011); Muller v. Culbertson, 408 F. App'x 194 (10th Cir. 2011), Jones v. KP&H LLC, 288 F. App'x 464 (10th Cir. 2008), Sheridan v. United States, 214 F. App'x 857 (10th Cir. 2007), Sheridan v. United States, 214 F. App'x 857 (10th Cir. 2007),  Phillips v. Grady Cty. Bd. of Cty. Comm'rs, 92 F. App'x 692 (10th Cir. 2004), Zoller Labs., LLC. v. NBTY, Inc., 111 F. App'x 978 (10th Cir. 2004), King v. PA Consulting Grp., Inc., 78 F. App'x 645 (10th Cir. 2003), and Carr v. Stryker Corp., 28 F.3d 112, 1994 WL 325401 (10th Cir. 1994)(table), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Defendants wanted -- so the Court denied transfer.  <u>Navajo Health Found.-Sage Hosp., Inc. v.</u>
<u>Burwell</u>, 86 F. Supp. 3d at 1250-51.

**LAW REGARDING SUBJECT-MATTER JURISDICTION**

It is a fundamental precept of American law that the federal courts are "courts of limited
jurisdiction."  <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 552 (2005).  Federal
courts "possess only that power authorized by [the] Constitution and statute."  <u>Kokkonen v.</u>
<u>Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994).  Among the powers that Congress has
bestowed upon the courts is the power to hear controversies arising under federal law -- federal-
question jurisdiction -- and controversies arising between citizens of different states -- diversity
jurisdiction.  <u>See</u> 28 U.S.C. §§ 1331, 1332.

Pursuant to rule 12(h)(3) of the Federal Rules of Civil Procedure, "[i]f the court determines
at any time that it lack subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ.
P. 12(h)(3).  Objection to a federal court's subject-matter jurisdiction "may be raised by a party,
or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of
judgment."  <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 506 (2006).  <u>See</u> <u>Kontrick v. Ryan</u>, 540 U.S.
443, 455 (2004)("A litigant generally may raise a court's lack of subject-matter jurisdiction at any
time in the same civil action, even initially at the highest appellate instance.");  <u>Mansfield,</u>
<u>Coldwater & Lake Mich. Ry. Co. v. Swan</u>, 111 U.S. 379, 382 (1884)(holding that the nature and
limits of federal judicial power require the court to raise the issue of subject-matter jurisdiction
sua sponte).

Whenever the court lacks jurisdiction of the subject matter involved in an action, the court
must dismiss the action.  <u>See</u> <u>Tuck v. United States Auto. Ass'n</u>, 859 F.2d 842, 844 (10th Cir.
1988).  "'The party seeking the exercise of jurisdiction bears the burden of establishing jurisdiction

and "must allege in his pleading the facts essential to show jurisdiction.""" United States ex rel. General Rock & Sand Corp. v. Chuska Dev. Corp., 55 F.3d 1491, 1495 (10th Cir. 1995)(quoting Penteco Corp. v. Union Gas Sys., Inc., 929 F.2d 1519, 1521 (10th Cir. 1991)(quoting McNutt v. Gen. Motors Acceptance Corp., 56 S. Ct. 780, 785 (1936))).   In determining whether a party adequately has presented facts sufficient to establish jurisdiction, the court should look to the complaint's face, see Whitelock v. Leatherman, 460 F.2d 507, 514 (10th Cir. 1972), accepting the well-pleaded factual allegations as true, see United States v. Rodriguez-Aguirre, 264 F.3d 1195, 1203 (10th Cir. 2001), but ignoring conclusory allegations of jurisdiction, see Groundhog v. Keeler, 442 F.2d 674, 677 (10th Cir. 1971).   "[D]ismissals for lack of jurisdiction should be without prejudice, because the court, having determined that it lacks jurisdiction over the action, is incapable of reaching a disposition on the merits of the underlying claims." Brereton v. Bountiful City Corp., 434 F.3d 1213, 1218 (10th Cir. 2006)(emphasis in original).

The Court has addressed subject-matter jurisdiction in a number of cases, including in the context of motions to remand and of motions to dismiss.   In Denny v. Orient Lines, 375 F. Supp. 2d 1320 (D.N.M. 2005)(Browning, J.), the Court dismissed the complaint for lack of subject-matter jurisdiction because, although the parties were citizens of different states and, therefore, diversity jurisdiction was present, the amount in controversy was less than $75,000.   See 375 F. Supp. 2d at 1323.   In U.S. Bank Nat'l Ass'n for Chase Mortg. Fin. Corp. Multiclass Mortg. Pass-Through Certificates Chaseflex Tr. Series 2006-1 v. First Morgan, 299 F. Supp. 3d 1202 (D.N.M. 2017)(Browning, J.), the Court remanded the case to State court, because the removing parties did not demonstrate that complete diversity existed among the parties or that there was $75,000.00 in controversy. See 299 F. Supp. 3d at 1206-09.   In Darr v. New Mexico Dep't of Game & Fish, 403 F. Supp. 3d 967 (D.N.M. 2019)(Browning, J.), a case removed from State court, the Court

remanded the case, because the plaintiff's complaint was "based entirely on New Mexico employment and disability causes of action, none of which on their face turn on a federal issue." 403 F. Supp. 3d at 1015.  In <u>Gallup Med Flight, LLC v. Builders Tr. of N.M.</u>, 240 F. Supp. 3d 1161 (D.N.M. 2017)(Browning, J.), a contract dispute, the Court concluded that there was not a "substantial federal question of law at issue" when the complaint was "based entirely on New Mexico contract causes of action . . . ."  240 F. Supp. 3d at 1231.

<u>**LAW REGARDING SUPPLEMENTAL JURISDICTION**</u>

The federal courts are "courts of limited jurisdiction."  <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. at 552.  Federal courts "possess only that power authorized by [the] Constitution and statute."  <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. at 377.  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  <u>See</u> 28 U.S.C. §§ 1331-32.  Section 1367 additionally grants the federal courts power to hear claims over which the court otherwise lacks original jurisdiction, if those claims are part of the same constitutional case as claims over which the court has original jurisdiction.  <u>See</u> 28 U.S.C. § 1367(a).

### 1.     <u>Congressional Authority to Exercise Supplemental Jurisdiction</u>.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. at 552.  The Supreme Court long has subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines, pendent jurisdiction and

ancillary jurisdiction; § 1367's passage codified those forms of jurisdiction, and additionally permits courts to hear cases under pendent-party jurisdiction,[93] which the Supreme Court previously had disallowed in <u>Finley v. United States</u>, 490 U.S. 545 (1989).  Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact."  <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966). Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties, whose insertion into the litigation does not have the support of any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it.  <u>See Owen Equip. & Erection Co. v. Kroger</u>, 437 U.S. 365, 375 n.18 (1978).

 In 1988, the Honorable William H. Rehnquist, then-Chief Justice of the United States, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  <u>See James v. Chavez</u>, No. CIV 09–0540, 2011 WL 6013547, at *5 (D.N.M. November 21, 2011)(Browning, J.).  In response to the Committee's findings regarding pendent, ancillary, and pendent-party jurisdiction, Congress codified the doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

---

[93]Pendant-party jurisdiction occurs when "a plaintiff with a federal claim against one defendant appends a state law claim, arising from a common nucleus of facts, against *another defendant*, who could not otherwise be sued in a federal court."  Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer, & David L. Shapiro, <u>Hart and Wechsler's The Federal Courts and The Federal System</u> 867 (7th ed. 2015)(emphasis in original)("Hart and Wechsler").  Ancillary jurisdiction refers to supplemental jurisdiction in diversity cases.  <u>See</u> Hart and Wechsler, <u>supra</u>, at 1447.  Pendent jurisdiction refers to supplemental jurisdiction in federal question cases.  <u>See</u> Hart and Wechsler, <u>supra</u>, at 861.

Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

**2.** **The District Courts' Discretion to Exercise Supplemental Jurisdiction.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion. See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)). In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction. The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction. 383 U.S. at 726.

Similarly, the supplemental jurisdiction statute enumerates four factors that the court should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity . . . ." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.  Numerous courts have acknowledged that § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Exec. Software N. Am. v. U.S. Dist. Ct., 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c) . . . ."); Bonadeo v. Lujan, No. CIV 08-0812, 2009 WL 1324119, at *8 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").

The Tenth Circuit has held that district courts should presume to decline jurisdiction over State claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state

claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of

Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).  This proclamation is

consistent with the Supreme Court's statement that

> [n]eedless decisions of state law should be avoided both as a matter of comity and
> to promote justice between the parties, by procuring for them a surer-footed reading
> of applicable law.  Certainly, if the federal claims are dismissed before trial, even
> though not insubstantial in a jurisdictional sense, the state claims should be
> dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726 (footnote omitted).

The Court previously has stated that a district court should usually decline to exercise

supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, No. CIV

08-0336, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court

and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The

Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines

to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has

dismissed all claims over which it has original jurisdiction[.]'"  Muller v. Culbertson, 408 F. App'x

194, 197 (10th Cir. 2011)(unpublished)(quoting 28 U.S.C. § 1367(c)(3))(second alteration in

Muller v. Culbertson, but not in 28 U.S.C. § 1367(c)(3)).  The Tenth Circuit vacated a district

court's ruling on State law supplemental claims when that court dismissed the case's federal claims

for lack of subject-matter jurisdiction, stating that, "[i]f a district court dismisses the federal claims

on the merits, it can as a matter of discretion exercise supplemental jurisdiction.  But when a district

court dismisses the federal claims for lack of subject matter jurisdiction, it lacks such discretion

and must dismiss the supplemental claims without prejudice."  Estate of Cummings v. United

States, 651 F. App'x 822, 828 (10th Cir. 2016)(citing Estate of Harshman v. Jackson Hole

Mountain Resort Grp., 379 F.3d at 1167; Scott v. Pasadena Unified Sch. Dist., 306 F.3d 646, 664 (9th Cir. 2002)).

The Court has assessed its discretion to exercise supplemental jurisdiction on a number of occasions.  In many instances, the Court has declined to exercise supplemental jurisdiction over State law claims when it has dismissed the federal claims in a case and accordingly has remanded cases to State court.  See, e.g., Favela v. City of Las Cruces ex rel. Las Cruces Police Dep't, 431 F. Supp. 3d 1255, 1277-78 (D.N.M. 2020)(Browning, J.); Salazar v. San Juan Cty. Det. Ctr., 301 F. Supp. 3d 992, 1002-04 (D.N.M. 2017)(Browning, J.); Valdez v. Roybal, 186 F. Supp. 3d 1197, 1280 (D.N.M. 2016)(Browning, J.).  Similarly, the Court has also declined to exercise supplemental jurisdiction over State law claims after the federal claims at issue in a case were adjudicated at summary judgment.  See, e.g., Ganley v. Jojola, 402 F. Supp. 3d 1021, 1102-03 (D.N.M. 2019)(Browning, J.)(remanding State law claims to state court); Ward v. City of Hobbs, 398 F. Supp. 3d 991, 1114 (D.N.M. 2019)(Browning, J.)(dismissing State law claims without prejudice); Sinfuego v. Curry Cty. Bd. of Cty. Commissioners, 360 F. Supp. 3d 1177, 1261 (D.N.M. 2018)(Browning, J.)(dismissing State law claims without prejudice).  In another instance, however, the Court chose to exercise supplemental jurisdiction over State law claims, when, in ruling on a motion for partial judgment on the pleadings, it determined (i) that some of the federal claims would remain in the case, and (ii) that a more developed record might reveal that the Court had diversity, rather than supplemental, jurisdiction over the state-law claims.  See Swepi, LP v. Mora Cty., N.M., 81 F. Supp. 3d 1075, 1188 n.36 (D.N.M. 2015)(Browning, J.).

## **LAW REGARDING STANDING**

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has two components.  First, standing has a constitutional component arising from Article III's

requirement that federal courts hear only genuine cases or controversies.  Second, standing has a prudential component.  See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).  The burden of establishing standing rests on the plaintiff. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiff must "'allege . . . facts essential to show jurisdiction.  If [they] fai[l] to make the necessary allegations, [they have] no standing.'"  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)(quoting McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936))(alteration and ellipsis in FW/PBS, Inc.).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "'unless "the contrary appears affirmatively from the record."'"  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986)).  "'[I]t is a long-settled principle that standing cannot be "inferred argumentatively from averments in the pleadings," but rather "must affirmatively appear in the record."'"  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted in Phelps)).

1.     **Article III Standing**.

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).  See U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination."'"  Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(quoting Massachusetts v. EPA, 549 U.S. 497, 539 (2007)(quoting Baker v. Carr, 369 U.S.

186, 204 (1962)(alteration in Wyoming ex rel. Crank))). "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing." San Juan Cty., Utah v. United States, 503 F.3d at 1171. To establish Article III standing, a plaintiff must show three things: "(1) 'an injury in fact that is both concrete and particularized as well as actual or imminent'; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d at 1298 (quoting Lujan v. Defs. Of Wildlife, 504 U.S. 555, 561 (1992)).

"Standing is determined as of the time the action is brought." Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)). In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law. 484 F.3d at 1285. The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Systems v. Gandy, the Tenth Circuit concluded that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law. See 416 F.3d at 1154. Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would

lose some minor patients seeking abortions.  416 F.3d at 1155.  Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.  See 416 F.3d at 1155.

The mere presence on the books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct that the statute prohibits.  See Winsness v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006).  "This does not necessarily mean that a statute must be enforced against the plaintiff before he can sue."  Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d 1263, 1267 (10th Cir. 2003)).  Where a plaintiff can show a "credible threat of prosecution," they can sue for prospective relief against enforcement.  Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d at 1267).  Thus, to satisfy Article III, the "plaintiff's expressive activities must be inhibited by 'an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement.'"  Winsness v. Yocom, 433 F.3d at 732 (quoting D.L.S. v. Utah, 374 F.3d 971, 975 (10th Cir. 2004)).  See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)(holding that the plaintiff has standing where he suffers "an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights")(quoting D.L.S. v. Utah, 374 F.3d at 975)).

The Court has addressed whether a party has Article III standing on multiple occasions and in a variety of contexts.  In New Mexico v. McAleenan, 450 F. Supp. 3d 1130 (D.N.M. 2020)(Browning, J.), the Court concluded that the plaintiffs, the State of New Mexico and the City of Albuquerque, had Article III standing to sue the Department of Homeland Security in

connection with an abruptly implemented practice of leaving paroled asylees in various locations in New Mexico which required both entities to provide emergency care to the asylees.  See 450 F. Supp. 3d at 1175–88.  In Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150 (D.N.M. 2016)(Browning, J.) the Court concluded that overriding royalty owners had standing to pursue claims for breach of the implied duty to market and breach of the covenant of good faith and fair dealing.  See 184 F. Supp. at 1197.  In that case, the Court concluded that the overriding royalty owners met the Article III standing requirements because, as they alleged the defendants "did not pay them the appropriate amount of royalty or overriding royalty payments, they allege[d] a concrete injury, which the Defendants' alleged breach of the implied duty to market caused" that damages could redress under New Mexican law.  184 F. Supp. 3d at 1197.  In Swepi, LP v. Mora Cty., N.M., 81 F. Supp. 3d 1075 (D.N.M. 2015)(Browning, J.), the Court concluded that an energy exploration company had Article III standing to bring a range of claims against a county that implemented an ordinance banning, among other things, the extraction of oil, natural gas, or other hydrocarbons.  See 81 F. Supp. 3d at 1148-57.  In League of United Latin Am. Citizens, N.M. (LULAC) v. Ferrera, 792 F. Supp. 2d 1222 (D.N.M. 2011)(Browning, J.), the Court concluded that a plaintiff who ran in a primary election for a position on the Court of Appeals of New Mexico and whose opponent brought an ethics complaint against him that led to summary suspension as an attorney before the election, which he lost, had "not sufficiently alleged an injury-in-fact traceable to the Defendants' actions or that a judgment in his favor would likely ameliorate his alleged injury-in-fact."  792 F. Supp. 2d at 1226-27, 1239 (D.N.M. 2011).

###   2.    **Prudential Standing**.

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).  Prudential standing consists of "a

judicially-created set of principles that, like constitutional standing, places 'limits on the class of persons who may invoke the courts' decisional and remedial powers.'" Bd. of Cty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(quoting Warth v. Seldin, 422 U.S. 490, 499, 95 S. Ct. 2197, 2205 (1975)).  Generally, there are three prudential standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "'a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit.'" Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (quoting Bennett v. Spear, 520 U.S. 154, 162, 117 S. Ct. 1154, 1161 (1997)).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing.  The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l v. Static Control Components, 572 U.S. 118, 127 (2014).  Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Lexmark Int'l v. Static Control Components, 572 U.S. at 127.  Notably, the Supreme Court stated that it "often 'conspicuously included the word "arguably" in the test to indicate that the benefit of any doubt goes to the plaintiff.'" Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)). Moreover, the test "'forecloses suit only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that"' it cannot reasonably be assumed that Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 527 U.S.

at 130 (quoting <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. at 225).  This "lenient approach" preserves the APA's flexible judicial-review provisions.  <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S. at 130.

## <u>LAW REGARDING SECTION 43(a) OF THE LANHAM ACT, 15 U.S.C. § 1125(a)</u>

15 U.S.C. § 1125(a), which corresponds to Section 43(a) of the Lanham Act, creates a cause of action for: (i) infringement of unregistered trademarks; (ii) false designation of origin, which encompasses the claims commonly known as "passing off" and "reverse passing off"; and (iii) false advertising.  15 U.S.C. § 1125(a).  In addition, although 15 U.S.C. 1125(a) does not make explicit reference to false endorsement, some courts have adopted the statute as the basis for a cause of action for false endorsement, <u>i.e.</u>, "when a celebrity's identity is connected with a product or service in such a way that consumers are likely to be misled about the celebrity's sponsorship or approval of the product or service."[94]  <u>ETW Corp. v. Jireh Pub., Inc.</u>, 332 F.3d 915, 925-928 (6th Cir. 2003).

15 U.S.C. § 1125(a)(1) states:

(1)     Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --

(A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with

---

[94]Although the Court is unable to locate a Lanham Act false endorsement case from the District of New Mexico, other courts in the Tenth Circuit have addressed false endorsement claims under the Lanham Act.  <u>See</u>, <u>e.g.</u>, <u>Trial Laws. Coll. v. Gerry Spences Trials Laws. Coll. at Thunderhead Ranch</u>, No. 1:20-CV-80-JMC, 2022 WL 2718075, at *10-14 (D. Wyo. March 29, 2022)(Carson, J.)(dismissing Lanham Act false endorsement claim); <u>Amazon Inc. v. Cannondale Inc.</u>, No. 99 N 571, 2000 WL 1800639, at *6-17 (D. Colo. July 24, 2000)(Nottingham, J.)(granting summary judgment to the defendant on plaintiff's claim for false endorsement under the Lanham Act).

another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  Section 43(a) "prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill.  It forbids, for example, the Coca-Cola Company's passing off its product as Pepsi-Cola or reverse passing off Pepsi-Cola as its product."  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 32 (2003).

"The hallmark of a Lanham Act suit is proof of the likelihood of confusion, which occurs 'when consumers make an incorrect mental association between the involved commercial products or their producers.'"  Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 966 (10th Cir. 1996)(quoting S.F. Arts & Athletics, Inc. v. United States Olympic Comm., 483 U.S. 522, 564 (1987)(Brennan, J., dissenting), quoted with approval in Jordache Enters., Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1484 (10th Cir.1987)).  The Tenth Circuit looks to six factors to determine whether a likelihood of confusion exists: (i) evidence of actual confusion; (ii) the contesting mark's strength; (iii) the degree of similarity between the competing marks; (iv) the alleged infringer's intent in adopting the contested mark; (v) the degree of care that consumers likely are to exercise in purchasing the parties' products; and (vi) the similarity of the parties' products and the manner in which they sell them.  See Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d 1136, 1143 (10th Cir. 2013)(citing Vail Assocs., Inc. v. Vent-Tel-Co., Ltd., 516 F.3d 853, 863 (10th Cir. 2008)).  See, e.g., King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d at 1090-93 (applying likelihood-of-confusion factors).  The six likelihood-of-confusion factors are non-

exhaustive, and no one factor predominates.  See Water Pik, Inc. v. Med-Sys, Inc., 726 F.3d at

1143; 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1239 (10th Cir. 2013)(noting that the

likelihood-of-confusion factors "should not be applied mechanically; some factors may carry far

more weight than others depending on the circumstances").  The Tenth Circuit states, however,

that "'[a]ctual confusion in the marketplace is often considered the best evidence of likelihood of

confusion.'"  King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d at 1092 (quoting

Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co., 22 F.3d 1527, 1534 (10th Cir. 1994)(alteration

in King of the Mountain Sports, Inc. v. Chrysler Corp., but not in Universal Money Ctrs. Inc. v.

Am. Tel. & Tel. Co.)).

In the trademark context, consumer confusion can take different forms, one of which is

"direct confusion," which occurs when consumers "develop the mistaken belief that the plaintiff

is the origin of the defendant's goods or services -- so that the defendant capitalizes on the

plaintiff's good name." 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1238 (citing Australian

Gold, Inc. v. Hatfield, 436 F.3d 1228, 1238 (10th Cir. 2006)).  "The classic case of direct confusion

occurs when '[c]ustomers want to buy the [plaintiff's] product and because of the similarity of the

marks, mistakenly buy the [defendant's] product instead.'"  1-800 Contacts, Inc. v. Lens.com, Inc.,

722 F.3d at 1238 (quoting 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair

Competition § 23:10 at 23-70 (4th ed.)(alteration in 1-800 Contacts, Inc. v. Lens.com, Inc., but not

McCarthy)).  In addition to the misperception that a defendant is the source of a plaintiffs' goods,

direct confusion also encompasses a "'mistaken belief in common sponsorship or affiliation.'"  1-

800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1239 (quoting Amoco Oil Co. v. Rainbow Snow,

748 F.2d 556, 558 (10th Cir. 1984)).

1.      **Infringement of Unregistered Trademarks**.

15 U.S.C. § 1125(a) is the only provision in the Lanham Act that "'protects an unregistered mark.'"  Underwood v. Bank of Am., Corp., 996 F.3d 1038, 1045 (10th Cir. 2021)(quoting Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1220 (2d Cir. 1987)).  The Lanham Act defines "trademark" as:

> any word, name, symbol, or device, or any combination thereof -- (1) used by a person, or (2) which a person has bona fide intention to use in commerce and applies to register . . . , to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127.  For the Lanham Act to protect an unregistered mark, the plaintiff must establish that: "(1) '[the] identifying mark . . . is inherently distinctive or . . . has acquired distinctiveness through secondary meaning,' (2) the mark is nonfunctional, and (3) the competitor's alleged violation of the plaintiff's rights in its mark is likely to cause consumer confusion."  Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d 1238, 1244 (10th Cir. 2016)(quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992), and citing Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1146 (10th Cir. 2016)).

The Tenth Circuit characterizes marks as "'inherently distinctive[']" if their "[']intrinsic nature serves to identify a particular source,[']" in which case they "[']almost *automatically* tell a customer that they refer to a brand and immediately signal a brand or product source.[']"  Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1244-45 (quoting Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 977 (emphasis in Forney Indus., Inc. v. Daco of Mo., Inc. and Sally Beauty Co. v. Beautyco, Inc.)).  "If the mark is not inherently distinctive, it can gain protection only once 'it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.'"

Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245 (quoting Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 211 (2000)).  Courts characterize marks as belonging to one of five categories -- (i) fanciful; (ii) arbitrary; (iii) suggestive; (iv) descriptive; or (v) generic, in descending order of distinctiveness -- to assess whether the mark is inherently distinctive.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245 (citing Abercrombie & Fitch v. Hunting World, Inc., 537 F.2d 4, 9-11 & n.12 (2d Cir. 1976)).  If a mark is fanciful, arbitrary, or suggestive, it is inherently distinctive and protectable as an unregistered trademark, and if a mark is descriptive, it requires evidence of secondary meaning to be protectable.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245.  Generic marks are not entitled to trademark protection under the Lanham Act.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245.

The Lanham Act requirement that a mark be used in commerce means that the mark's use must be "in the ordinary course of trade, and not merely to reserve a right in a mark."  15 U.S.C. § 1127.  Specifically, a mark is used in commerce when "it is placed . . . on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or . . . on documents associated with the goods or their sale," and "the goods are sold or transported in commerce . . . ."  15 U.S.C. § 1127.  Regarding the role of priority in the use of a mark in commerce, the Tenth Circuit states:

> The plaintiff's "use of a mark in commerce . . . must be sufficient to establish *ownership rights* for a plaintiff to recover against subsequent users under section 43(a)."  . . .  Whether such prior use is sufficient to confer a protectable interest in the mark does not turn on whether the use was for profit, but instead on whether the activities "bear elements of competition, notwithstanding [a] lack of an immediate profit-motive."

Underwood v. Bank of Am. Corp., 996 F.3d 1038, 1053 (10th Cir. 2021)(quoting Planetary Motion, Inc. v. Techsplosion, Inc., 21 F.3d 1188, 1195, 1199, 1200 (11th Cir. 2001)(emphasis in Planetary Motion, Inc. v. Techsplosion, Inc., but not Underwood v. Bank of Am. Corp.; first

ellipsis and alteration in Underwood v. Bank of Am. Corp., but not Planetary Motion, Inc. v. Techsplosion, Inc.)).  A plaintiff can establish use of a mark in commerce by showing "actual use" through commercial transactions, or, in the absence of actual sales, "analogous use" through a product's promotion or advertisement.  Underwood v. Bank of Am. Corp., 996 F.3d 1038 at 1053-54.

The central inquiry in an infringement claim under 15 U.S.C. § 1125(a) is "whether the junior user's mark is likely to cause confusion with the senior user's mark."  Water Pik, Inc. v. Med-Systems, Inc., 726 F.3d at 1143.  The Tenth Circuit states that the elements of an infringement claim under 15 U.S.C. § 1125 are: "(1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used 'an identical or similar mark' in commerce . . . ; and (3) that the defendant's use is likely to confuse consumers" -- nearly identical elements to those of a claim for infringement of a registered mark under Section 32 of the Lanham Act, "except that the registration of a mark serves as prima facie evidence of both the mark's validity and the registrant's right to use it in commerce . . . ."  1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1238 (citing Donchez v. Coors Brewing Co., 392 F.3d 1211, 1215 (10th Cir. 2004); Utah Lighthouse Ministry v. Found. For Apologetic Info. & Research, 527 F.3d 1045, 1050 (10th Cir. 2008).

In addition to 15 U.S.C. § 1125(a)'s protections, State common law can provide additional protections for an unregistered trademark.  See Underwood v. Bank of Am. Corp., 996 F.3d at 1046.  "Federal and state trademark protections generally parallel each other, and the former do not preempt the latter."  Underwood v. Bank of Am. Corp., 996 F.3d at 1046.  Further, unregistered trademarks can find protection in other statutes, including the Anticybersquatting Consumer Protection Act, 15 U.S.C. 1125(d).  See Matal v. Tam, 582 U.S. 218, 226 (2017)(citing 5 McCarthy on Trademarks and Unfair Competition § 25A:49, at 25A-198 (5th ed.)).

- 150 -

2.     **False Designation of Origin.**

While the Lanham Act generally is a statute governing trademarks and other marks, § 43(a) "is one of the few provisions that goes beyond trademark protection." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. at 28-29.  Section 43(a) "created a federal remedy against a person who used in commerce either 'a false designation of origin, or any false description or representation' in connection with 'any goods or services.'" Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. at 29.  False designation of origin under the Lanham Act includes the claim sometimes referred to as "passing off," as well as its opposite, "reverse passing off." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. at 30.  Passing off occurs "when a producer misrepresents his own goods or services as someone else's," and reverse passing off occurs when a "producer misrepresents someone else's goods or services as his own." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. at 27 n.1.  The false designation of origin provisions in § 43(a) cover both a product's origin of production and geographic origin. See Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. at 30.

A party who believes "it has or will suffer damages because the competitor's product or packaging is so similar as to confuse purchasers of the product's source" may bring an action under 15 U.S.C. § 1125(a). Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 516-17 (10th Cir. 1987). To bring a claim for false designation of origin, a plaintiff must show that: (i) it has a protectable interest in a mark; (ii) the defendant used in commerce a mark that is similar or identical; and (iii) the defendant's use of the mark is likely to result in consumer confusion. See Strobel v. Rusch, 431 F. Supp. 3d 1315, 1326 (D.N.M. 2020)(Brack, J.)(quoting 1-800 Contacts, Inc. v. Lenses.com, Inc., 722 F.3d at 1238).

### 3.    **False Advertising**.

Section 43(a) creates a cause of action for false advertising.  See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. at 778 (commenting that, under the original Lanham Act, "[t]he phrase ['false description or representation'] encompassed two kinds of wrongs: false advertising and the common-law tort of passing off" (footnotes and quotation marks omitted)); Marcinkowska v. IMG Worldwide, Inc., No. 2009-1213, 2009 WL 2562745, at *4 (Fed. Cir. August 20, 2009)(stating that Section 43(a)(1)(B) of the Lanham Act "prohibits false advertising in connection with the name, description, or origin of goods or services in the United States" (quotation marks omitted)). To sustain a Lanham Act false advertising claim, the a plaintiff must prove: (i) that a defendant made a false or misleading statement of fact in a commercial advertisement about its own or another's product; (ii) the misrepresentation is material, in that it is likely to influence the purchasing decision; (iii) the misrepresentation deceives or has the tendency to deceive a substantial segment of its audience; (iv) a defendant placed the false or misleading statement in interstate commerce; and (v) the plaintiff has been injured or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.  See Zoller Labs., LLC. v. NBTY, Inc., 111 F. App'x. 978, 982 (10th Cir. 2004)(unpublished).  See also Marcinkowska v. IMG Worldwide, Inc., 2009 WL 2562745, at *4; Scotts Co. v. United Indus. Corp., 315 F.3d 264, 272 (4th Cir. 2002);  Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-11 (1st Cir. 2002); IQ Prods. Co. v. Pennzoil Prods. Co., 305 F.3d 368, 375 (5th Cir. 2002); United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998); Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997); Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,

19 F.3d 125, 129 (3d Cir. 1994); <u>Guidance Endodontics, LLC v. Dentsply Int'l, Inc.</u>, No. CIV 08-

1101 JB/RLP, 2011 WL 1336473, at *6 (D.N.M. March 31, 2011)(Browning, J.).

## LAW REGARDING THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT, 15 U.S.C. § 1125(d)

"Congress enacted the Anti-Cybersquatting Protection Act (ACPA), 15 U.S.C. § 1125(d),

to address 'a new form of piracy on the Internet caused by acts of "cybersquatting," which refers

to the deliberate, bad-faith, and abusive registration of Internet domain names in violation of the

rights of trademark owners.'" <u>Utah Lighthouse Ministry v. Found. for Apologetic Info. &</u>

<u>Research</u>, 527 F.3d at 1057 (quoting S. Rep. No.106-140, at 4 (1999)).  To have standing to bring

an action for cybersquatting under 15 U.S.C. § 1125(d), a plaintiff must be the registered owner

or assignee of a mark.  <u>See</u> <u>Hargrave v. Chief Asian, LLC</u>, 479 F. App'x 827, 829 (10th Cir.

2012)(citing 15 U.S.C. § 1125(d)(1)(A)).  The ACPA creates the following cause of action for

cybersquatting:

> (1)(A)        A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person --
>
> (i)        has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii)        registers, traffics in, or uses a domain name that --
>
>> (I)        in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>>
>> (II)        in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
>>
>> (III)        is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).   See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, 527 F.3d at 1057 (summarizing the ACPA as providing "liability if a person registers, traffics in, or uses a domain name that is identical or confusingly similar to a distinctive mark, with a bad faith intent to profit from that mark").   The ACPA then lists nine factors to consider in assessing whether a defendant has bad faith intent.   See 15 U.S.C. § 1125(d)(1)(B).   Evidence of "bad faith intent to profit" from a mark exists, for example, when a defendant "purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price," or when a defendant "divert[s] customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's."   Utah Lighthouse Ministry v. Found. for Apologetic Info & Research, 527 F.3d at 1058.

### LAW REGARDING CANCELLATION OF FEDERAL TRADEMARK REGISTRATION ON THE BASIS OF FRAUD UNDER THE LANHAM ACT, 15 U.S.C. § 1064

The Lanham Act's provision regarding cancellation of trademarks permits a person who "believes that he is or will be damaged" by the existence of a mark to seek that mark's cancellation within five years of registration.   15 U.S.C. § 1064.   Canceling a trademark under the Lanham Act requires a plaintiff to establish: "'(1) that it has standing; and (2) that there are valid grounds for canceling the registration.'"   Underwood v. Bank of Am. Corp., 996 F.3d at 1050 (quoting Cunningham v. Laser Golf Corp., 222 F.3d 943, 945 (Fed. Cir. 2000)).   The Lanham Act's cancellation provision contemplates a number of instances in which cancellation is appropriate, including when "registration was obtained fraudulently . . . , or if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used."   15 U.S.C. 1064(3).   "A court should not lightly undertake cancellation on the basis of fraud, . . . and the burden of proving fraudulent procurement

of a registration is heavy . . . ."  Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d at (citing

Robert V. Vance & Assocs., Inc. v. Baronet Corp., 487 F. Supp. 790, 800 (N.D. Ga. 1979); W.D.

Byron & Sons v. Stein Bros. Mfg., 377 F.2d 1001, 1003 (Cust. & Pat.App. 1967)).  To achieve

cancellation of a mark on the basis of fraud, a party must prove, by clear-and-convincing evidence,

that the mark's registrant deliberately misled the Patent Office.  See Beer Nuts, Inc. v. Clover Club

Foods Co., 711 F.2d at 942 (citing Money Store v. Harriscorp Fin., Inc., 689 F.2d 666, 670 (7th

Cir. 1982); Wrist-Rocket Mfg. Co. v. Saunders Archery Co., 516 F.2d 846, 852 (8th Cir.), cert.

denied, 423 U.S. 870 (1975)).  "'Statements of honest, but perhaps incorrect, belief or innocently

inaccurate statements of fact are insufficient as are knowing misstatements which would have a *de*

*minimus* effect on the validity of the service mark.'"  Beer Nuts, Inc. v. Clover Club Foods Co.,

711 F.2d at 942 (quoting Five Platters, Inc. v. Purdie, 419 F. Supp. 372, 384 (D. Md. 1976)).

## LAW REGARDING COPYRIGHT INFRINGEMENT

The Copyright Act of 1976, 17 U.S.C. §§ 101-810 (the "Copyright Act"), governs

copyright infringement claims, over which federal courts have exclusive jurisdiction.  See 28

U.S.C. § 1338(a).  The Copyright Act provides that

> the owner of copyright under this title has the exclusive rights to do and to authorize
> any of the following: (1) to reproduce the copyrighted work in copies . . . ; (2) to
> prepare derivative works based upon the copyrighted work; [and] (3) to distribute
> copies . . . of the copyrighted work to the public by sale or other transfer of
> ownership, or by rental, lease, or lending . . . .

17 U.S.C. § 106.  Anyone who violates any of the copyright owner's exclusive rights by using or

authorizing the copyrighted work's use in one of the ways that the statute outlines infringes the

copyright.  See Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 433 (1984)(citing

17 U.S.C. § 501(a)).

There are two elements to a copyright infringement claim: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). To prevail on a claim of copyright infringement, the plaintiff bears the burden of establishing ownership of a valid copyright and the defendant's violation of any one of the exclusive rights that 17 U.S.C. § 106 grants to copyright owners. See Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 831-32 (10th Cir. 1993); Palladium Music, Inc. v. EatSleepMusic, Inc., 398 F.3d at 1196.

To establish direct copyright infringement, a plaintiff must allege and prove that a defendant "unlawfully appropriated protected portions of the copyrighted work." Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d at 832. This element requires proving both: (i) that the defendant, as a factual matter, copied portions of the plaintiff's work; and (ii) that those elements of the work that were copied are protected expression and used in such a manner that the appropriation is actionable under § 106. See Jacobsen v. Deseret Book Co., 287 F.3d 936, 942 (10th Cir. 2002); Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d at 832.

The Copyright Act contains a statute-of-limitations provision, 17 U.S.C. § 507(b), which provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). This three-year period begins to run when "the plaintiff knows or has reason to know of the infringement." Diversey v. Schmidly, 738 F.3d at 1201 (citing Roley v. New World Pictures, Ltd., 19 F.3d 479, 481 (9th Cir. 1994)). The Tenth Circuit has adopted the majority view of § 507(b) as "evenhanded": a plaintiff cannot bring claims for infringement occurring outside the three-year period, but a plaintiff does not waive their claims for infringement occurring during the three-year

period by failing to sue for earlier known infringements.  Diversey v. Schmidly, 738 F.3d at 1201

(citing Roley v. New World Pictures, 19 F.3d at 481).

### LAW REGARDING COMMON-LAW UNFAIR COMPETITION

"New Mexico courts generally rely on the definition set forth in the Restatement (Third)

of Unfair Competition § 1 (Am. Law Inst. 1995) to define the elements of a common law unfair

competition claim."  Purvis Indus., LLC v. Spokane Indus., Inc., No. CIV. 18-0585 RB/LF, 2019

WL 1992911, at *9 (D.N.M. May 6, 2019)(Brack, J.)(citing N.M. Oncology & Hematology

Consultants, Ltd. v. Presbyterian Healthcare Servs., 54 F. Supp. 3d 1189, 1235-36 (D.N.M.

2014)(Vazquez, J.)(collecting cases)).  Indeed, in Guidance Endodontics, LLC v. Dentsply Intern.,

Inc., the Court relied on the Restatement's elaboration of the elements of a claim for common-law

unfair competition.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d at

1249.  Common-law unfair competition bars particular methods of competing, specifically: (i)

deceptive marketing or false advertising; (ii) trademark infringement; (iii) misappropriation of the

trade values of another; or (iv) conduct otherwise "determined to be actionable as an unfair method

of competition."  Restatement (Third) of Unfair Competition § 1 & cmt. a (1995).

### 1.    Common-Law False Advertising.

The Introductory Note to Chapter 2 of the Restatement (Third) of Unfair Competition

explains: "This Chapter [2] addresses the rules governing liability for injury to the commercial

interests of competitors and others arising from . . . representations falsely describing the qualities

or characteristics of a seller's goods or services, often referred to as 'false advertising.'"

Restatement (Third) of Unfair Competition ch.2, intro. note.  Section 2 sets forth the general

principle:

> One who, in connection with the marketing of goods or services, makes a
> representation relating to the actor's own goods, services, or commercial activities

that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another under the rule stated in § 3 is subject to liability to the other for the relief appropriate under the rules stated in §§ 35-37.

Restatement (Third) of Unfair Competition § 2.

A representation is to the likely commercial detriment of another if: (a) the representation is material, in that it is likely to affect the conduct of prospective purchasers; and (b) there is a reasonable basis for believing that the representation has caused or is likely to cause a diversion of trade from the other or harm to the other's reputation or good will.

Restatement (Third) of Unfair Competition § 3.

### a.    Common-Law False Designation of Origin.

The Restatement (Third) of Unfair Competition's general principle regarding false advertising finds specific application, among other areas, in the context of false designation of origin claims, which are sometimes referred to as claims for "passing off." Restatement (Third) of Unfair Competition § 4.  When a seller "passes off" its goods as those of another, it leads "prospective purchasers to believe that another person is associated with the actor or with the goods or services marketed by the actor, thus placing the other person's reputation at risk and diverting to the actor the benefit of the other's good will." Restatement (Third) of Unfair Competition § 4. In at least one meaningful respect, the proof required for a common-law false-designation-of-origin claim departs from the proof required for other common-law false adverting claims: to establish liability for false designation of origin, "independent proof of likely commercial detriment as required under the general rule stated in § 2 is unnecessary . . . ." Restatement (Third) of Unfair Competition § 4.  Proving false designation of origin, however, requires that "the representation must create a likelihood that a significant portion of the audience will be deceived or misled with respect to the identity or commercial affiliation of the actor or the source or sponsorship of the actor's goods or services," although "[p]roof of actual deception is not

required." Restatement (Third) of Unfair Competition § 4. Although there is no requirement to prove intent to deceive on the part of the seller, "evidence that the representation was in fact intended to mislead prospective purchasers . . . may justify an inference that deception is likely." Restatement (Third) of Unfair Competition § 4. If there is evidence of intent to deceive, "the burden may properly shift to the actor to demonstrate that deception is unlikely despite the attempt to deceive." Restatement (Third) of Unfair Competition § 4. Although the Court has adjudicated a common-law claim for false advertising, see Guidance Endodontics, LLC v. Dentsply Intern., Inc., 708 F. Supp. 2d at 1251-52, it has not confronted a claim for common-law false designation of origin.

### 2. **Common-Law Trademark Infringement.**

New Mexico has passed a Trademark Act, N.M. Stat. Ann. §§ 57-3B-1 to 57-3B-17. Section 2 of the Trademark Act states that it is intended "to provide a system of state trademark registration and protection substantially consistent with the federal system . . . under the Trademark Act of 1946." N.M. Stat. Ann. § 57-B3-2. While the Court has found no New Mexico case law addressing the issue, the New Mexico Legislature has determined to extinguish the common-law cause of action for trademark infringement, if, indeed, New Mexico has ever adopted it. Before 1997, the New Mexico Trademark Act included a provision that explicitly "preserve[d] the common law rights to trademarks acquired in good faith at any time." S & S Invs., Inc. v. Hooper Enters., Ltd., 1993-NMCA-122, ¶ 5, 116 N.M. 393, 395, 862 P.2d 1252, 1254 (citing N.M. Stat. Ann. § 57-3-12). In 1997, the New Mexico Legislature repealed most of Article 3 of Chapter 57 and recodified much of it into Article 3B. See N.M. Stat. Ann. §§ 57-3-1-57-3-12. Article 3B lacks any provision expressly retaining common-law trademark rights. Trademark infringement claims thus must be based on trademarks recognized under federal trademark law or under the

New Mexico Trademark Act.  Moreover, even if such a cause of action exists, in New Mexico, it has the same elements as a claim of trademark infringement under the Lanham Act.  See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, 527 F.3d at 1049-50 ("Trademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together . . . ."); N.M. Stat. Ann. § 57-3B-2 ("The purpose of the Trademark Act is to provide a system of state trademark registration and protection substantially consistent with the federal system [and] the construction given the federal act should be examined as persuasive authority for interpreting and construing the Trademark Act.").

## LAW REGARDING RIGHTS OF PUBLICITY

The right of publicity is the right of a person to control the commercial use of his or her identity.  See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 967 (citing McCarthy on Publicity § 1.1[A][1] (1st ed.)); Restatement (Third) of Unfair Competition § 46.  "Most formulations of the right protect against the unauthorized use of certain features of a person's identity -- such as name, likeness, or voice -- for commercial purposes." Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 967 (citing McCarthy on Publicity §§ 4.9-4.15 (1st ed.)).  See Moore v. Sun Pub. Corp., 1994-NMCA-104, ¶ 28, 118 N.M. 375, 383, 881 P.2d 735, 743 ("Invasion of the 'right of publicity,' also known as 'appropriation,' consists of the exploitation of the plaintiff's name or likeness, usually for commercial gain, as in the unauthorized use of the plaintiff's name in an advertising endorsement for a product.").  The right of publicity is a cognizable property interest akin to the property interest in trademark or copyright.  See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 967.  "Although publicity rights are related to laws preventing false endorsement, they offer substantially broader protection." Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 967.

There is no statutory right of publicity in New Mexico, and the two New Mexico cases that mention rights of publicity -- both in dicta regarding invasion of privacy claims -- provide little indication whether New Mexico law permits a right-of-publicity cause of action.[95]  See Moore v. Sun Pub. Corp., 1994-NMCA-104, ¶ 28, 118 N.M. 375, 382-83, 881 P.2d. 735, 742-43; McNutt v. New Mexico State Trib. Co., 1975-NMCA-085, ¶ 8, 88 N.M. 162, 165-66, 538 P.2d 804, 807-08 (quoting William L. Prosser, Law of Torts § 117 (4th ed. 1971), for the proposition that there

---

[95]In Moore v. Sun Pub. Corp., the Court of Appeals of New Mexico states that, "[a]lthough the New Mexico appellate courts have occasionally been called upon to consider whether an invasion of privacy occurred, it has never been necessary to make clear distinctions among the various categories into which this tort may be divided," and that

> Professor Smolla recently summarized the four categories, originally set forth by Dean Prosser, as follows:
>
> (1)  *False Light Invasion of Privacy*.  The essence of this tort, a close cousin of defamation, is the placing of another "in a false light in the public eye."
>
> (2)  *Intrusion*.  This tort, distinct from but related to trespass, involves an invasion of the plaintiff's "private" space or solitude -- eavesdropping on private conversations or peeping through the bedroom window, for example.
>
> (3)  *Publication of Private Facts*.  This tort involves the publication of true but intimate or private facts about the plaintiff, such as matters concerning the plaintiff's sexual life or health.  Since it is premised on publication of facts that are private but nonetheless true, it is the most problematic of the privacy torts in terms of reconciliation with the first amendment.
>
> (4)  *The Right of Publicity or Appropriation*.  Invasion of the "right of publicity," also known as "appropriation," consists of the exploitation of the plaintiff's name or likeness, usually for commercial gain, as in the unauthorized use of the plaintiff's name in an advertising endorsement for a product.

1994-NMCA-104, ¶ 28, 118 N.M. 375, 382-83, 881 P.2d. 735, 742-43 (quoting Rodney A. Smolla, Law of Defamation § 10.01[2], at 10-3 (1994)).

is a "complex of four" right-of-privacy torts, including "appropriation, for the defendant's benefit or advantages, of the plaintiff's name or likeness"). While the Tenth Circuit has opined on the nature of right-of-publicity claims and interpreted the right-of-publicity law of other States, it has not indicated whether right-of-publicity claims are actionable under New Mexico law.[96] See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 967-68 (discussing rights of publicity and interpreting Oklahoma right-of-publicity statute).

In the absence of clear support from New Mexico statutes or case law, the Court looks to New Mexico State courts' history of recognizing the principles of Restatement (Third) of Unfair Competition for purposes of evaluating common-law unfair competition claims. See N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs., 54 F. Supp. 3d at 1235 ("New Mexico courts have, in the absence of controlling authority, relied upon the Restatement's articulation of state law." (collecting cases)). For example, in Guidance Endodontics, LLC v. Dentsply International, Inc., the Court concludes that, "[b]ecause New

---

[96]In its discussion of rights of publicity in connection with the Oklahoma right-of-publicity statute, the Tenth Circuit notes, among other things, that "most formulations of the right protect against the unauthorized use of certain features of a person's identity -- such as name, likeness, or voice -- for commercial purposes," and that, "[a]lthough publicity rights are related to laws preventing false endorsement, they offer substantially broader protection." Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 967. The Tenth Circuit offered the following hypothetical right-of-publicity fact pattern:

> Suppose, for example, that a company, Mitchell Fruit, wanted to use pop singer Madonna in an advertising campaign to sell bananas, but Madonna never ate its fruit and would not agree to endorse its products. If Mitchell Fruit posted a billboard featuring a picture of Madonna and the phrase, "Madonna may have ten platinum albums, but she's never had a Mitchell banana," Madonna would not have a claim for false endorsement. She would, however, have a publicity rights claim, because Mitchell Fruit misappropriated her name and likeness for commercial purposes. Publicity rights, then are a form of property protection that allows people to profit from the full commercial value of their identities.

Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d at 967-68.

Mexico courts tend to follow *Restatement* law when dealing with issues of first impression, and in the absence of any state law on the subject, the Court concludes that the Supreme Court of New Mexico would likely follow the *Restatement's* view on common-law claims of trademark dilution."  708 F. Supp. 2d at 1253 (collecting cases).  Here too, in the rights-of-publicity context, the Court anticipates that the Supreme Court of New Mexico likely would adopt the principles of the Restatement (Third) of Unfair Competition, as it has for other common-law unfair competition claims.  See, e.g., Pincheira v. Allstate Ins. Co., 2008-NMSC-049, ¶ 54, 144 N.M. 601, 613, 190 P.3d 322, 334 (citing Restatement (Third) of Unfair Competition in connection with a trade secret claim).

In elaborating a right-of-publicity cause of action, the Restatement (Third) of Unfair Competition states: "One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability . . . ."  Restatement (Third) of Unfair Competition § 46.  "The sale of merchandise bearing a person's name or likeness ordinarily constitutes a use of the identity for purposes of trade . . . ."  Restatement (Third) of Unfair Competition § 47.  The unauthorized use of a person's right of publicity must be "sufficient to identify the person whose identity the defendant is alleged to have appropriated."  Restatement (Third) of Unfair Competition § 46.  Proof of deception, consumer confusion, and evidence of intent to infringe another's right of publicity are not necessary to establish liability under a right-of-publicity cause of action.  See Restatement (Third) of Unfair Competition § 46.  Rights of publicity are property rights assignable to others.  See Restatement (Third) of Unfair Competition § 46.  Further, "[c]onduct that would otherwise infringe the personal or commercial interests protected by the rights of privacy and publicity is not

actionable if the conduct is within the scope of consent given by the holder of the right."
<u>Restatement (Third) of Unfair Competition</u> § 46.

The <u>Restatement (Third) of Unfair Competition</u> prescribes the issuance of injunctive relief as a remedy for a right-of-publicity claim. <u>See</u> <u>Restatement (Third) of Unfair Competition</u> § 48. For purposes of injunctive relief, a "comparative appraisal of all the factors of the case," including the following "primary factors," is appropriate:

    (a)    the nature of the interest to be protected;

    (b)    the nature and extent of the appropriation;

    (c)    the relative adequacy to the plaintiff of an injunction and of other remedies;

    (d)    the relative harm likely to result to the legitimate interests of the defendant if an injunction is granted and to the legitimate interests of the plaintiff if an injunction is denied;

    (e)    the interests of third persons and of the public;

    (f)    any unreasonable delay by the plaintiff in bringing suit or otherwise asserting his or her rights;

    (g)    any related misconduct on the part of the plaintiff; and

    (h)    the practicality of framing and enforcing the injunction.

<u>Restatement (Third) of Unfair Competition</u> § 48. "A continuing or threatening infringement of a person's right of publicity ordinarily justifies injunctive relief." <u>Restatement (Third) of Unfair Competition</u> § 48. Although "an injunction will ordinarily prohibit only unauthorized use of the plaintiff's identity in advertising or merchandising activities," if a defendant "intrudes upon other protected interests such as the personal interests protected by the right of privacy," a broader injunction be appropriate. <u>Restatement (Third) of Unfair Competition</u> § 48.

The <u>Restatement (Third) of Unfair Competition</u> also provides for monetary damages as a "common remedy in actions for infringement of the right of publicity." <u>Restatement (Third) of</u>

Unfair Competition § 49.  For purposes of monetary damages, a "comparative appraisal of all the factors of the case," including the following "primary factors," is appropriate:

   (a)   the degree of certainty with which the plaintiff has established the fact and extent of the pecuniary loss or the actor's pecuniary gain resulting from the appropriation;

   (b)   the nature and extent of the appropriation;

   (c)   the relative adequacy to the plaintiff of other remedies;

   (d)   the intent of the actor and whether the actor knew or should have known that the conduct was unlawful;

   (e)   any unreasonable delay by the plaintiff in bringing suit or otherwise asserting his or her rights; and

   (f)   any related misconduct on the part of the plaintiff.

Restatement (Third) of Unfair Competition § 49.  "Monetary relief for an appropriation of the commercial value of a person's identity can consist of either compensatory damages measured by the loss to the plaintiff or restitutionary relief measured by the unjust gain to the defendant." Restatement (Third) of Unfair Competition § 49.

## LAW REGARDING TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

Under New Mexico law, tortious interference with an existing contractual relationship and tortious interference with a prospective contractual relationship are separate claims.  See Fikes v. Furst, 2003-NMSC-033, ¶ 22, 134 N.M. 602, 609, 81 P.3d 545, 552; Guest v. Berardinelli, 2008-NMCA-144, ¶ 32, 145 N.M. 186, 196, 195 P.3d 353, 363.  New Mexico courts have recognized that existing contractual relationships merit more protection than prospective contractual relationships, and, thus, a different analysis is appropriate for the two claims.  See Fikes v. Furst, 2003-NMSC-033, ¶ 22, 134 N.M. 602, 609, 81 P.3d 545, 552.  Neither New Mexico, nor

the Restatement, nor, to the Court's knowledge, any other jurisdiction, recognizes a claim for attempted tortious interference.

1.      **New Mexico Law Regarding Tortious Interference With Existing Contractual Relationships.**

To plead properly a claim of tortious interference with existing contractual relationships, a plaintiff must allege that: (i) the defendant had knowledge of existing contracts; (ii) the contracts were breached; (iii) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract; (iv) damages flowed from the breached contract; and (v) the defendant induced the breach without justification or privilege. See Wolf v. Perry, 1959-NMSC-044, ¶¶ 19-22, 65 N.M. 457, 461-62, 339 P.2d 679, 681-82; Ettenson v. Burke, 2001-NMCA-003, ¶ 14, 130 N.M. 67, 73, 17 P.3d 440, 446. A plaintiff seeking to hold a defendant liable for tortious interference with an existing contractual relationship must allege "that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof." Wolf v. Perry, 1959-NMSC-044, ¶ 22, 339 P.2d at 682. Unless the defendant's allegedly tortious actions were "the proximate cause of the injury there is no liability." Wolf v. Perry, 1959-NMSC-044, ¶ 22, 65 N.M. 457, 462, 339 P.2d 679, 682 (internal quotation marks and citations omitted).

A plaintiff also must allege that the defendant acted either with an improper motive or with improper means, and that "the improper motive or improper means [was] used in persuading the person to breach the contract." Martin v. Franklin Capital Corp., 2008-NMCA-152, ¶ 7, 145 N.M. 179, 182, 195 P.3d 24, 27. The plaintiff does not need to allege that the improper motive was the sole motive for the interference. See Fikes v. Furst, 2003-NMSC-0033, ¶ 21, 134 N.M. 602, 609, 81 P.3d 545, 552 ("This Court, though, has never stated that an improper motive must be the sole motive for interfering with an existing contract."). Violence, threats or other intimidation, deceit

- 166 -

or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood, can indicate improper means, but this list is not definitive.  See M & M Rental Tools, Inc. v. Milchem, Inc., 1980-NMCA-072, ¶ 29, 94 N.M. 449, 454, 612 P.2d 241, 246.

An ongoing business relationship, specifically a relationship in which a company fills orders for repeat purchasers who are not contractually obligated to purchase again in the future, does not, without more, constitute a contractual relation.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. 08-1101 JB/RLP, Memorandum Opinion and Order at 15-16, filed September 11, 2009 (D.N.M.)(Browning, J.)(Doc. 316)("Guidance Endodontics MOO")("[T]he Court believes that the Supreme Court of New Mexico would hold that the alleged ongoing business relationship between [the Plaintiff] and its customers does not, without more, constitute an existing contractual relation.").  New Mexico's Uniform Commercial Code permits a contract for the sale of goods to be formed "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  N.M. Stat. Ann. § 55-22-4(1) (1961).  Section 55-2-204(1) implies that there must be some showing of agreement.  Even though one or more terms may be left open, a contract for sale will not fail for indefiniteness if "the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."  N.M. Stat. Ann. § 55-2-204(3) (1961).  It is not clear, however, that the courts could provide a remedy if a party in an ongoing business relationship attempted to enforce the business relationship.  An ongoing business relationship therefore does not, without more, constitute an existing contractual relationship.  See Guidance Endodontics MOO at 16.

The Court has adjudicated cases involving claims for tortious interference with existing contractual relations.  In Horizon AG-Prods. v. Precision Systems Engineering, Inc., No. CIV 09-1109 JB/DJS, 2020 WL 4054131 (D.N.M. September 28, 2010)(Browning, J.), a case in which a

manufacturer sued an engineering firm it retained to renovate its factory in connection with business disruptions that "would have" occurred had the manufacturer not stopped them, the Court dismissed the plaintiff's tortious-interference-with-existing-contractual-relationships claim, because the plaintiff did not allege sufficient facts regarding (i) the defendant's knowledge of the plaintiff's existing contracts; (ii) the defendant's interference with the performance of the plaintiff's existing contracts; and (iii) the defendant's actions impact on the expense and burden of the plaintiff performing under a contract.  2020 WL 4054131, at *1-2, *10-12.  Similarly, in Friedlander v. Cook, No. CIV 06-1160 JB/DJS, 2008 WL 4830814 (D.N.M. August 13, 2008)(Browning, J.), the Court dismissed a plaintiff's claim for interference with existing contractual relations, because the plaintiff did not plead the elements necessary for that claim, specifically, that a defendant played "'an active and substantial part in causing'" the loss of the benefits from a contract at issue or "'induced the breach' or otherwise interfered with that contract."  2008 WL 4830814, at *4-5.

## 2.    New Mexico Law Regarding Tortious Interference With Prospective Contractual Relationships.

New Mexico courts have adopted the tort of interference with prospective contractual relations, as stated in Restatement (Second) of Torts § 766B (Am. Law. Inst. 1965).  See Anderson v. Dairyland Ins. Co., 1981-NMSC-130, ¶ 11, 97 N.M. 155, 158–59, 637 P.2d 837, 840-41 (stating the Supreme Court of New Mexico's approval of the New Mexico Court of Appeals' adoption of the Restatement (Second) of Torts § 766B); M & M Rental Tools, Inc. v. Milchem, Inc., 1980-NMCA-072, ¶ 20, 94 N.M. 449, 453, 612 P.2d 241, 245 (adopting Restatement (Second) of Torts § 766B as a cause of action under New Mexico State law).  Section 766B states:

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm

resulting from loss of the benefits of the relation, whether the interference consists of:

(a)     inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b)     preventing the other from acquiring or continuing the prospective relation.

M & M Rental Tools, Inc. v. Milchem, Inc., 1980-NMCA-072, ¶ 20, 94 N.M. 449, 453, 612 P.2d 241, 245; Restatement (Second) of Torts § 766B.  In short, a plaintiff must allege that "there was an actual prospective contractual relation which, but for the [Defendant's] interference, would have been consummated."  Anderson v. Dairyland Ins. Co., 1981-NMSC-130, ¶ 13, 97 N.M. at 159, 637 P.2d at 841.

A plaintiff also must allege that the defendant committed the tort with either improper motive or through improper means.  See Zarr v. Washington Tru Solutions, LLC, 2009-NMCA-050, ¶ 10-11, 146 N.M. 274, 276-77, 208 P.3d 919, 921-22.  The Court of Appeals of New Mexico has held that, although a plaintiff must allege that the defendant's sole motive was to harm under the improper motive theory, such a showing is not necessary under an improper-means theory.  See Zarr v. Washington Tru Solutions, LLC, 2009-NMCA-050, ¶ 11, 208 P.3d at 921-22.

The commentary to the Restatement (Second) of Torts § 766B describes the relationships that will support an interference with prospective contractual relations tort:

The relations protected against intentional interference by the rule stated in this Section include any prospective contractual relations, except those leading to contracts to marry, if the potential contract would be of pecuniary value to the plaintiff. Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts. Interference with the exercise by a third party of an option to renew or extend a contract with the plaintiff is also included. Also included is interference with a continuing business or other customary relationship not amounting to a formal contract. In many respects, a contract terminable at will is closely analogous to the relationship covered by this Section.

> The expression, prospective contractual relations, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation.

Restatement (Second) of Torts § 766B cmt. c.  See Mountain Highlands, LLC v. Hendricks, No. CIV 08-0239, 2009 WL 2486047, at *12-13 (D.N.M. July 30, 2009)(Browning, J.).

In Los Alamos National Bank v. Martinez Surveying Services, LLC, 2006-NMCA-081, 140 N.M. 41, 139 P.3d 201, overruled on other grounds by Zarr v. Washington Tru Solutions, LLC, 2009-NMCA-050, ¶ 11, 146 N.M. 274, 277, 208 P.3d 919, 922, the Court of Appeals of New Mexico reversed a judgment in the defendant/counter-plaintiff's favor on its claim of interference with prospective contractual relations because neither improper means nor improper motive were present.  See Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 1, 140 N.M. 41, 43, 139 P.3d 201, 203.  The alleged prospective contractual relationship was an "ongoing, voluntary relationship" in which a company regularly bought surveys from the defendant/counter-plaintiff.  Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 3, 140 N.M. 41, 43, 139 P.3d 201, 203.  Neither party argued that this relationship was not a prospective contractual relationship, and the Court of Appeals did not discuss the issue.  This relationship appears to be typical of the situations that have arisen in New Mexico involving prospective contractual relations.  See Zarr v. Washington Tru Solutions, LLC, 2009-NMCA-050, ¶¶ 17-23, 146 N.M. 274, 278-80, 208 P.3d 919, 923-24 (discussing a claim for intentional interference with an at-will employment relationship, and stating that any claim of intentional interference with an at-will employment relationship is treated as interference with a prospective employment relationship); M & M Rental Tools, Inc. v. Milchem, Inc., 1980-NMCA-072, ¶¶ 1-11, 94 N.M. 449, 450-52, 612 P.2d 241, 242-43 (stating that the plaintiff brought

a suit for interference with prospective contractual relations following a situation where the plaintiff was discussing selling a pump to a company when the defendant, who was visiting the plaintiff's premises, asked to speak to the buyer and offered to sell the pump to the buyer).

The Court understands that comment c and its broad definition of contractual relations applies only to prospective contractual relations and not to existing contractual relations. The broader definition of prospective contractual relationships is consistent with New Mexico case law that analyzes the two claims separately, because existing contractual relationships merit more protection than prospective contractual relationships. See Fikes v. Furst, 2003-NMSC-033, ¶¶ 21-22, 134 N.M. 602, 609, 81 P.3d 545, 552. This broader definition of prospective contractual relationships is consistent with New Mexico law, because it is more difficult to recover under a claim of interference with prospective contractual relations than it is to recover under a claim of interference with existing contractual relations. See Fikes v. Furst, 2003-NMSC-033, ¶ 21, 134 N.M. 602, 609, 81 P.3d 545, 552 ("This Court . . . has never stated that an improper motive must be the sole motive for interfering with an existing contract."); Zarr v. Washington Tru Solutions, LLC, 2009-NMCA-050, ¶¶ 12-16, 146 N.M. 274, 277-28, 208 P.3d 919, 921-22 (stating that, under the improper motive theory, a plaintiff must allege that the defendant's sole motive was to harm). Accordingly, while New Mexico imposes a more demanding standard to establish interference with prospective contractual relations, New Mexico will require less if there is a legally enforceable contract; the broader business relationships must meet the more stringent standards. See Horizon AG-Prods. v. Precision Sys. Eng'g, Inc., 2010 WL 4054131, at *5-8.

The Court has adjudicated cases involving tortious interference with prospective contractual relationships. In Horizon AG-Prods. v. Precision Systems Engineering, Inc., a case in which a manufacturer sued an engineering firm it retained to renovate its factory in connection

with business disruptions that "would have" occurred had the manufacturer not stopped them, the Court dismissed the plaintiff's tortious-interference-with-prospective-contractual-relationships claim, because the plaintiff (i) did not allege sufficient facts regarding the existence of  a prospective contractual relationship at issue or the defendant's interference with that relationship and (ii) made allegations about a speculative harm that did not actually occur.  2020 WL 4054131, at *1-2, *12-13.  In Mountain Highlands, LLC v. Hendricks, a case that arose out of the plaintiff's bankruptcy proceedings, the Court rejected the defendants' argument that it should dismiss a claim for tortious interference with prospective contractual relations on the legal ground "that the interference claim requires proof that the [d]efendants acted with a sole motive to harm," because a plaintiff need not show sole motive to harm to prevail on such a claim under New Mexico law. See 2009 WL 2486047, at *7.

## LAW REGARDING INTERPRETING STATE LAW

When a federal district court sits in diversity jurisdiction, or in federal question jurisdiction and interprets State law, the court looks to the same principles that govern under Erie R.R. v. Tompkins, 304 U.S. 64 (1938)("Erie"), and applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d at 1224-25.  "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110

F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[97]  If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance

---

[97]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the State supreme court's own precedent if the federal court concludes that the State supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts obviously should be reticent to formulate an Erie prediction that conflicts with State-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in State and federal courts, as the old State supreme court precedent usually binds state trial courts.  The factors to which a federal court should look before making an Erie prediction that a State supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the State supreme court decision from which the federal court is considering departing -- the younger the State case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the State supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the State supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a State supreme court case that a federal court that Erie predicts will be overruled is likely to be very old, neglected by subsequent State-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

from decisions rendered by lower courts in the relevant state")).[98]   The Court may also rely on

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Tr. v. WPX Energy

---

[98]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law (Beals v. Hale, 4 How. 37, 54, 11 L.Ed. 865 [(1846)]; Erie Railroad Co. v. Tompkins, 304 U.S. [at] 78, 58 . . . ), but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  See Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 209 [(1938)].  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 [(1940)], decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court (Erie Railroad Co. v. Hilt, 247 U.S. 97, 100, 101 [(1918)]; Erie Railroad Co. v. Duplak, 286 U.S. 440, 444 [(1932)]), and we think that the decisions of the Court of Chancery are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[99]  Ultimately, "the Court's task is to predict what the

state supreme court would do."  Wade v. EMCASCO Ins., 483 F.3d at 666.  Accord Mosley v.

Titus, 762 F. Supp. 2d at 1332 (citation omitted).

---

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes omitted).  The Supreme Court
has softened this position over the years; federal courts are no longer bound by state trial or
intermediate court opinions, but "should attribute [them] some weight . . . where the highest court
of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King
v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore
et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate
state appellate courts usually must be followed . . . [and] federal courts should give some weight
to state trial courts decisions."(emphasis and title case omitted)).

[99]In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state court
interpretations of state law with the need for uniformity among federal judges.  If the Court adheres
too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing
years, then parties litigating state-law claims will be subject to a different body of substantive law,
depending on whether they litigate in state court or federal court.  This result frustrates the purpose
of Erie, which held that federal courts must apply state court interpretations of state law, rather
than their own, in part so that parties achieve a consistent result regardless of the forum.  This
consideration pulls the Court toward according Tenth Circuit precedent less weight and according
state court decisions issued in the ensuing years more weight.  On the other hand, when the state
law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper
interpretation.  Otherwise, different federal judges within the same circuit -- or even the same
district, as district courts' decisions are not binding, even upon themselves -- would be free to
adopt differing interpretations of a state's law.  This consideration pulls the Court towards a
stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless
whether it accurately reflects state law -- at least provides consistency at the federal level, so long
as federal district judges are required to follow it.
        The Court must decide how to weigh Tenth Circuit case law against more-recent state court
decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth
Circuit precedent unless there is intervening case law directly on point from the state's highest
court, on one end; and independently interpreting the state law, regarding the Tenth Circuit
precedent as no more than persuasive authority, on the other.  In striking this balance, the Court
notes that it is generally more concerned about systemic inconsistency between the federal courts
and the state courts than it is about inconsistency among federal judges.  Judges, even those within
a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law
differently from one another; this inconsistency is part and parcel of a common-law judicial
system.  More importantly, litigants seeking to use forum selection to gain a substantive legal

advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in State law.  Tenth Circuit decisions interpreting a particular State's law on a specific issue are further apart in time than the collective district courts' decisions are.  More importantly, the Tenth Circuit typically does not address such issues with the frequency that the State's courts themselves do.  Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the State law of the State in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one State.  It is perhaps a more workable design for each district court to keep track of legal developments in the State law of its own State(s) than it is for the Tenth Circuit to monitor separate legal developments in eight States.  The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent.  See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases).  Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing State supreme court precedent.  See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908.  See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis).  The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of State law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the State law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a State law issue after the publication of a Tenth Circuit opinion on point may not

come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening State court cases.

When interpreting State law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*.  Its holdings are descriptive and not prescriptive -- interpretive and not normative.  Because federal judicial opinions lack independent substantive force on State law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting State law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))).  This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, the late United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary,

even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of State law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866. From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the limitation of Honorable Michael W. McConnell, then-United States Circuit Judge for the Tenth Circuit, in Wankier v. Crown Equip. Corp. of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th

## ANALYSIS

The parties' briefing traverses a range of legal issues which the Court considers in turn. First, the Court concludes that the Third Amended Complaint and the Plaintiffs' case are properly before the Court, because: (i) the Plaintiffs have standing to bring their claims; (ii) the Court has subject-matter jurisdiction over the Plaintiffs' claims; (iii) the Court has personal jurisdiction over the Defendants; and (iv) venue is proper in the United States District Court for the District of New Mexico. Next, the Court turns to the Plaintiffs' MSJ, and concludes that the Plaintiffs are entitled

---

Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in Kokins v. Teleflex, Inc.)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

to summary judgment on: (i) Count I, Unfair Competition Under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (ii) Count V, Copyright Infringement, 17 U.S.C. §§ 501-13; and (iii) Count VII, Violation of Common Law Right of Publicity.  Having granted the Plaintiffs' MSJ, the Court considers the Final Judgment Motion and concludes that the Plaintiffs are entitled to the relief that the Final Judgment Motion requests, subject to alterations to the proposed injunction in light of the Supreme Court's recent holding in Abitron.  Accordingly, the Court grants the Final Judgment Motion, thereby dismissing without prejudice the Plaintiffs' remaining claims.  With no more claims before the Court, the Court denies Loyd's MSJ and will enter a separate Final Judgment against Loyd, which, in combination with the Defaulting Defendants FJ, disposes of this case.

I.   **THE PLAINTIFFS' COMPLAINT AND CASE ARE PROPERLY BEFORE THE COURT.**

In her briefing, Loyd challenges repeatedly the Plaintiffs' ability to bring their claims and the Court's propriety to hear the case.  According to Loyd, this case is:

> [A] calculated, well-organized, and well planned "Unconscionable" fraud scheme by Judy and Tony Spera, Warner Brothers Entertainment Inc. and New Line Productions, Inc., and each and every one of their attorneys, . . .  to commit fraud on the court and Defendant, Bea Loyd . . . by knowingly, deliberately, intentionally and egregiously misrepresenting and concealing relevant facts in the District of New Mexico Court system.

Loyd's MSJ at 2; Loyd's Reply at 2.  The Court reads Loyd's briefing liberally and considers her arguments under a variety of legal theories, but, after a thorough analysis, the Court concludes that neither the facts in the record nor controlling legal authority support any of Loyd's contentions.  For the reasons discussed below, the Plaintiffs' claims and this suit are properly before the Court.

A.   **CONTRARY TO LOYD'S CONTENTIONS, THE PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS.**

Loyd's first set of arguments concern whether the Plaintiffs have standing to bring their claims.  Loyd contends: "[I]t is clear that Ed and Lorraine Warren sold 100% of their rights to the

Warren's intellectual property rights. Thus, Plaintiffs do not have rights in the [Warren IP], and therefore, no standing to bring this lawsuit against Defendants." Loyd's MSJ at 5. Loyd also disputes whether the Warrens held certain of the IP rights during their lives, namely the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks. See Loyd Response at 17. Loyd is correct in her premise that the Plaintiffs' standing hinges on their ownership rights in the disputed Warren IP, but erroneous in her allegations that the Plaintiffs lack these rights. The undisputed facts in the record demonstrate that, as a matter of law, the Plaintiffs have standing based on their ownership interests in the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks, the Seekers of the Supernatural television series, and the Warrens' common law rights of publicity.

### 1.   The Warrens Owned the Disputed Warren IP During Their Lives.

There is no genuine dispute of material fact that the Warrens owned the disputed Warren IP during their lives. The Warren IP at issue in this case includes: (i) the ED AND LORRAINE WARREN or SEEKERS OF THE SUPERNATURAL trademarks (and the internet domains related to those trademarks); (ii) the copyrights to the Seekers of the Supernatural television program; and (iii) the Warrens' rights of publicity. The Court examines the ownership of each subset of Warren IP during the Warrens' lifetimes in turn.

### a.   ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL Are Protectable as Unregistered Trademarks.

As a preliminary matter, the Court must determine whether ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL are protectable as unregistered trademarks under Section 43(a) of the Lanham Act. See 15 U.S.C. § 1125(a)(providing a cause of action for infringement of an unregistered trademark). 15 U.S.C. § 1127 includes in its definition of

"trademark" "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. For the Lanham Act to protect an unregistered mark, the plaintiff must establish that: "(1) '[the] identifying mark . . . is inherently distinctive or . . . has acquired distinctiveness through secondary meaning,' (2) the mark is nonfunctional, and (3) the competitor's alleged violation of the plaintiff's rights in its mark is likely to cause consumer confusion." Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1244 (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. at 769, and citing Savant Homes, Inc. v. Collins, 809 F.3d at 1146). Looking to the categories that the Tenth Circuit elaborated in Forney Industries, Inc. v. Daco of Mo., Inc., the Court must determine, therefore, whether ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL are: (i) fanciful; (ii) arbitrary; (iii) suggestive; (iv) descriptive; or (v) generic, noting that the first three categories are deemed inherently distinctive, while the fourth requires proof of secondary meaning. See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245 (citing Abercrombie & Fitch v. Hunting World, Inc., 537 at 9-11 & n.12). A mark develops secondary meaning when "[']in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.'" Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245 (quoting Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. at 211 (brackets and internal quotation marks omitted in Forney Indus., Inc. v. Daco of Mo., Inc., but not in Wal-Mart Stores, Inc. v. Samara Bros.)).

ED AND LORRAINE WARREN describes the Warrens as a couple, with reference to the spouses' first names and shared last name. By describing the Warrens in the collective, ED AND LORRAINE WARREN differs from a mark that describes one individual, e.g., LORRAINE

WARREN, or two separate individuals, e.g., ED WARREN AND LORRAINE WARREN. This distinction carries some significance in light of case law from the United States Courts of Appeals. While Tenth Circuit case law on the distinctiveness of individuals' names is scarce, in the registered-marks context, other courts have looked askance at the notion that trademarks based on individuals' names are inherently distinctive. See, e.g., Parks LLC v. Tyson Foods, Inc., 863 F.3d 220, 231 (3rd Cir. 2017)("Trademarks based on the surname of a founder are not inherently distinctive."); Lane Capital Mgt., Inc. v. Lane Capital Mgt., Inc., 192 F.3d 337, 345 (2d Cir. 1999)("Marks that are 'primarily merely surnames' constitute a specific subcategory of descriptive marks, in that they describe the fact that the named individual is affiliated with the firm." (citing Pirone v. MacMilan, Inc., 894 F.2d 579, 583 (2d Cir. 1990); 15 U.S.C. §§ 1052(e)(1), 1052(e)(4), 1052(f); 815 Tonawanda St. Corp. v. Fay's Drug Co., 842 F.2d 643, 648 (2d Cir. 1998)); E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992)("While personal names used as trademarks are not inherently distinctive, they are treated as strong marks upon a showing of secondary meaning . . . .  Secondary meaning is the consumer's association of the mark with a particular source or sponsor."). Because ED AND LORRAINE WARREN serves to describe a couple as a duo, it is not a mark that is "primarily merely [a] surname," but one that also describes a partnership between two people. Lane Capital Mgt., Inc. v. Lane Capital Mgt., Inc., 192 F.3d at 345.

On the question of a mark's inherent distinctiveness, the Tenth Circuit states: "A mark is 'inherently distinctive if its intrinsic nature serves to identify a particular source.  Such [marks] almost *automatically* tell a customer that they refer to a brand and immediately signal a brand or product source.'" Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1244-45 (quoting Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 977 (alteration in Forney Indus., Inc. v. Daco of Mo.,

Inc., but not in Sally Beauty Co. v. Beautyco, Inc.; italics in Forney Indus., Inc. v. Daco of Mo.,
Inc., and Sally Beauty Co. v. Beautyco, Inc.)).  Although ED AND LORRAINE WARREN, when
affixed to a film or book, "immediately signal[s] a brand or product source" by identifying the duo
that created the film or wrote the book, it cannot be considered inherently distinctive under the
framework that the Tenth Circuit adopts from Abercrombie & Fitch Co. v. Hunting World, Inc.,
537 F.2d 4 (2d Cir. 1976), unless it can be characterized as fanciful, arbitrary, or suggestive.
Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245.  The plain meaning of fanciful, arbitrary,
or suggestive does not apply to ED AND LORRAINE WARREN, which is properly characterized
as a descriptive word mark, because it identifies E. Warren and L. Warren as the product's creators.
Accordingly, the Court must look to whether ED AND LORRAINE WARREN acquired a
secondary meaning to justify its protection as an unregistered mark.  See Forney Indus., Inc. v.
Daco of Mo., Inc., 835 F.3d at 1245.

The summary judgment record indicates that ED AND LORRAINE WARREN acquired
distinctiveness through a secondary meaning.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835
F.3d at 1244.  In the decades following World War II, the Warrens "investigated and researched
thousands of cases of hauntings, possessions, and other paranormal activities around the world."
Factual Background, supra at 6-7 (citing Plaintiffs' MSJ ¶ 2, at 3-4 (asserting this fact); J. Spera
Decl. ¶ 3, at 2).  As a result of their activities, the Warrens, as a couple, gained notoriety that caused
the mark ED AND LORRAINE WARREN to acquire distinctiveness through a secondary
meaning.

First, ED AND LORRAINE WARREN acquired distinctiveness through a secondary
meaning as a result of the Warrens' public speaking appearances.  The Warrens toured on the
lecture circuit, speaking to audiences about their research into the paranormal.  See Factual

Background, _supra_ at 7 (citing Plaintiffs' MSJ ¶ 3, at 4 (asserting this fact); J. Spera Decl. ¶ 4, at 2; 1989 Flyer at 1).  In media appearances and publicity materials, E. Warren and L. Warren are referred to as "The Warrens," "Ed and Lorraine Warren," and/or the "Seekers of the Supernatural." Factual Background, _supra_ at 7-8 (quoting Plaintiffs' MSJ ¶ 3, at 4 (asserting this fact); J. Spera Decl. ¶ 4, at 2, and citing Connecticut Magazine Issue at 1 (April, 1972 issue of Connecticut Magazine featuring a cover image of E. Warren and L. Warren in front of an ramshackle house with the title "The Warrens: Seekers of the Supernatural"); Bloomfield High School Flyer at 1 (advertising the Warrens' upcoming March, 1983, talk at a high school with the billing "SEEKERS OF THE SUPERNATURAL AMERICA'S TOP GHOST HUNTERS ED & LORRAINE WARREN")).  The couple's notoriety spread beyond Connecticut, and the Warrens spoke to paying audiences around the country -- particularly at colleges and universities -- under the billing "Seekers of the Supernatural."  See Factual Background, _supra_ at 8 (citing Plaintiffs MSJ ¶¶ 2-3, at 3-5 (asserting this fact); J. Spera Decl. ¶4, at 2; 1989 Flyer at 1-2 (Publicity notice depicting the Warrens sitting in front of a horned skull billing the Warrens as the "Seekers of the Supernatural _Celebrating 20 Years on the College Circuit_")(emphasis in original)).

Second, ED AND LORRAINE WARREN acquired distinctiveness through a secondary meaning as a result of the Warrens' books, as well as through other authors and filmmakers' works based on the Warrens' lives.  "[T]he Warrens authored or co-authored numerous books about the paranormal and about their work with paranormal activities."  Factual Background, _supra_ at 9 (quoting Plaintiffs' MSJ ¶ 2, at 4 (asserting this fact), and citing J. Spera Decl. ¶ 3, at 2).  Other writers and filmmakers have also drawn upon the Warrens' accounts of the occult; their "investigations and casefiles have inspired or have been adapted into books, a television series, and movies."  Factual Background, _supra_ at 9 (quoting Plaintiffs' MSJ ¶ 4, at 4 (asserting this fact),

and citing J. Spera Decl. ¶ 5, at 2).  In particular, the Warrens gained widespread fame for their association with a famous house haunting dubbed The Amityville Horror, the source for a 1976 bestselling book and 1979 blockbuster movie of the same name.  See Factual Background, supra at 9 (citing Plaintiffs' MSJ ¶ 4, at 4 (asserting this fact); J. Spera Decl. ¶ 5, at 2; 1989 Flyer at 2 ("The Warrens most celebrated case involved their role as chief investigators of the haunting on Long Island that became the subject of a number one best selling book and movie, *The Amityville Horror*.")).

The Court concludes that the undisputed facts establish that Warrens' notoriety in investigating the paranormal, generated through their lectures as well as the creation of books, television series, and films,[100] causes the ED AND LORRAINE WARREN mark to take on distinctiveness through a secondary meaning.  Rather than merely naming E. Warren and L. Warren, the ED AND LORRAINE WARREN mark serves to identify the Warrens as a particular work's creators or inspiration.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245 ("A mark develops secondary meaning when '["]in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.'"" (quoting Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. at 211 (brackets and internal quotation marks omitted in Forney Indus., Inc. v. Daco of Mo., Inc., but not in Wal-Mart Stores, Inc. v. Samara Bros.))).  Further, ED AND LORRAINE WARREN is nonfunctional, and a competitor's violation of the Warrens' and their successors' rights in the mark likely would cause customer confusion by

---

[100]As previously noted, in addition to the books the Warrens authored and co-authored, see Factual Background, supra at 9 (citing Plaintiffs' MSJ ¶ 2, at 4 (asserting this fact); J. Spera Decl. ¶ 3, at 2), a number of works by other writers and filmmakers have chronicled the Warrens' activities, see Factual Background, supra at 9 (citing Plaintiffs' MSJ ¶ 4, at 4 (asserting this fact), and J. Spera Decl. ¶ 5, at 2).  The Warrens' works, as well as those which they inspired, both contribute to the notoriety associated with the couple, which in turn generates distinctiveness through a secondary meaning for the ED AND LORRAINE WARREN mark.

misidentifying a particular work as associated with or produced by the Warrens.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1244 (listing the Lanham Act's requirements for an unregistered mark's protection).  Accordingly, ED AND LORRAINE WARREN is protectable as an unregistered mark under Section 43(a) of the Lanham Act.  15 U.S.C. § 1125(a).

Having concluded that the ED AND LORRAINE WARREN mark is protectable under the Lanham Act, the Court now examines whether the SEEKERS OF THE SUPERNATURAL mark is (i) fanciful, (ii) arbitrary, (iii) suggestive, (iv) descriptive, or (v) generic, for purposes of determining whether SEEKERS OF THE SUPERNATURAL is inherently distinctive for the Lanham Act's purposes.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245 (citing Abercrombie & Fitch v. Hunting World, Inc., 537 at 9-11 & n.12).  The Court proceeds through these five categories to determine whether SEEKERS OF THE SUPERNATURAL belongs to one of the first three, which indicate inherent distinctiveness.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245 (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. at 768).  SEEKERS OF THE SUPERNATURAL, which contains the pre-existing English words "Seekers" and "Supernatural," is not a fanciful mark, as the Tenth Circuit defines such marks as "words invented or selected for the sole purpose of functioning as a trademark."  Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 976 (citing King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d at 1093).  Whether SEEKERS OF THE SUPERNATURAL is an arbitrary mark hinges on whether it "['] comprise[s] those words . . . , that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services.'"  King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d at 1093 (quoting 2 McCarthy on Trademarks and Unfair Competition § 11:11 (5th ed.)).  The Court concludes that SEEKERS OF THE SUPERNATURAL is not an abstract mark, because, as the

Warrens were investigators of the paranormal, or, in the analogous phrase, "seekers of the supernatural," the mark suggests the characteristic of the Warrens' works, i.e., that they involve investigating paranormal activity.  See King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d at 1093.

The next category of marks, which can be difficult to distinguish from the "arbitrary" category,[101] is "suggestive," which includes marks that "suggest some quality or ingredient of the goods."  King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d at 1093.  That "suggestive marks 'suggest[] rather than describe[] a characteristic of the product and require[] the consumer to use imagination and perception to determine the product's nature'" indicates that SEEKERS OF THE SUPERNATURAL properly is characterized as a suggestive mark.  Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 976 (citing First Sav. Bank, F.S.B. v. First Bank Sys., Inc., 101 F.3d 645, 655 (10th Cir. 1996)(brackets in Sally Beauty Co. v. Beautyco., Inc., but not in First Sav. Bank, F.S.B. v. First Bank Sys., Inc.)).  SEEKERS OF THE SUPERNATURAL does not describe the Warrens' occupation in concrete terms; it instead alludes to their being paranormal investigators through a more abstract and poetic formulation that "requires the consumer to use imagination and perception to determine" the Warrens' works' nature.  First Sav. Bank, F.S.B. v. First Bank Sys., Inc., 101 F.3d at 655.  Because the Court concludes that SEEKERS OF THE SUPERNATURAL is a suggestive mark, it is inherently distinctive for the Lanham Act's purposes.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1245 (citing Two Pesos, Inc.

---

[101]As noted in McCarthy on Trademarks and Unfair Competition, "for legal purposes, there is little if any, reason to make the distinction" between arbitrary and suggestive marks, "and the cases hardly ever bother to do so," because "'[a]rbitrary' and 'suggestive' marks fall within the same legal pigeon hole of classification in that neither category requires proof of secondary meaning for legal protection and registration . . . ."  2 McCarthy on Trademarks and Unfair Competition § 11:12 (5th ed.).

v. Taco Cabana, Inc., 505 U.S. at 768).   Like the ED AND LORRAINE WARREN mark, SEEKERS OF THE SUPERNATURAL is nonfunctional, and, given the Warrens' notoriety and association with the mark, its violation likely would cause customer confusion by misidentifying a particular work as associated with or produced by the Warrens.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1244 (listing the Lanham Act's requirements for an unregistered mark's protection).

> **b.      The Warrens Owned the Unregistered ED AND  LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL Trademarks During Their Lives.**

Having concluded that ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL are both unregistered marks protectable under Section 43(a) of the Lanham Act, the Court now looks to whether the Warrens owned these marks during their lifetimes.  See Forney Indus., Inc. v. Daco of Mo., Inc., 835 F.3d at 1244 (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. at 769, and citing Savant Homes, Inc. v. Collins, 809 F.3d at 1146).  As previously discussed, the Warrens used the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATRUAL marks in commerce during their lifetimes.   See, e.g., Factual Background, supra at 7-8 ("In media appearances and publicity materials, E. Warren and L. Warren are referred to as 'the Warrens,' 'Ed and Lorraine Warren' and/or the 'Seekers of the Supernatural'" (quoting Plaintiffs' MSJ ¶ 3, at 4 (asserting this fact); J. Spera Decl. ¶ 4, at 2, and citing Connecticut Magazine Issue at 1 (April, 1972 issue of Connecticut Magazine featuring a cover image of E. Warren and L. Warren in front of an ramshackle house with the title "The Warrens: Seekers of the Supernatural"); Bloomfield High School Flyer at 1 (advertising the Warrens' upcoming March, 1983, talk at a high school with the billing "SEEKERS OF THE SUPERNATURAL AMERICA'S TOP GHOST HUNTERS ED & LORRAINE WARREN")).

Noting that "[r]ights in a trademark are determined by the date of the mark's first use in commerce," Hana Fin., Inc. v. Hana Bank, 574 U.S. 418, 419 (2015), the summary judgment record satisfies the Court that the Warrens established priority in the use of the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL as early as the 1970s.  See Factual Background, supra at 7-8 (citing Connecticut Magazine Issue at 1).

The Court being satisfied that the Warrens exercised use of the marks during their lifetimes, it now examines whether they assigned those rights to any other person or entity during their lives, as the Lanham Act permits.  See 15 U.S.C. § 1127 ("The terms 'applicant' and 'registrant' embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant."). "A valid assignment forges a link in a chain of priority of use to the mark.  To prove the earliest priority of use, a person or company must be able to prove a chain of title extending back to the original user of the mark."  3 McCarthy on Trademarks and Unfair Competition § 18:15 (5th ed.). Accordingly, any assignment of the marks would break the chain of title from the marks' original owners, the Warrens.  E. Warren died in 2006.  See Factual Background, supra at 13 (citing Plaintiffs' MSJ ¶ 11, at 5 (asserting this fact); T. Spera Decl. ¶ 7, at 2; E. Warren Obituary).  There is no evidence in the summary judgment record of the Warrens assigning the ED AND LORRAINE WARREN or SEEKERS OF THE SUPERNATURAL before E. Warren's death. Because E. Warren died intestate, his property passed to his wife, L. Warren.  See Factual Background, supra at 13 (citing Plaintiffs' MSJ ¶ 11, at 5 (asserting this fact); T. Spera Decl. ¶ 7, at 2).  Next, the Court looks to whether, after all E. Warren's property passed to L. Warren via intestate succession, L. Warren assigned the ED AND LORRAINE WARREN or SEEKERS OF THE SUPERNATURAL marks.  L. Warren died in 2019.  Factual Background, supra at 19 (citing Plaintiffs' MSJ ¶ 14, at 5 (asserting this fact); T. Spera Decl. ¶ 9, at 2;  L. Warren Obituary at 1;

Loyd's Response to Plaintiffs at 4 (admitting this fact)).

Before L. Warren died, in 2011, she "granted a life story option for the Warrens' case files to New Line Productions, including exclusive rights to use their names and likenesses in connection with their casefiles." See Factual Background, supra at 13-14 (quoting Plaintiffs' MSJ ¶ 12, at 6, and citing T. Spera Decl. ¶ 8 at 4; Option Contract).  This contract with New Line, by "grant[ing] a life story option for the Warrens' case files . . . , including exclusive rights to use their names and likenesses in connection with their casefiles," granted New Line rights to use the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks.  Given that J. Spera, T. Spera, Warner Bros., and New Line are all Plaintiffs in this case and there is no dispute as to ownership of the marks among the Plaintiffs, the Court need not examine the Option Contract's specifics as to the rights of the various Plaintiffs in comparison to each other.  See King Cole Partners, LP v. CD Listening Bar, Inc., No. SACV111557JSTANX, 2012 WL 13024683, at *4 (C.D. Cal. March 28, 2012)(Tucker, J.)(noting that, "[i]f there is any dispute between the co-owners" of intellectual property "as to their rights, that dispute is properly between the co-owners, not between a co-owner and Defendants").  The relevant point is that there is no evidence in the summary judgment record of these marks' assignment to any individual or entity that is not a Plaintiff in this case.  Accordingly, the Court concludes that the Warrens were the sole owners and had priority of use of the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL during their lifetimes, subject to New Line's rights under the Option Contract.

        **c.**      **The Warrens Owned the <u>Seekers of the Supernatural</u> Television Program Copyright During Their Lives.**

Second, the Court analyzes whether the Warrens owned the copyright to the Seekers of the Supernatural television program during their lives.  The Warrens and T. Spera created the Seekers of the Supernatural television series in the 1990s, when both E. Warren and L. Warren were still

alive.  See Factual Background, supra at 12 (quoting Plaintiffs' MSJ ¶ 7, at 5(asserting this fact),

and citing T. Spera Decl. ¶ 3, at 2).  The Seekers of the Supernatural television program appeared

on public access television in New England from 1997 to 2000.  See Factual Background, supra at

12 (quoting Plaintiffs' MSJ ¶ 8, at 5 (asserting this fact), and citing T. Spera Decl. ¶ 4, at 2).  The

Warrens did not register the copyright for Seekers of the Supernatural at the time of its production

or airing on television.  See Factual Background, supra at 12 (citing Plaintiffs' MSJ ¶ 10, at 5; T.

Spera Decl. ¶ 5, at 2; Spera Seekers Copyright Registration (listing effective date of registration

for Seekers of the Supernatural as February 10, 2015)).  The Warrens, however, need not have

registered the copyright to Seekers of the Supernatural, because the Copyright Act protects

"original works of authorship," including "audiovisual works," 17 U.S.C. § 102(a)(6), whether

their copyrights are registered or not, because "[c]opyright registration is not a prerequisite for

copyright protection . . . .  Rather, registration is necessary only as a prerequisite to suing for

infringement."  Enter. Mgmt. Ltd., Inc. v. Warrick, 717 F.3d 1112, 1119 (10th Cir. 2013)(citing

17 U.S.C. §§ 102, 408(a), 411(a); La Resolana Architects, PA v. Clay Realtors Angel Fire, 416

F.3d 1195, 1199 (10th Cir. 2005), abrogated by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154

(2010)).  See Feist Publ'n, Inc. v. Rural Tel. Serv. Co., 499 U.S. at 345 (1991)(citing 1 M. Nimmer

& D. Nimmer, Nimmer on Copyright §§ 2.01[A], [B] (1990)("Original, as the term is used in

copyright, means only that the work was independently created by the author (as opposed to copied

from other works), and that it possesses at least some minimal degree of creativity.").

Accordingly, because the Warrens and T. Spera created <u>Seekers of the Supernatural</u>, they owned the copyright for it as a joint work, even if it was, for a time, unregistered.[102]   <u>See</u> <u>Enter.</u> <u>Mgmt. Ltd., Inc. v. Warrick</u>, 717 F.3d at 1119.   Given that E. Warren died intestate in 2006, <u>see</u> Factual Background, <u>supra</u> at 13 (citing Plaintiffs' MSJ ¶ 11, at 5 (asserting this fact); T. Spera Decl. ¶ 7, at 2; E. Warren Obituary), and his property passed to L. Warren, <u>see</u> Factual Background, <u>supra</u> at 13 (citing Plaintiffs' MSJ ¶ 11, at 5 (asserting this fact); T. Spera Decl. ¶ 7, at 2), L. Warren and T. Spera were the sole owners of the <u>Seekers of the Supernatural</u> copyright by 2006.   There is no evidence in the summary judgment record that Loyd acquired the copyright to <u>Seekers of the</u> <u>Supernatural</u>, whether directly from E. Warren, or through third parties, or that she had any substantive involvement in its creation, given that Loyd "did not write, produce, direct, edit or create any episodes" of the show, Factual Background, <u>supra</u> at 21 (quoting Plaintiffs' MSJ ¶ 18, at 7 (asserting this fact)), and did not attend any of the shows' tapings, <u>see</u> Factual Background, <u>supra</u> at 21 (citing Plaintiffs' MSJ ¶ 18, at 7 (asserting this fact)).   The fact that E. Warren gave Loyd VHS tapes of the <u>Seekers of the Supernatural</u> series and asked her to facilitate airing it on a New York public-access cable-television channel, Manhattan Neighborhood Network, does not constitute Loyd's acquisition of the <u>Seekers of the Supernatural</u> copyright.   <u>See</u> Factual Background, <u>supra</u> at 22 (citing Plaintiffs' MSJ ¶ 18, at 7 (asserting that Loyd testified to this fact in the Loyd Depo.); Loyd Depo. at 84:9-21 (Loyd)).   Further, the Warrens did not give Loyd exclusive rights to use their names or likenesses for commercial purposes.   <u>See</u> Factual Background, <u>supra</u> at 22 (citing Plaintiffs' MSJ ¶ 47, at 13).

---

[102]Under the Copyright Act, because <u>Seekers of the Supernatural</u> had three authors, it is considered a "joint work."  17 U.S.C. § 101 ("A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.").

L. Warren and T. Spera memorialized their ownership of the joint work when they registered the copyright for the Seekers of the Supernatural television program with the United States Copyright Office under registration number Pau 3-769-603, with an effective registration date of February 10, 2015.  See Factual Background, supra at 12 (citing Plaintiffs' MSJ ¶ 10, at 5(asserting this fact); T. Spera Decl. ¶ 5, at 2; Spera Seekers Copyright Registration (listing the titles of 24 episodes of the "SEEKERS OF THE SUPERNATURAL," giving 1998 as the year of completion, and stating "**Copyright Office notes**: Basis for registration: unpublished collection." (bold in original)).  Accordingly, until L. Warren died in 2019, see Factual Background, supra at 19 (citing Plaintiffs' MSJ ¶ 14, at 5 (asserting this fact); T. Spera Decl. ¶ 9, at 2;  L. Warren Obituary at 1; Loyd's Response to Plaintiffs at 4 (admitting this fact)), she and T. Spera owned the copyright to the Seekers of the Supernatural television program.  In summary, the Court concludes that E. Warren, L. Warren, and T. Spera owned the copyright to the Seekers of the Supernatural television program until E. Warren's death in 2006, after which ownership passed to L. Warren and T. Spera, who registered the copyright in 2015 and who jointly owned the copyright until L. Warren's death in 2019, subject to whatever rights New Line might derive from the Option Contract.

> ### d.   The Warrens Owned Their Own Rights of Publicity During Their Lives.

Third, the Court examines whether the Warrens owned their own rights of publicity during their lives.  The parties stipulate that Connecticut law governs the right-of-publicity claim.  See JSR at 3 ("The parties further stipulate and agree that the law governing this case is: . . . Connecticut state law with respect to the rights of publicity claim . . . .").  The summary judgment record indicates that the parties are correct to stipulate to the use of Connecticut law for the right-of-publicity claim.  A right-of-publicity claim originates under State law.  See 1 McCarthy on

Publicity § 3:1 (2d ed. 2020)("The right of publicity is a state law created intellectual property right whose infringement is a commercial tort of unfair competition.").  The relevant inquiry in determining which State's laws to apply in a right-of-publicity case is into a decedent's domicile at time of death.  See Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp at 188 ("The parties agree that Connecticut law governs any post-mortem right of publicity [the decedent] might have, since he died a citizen and resident of that state").  The Warrens lived and died in Connecticut.  See, e.g., Factual Background, supra at 12 (citing Plaintiffs' MSJ ¶ 8, at 5 (noting that the Warrens "filmed the Seekers series in a studio in Connecticut, which is where the Warrens resided"); Spera Seekers Copyright Registration at 3 (listing a Monroe, Connecticut, address for L. Warren); E. Warren Obituary at 3 (noting that E. Warren was born in Bridgeport, Connecticut, and lived in Monroe at the time of his death); L. Warren Obituary at 6 (noting that L. Warren was born in Devon, Connecticut, and died in Monroe)).  Further, the Court concludes from the summary judgment record that J. Spera and T. Spera were Connecticut residents when L. Warren died.[103]  See L. Warren Obituary at 6 (indicating that J. Spera and T. Spera were New Milford, Connecticut, residents).  Accordingly, the Court sees no reason to question the parties' stipulation to the applicability of Connecticut State law for the right-of-publicity claim, and accordingly proceeds through its analysis under Connecticut State law.

---

[103]While the L. Warren obituary indicates that J. Spera and T. Spera were residents of "New Milford" at the time of L. Warren's death, it does not specify the state in which New Milford is located.  L. Warren Obituary at 6.  The Court understands that New Milford refers to New Milford, Connecticut, because: (i) E. Warren's obituary describes J. Spera and T. Spera as residents of New Milford, Connecticut, see E. Warren Obituary at 3; (ii) the Seekers Copyright Registration provides a New Milford, Connecticut address for T. Spera, see Seekers Copyright Registration at 3; and (iii) the L. Warren obituary ran in the Connecticut Post, describes other Connecticut towns without reference to their being in Connecticut, and specifies when a named individual is from another State, see L. Warren Obituary at 6-7.

Given that "[t]he right of publicity is simply the inherent right of every human being to control the commercial use of his or her identity," 1 McCarthy on Publicity § 3:1 (2d ed.), it follows that an individual is the sole owner of his or her own right of publicity.  The Court's inquiry, however, cannot stop there.  Given that the right of publicity is a creature of State law, see 1 McCarthy on Publicity § 3:1 (2d ed.), the Court must determine whether Connecticut recognizes a right of publicity.

While Connecticut has no right-of-publicity statute, and case law on the right of publicity is scarce, in Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., the Honorable Loretta A. Preska, United States District Judge for the United States District Court for the Southern District of New York, in a case involving a decedent who was a Connecticut resident at time of death, determined that Connecticut State law creates a cause of action for right of publicity.  See Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. at 189 (stating that Judge Preska "found no reason to believe that Connecticut would buck the apparent trend in the law towards recognizing the right of publicity" and concluding that "Connecticut's high court would recognize a right of publicity").  Judge Preska's analysis is persuasive.  Noting that Connecticut has no statutory right of publicity, Judge Preska proceeds to distinguish invasion-of-privacy causes of action from publicity causes of action, noting that the former had previously appeared in Connecticut case law, see Goodrich v. Waterbury Republican-Am., Inc., 188 Conn. 107, 448 A.2d 1317 (1982), but that the latter had not, see Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. at 189.  Judge Preska looks to Goodrich v. Waterbury Republican-Am., Inc. and Steding v. Battistoni, 3 Conn. Cir. Ct. 76 (1964) -- both violation-of-privacy cases -- as support for "Connecticut's recognition of the general principal [sic] that a person's identity is a valuable commodity that should not be exploited absent the permission of its owner."  Jim Henson Prods.,

Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. at 189.  Further, Judge Preska emphasizes that, as of 1994, when Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc. was decided, half the states had recognized a right of publicity, sixteen under common law and nine by statute, and only two had rejected the right of publicity's existence as a cause of action.  See 867 F. Supp. at 189. Judge Preska saw "no reason to believe that Connecticut would buck the apparent trend in the law towards recognizing a right of publicity."  867 F. Supp. at 189.  The Court has not located any Connecticut State court case subsequent to Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc. adjudicating a right-of-publicity claim under Connecticut State law.[104]

In 2020, however, the United States Court of Appeals for the Second Circuit dealt with a right-of-publicity claim under Connecticut State law in In re Jackson, 972 F.3d 25 (2d Cir. 2020). In that case, the Second Circuit, noting that "there is very little Connecticut authority as to the boundaries of Connecticut's common law right of publicity," chose to "derive its probable scope from the Restatement (Second) of Torts."  In re Jackson, 972 F.3d at 38 (citing Goodrich v. Waterbury Republican-Am., Inc., 188 Conn. 107, 448 A.2d 1317, 1329 (1982)).  Regarding the Restatement view of the right of publicity, the Second Circuit states:

> The Restatement provides that "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy."  Restatement (Second) of Torts § 652C.  It explains that, while "[t]he common form of invasion of privacy . . . is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product," the rule is "not limited to commercial appropriation" and "applies also when the defendant makes use of the plaintiff's name or likeness for his own purposes and

---

[104]The only Connecticut State court case that the Court has located which discusses the right of publicity in any detail is a case from the Superior Court of Connecticut, Gen. Star Indem. Co. v. Travelers Indem. Co., No. CV0840233383S, 2013 WL 1849285, at *11 (Conn. Super. Ct. April 9, 2013).  That case, an insurance coverage dispute, did not adjudicate a right-of-publicity claim, but resulted in a conclusion that, under Missouri law, violating the right of publicity constituted a "personal injury" under the terms of the insurance policy at issue.  Gen. Star Indem. Co. v. Travelers Indem. Co., No. CV0840233383S, 2013 WL 1849285, at *12.

benefit, even though the use is not a commercial one."  *Id.* cmt. b.  The Restatement
thus at least initially sets out what appears to be a highly inclusive definition of the
tort; a defendant is unlikely to publish a reference to a plaintiff unless the defendant
view it as being somehow to his potential benefit.  However, the Restatement then
provides, more restrictively, that "the defendant must have appropriated . . . the
reputation, prestige, social or commercial standing, public interest or other values
of the plaintiff's name or likeness," *id.* cmt. c, and that "[t]he value of the plaintiff's
name is not appropriated by mere mention of it, . . . nor is the value of his likeness
appropriated when it is published for purposes other than taking advantage of his
reputation, prestige, or other value associated with him, for purposes of publicity,"
*id.* cmt. d.

In re Jackson, 972 F.3d at 38.  In the absence of Connecticut State case law adjudicating right-of-

publicity claims, the Court is satisfied from Jim Henson Prods., Inc. v. John T. Brady & Assocs.,

Inc. and In re Jackson that, if the Supreme Court of Connecticut were to hear a case regarding the

right of publicity, it would determine that the right of publicity is a viable cause of action under

Connecticut State law.  It follows that, because the Warrens lived and died in Connecticut, see,

e.g., Factual Background, supra at 12 (citing Plaintiffs' MSJ ¶ 8, at 5)(noting that the Warrens

"filmed the Seekers series in a studio in Connecticut, which is where the Warrens resided"); Spera

Seekers Copyright Registration at 3 (listing a Monroe, Connecticut address for L. Warren); E.

Warren Obituary at 3 (noting that E. Warren was born in Bridgeport, Connecticut, and lived in

Monroe, Connecticut, at the time of his death); L. Warren Obituary at 6 (noting that L. Warren

was born in Devon, Connecticut, and died in Monroe, Connecticut)), they had ownership of their

rights of publicity during their lives,[105] a claim for the violation of which is actionable under

---

[105]As discussed in relation to the Warrens' trademarks and copyrights, the Warrens' owned
their rights of publicity subject to whatever rights to use them New Line might derive from the
Option Contract.

Connecticut State law, see In re Jackson, 972 F.3d at 38; Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. at 189.[106]

_____

[106]After having considered the arguments for and against recognizing a common-law right of publicity, the Court concludes that it is logical for courts to recognize a cause of action for common-law right of publicity in jurisdictions that have not passed a right-of-publicity statute. As the Tenth Circuit notes in Cardtoons, L.C. v. Major League Baseball Players Ass'n, "[l]ike trademark and copyright, the right of publicity involves a cognizable property interest." 95 F.3d at 967 (citing Zacchini v. Scripps-Howard Broad. Co., 433 U.S. 562, 573 (1977); Restatement (Third) of Unfair Competition § 46 cmt. g.). As a cognizable property interest that is also bound up in "an individual's interest in personal dignity and autonomy," Restatement (Third) of Unfair Competition § 46 cmt. c, the right of publicity is worthy of protection through a cause of action for its violation. The Court finds persuasive the Restatement (Third) of Unfair Competition's rationale for protecting the right of publicity:

> Recognition of a right of publicity has been justified on numerous grounds. Like the right of privacy, the right of publicity protects an individual's interest in personal dignity and autonomy. With its emphasis on commercial interests, the right of publicity also secures for plaintiffs the commercial value of their fame and prevents the unjust enrichment of other seeking to appropriate that value for themselves. The right to prohibit unauthorized commercial exploitation of one's identity allows a person to prevent harmful or excessive commercial use that may dilute the value of the identity. Although proof of deception or confusion is not an element of liability . . . , the right of publicity indirectly affords protection against false suggestions of endorsements or sponsorship. Some decisions also invoke an incentive rationale analogous to that supporting the recognition of exclusive rights under copyright and patent law.

Restatement (Third) of Unfair Competition § 46 cmt. c.

The Court notes the Restatement's concession that "[t]he rationales underlying recognition of a right of publicity are generally less compelling than those that justify rights in trademarks of trade secrets." Restatement (Third) of Unfair Competition § 46 cmt. c. Accordingly, the Restatement instructs that "courts may be properly reluctant to adopt a broad construction of the publicity right," without specifying what a broad construction would entail. Restatement (Third) of Unfair Competition § 46 cmt. c. The Court considers the facts of this case to be within the right-of-publicity cases' heartland and not to test the bounds of what constitutes a "broad construction of the publicity right." Restatement (Third) of Unfair Competition § 46 cmt. c.

The sole aspect of this case that might place it on the outer boundaries of that heartland is that fact that it involves post-mortem rights of publicity. Even so, as Judge Preska acknowledged in Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., "'the overwhelming majority rules under either statute or common law is that the right of publicity is descendible property and has an

### 2.      __The Plaintiffs Presently Own the Warren IP__.

Having concluded that the Warrens owned the Warren IP during their lives, as part of its

standing analysis, the Court now determines that the Plaintiffs presently own the Warren IP.  As

previously noted, the Warren IP at issue in this case includes: (i) the ED AND LORRAINE

---

unconditional postmortem duration.'"  867 F. Supp. at 189-90 (quoting McCarthy on Publicity, §
28.06 [4] (1st ed.)).  The Court finds persuasive the authority that Judge Preska cites for the right
of publicity surviving death:

> First, it is consistent with our recognition that an individual's right of
> testamentary disposition is an essential right.  If a celebrity's right of publicity is
> treated as an intangible property right in life, it is no less a property right at
> death . . . .

> Second, it recognizes one of the basic principles of Angle-American [sic]
> jurisprudence that "one may not reap where another has sown nor gather where
> another has strewn." . . .  This unjust enrichment principle argues against granting
> a windfall to an advertiser who has no colorable claim to a celebrity's interest in
> the right of publicity . . . .

> Third, recognizing that the right of publicity is descendible is consistent
> with a celebrity's expectation that he is creating a valuable capital asset that will
> benefit his heirs and assigns after his death . . . .

> Fourth, concluding that the right of publicity is descendible recognizes the
> value of the contract rights of persons who have acquired the right to use a
> celebrity's name and likeness.  The value of this interest stems from its duration
> and its exclusivity.  If a celebrity's name and likeness were to enter the public
> domain at death, the value of any existing contract made while the celebrity was
> currently alive would be greatly diminished . . . .

> Fifth, recognizing that the right of publicity can be descendible will further
> the public's interest in being free from deception with regard to the sponsorship,
> approval or certification of goods and services . . . .

> Finally, recognizing that the right of publicity can be descendible is
> consistent with the policy against unfair competition through the use of deceptively
> similar corporate names.

Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. at 190 (quoting State ex.
Rel Elvis Presley Intern. Memorial Found. V. Crowell, 733 S.W. 2d 89, 97-99 (Tenn.Ct.App.
1987)(internal citations omitted in Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.)).

WARREN or SEEKERS OF THE SUPERNATURAL trademarks (and the internet domains related to those trademarks); (ii) the copyrights to the <u>Seekers of the Supernatural</u> television program; and (iii) the Warrens' rights of publicity.  The Court examines the present ownership of each subset of Warren IP in turn.[107]

> a.   **As the Primary Beneficiary of L. Warren's Estate, J. Spera Owns the ED AND LORRAINE WARREN and SEEKERS OF <u>THE SUPERNATURAL Trademarks</u>.**

The Court next examines the question who now owns the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks.  As previously noted, the Warrens owned both trademarks during their lifetimes; the Warrens owned them jointly until E. Warren's death in 2006, and then L. Warren alone owned them until her own death in 2019.  The relevant inquiry, then, is: to whom did title to ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL pass on the death of L. Warren?

To answer this question, the Court looks to L. Warren's Will.  L. Warren's Will names J. Spera as her estate's personal representative and executrix.  <u>See</u> Factual Background, <u>supra</u> at 19 (citing Plaintiffs' MSJ ¶ 15, at 3 (asserting this fact); L. Warren's Will at 2).  J. Spera is also the primary beneficiary under L Warren's will; aside from a vintage Chevrolet bequeathed to T. Spera, L. Warren "bequeathed all her assets, including any property of 'whatever nature and wherever located'" to her daughter, J. Spera.  Factual Background, <u>supra</u> at 19-20 (quoting Plaintiffs' MSJ

---

[107]As discussed above, given that J. Spera, T. Spera, Warner Bros., and New Line are all Plaintiffs in this case and there is no dispute as to ownership of the Warren IP among the Plaintiffs, the Court need not examine the Option Contract's specifics as to the rights of the various Plaintiffs in comparison to each other.  <u>See</u> <u>King Cole Partners, LP v. CD Listening Bar, Inc.</u>, No. SACV111557JSTANX, 2012 WL 13024683, at *4 (C.D. Cal. March 28, 2012)(Tucker, J.)(noting that, "[i]f there is any dispute between the co-owners" of intellectual property "as to their rights, that dispute is properly between the co-owners, not between a co-owner and Defendants").

¶ 15, at 6 (asserting this fact), and citing T. Spera Decl. ¶ 9, at 3, and L. Warren's Will at 2).[108]

Because the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks were L. Warren's property at the time of her death, they passed by operation of L. Warren's will to J. Spera, subject to any rights New Line might have under the Option Contract. See Factual Background, supra at 19-20 (quoting Plaintiffs' MSJ ¶ 15, at 6 (asserting this fact), and citing T. Spera Decl. ¶ 9, at 3; L. Warren's Will at 2). Accordingly, J. Spera inherited priority of use in the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks from her mother, L. Warren, who, with her husband, was the first to use the marks in commerce. See Hana Fin., Inc. v. Hana Bank, 574 U.S. at 419 ("Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users."); McCarthy on Trademarks and Unfair Competition § 18:15 (5th ed.)("A valid assignment forges a link in a chain of priority of use of the mark."). Nevertheless, despite J. Spera's priority in the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks, Loyd and an entity associated with her have attempted to register the marks with the USPTO. See Factual Background, supra at 27-37.

First, on November 16, 2014, a United Kingdom corporation named "Galactic Media" filed an application with the USPTO, seeking a trademark for "ED AND LORRAINE WARREN." Factual Background, supra at 29 (citing Plaintiffs' MSJ ¶ 34, at 11 (asserting this fact); Warren

---

[108]As discussed in n.44, see supra at 20-21, Loyd's three arguments that the Warren IP did not pass from L. Warren to J. Spera -- on the basis that (i) L. Warren put the Warren IP in a separate trust, the assets of which did not pass via L. Warren's will; (ii) the Warrens transferred all Warren IP to De-Rosa Grund during their lives; and (iii) because the inventory J. Spera submitted to the Connecticut probate court did not name all the Warren IP, no transfer to J. Spera occurred -- do not find support in the summary judgment record or in relevant law, and, accordingly, there is no genuine dispute that J. Spera inherited the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks from her mother.

Trademark Application)(listing the original registrant as "Galactic Media," a corporation organized in the United Kingdom)).  That Loyd paid the $550.00 application fee for the Galactic Media registration, <u>see</u> Factual Background, <u>supra</u> at 29 (citing Plaintiffs' MSJ ¶ 35, at 11 (asserting this fact); Campbell-Zhong Letter), indicates her affiliation with Galactic Media, which is now defunct, <u>see</u> Factual Background, <u>supra</u> at 29-30 (citing Plaintiffs' MSJ ¶ 34, at 11; Galactic Media Companies House Record).  At the time Galactic Media filed the application, E. Warren was deceased, but L. Warren was living under J. Spera and T. Spera's care.  <u>See</u> Factual Background, <u>supra</u> at 30 (citing Plaintiffs' MSJ ¶ 36, at 11 (asserting this fact); T. Spera Decl. ¶¶ 7-9, at 2).  Galactic Media submitted to the USPTO, on August 26, 2015, an undated and nonsensical consent form stating, "I consent to the use and registration by Galactic Media of my Lorraine Warren as a trademark and/or service mark with the," purportedly bearing an L. Warren signature.  <u>See</u> Factual Background, <u>supra</u> at 30-31 (citing Plaintiffs' MSJ ¶ 37, at 11 (asserting this fact); Consent Form).  Loyd did not see L. Warren sign the Consent Form.  <u>See</u> Factual Background, <u>supra</u> at 31 (citing Plaintiffs' MSJ ¶ 40, at 12 (asserting this fact)).  J. Spera and T. Spera never have heard of a company named Galactic Media and have no knowledge of L. Warren signing a Consent Form of this nature while L. Warren was under their care.  <u>See</u> Factual Background, <u>supra</u> at 31 (citing Plaintiffs' MSJ ¶ 38, at 11-12 (asserting this fact); J. Spera Decl. ¶ 11, at 3; T. Spera Decl. ¶ 13, at 3-4).  The plaintiffs assert that "Tony and Judy Spera knew that, in 2011, Lorraine Warren had granted exclusive rights to use Ed and Lorraine's names and likenesses to New Line and Ms. Warren could not have granted the same rights again," Factual Background, <u>supra</u> at 31-32 (quoting Plaintiffs' MSJ ¶ 38, at 11-12 (asserting this fact), and citing J. Spera Decl. ¶ 11, at 3; T. Spera Decl. ¶ 13, at 3-4).  Even so, as the Court has discussed in detail in the Factual Background, there is a genuine dispute of fact as to whether the signature on the

Consent Form was genuine or forged, i.e., whether L. Warren ever signed the Consent Form. See Factual Background, supra at 32-36 n.70.

The Court, reemphasizes, however, that, although there may be a genuine dispute of fact as to who affixed the signature to the Consent Form, this dispute does not make the genuine dispute of fact material for summary judgment purposes. [109] See Factual Background, supra at 32-36 n.70. "'A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented.'" Estate of Taylor v. Salt Lake City, 16 F.4th 744, 756 (10th Cir. 2021)(quoting E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000), and citing Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2012)). Here, based on Loyd's deposition testimony in reference to the Consent Form that "Lorraine told me this was her signature," there is a genuine dispute of fact as to who signed the Consent Form. Factual Background, supra at 32 n.70 (quoting Loyd Depo. at 133:1-134:7 (McCue, Loyd)). Acknowledging this genuine dispute of fact, the Court concludes, nevertheless, that it is immaterial, because it does not "have an effect on the outcome of the lawsuit." Estate of Taylor v. Salt Lake City, 16 F.4th at 756 (quoting E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d

---

[109]By way of summary, the Court concludes its attempt to disentangle the facts surrounding the signature on the Consent Form by stating:

> Looking at the record as a whole . . . , Loyd's sworn testimony regarding L. Warren authenticating her signature is sufficient evidence for a rational trier of fact to conclude that the signature is authentic. Accordingly, pursuant to rule 56(e), the Court concludes that Loyd's arguments and her testimony rise beyond a mere scintilla of evidence and constitutes a genuine issue of fact regarding the Consent Form's signature. The Court does not, however, presume that this issue of fact, though genuinely disputed, constitutes a "material" fact for purposes of summary judgment.

Factual Background, supra at 36 n.70.

at 1190, and citing Tabor v. Hilti, Inc., 703 F.3d at 1215).  In 2011, L. Warren "granted a life story option for the Warren's case files to New Line Productions, including exclusive rights to use their names and likenesses in connection with their casefiles."  Factual Background, supra at 13-14 (quoting Plaintiffs' MSJ ¶ 12, and citing T. Spera Decl. ¶ 8 at 4; Option Contract).  Accordingly, the Court credits the Plaintiffs' assertion that, because L. Warren already had granted New Line in 2011, "*exclusive* rights to her and her late husband's life story, including rights to use their names," L. Warren "did not have the rights to convey to Galactic Media in 2015."  Plaintiffs' MSJ at 21 (emphasis is Plaintiffs' MSJ).  See Plaintiffs' MSJ ¶ 12, at 6 (citing T. Spera Decl. ¶ 8, at 4).  Given the Option Contract, even if the Consent Form were valid, it would not give Galactic Media any rights to the Warren IP.  Accordingly, the Court deems the genuine dispute of fact as to the Consent Form immaterial.  See Estate of Taylor v. Salt Lake City, 16 F.4th at 756 (quoting E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d at 1190, and citing Tabor v. Hilti, Inc., 703 F.3d at 1215).

Second, the Court addresses Loyd's attempt to register the SEEKERS OF THE SUPERNATURAL mark.  After the death of L. Warren, Loyd filed an application with the USPTO on March 16, 2020, seeking to register the SEEKERS OF THE SUPERNATURAL mark.  See Factual Background, supra at 27 (citing Plaintiffs' MSJ ¶ 31, at 10 (asserting this fact); Seekers Trademark Application (listing "Bea Loyd" as the "Owner Name" for the SEEKERS OF THE SUPERNATURAL mark)).  As previously noted, Loyd did not have priority in the use of the SEEKERS OF THE SUPERNATURAL mark, given that it passed by operation of the will of L. Warren, who had priority in the mark with her husband, E. Warren, to the Warrens' daughter, J. Spera, subject to any rights New Line gained in the Option Contract.  See Factual Background, supra at 19-20 (quoting Plaintiffs' MSJ ¶ 15, at 6, and citing T. Spera Decl. ¶ 9, at 3; L. Warren's

Will at 2); Hana Fin., Inc. v. Hana Bank, 574 U.S. at 419 ("Rights in a trademark are determined by the date of the mark's first use in commerce.  The party who first uses a mark in commerce is said to have priority over other users."); McCarthy on Trademarks and Unfair Competition § 18:15 (5th ed.)("A valid assignment forges a link in a chain of priority of use of the mark.").  Because there is no evidence in the summary judgment record that L. Warren assigned the SEEKERS OF THE SUPERNATURAL mark to Loyd, the inquiry as to its present ownership is less complicated than that regarding the ED AND LORRAINE WARREN mark, which is subject to a genuine dispute of fact.  See Factual Background, supra at 32-36 n.70.  Importantly, however, Loyd has not yet registered successfully the SEEKERS OF THE SUPERNATURAL MARK, given that, as of June 16, 2021, the USPTO has "suspended action on Loyd's application pending" the resolution of this civil case.  Factual Background, supra at 28-29 (quoting Plaintiffs' MSJ ¶ 33, at 11 (asserting this fact), and citing Suspension Order).  The Court concludes that there is no genuine dispute of material fact that J. Spera has priority of use in, and is the current owner of, the SEEKERS OF THE SUPERNATURAL trademark, subject to any rights New Line gained from the Option Contract.

> **b.      J. Spera and T. Spera Own Jointly the Copyright to Seekers of the Supernatural Television Program, Because T. Spera Registered It Jointly With L. Warren, Whose Ownership Passed to J. Spera by Operation of L. Warren's Will.**

The Court conducts a similar analysis to that which it conducted for the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks to determine the present ownership of the copyright to the Seekers of the Supernatural television program.  The starting point for this inquiry is L. Warren and T. Spera's registration of the copyright with the United States Copyright office under registration number Pau 3-769-603, with an effective registration [189] date of February 10, 2015.  See Factual Background, supra at 12 (citing

Plaintiffs' MSJ ¶ 10, at 5 (asserting this fact); T. Spera Decl. ¶ 5, at 2; Spera Seekers Copyright Registration (listing the titles of twenty-four episodes of the "SEEKERS OF THE SUPERNATURAL," giving 1998 as the year of completion, and stating "**Copyright Office notes**: Basis for registration: unpublished collection." (bold in original)).   Accordingly, as previously noted, before L. Warren's death in 2019, L. Warren and T. Spera owned jointly the copyright. While L. Warren's death left T. Spera's ownership in the copyright undisturbed, it caused L. Warren's ownership to pass to her daughter, J. Spera, by operation of the same L. Warren will provision that caused the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks to pass to J. Spera, given that L. Warren's share of the Warren IP was includable in her assets under the terms of the L. Warren will.   See Factual Background, supra at 19-20 (quoting Plaintiffs' MSJ ¶ 15, at 6, and citing T. Spera Decl. ¶ 9, at 3; L. Warren's Will at 2).   Accordingly, J. Spera has taken her mother's place as co-owner of the Seekers of the Supernatural television program copyright with T. Spera, subject to any rights New Line gained from the Option Contract.

> **c.     Because J. Spera Is L. Warren's Sole Heir, She Is the Owner of the Warrens' Post-Mortem Rights of Publicity.**

The Court now examines the present ownership of the Warrens' post-mortem rights of publicity.   Given that the Court understands an individual's right-of-publicity to survive death under Connecticut State law, see supra at 199-200 n.106 (quoting Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. at 190 (quoting State ex. Rel Elvis Presley Intern. Memorial Found. V. Crowell, 733 S.W. 2d at 97-99 (internal citations omitted in Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.))), it must determine to whom the Warrens' rights of publicity passed upon (i) E. Warren's death, and (ii) L. Warren's death.   Given that E. Warren died intestate and his property passed accordingly to his wife, L. Warren, see Factual Background, supra at 13

(citing  Plaintiffs' MSJ ¶  11, at 5(asserting this fact); T. Spera Decl. ¶ 7, at 2), his post-mortem rights of publicity passed into L. Warren's ownership in 2006.  The next inquiry is into whose possession the Warrens' rights of publicity passed at L. Warren's death.  With the exception of a vintage Chevrolet bequeathed to T. Spera, L. Warren's will "bequeathed all her assets, including any property of 'whatever nature and wherever located'" to J. Spera.  See Factual Background, supra at 19-20 (quoting Plaintiffs' MSJ ¶ 15, at 6 (asserting this fact), and citing T. Spera Decl. ¶ 9, at 3; L. Warren's Will at 2).  Because the Warrens' rights of publicity were L. Warren's property at the time of her death, they passed by operation of L. Warren's will to J. Spera.  See Factual Background, supra at 19-20 (quoting Plaintiffs' MSJ ¶ 15, at 6 (asserting this fact), and citing T. Spera Decl. ¶ 9, at 3; L. Warren's Will at 2).  The Court concludes that J. Spera owns that Warren's post-mortem rights of publicity, subject to any rights New Line gained from the Option Contract.

### 3.     The Plaintiffs Satisfy the Constitutional and Statutory Requirements for Standing.

Having concluded that the Plaintiffs own the Warren IP, the Court now examines whether they meet the constitutional and statutory requirements for standing, i.e., whether they satisfy the Article III and prudential standing requirements.  The burden of establishing standing rests on the Plaintiffs.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. at 104.  Given that Loyd challenges the Plaintiffs' standing, the Court must presume lack of jurisdiction "'unless "the contrary appears affirmatively from the record."'"  Renne v. Geary, 501 U.S. at 316 (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. at 546).  The record reveals that the Plaintiffs meet their burden in proving that they satisfy the constitutional and statutory requirements for standing.

a.   **The Plaintiffs Satisfy the Article III Standing Requirements**.

First, the Court examines whether the Plaintiffs satisfy the Article III standing requirements.  "Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cty., Utah v. United States, 503 F.3d at 1171.  See U.S. Const. art. III, § 2.  To establish Article III standing, a plaintiff must show three things: "(i) an injury in fact that is both concrete and particularized as well as actual or imminent; (ii) an injury that is traceable to the conduct complained of; and (iii) an injury that is redressable by a decision of the court."  Wy. ex rel. Crank v. United States, 539 F.3d at 1241 (citing Lujan v. Defenders of Wildlife, 504 U.S. at 560-61; State ex rel. Sullivan v. Lujan, 969 F.2d 877, 880 (10th Cir. 1992)).  "'Standing is determined as of the time the action is brought.'"  Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d at 1285 (quoting Nova Health Sys. v. Gandy, 416 F.3d at 1154).

As stated above, at the time that the Plaintiffs filed the Original Complaint, both the Warrens were both deceased, and the Warren IP had passed, by one means or another, to the Plaintiffs.  That individual pieces of Warren IP have different owners -- e.g., J. Spera owns the trademarks outright, but is a co-owner of the Seekers of the Supernatural copyright with T. Spera -- does not disturb the standing analysis, because, "[i]f at least one plaintiff has standing, the suit may proceed,"  Biden v. Nebraska, No. 22-506, 2023 WL 4277210, at *6 (U.S. June 30, 2023)(citing Rumsfeld v. Forum for Acad. And Inst. Rights, Inc., 547 U.S. 47, 52, n.2 (2006)).  The Court's analysis proceeds accordingly.

The Court first must determine whether the Plaintiffs had, as of January 21, 2020, properly alleged "'an injury in fact that is both concrete and particularized as well as actual or imminent.'"  Wy. ex rel. Crank v. United States, 539 F.3d at 1241 (citing Lujan v. Defenders of Wildlife, 504 U.S. at 560-61; State ex rel. Sullivan v. Lujan, 969 F.2d at 880).  In their Third Amended

Complaint, which supplements the allegations in the original Complaint, the Plaintiffs allege that

Loyd orchestrated a "fraudulent scheme to usurp Plaintiffs' intellectual property rights relating to

the late Ed and Lorraine Warren," including by

> (a) fraudulently registering the Warrens' personal names -- ED AND LORRAINE
> WARREN -- as a federal trademark, supported by false statements made under
> penalty of perjury to the United States Government and an apparently forged
> written consent from Lorraine Warren; (b) fraudulently registering or applying to
> register the ED AND LORRAINE WARREN mark in Australia, Canada, and the
> European Union; (c) fraudulently registering or applying to register the SEEKERS
> OF THE SUPERNATURAL mark in the United States and European Union; (d)
> fraudulently registering copyrights using content from the Warrens' *Seekers of the
> Supernatural* television series with the United States Copyright Office; (e)
> registering the Warrens' names and the *Seekers of the Supernatural* mark as domain
> names with the bad faith intent to profit from the domains; (f) using the Warrens'
> names and likenesses for commercial purposes in blatant violation of their rights of
> publicity; and (g) selling infringing copies of the Warrens' works through multiple
> websites.  Incredibly, after stealing the Plaintiff's intellectual property, Defendants
> then used the stolen rights to interfere with the Plaintiffs' sale of licensed works.

Third Amended Complaint ¶¶ 1, 3, at 1-2.  The Plaintiffs bring ten claims, each involving the

Warren IP: (i) Count I, for Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(a);

(ii) Count II, Cancellation of Federal Trademark Registration Under the Lanham Act, 15 U.S.C. §

1064; (iii) Count III, Cybersquatting Under the Anticybersquatting Consumer Protection Act, 15

U.S.C. § 1125(c), as to the Warren Domain Names; (iv) Cybersquatting Under the

Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c), as to the Seekers Domain

Names; (v) Copyright Infringement, 17 U.S.C. §§ 501-13; (vi) Cancellation of Copyright

Registrations; (vii) Violation of Common Law Right of Publicity; (viii) Common Law Trademark

Infringement; (ix) Common Law Unfair Competition; and (x) Tortious Interference With

Prospective Economic Advantage.  See Third Amended Complaint ¶¶ 65-118, at 19-25.

First, the Court must determine whether the Plaintiffs allege "'an injury in fact that is both

concrete and particularized as well as actual or imminent.'"  Wy. ex rel. Crank v. United States,

539 F.3d at 1241 (citing Lujan v. Defenders of Wildlife, 504 U.S. at 560-61; State ex rel. Sullivan v. Lujan, 969 F.2d at 880).  While the allegations and claims regarding Loyd's use of individual pieces of Warren IP are heterogenous, at core, they each involve Loyd's "invasion of a legally protected interest," i.e., the Plaintiffs' intellectual property rights in the Warrens' trademarks, copyrights, and rights of publicity at issue.  Lujan v. Defs. of Wildlife, 504 U.S. at 560.  The invasions that the Plaintiffs allege of their legally protected interests are "concrete and particularized," as the Plaintiffs describe in some detail in the Third Amended Complaint -- and support at summary judgment -- allegations of Loyd's violating their intellectual property rights. See Third Amended Complaint ¶¶ 27-30, at 8 (describing the Defendants' sale of "more than 100 titles of books, ebooks, MP3 recordings, and other audio-visual materials using content from the Warrens' *Seekers of the Supernatural* series"); id. ¶¶ 30-44(a), at 8-14 (describing trademark registrations for ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL); id. ¶¶ 45-50, at 14-16 (describing the Ali Mazuren, Taffy Sealyham, and J. Smith copyright registrations); id. ¶¶ 51-61, at 17-19 (describing Loyd's domain name registrations for <edandlorrainewarren.com> and <seekersofthesupernatural.com>, use of Warren IP on an Ali Mazuren YouTube channel, sale of infringing works, and sending takedown notices claiming to be the owner of the ED AND LORRAINE WARREN mark).  Further, the injuries that the Plaintiffs describe were "actual," rather than "'conjectural'" or "'hypothetical,'" having already occurred by the time of the Complaint's filing on January 21, 2020.  Lujan v. Defs. of Wildlife, 504 U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)(quoting Los Angeles v. Lyons, 461 U.S. 95, 102 (1983))).  See, e.g., Factual Background, supra at 24-25 ("Between 2017-2020, Loyd sold thousands of copies of the Warren IP products via the websites CDBaby.com, BookBaby.com, and Apple Books." (citing Plaintiffs' MSJ ¶ 29, at 10 (asserting

this fact))).  Accordingly, the Court concludes that the Plaintiffs establish that they have suffered an injury in fact.  See Lujan v. Defs. Of Wildlife, 504 U.S. at 560.

Second, the Court must determine whether there is a "causal connection between the injury and the conduct complained of," i.e., whether the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Lujan v. Defs. Of Wildlife, 504 U.S. at 560 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)(alterations in Lujan v. Defs. of Wildlife, but not Simon v. E. Ky. Welfare Rights Org.)).  The Third Amended Complaint and summary judgment record indicate that Loyd, acting in her own name and under the aliases, violated the Plaintiffs' intellectual property rights in a variety of ways.  See Third Amended Complaint ¶¶ 27-64, at 8-19; Factual Background, supra at 23-37.  The Complaint's allegations and factual record that supports them at summary judgment leave no doubt that the injuries in question were "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Lujan v. Defs. Of Wildlife, 504 U.S. at 560 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)(alterations in Lujan v. Defs. of Wildlife, but not Simon v. E. Ky. Welfare Rights Org.)).  See, e.g., Factual Background, supra at 24-25 ("Between 2017-2020, Loyd sold thousands of copies of the Warren IP products via the websites CDBaby.com, BookBaby.com, and Apple Books." (citing Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact); id. ¶¶ 27-29 (describing Loyd's trademark registration for SEEKERS OF THE SUPERNATURAL mark); id. ¶ 37 (stating that "Galaxtic Media purported to assign the registration for the ED AND LORRAINE WARREN trademark to Ms. Loyd" (quoting Plaintiffs' MSJ ¶ 43, at 12 (asserting this fact)), and that, "[i]n the Trademark Assignment, Loyd listed her address as the same West Vancouver address that Metagalaxtic and Galaxtic Media used," (citing

Plaintiffs' MSJ ¶ 43, at 12 (asserting this fact); Trademark Assignment at 1))).   Given the Complaint's allegations and the support they find in the summary judgment record, the Court is satisfied that the injuries the Plaintiffs suffered are traceable to Loyd's actions, whether undertaken in her own name or under one of her aliases also named in the Complaint.  See Lujan v. Defs. Of Wildlife, 504 U.S. at 560.

As the last step in its Article III standing analysis, the Court looks to whether there is "an injury that is redressable by a decision of the court."  Wy. ex rel. Crank v. United States, 539 F.3d at 1241 (citing Lujan v. Defenders of Wildlife, 504 U.S. at 560-61; State ex rel. Sullivan v. Lujan, 969 F.2d at 880).  "[I]t must be 'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Lujan v. Defenders of Wildlife, 504 U.S. at 561 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. at 38, 43).  The Plaintiffs seek injunctive relief, damages, and attorneys' fees and costs.  See Third Amended Complaint ¶¶ B-L, at 27-30.  The injunctive relief the Plaintiffs seek would, through various means, force the Loyd to stop using and infringing the Warren IP, i.e., to stop the continuing harm resulting from Loyd's misappropriation. See, e.g., Third Amended Complaint ¶¶ B, at 27-28 (describing eleven-part request for injunctive relief).  The Plaintiffs also seek the following damages:

> (1) the amount of Plaintiffs' actual damages and Defendants' profits or, at Plaintiffs' election, statutory damages in the amount of $150,000 per infringement, pursuant to the Copyright Act, 17 U.S.C. § 504; (2) the amount of Plaintiffs' actual damages and profits derived from Defendants' infringement of Plaintiffs ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks, and the costs of the action, in accordance with 15 U.S.C. § 1117(a), and that such amounts be trebled pursuant to 15 U.S.C. § 1117(b); (3) statutory damages for cybersquatting in the amount of $100,000 per domain name pursuant to 15 U.S.C. § 1125(c); and (4) compensatory, consequential, punitive and other damages on each of Plaintiffs' other claims to the extent permitted by law.

Third Amended Complaint ¶ J, at 29.  The Court concludes that, given the monetary and equitable relief which the Plaintiffs seek, it is "'likely'" rather than "'speculative'" that the Plaintiffs' alleged

injury would be redressable through the Court's favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. at 561 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. at 38, 43). Accordingly, the Court is satisfied that the Plaintiffs have met their burden in establishing Article III standing in this case.

**b.**   **The Plaintiffs Satisfy the Prudential Standing Requirements.**

Generally, there are three prudential standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "'a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit.'"  Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (quoting Bennett v. Spear, 520 U.S. at 162).  The fact that the Plaintiffs are asserting their own rights in the Warren IP, satisfies the first requirement, i.e., that "a plaintiff must assert his own rights, rather than those belonging to third parties," Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112.  The same fact also satisfies the second requirement that the claim not be a generalized grievance.  See Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112. In determining whether the third requirement is satisfied, the Court looks to the nature of the Plaintiffs' claims to determine whether their "[']grievance . . . arguably fall[s] within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit.'"  Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (quoting Bennett v. Spear, 520 U.S. at 162).  Here, the Plaintiffs proceed with ten claims, including both statutory and common-law causes of action of action, all of which concern the protection of intellectual property rights.  See Complaint ¶¶ 65-118, at 20-26 (outlining trademark, copyright, cybersquatting, right-of-publicity, unfair competition, and tortious interference with prospective economic advantage claims).  Given

the substance of the Plaintiffs' allegations and the theories under which the Plaintiffs proceed, the Court is satisfied that the Plaintiffs satisfy the third prudential standing requirement.  See Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (quoting Bennett v. Spear, 520 U.S. at 162). Accordingly, the Court concludes that the Plaintiffs meet their burden to establish prudential standing.

### 4.    J. Spera and T. Spera Are Active Participants in This Lawsuit.

Having concluded that the Plaintiffs have Article III and prudential standing, the Court now addresses the arguments that Loyd makes, which, read liberally, appear directed at the question of standing.  Specifically, Loyd alleges that the "Plaintiffs Judy and Tony Spera claim they did not file this lawsuit, never spoke to the attorneys and they are not paying for this lawsuit." Loyd's Response at 17.  Loyd has not deposed either of the Speras to question them about their involvement or lack thereof in this action, or otherwise gathered evidence to support her allegation.

Having reviewed the record, including the parties' and their counsel's representations, the Court concludes that Loyd's unusual allegation that the Speras, in spite of being named plaintiffs, are not active participants in this action, lacks a sound basis in the relevant facts and applicable law.  First, the Court accepts the representations of the Plaintiffs' counsel, Mr. McCue, as an officer of the Court, that the Speras authorized him to serve as their lawyer in this matter.  On this subject, Mr. McCue informed the Court:

> As an officer of the Court I represent to the Court that I represent all the plaintiffs, including Tony Spera, and Judy Spera[;] we have been communicating with the regarding this case and their counsel with their personal counsel [Gary Barkin].  They didn't teach me in law school how to address issues with somebody questioning whether you are actually representing your clients or in this case Ms. Loyd has actually accused us in her papers [of] steal][ing] [the] identities [of] Judy and Tony Spera[,] but I can assure the Court that we represent them and I think it's Ms. Loyd's burden to prove otherwise.

June 23 Tr. at 11:20-12:7 (McCue).  Although it is Loyd's burden to prove that the representations of the Plaintiffs' counsel are inaccurate, she cites to no evidence that substantiates her allegation. See Loyd's Response at 17.  Indeed, the undisputed facts in the record establish that J. Spera and T. Spera consent to Mr. McCue and his colleagues representing them.  Declaration of Judy Spera at 1 (dated June 8, 2021), filed June 8, 2021 (Doc. 58-9)(declaring under penalty of perjury: "I authorize counsel from Lewis Roca Rothgerber Christie LLP, including Michael McCue, Ross Crown, and Meng Zhong to represent me in this action"); Declaration of Tony Spera at 1 (dated June 8, 2021), filed June 8, 2021 (Doc. 58-10)(same).  Moreover, the Speras have participated actively in their suit, swearing to multiple affidavits in support of their claims and furnishing evidence from the Warrens' archives.  See J. Spera Decl. at 1-4; T. Spera Decl. at 1-4.  Given the evidence in the record, Mr. McCue's representations to the Court, the Speras' sworn declarations, and Loyd's lack of evidence to support her allegation, the Court sees no sound basis to question the veracity of the Speras' participation in this case, J. Spera's status as personal representative and executrix for L. Warren's estate, or Lewis Roca Rothgerber Christie LLP's representation of the Speras.

### 5.    The Earlier Series of Disputes Between New Line and DeRosa-Grund Do Not Compromise the Plaintiffs' Standing.

The next of Loyd's arguments regarding standing centers on the facts of the DeRosa-Grund Disputes, to which she devotes the section she labels "Statement of Relevant Facts" in Loyd's MSJ and Loyd's Response to Plaintiffs.  Factual Background, supra at 15 (citing Loyd's MSJ at 3-5; Loyd's Response at 2-5; Plaintiffs' MSJ Reply at 3-5; Plaintiff's Response at 3-6; McCue Decl. ¶¶ 2-15, at 2-4; JAMS Award at 5).  At the core of the DeRosa-Grund Disputes are intellectual property rights related to The Conjuring, its sequels, and associated pieces of Warren IP, with Warner Bros. and New Line firing the opening salvo via a JAMS Arbitration proceeding, New

Line Prod. v. Tony DeRosa-Grund. See Factual Background, supra at 16-17 (citing Plaintiffs' Response at 3-6 (asserting this fact); McCue Decl. ¶¶ 2-15, at 2-4; JAMS Award at 1-32). In the JAMS Award, the arbitrator held: "'Any rights acquired by DeRosa-Grund under the [purported agreements between DeRosa-Grund and the Warrens] are the sole property of New Line under the Agreements [between DeRosa-Grund and New Line].'" Plaintiffs' Response ¶ 5, at 6 (quoting JAMS Award at 27)(asserting this fact). See McCue Decl. ¶ 6 at 2-3; JAMS Award at 26-27. Loyd makes at times several contradictory arguments in support of her interpretation that the DeRosa-Grund Disputes reveal the Plaintiffs' lack of standing. Specifically, Loyd argues that, "[a]fter three (3) years of litigation" of the DeRosa-Grund disputes, "it is clear that Ed and Lorraine Warren sold 100% of their rights to the Warren's [sic] intellectual property rights." Loyd's MSJ at 5. See Loyd's Response at 8 (repeating her assertions about the Warrens selling "100% of their rights," but revising the number of "years of litigation" to be "[f]our (4)" in the heading and "eight (8)" in the text's body).

The fatal flaw in Loyd's argument that the DeRosa-Grund Disputes defeat the Plaintiffs' standing is that it finds no support in the summary judgment record. See Factual Background, supra at 17-18 n.39 (discussing Loyd's allegations regarding the DeRosa-Grund Disputes and concluding that "there is no dispute regarding the content of the DeRosa-Grund Disputes"). As the Court notes, despite Loyd's non-compliance with D.N.M.LR-Civ. 56.1(b), the Court has labored to "step back from the trees and see if Loyd has pointed to, somewhere in her briefing or at the oral argument, competent evidence in the record that shows there is a genuine dispute of material fact" as to the impact of the DeRosa-Grund Disputes on this case. Factual Background, supra at 16 n.38. Reading Loyd's arguments liberally, and, having examined in detail the filings from the DeRosa-Grund Disputes which the parties submit as exhibits, the Court is unable to find

any genuine dispute of material fact as to the impact of the DeRosa-Grund Disputes on this case. See Factual Background, supra at 16-18 nn.38-39.  Indeed, from the Court's review, the DeRosa-Grund Disputes do not involve the Warren IP at issue in Plaintiffs' MSJ, i.e., the copyrights to the Seekers of the Supernatural show, the ED AND LORRAINE WARREN or SEEKERS OF THE SUPERNATURAL TRADEMARKS, the internet domains related to those trademarks, or the Warrens' rights of publicity.  See Factual Background, supra at 18-19 (citing Plaintiffs' Response ¶¶ 1-5, at 5-6 (asserting this fact)).  Given that the DeRosa-Grund Disputes do not concern the Warren IP at issue in this case, Loyd's arguments regarding their impact on the Plaintiffs' standing are unpersuasive and do not disturb the Court's standing analysis.

## B.   THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THE PLAINTIFFS' CLAIMS.

Having concluded that the Plaintiffs have standing, the Court now examines whether it has subject-matter jurisdiction over the Plaintiffs' claims.  See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552 ("[D]istrict courts of the United States . . . are 'courts of limited jurisdiction[.']" (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994))). The Plaintiffs and Loyd stipulate in the JSR that "the United States District Court for the District of New Mexico has jurisdiction [over] . . . the subject matter."  JSR at 3.  Nevertheless, the Court conducts its own review to confirm that it possesses jurisdiction.  See Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

The Plaintiffs bring ten claims: (i) Count I, for Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(a); (ii) Count II, Cancellation of Federal Trademark Registration Under the Lanham Act, 15 U.S.C. § 1064; (iii) Count III, Cybersquatting Under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c), as to the Warren Domain Names;

(iv) Cybersquatting Under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c), as to the Seekers Domain Names; (v) Copyright Infringement, 17 U.S.C. §§ 501-13; (vi) Cancellation of Copyright Registrations; (vii) Violation of Common Law Right of Publicity; (viii) Common Law Trademark Infringement; (ix) Common Law Unfair Competition; and (x) Tortious Interference With Prospective Economic Advantage.  See Third Amended Complaint ¶¶ 65-118, at 19-25.  Counts I, II, III, IV, V, and VI are brought pursuant to federal statutes, while Counts VII, VIII, IX, and X arise under State common law.  See Third Amended Complaint ¶¶ 65-118, at 19-25.  While the Plaintiffs only move for summary judgment on Counts I, V, and VII, because Loyd moves for summary judgment on all ten of the Plaintiffs' claims, the Court must conduct a subject-matter jurisdiction analysis of each claim.  The Court concludes that it has jurisdiction over each of the Plaintiffs' claims, because the first six Counts arise under federal law and share a common nucleus of operative fact with the remaining four State law claims, thereby permitting the Court to exercise supplemental jurisdiction over them.  To facilitate its subject-matter jurisdiction analysis, the Court divides the Plaintiffs' claims into subject-matter categories -- statutory trademark claims (Counts I and II), statutory cybersquatting claims (Counts III and IV), statutory copyright claims (Counts V and VI), and State common-law claims (Counts VII through X) -- and examines each claim category.

### 1.     The Plaintiffs' Trademark Claims Arise Under the Lanham Act.

The Plaintiffs pursue two claims under the Lanham Act: Count I, for unfair competition pursuant to 15 U.S.C. § 1125(a)(1)(A); and Count II, for cancellation of federal trademark registration pursuant to 15 U.S.C. § 1064.  See Third Amended Complaint ¶¶ 65-81, at 19-21.  As 28 U.S.C. § 1338 states, "[t]he district courts . . . have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and

trademarks." 28 U.S.C. § 1338(a).  Here, Counts I and II are trademark claims that proceed under an Act of Congress, specifically, the Lanham Act.  See Third Amended Complaint ¶¶ 65-74, at 19-20 (proceeding under 15 U.S.C. § 1125(a)(1)(A) and § 1064).  Accordingly, the Court has subject-matter jurisdiction over Counts I and II.

### 2.     The Plaintiffs' Cybersquatting Claims Arise Under the Anticybersquatting Consumer Protection Act.

The Plaintiffs pursue two claims under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c): Count III for the Warren domain names, and Count IV for the Seekers domain names.  See Third Amended Complaint ¶¶ 71-81, at 20-21.  "Congress enacted the Anti-Cybersquatting Protection Act (ACPA), 15 U.S.C. § 1125(d), to address 'a new form of piracy on the Internet caused by acts of "cybersquatting," which refers to the deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners.'" Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, 527 F.3d at 1057 (quoting S. Rep. No.106-140, at 4 (1999)).  Given that the ACPA provides a cause of federal cause of action to trademark holders who discover the unlawful use of their trademarks in internet domain names, the Court has subject-matter jurisdiction over the Plaintiffs' Counts III and IV.  See 28 U.S.C. § 1338(a) (providing original jurisdiction to the United States District Court for a "civil action arising under any Act of Congress relating to . . . trademarks").

### 3.     The Plaintiffs' Copyright Claims Arise Under the Copyright Act.

The Plaintiffs pursue two copyright claims: Count V, for copyright infringement pursuant to 17 U.S.C. §§ 501-13; and Count VI, for cancellation of copyright registrations, for which the Plaintiffs invoke authority from the Compendium of U.S. Copyright Office Practices, Third

Edition ("Compendium") § 1807.4(E).[110]  Third Amended Complaint ¶¶ 89-100, at 22-24.  Under

28 U.S.C. § 1338(a), "[t]he district courts . . . have original jurisdiction of any civil action arising

under any Act of Congress relating to . . . copyrights."  28 U.S.C. § 1338(a).  According, the Court

has subject-matter jurisdiction over Counts V, which proceeds explicitly under the Copyright Act.

At to Count VI, the Plaintiffs invoke the authority the Compendium, rather than the

Copyright Act itself.  See Third Amended Complaint ¶ 100, at 23-24 ("Defendant's copyright

registrations are subject to cancellation by order of the Court pursuant to the Compendium of U.S.

Copyright Office Practices 1807.4(E).").  The Compendium indicates, however, that the statutory

authority for copyright cancellation rests in the Copyright Act itself.  See Compendium (Third) §

1807.1 ("The Register of Copyrights has the authority to cancel a registration if 'the material

deposited does not constitute copyrightable subject matter' or if 'the claim is invalid for any other

reason.'" (quoting 17 U.S.C. § 410(b))).  See also Compendium at 2 (noting that "[t]he policies

and practices set forth in the Compendium do not in themselves have the force and effect of law

and are not binding upon the Register of Copyrights or Copyright Office staff," but that "the

Compendium does explain the legal rationale and determinations of the Copyright Office").

Accordingly, the Court considers Count VI to be a claim under the Copyright Act and to fall inside

28 U.S.C. § 1338(a)'s ambit, which provides the Court with subject-matter jurisdiction over "any

civil action arising under any Act of Congress relating to . . . copyrights."  28 U.S.C. § 1338(a).

---

[110]Although the Plaintiffs cite to the Compendium's "Voluntary Cancellation" section, § 1807.4(E), the substance of the Plaintiffs' request for Court-ordered relief in Count VI suggests that the Plaintiffs intend to invoke the Compendium's "Court Ordered Cancellation" section. Compare Compendium (Third) § 1807.4(E) (permitting "a request to cancel a registration, provided that the request is made by the copyright claimant . . . or the claimant's duly authorized agent"), with Compendium (Third) § 1807.4(F) (empowering plaintiffs "in a copyright infringement lawsuit to ask the court to issue an order directing a party to cancel his or her registration . . . using the procedure described in Section 1807.4(E)" of the Compendium).  The Court accordingly construes Count VI to proceed under § 1807.4(F) of the Compendium.

4.      **The Plaintiffs' State Common-Law Claims Are Within the Court's Supplemental Jurisdiction.**

Having concluded that it has subject-matter jurisdiction over the Plaintiffs' six statutory claims, the Court now examines whether it may exercise supplemental jurisdiction over the remaining four State common-law claims.  In addition to its federal-question jurisdiction and diversity jurisdiction, see 28 U.S.C. §§ 1331-32, the Court has the power to hear claims over which it otherwise lacks original jurisdiction, if those claims are part of the same constitutional case as claims over which the court has original jurisdiction, see 28 U.S.C. § 1367(a); Exxon Mobil Corp. v. Allpattah Servs., Inc., 545 U.S. at 552 ("[I]t is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."). Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs, 383 U.S. at 725.  The decision to exercise supplemental jurisdiction is a matter of judicial discretion. See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1165 (citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. at 173).  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compels courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction. 383 U.S. at 726.  See 28 U.S.C. § 1367(c) (enumerating factors for courts to consider when deciding whether to exercise supplemental jurisdiction).  Because the four State common-law claims are heterogeneous, the Court conducts a separate supplemental-jurisdiction analysis for each one.  These analyses support the conclusion that the Court may exercise supplemental jurisdiction over Counts VII through X.

The Court concludes that it has subject-matter jurisdiction over Count VII, which states a claim for violation of the common-law right of publicity.  See Third Amended Complaint ¶¶ 101-04, at 24.  As discussed above, in this case, the common-law right-of-publicity claim proceeds under Connecticut State law.  Unlike Counts VIII (Common Law Trademark Infringement) and IX (Common Law Unfair Competition), Count VII is a standalone claim in this case: it proceeds with no companion statutory claim, as there is no statutory right of publicity under Connecticut State law.  See Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. at 188.  The Court looks to whether this standalone State claim "derive[s] from a common nucleus of operative fact" with the federal claims in this case.  United Mine Workers v. Gibbs, 383 U.S. at 725.  The Court concludes that the Plaintiffs' right-of-publicity claim is inextricably linked to its other claims for violations of their intellectual property rights.  At the core of this case is Loyd's unauthorized sale of thousands of copies of Warren IP products between 2017 and 2020.  See Factual Background, supra at 24-25 (citing Plaintiffs' MSJ ¶ 29, at 10).  Because Loyd's selling Warren IP products implicates use of a range of Warren IP, including trademarks, copyrights, and rights of publicity, the Court concludes that the right-of-publicity claim shares a common nucleus of operative fact with the claims brought under federal statutes in this case.  See United Mine Workers v. Gibbs, 383 U.S. at 725.  Further, the Court concludes that "judicial economy, convenience and fairness to litigants" weigh in favor of the Court's adjudicating the right-of-publicity claim with the other intellectual property claims at issue in this case.  United Mine Workers v. Gibbs, 383 U.S. at 726.  Accordingly, the Court exercises supplemental jurisdiction over Count VII.

The Court concludes that it has subject-matter jurisdiction over Count VIII, which asserts a claim for common-law trademark infringement.  See Third Amended Complaint, ¶¶ 105-07, at 24.  Count VIII is a State common-law claim that serves as a companion to the federal statutory

trademark claims in this case -- Count I and Count II.  This case centers in part on Loyd's infringement of the Warrens' trademarks, which serves as a "common nucleus of operative fact" for the federal and State trademark claims.  United Mine Workers v. Gibbs, 383 U.S. at 725. Accordingly, the Court concludes that it has subject-matter jurisdiction over Count VIII.

The Court concludes that it has subject-matter jurisdiction over Count IX, which states a claim for common-law unfair competition.  See Third Amended Complaint ¶¶ 108-10, at 25. Count IX is a State common-law companion claim to the federal statutory unfair competition claim in this case, Count I, for Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(a). The same unfair competition that underlies the Plaintiffs' Count I underlies Count IX, as well. Accordingly, the Court concludes that there is a "common nucleus of operative fact" that justifies its subject-matter jurisdiction over Count IX.  United Mine Workers v. Gibbs, 383 U.S. at 725.

Finally, the Court concludes that it has subject-matter jurisdiction over Count X, which states a claim for Tortious Interference With Prospective Economic Advantage.  See Third Amended Complaint ¶¶ 111-18, at 26.  In support of Count X, the Plaintiffs allege that the "Plaintiffs have economic relationships with third parties for the sale of books and other works based on the Warrens' *Seekers of the Supernatural* series" and that the "Defendants engaged in wrongful conduct to disrupt Plaintiffs' relationship by sending takedown notices to such third parties."  Third Amended Complaint ¶¶ 112, 115, at 26.  This tortious interference claim intersects factually with the Plaintiffs' other claims in this case.  As the Third Amended Complaint alleges, in July, 2019, "Loyd sent takedown notices to the copyright agents for Barnes & Noble and Ingram Content Group, among others, claiming that she was the owner of the ED AND LORRAINE WARREN mark and that the bookstores' sale of books written by Ed and Lorraine Warren and others violated her trademark rights."  Third Amended Complaint ¶ 60, at 18-19.  Further, the

Plaintiffs allege, "Loyd is relying on the fraudulent copyright and trademark registrations and filings in the U.S. and foreign countries to interfere with Plaintiffs' intellectual property rights." Third Amended Complaint ¶ 60, at 19.  The Court is satisfied that Loyd's alleged tortious interference with the Plaintiffs' prospective economic advantage shares a "common nucleus of operative fact" with the other intellectual property claims that the Plaintiffs bring.  United Mine Workers v. Gibbs, 383 U.S. at 725.  Loyd's sending takedown notices to sellers of Warren IP is factually bound up with the trademark, copyright, and right-of-publicity claims, among others. The Court deems it in the interest of "judicial economy, and convenience and fairness to litigants" to adjudicate Count X with the other, related counts in the Third Amended Complaint.  United Mine Workers v. Gibbs, 383 U.S. at 726.  See 28 U.S.C. § 1367(c) (enumerating factors for courts to consider when deciding whether to exercise supplemental jurisdiction).  Accordingly, the Court concludes that it has subject-matter jurisdiction over Count X.

### C.    THE COURT HAS PERSONAL JURISDICTION OVER EACH DEFENDANT.

As the next step in its analysis, the Court concludes that it has personal jurisdiction over each defendant in this case.  First, the Court discusses its personal jurisdiction over the corporate entity defendants.  Second, the Court discusses its personal jurisdiction over Loyd.

#### 1.    The Corporate Defendants Are Formed in New Mexico and Therefore Subject to the Court's Jurisdiction.

The Court's personal jurisdiction extends to each of the corporate Defendants in this case. As the Third Amended Complaint states, and the New Mexico Secretary of State's database confirms, the corporate defendants remaining in this case, i.e., Metagalaxtic, LLC; Omnimedia, LLC; Cohen Goldberg & Smith, LLC; and Seekers of the Supernatural LLC, are all entities formed in New Mexico which are now dissolved.  See Third Amended Complaint ¶¶ 10-13, at 5.  Given

that the corporate entities are formed in New Mexico, the Court is satisfied that they have the "'minimum contacts'" with New Mexico necessary to ensure that "having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1070 (10th Cir. 2008)(quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  Accordingly, the Court concludes that it has personal jurisdiction over the corporate defendants.

> ### 2.     Loyd Is Subject to the Court's Personal Jurisdiction, Because of Her Systematic Contacts Within New Mexico Through the Formation of the Corporate Entities in This Case.

The Court concludes that it has personal jurisdiction over Loyd.  "The party seeking to establish personal jurisdiction over a foreign litigant must make two showings: first, that the exercise of jurisdiction is sanctioned by the state's long-arm statute; and second, that it comports with the due process requirements of the Fourteenth Amendment." Marcus Food Co. v. DiPanfilo, No. CIV 10-3285, 2011 WL 5084997, at *3 (10th Cir. Oct. 27, 2011)(unpublished).  New Mexico's long-arm "statute extends the jurisdictional reach of New Mexico courts as far as constitutionally permissible." Tercero v. Roman Catholic Diocese of Norwich, Conn., 2002-NMSC-018, ¶ 6, 132 N.M. 312, 316, 48 P.3d 50, 54 (2002).  Consequently, the Court "'need not conduct a statutory analysis apart from the due process analysis.'" Marcus Food Co. v. DiPanfilo, 2011 WL 5084997, at *3 (quoting Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1159).  Given that "general jurisdiction is based on an out-of-state defendant's 'continuous and systematic contacts within the forum state,'" the Court looks to whether Loyd has maintained such contacts. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078 (quoting Trujillo v. Williams, 465 F.3d at 1218 n.7 (10th Cir. 2006).  The summary judgment record establishes that Loyd controlled the corporate entities formed in New Mexico, a fact evidenced, for example, by the fact that Loyd's Trademark

Assignment and request that the USPTO reissue the Warren Trademark in Loyd's name list the same West Vancouver address as that which Metagalaxtic and Galaxtic Media used.  See Factual Background¸ supra at 37 (citing Plaintiffs' MSJ ¶ 43, at 12; Trademark Assignment at 1; Plaintiffs' MSJ ¶ 45, at 13; Section 7 Request Form at 1).  By incorporating and controlling corporate entities in New Mexico, Loyd has the requisite "'minimum contacts' with the forum state, demonstrating that [s]he 'purposefully availed' h[er]self of the protections or benefits of the state's laws and 'should reasonably anticipate being haled into court there.'"  Diener v. Trapeze Asset Mgmt., Inc., 2015 WL 8332933, at *9 (quoting Marcus Food Co. v. DiPanfilo, 2011 WL 5084997, at *4 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473-76 (1985), and citing Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1159-60 (10th Cir. 2010))).  Accordingly, the Court concludes that it has personal jurisdiction over Loyd.  In various filings, including her MTD and Final Judgment Opposition, Loyd argues that the Court lacks personal jurisdiction over this matter.  See, e.g., MTD at 11-19; Final Judgment Opposition at 2.  The Plaintiffs note correctly in their MTD Opposition that Loyd's objections to the Court's personal jurisdiction are untimely and waived.  See MTD Opposition at 1-5.  Further, the Court notes that the parties stipulated on July 14, 2020, that "the United States District Court for the District of New Mexico has jurisdiction of the parties and the subject matter."  JSR at 3.  Accordingly, the Court concludes that it has personal jurisdiction over Loyd, and over the other Defendants.

### D.   VENUE IS PROPER IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO.

The Court concludes that venue is proper in the United States District Court for the District of New Mexico.  The purpose of venue is to assure that lawsuits are filed in appropriately convenient courts for the matters raised and for the parties involved in the action.  See Leroy v. Great W. United Corp., 443 U.S. at 185.  The federal venue provision allows a plaintiff to file in:

(i) "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; (ii) "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or, (iii) "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b).  See Res. Assocs. Grant Writing & Evaluation Servs., Inc. v. Southampton Union Free Sch. Dist., 193 F. Supp. 3d at 1226. In some circumstances, "[t]he interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." Res. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citing Coffey v. Van Dorn Iron Works, 796 F.2d at 220-21).  The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action.  Driggers v. Clark, 422 F. App'x at 749-50 (citing Trujillo v. Williams, 465 F.3d at 1222).

Here, the Court exercises its discretion not to transfer the case to a different venue, because transfer would not be in the interest of justice.  See Driggers v. Clark, 422 F. App'x at 749-50 (citing Trujillo v. Williams, 465 F.3d at 1222).  Venue is proper in the United States District Court for the District of New Mexico, because it is the district "in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b).  As discussed above, Loyd formed and controlled entities in New Mexico that served as the vehicles for her infringement of the Warren IP.  The Court acknowledges that Connecticut State law governs the right of publicity claim, as the parties stipulate.  See JSR at 3 ("The parties further stipulate and agree that the law governing this case is: . . . Connecticut state law with respect to the rights of publicity claim . . . .").  The need to interpret Connecticut state law for a single claim does not justify this case's transfer

to Connecticut.  Further, the parties stipulated, early in the litigation, on July 14, 2020, that venue

is proper in the United States District Court for the District of New Mexico.  See JSR at 3 ("The

parties hereto stipulate and agree that venue is properly laid in this District . . . .).  Further, rules

12(g) and 12(h) of the Federal Rules of Civil Procedure provide that, if a party does not raise its

objection to venue in its responsive pleading or in its first rule 12(b) motion, it waives the objection

and accepts the plaintiff's chosen venue.  See Fed. R. Civ. P. 12(h)(1) ("A party waives any defense

listed in Rule 12(b)(2)-(5) by (A) omitting it from a motion in the circumstances described in Rule

12(g)(2); or (B) failing to either: (i) make it by motion under this rule; or (ii) include it in a

responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.").

Further, even if Loyd had not made a stipulation regarding venue, the Court credits the Plaintiffs'

arguments that Loyd's venue arguments are untimely and waived.  See MTD Opposition at 1-5.

Accordingly, the Court concludes that the United States District Court for the District of New

Mexico is the proper venue for this litigation.

## II.     THE COURT GRANTS THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR CLAIM FOR UNFAIR COMPETITION UNDER THE LANHAM ACT, BECAUSE THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT LOYD INFRINGED THE WARRENS' TRADEMARKS.

Having determined that the case and parties are properly before the Court, the Court

proceeds to its analysis of the first claim on which the Plaintiffs move for summary judgment,

Count I, Unfair Competition Under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), and grants the

Plaintiffs summary judgment on that claim.  15 U.S.C. § 1125(a)(1) states:

> (1)     Any person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any word, term, name, symbol, or
> device, or any combination thereof, or any false designation of origin, false
> or misleading description of fact, or false or misleading representation of
> fact, which --

(A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person

. . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  As discussed in detail in the Court's standing analysis, ownership of the unregistered ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks passed on L. Warren's death to her daughter, J. Spera.  There is no genuine dispute of material fact as to J. Spera's ownership and priority of use of the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks that are the subject of Count I, subject to whatever rights New Line acquired in the Option Contract.  Indeed, the summary judgment record reveals that, even resolving all disputed facts in Loyd's favor, fully crediting her testimony, and accepting the disputed Consent Form as authentic, Loyd does not have legal rights to the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks.[111]  Accordingly, the Court's inquiry turns to whether Loyd used the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks in commerce.

There is no genuine dispute of material fact that Loyd used the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks in commerce.  As the Factual Background section of this Memorandum Opinion and Order states:

Loyd has sold Warren IP in various media through accounts on several ecommerce platforms.  See Plaintiffs' MSJ ¶¶ 28-29, at 9-10 (asserting this fact).  Specifically, Loyd has sold content derived from the Seekers of the Supernatural series "in the form of downloadable media, paperback books, recordings, MP3s, and scripts of the recordings." Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact).

---

[111]Further, resolving any ambiguity regarding which Plaintiffs hold which rights is not relevant to the Court's analysis.

> Between 2017-2020, Loyd sold thousands of copies of the Warren IP products via the websites CDBaby.com, BookBaby.com, and Apple Books.  See Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact).  Loyd sells these products "for less than $1 per copy on average."  Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact).

Factual Background, supra at 23-24 (footnotes omitted).  Further,

> Loyd submitted specimens in support of her Seekers Trademark Application.  See Plaintiffs' MSJ ¶ 32, at 10-11 (asserting this fact); Specimens attached to U.S. Trademark Application Serial No. 88835775, filed August 6, 20212 (Doc 81.-14)("Specimens").   Loyd's Specimens include a collection of screenshots displaying audio and video copies of Seekers of the Supernatural for sale in various marketplace, each of which "prominently mentioned Ed and Lorraine Warren" in their packaging and title.  Plaintiffs' MSJ ¶ 32, at 10-11 (asserting this fact).  See Specimens at 2-10.

Factual Background, supra at 27 (footnotes omitted).  On this record, there is no genuine dispute of material fact that Loyd used the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks in commerce.

Having concluded it is undisputed that Loyd used the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks in commerce, the Court examines whether Loyd's use of the marks "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person," and concludes that Loyd's use of the marks caused consumer confusion.  The Tenth Circuit looks to six factors to determine whether a likelihood of confusion exists: (i) evidence of actual confusion; (ii) the contesting mark's strength; (iii) the degree of similarity between the competing marks; (iv) the alleged infringer's intent in adopting the contested mark; (v) the degree of care that consumers likely are to exercise in purchasing the parties' products; and (vi) the similarity of the parties' products and the manner in which they sell them.  See Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d at 1143 (citing Vail Assocs., Inc. v. Vent-Tel-Co., Ltd., 516 F.3d at 863).   The six

likelihood-of-confusion factors are non-exhaustive, and no one factor predominates.  See Water

Pik, Inc. v. Med-Sys, Inc., 726 F.3d at 1143; 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at

1239 (noting that the likelihood-of-confusion factors "should not be applied mechanically; some

factors may carry far more weight than others depending on the circumstances").  The Tenth

Circuit has stated, however, that "'[a]ctual confusion in the marketplace is often considered the

best evidence of likelihood of confusion.'"  King of the Mountain Sports, Inc. v. Chrysler Corp.,

185 F.3d at 1092 (quoting Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co., 22 F.3d at 1534

(alteration in King of the Mountain Sports, Inc. v. Chrysler Corp., but not in Universal Money

Ctrs. Inc. v. Am. Tel. & Tel. Co.))).

Each of the factors that the Tenth Circuit applies to determine whether there is a likelihood

of confusion support the Court's conclusion that Loyd's use of the ED AND LORRAINE

WARREN and SEEKERS OF THE SUPERNATURAL trademarks created a likelihood of

confusion under the Lanham Act.  See 15 U.S.C. § 1125(a)(1)(A).  First and foremost, the

summary judgment record presents evidence of actual customer confusion regarding the source of

the Warren IP items that Loyd sold.  For example, there is no genuine dispute of material fact that:

> There are instances of actual confusion among consumers as to the source"
> of these products.  Plaintiffs' MSJ ¶ 30, at 10 (asserting this fact).  See
> Goodreads.com page for Conversations With Ed and Lorraine Warren at 1 (dated
> July 28, 2016), filed August 6, 2021 (Doc 81-12 at 3)(satisfied consumer of Loyd's
> book)(giving it an "A+" and leaving a review indicating that she associates it with
> the Warrens: "I feel like [E]d and Lorraine Warren are wonderful at what they do.
> I couldn't put this book down or any other book they have written or been a part of
> for that matter."); Goodreads.com page for Mysterious Places: Ed and Lorraine
> Warren: Mysterious Places at 1, filed August 6, 2021 (Doc 81-12 at 3)(dissatisfied
> reader)(leaving a one-star review: "Not their best book.  It's a collection of radio
> shows transcriptions regarding places supposedly haunted and the meaning of
> certain phenomena but it lacks any critical analysis about those places and
> experiences.").

Factual Background, supra at 25 (footnotes omitted).  Given that "'[a]ctual confusion in the marketplace is often considered the best evidence of likelihood of confusion,'" the Court could conclude on the "actual confusion" factor alone that Loyd's use of the marks caused a likelihood of confusion.  King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d at 1092 (quoting Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co., 22 F.3d at 1534 (alteration in King of the Mountain Sports, Inc. v. Chrysler Corp., but not in Universal Money Ctrs. Inc. v. Am. Tel. & Tel. Co.)))).  Nonetheless, the Court considers the other factors, as well.  The second and third factors, i.e., the contesting mark's strength and the degree of similarity between the competing marks, weigh heavily in favor of actual confusion, because Loyd was not using similar marks to the Warrens', but instead using the very same marks, ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL.  See Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d at 1143 (citing Vail Assocs., Inc. v. Vent-Tel-Co., Ltd., 516 F.3d at 863).  As to the fourth factor, the Loyd's "intent in adopting the contested mark," the summary judgment record taken as a whole -- including Loyd's sale of Warren IP goods and attempts to register various kinds of Warren IP -- indicates an intent to profit, without authorization, off the Warren's notoriety, which further supports likelihood of confusion.  See Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d at 1143 (citing Vail Assocs., Inc. v. Vent-Tel-Co., Ltd., 516 F.3d at 863).  The fifth factor, the "the degree of care that consumers likely are to exercise in purchasing the parties' products," also weighs in favor of a likelihood of confusion.  See Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d at 1143 (citing Vail Assocs., Inc. v. Vent-Tel-Co., Ltd., 516 F.3d at 863).  While customers are likely to be deliberate about whose books and videos they purchase, because they are likely to seek out the works of a particular individual for their artistic merit or entertainment value, a reasonable customer is not likely to question, for example, whether a book or video with a particular person's name on the

cover comes from another person entirely.  Further, the Court credits the Plaintiffs' argument that the low price of the items Loyd sold weighs in favor of a likelihood of confusion.  See Sally Beauty Co v. Beautyco, Inc., 304 F.3d at 975.  The Court concludes that the nature of the Warrens' products lends itself to customer confusion when a third party begins to sell items with the ED AND LORRAINE WARREN or SEEKERS OF THE SUPERNATURAL marks.  The sixth factor, the similarity of the parties' products and the manner in which they sell them," also weighs in favor of a likelihood of confusion, given that the products Loyd sold were print and visual media, much like the Warrens' products.  Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d at 1143 (citing Vail Assocs., Inc. v. Vent-Tel-Co., Ltd., 516 F.3d at 863).  Accordingly, the Court concludes that Loyd's use of the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks in commerce caused a likelihood of customer confusion and, indeed, actual customer confusion.

The Court concludes that Loyd's use of the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks in commerce constitutes a violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), and, accordingly, grants the Plaintiffs summary judgment on Count I.  This is a "classic case of direct confusion" in which "'[c]ustomers want to buy the [Plaintiff's] product and because of the similarity of the marks, mistakenly buy the [Defendant's] product instead.'"  1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1238 (quoting 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10 at 23-70 (4th ed. 2013)(alteration in 1-800 Contacts, Inc. v. Lens.com, Inc.)).  Indeed, Loyd's use of the Warrens' marks caused customers to "develop the mistaken belief that the plaintiff is the origin of the defendant's goods or services -- so that the defendant capitalizes on the plaintiff's good name."  1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1238 (citing Australian Gold, Inc. v. Hatfield,

436 F.3d at 1238).  Having concluded that the Plaintiffs are entitled to summary judgment on Count I, the Court proceeds to evaluate Count V for Copyright Infringement under the Copyright Act.

### III.   THE COURT GRANTS THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR CLAIM FOR COPYRIGHT INFRINGEMENT, BECAUSE THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT LOYD INFRINGED THE SEEKERS OF THE SUPERNATURAL COPYRIGHT.

The Court concludes that Loyd infringed the Plaintiffs' copyright by selling copies of the Seekers of the Supernatural television series.  There are two elements to a copyright infringement claim: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. at 361.  The Court first examines J. Spera and T. Spera's ownership of the copyright to the Seekers of the Supernatural television program, before examining Loyd's "copying of constituent elements of the work that are original."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. at 361.

First, as discussed in the Court's standing analysis, the Court concludes that J. Spera and T. Spera own jointly the copyright to the Seekers of the Supernatural television program, subject to whatever rights New Line gains from the Option Contract, because T. Spera registered it jointly with L. Warren, whose ownership passed to J. Spera by operation of L. Warren's will.  There is no evidence in the summary judgment record that Loyd acquired the copyright to Seekers of the Supernatural, whether directly from E. Warren, or through third parties (including "Ali Mazuren"), or that she had any substantive involvement in its creation, given that Loyd "did not write, produce, direct, edit or create any episodes" of the show, Factual Background, supra at 21 (quoting Plaintiffs' MSJ ¶ 18, at 7 (asserting this fact)), and did not attend any of the shows' tapings, see Factual Background, supra at 21 (citing Plaintiffs' MSJ ¶ 18, at 7 (asserting this fact)).  That E. Warren gave Loyd VHS tapes of the Seekers of the Supernatural series and asked her to facilitate

airing it on a New York public-access cable-television channel, Manhattan Neighborhood Network, does not constitute Loyd's acquisition of the Seekers of the Supernatural copyright. See Factual Background, supra at 22 (citing Plaintiffs' MSJ ¶ 18, at 7 (asserting that Loyd testified to this fact in the Loyd Depo.); Loyd Depo. at 84:9-21 (Loyd)). Indeed, under 17 U.S.C. § 204, "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). See Schwasinger v. Price, 789 F. Supp. 347, 351 (D. Kan. 1992)(Theis, J.)("Transfer of copyright ownership is not valid unless made in writing signed by the owner of the rights being conveyed."), aff'd, 978 F.2d 1268 (10th Cir. 1992). Because there is no evidence -- much less necessary written evidence -- in the summary judgment record that the Seekers of the Supernatural copyright ever was transferred to Loyd, whether directly or through a third party, there is no genuine dispute of material fact as to J. Spera and T. Spera's ownership of the copyright, subject to New Line's rights from the Option Contract. Having so concluded, the Court turns its attention to whether Loyd copied the Seekers of the Supernatural copyright.

Second, there is no genuine dispute of material fact that Loyd copied the Seekers of the Supernatural television program. As previously discussed,

> Loyd has sold Warren IP in various media through accounts on several ecommerce platforms. See Plaintiffs' MSJ ¶¶ 28-29, at 9-10 (asserting this fact). Specifically, Loyd has sold content derived from the Seekers of the Supernatural series "in the form of downloadable media, paperback books, recordings, MP3s, and scripts of the recordings." Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact). Between 2017-2020, Loyd sold thousands of copies of the Warren IP products via the websites CDBaby.com, BookBaby.com, and Apple Books. See Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact). Loyd sells these products "for less than $1 per copy on average." Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact).

Factual Background, supra at 23-24 (footnotes omitted).  In a typical copyright action, the dispute focuses on proving that a defendant copied the protected work.  This infringement action is different in that there is no ambiguity around Loyd's copying the work.  Because the Copyright Act protects the underlying intellectual property as well as derivative works, Loyd's change of medium -- from videotape to DVD to downloadable movie file, or from audiovisual work to audio or textual work with the same content -- does not license her infringement.  See 17 U.S.C. § 106. In short, because there is no genuine dispute of material fact that Loyd lacks an ownership interest in the Seekers of the Supernatural television program copyright and sold copies of the series online, the Court concludes that Loyd infringed the Seekers of the Supernatural copyright, making the Plaintiffs entitled to summary judgment on Count V.

## IV.   THE COURT GRANTS THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR RIGHT-OF-PUBLICITY CLAIM, BECAUSE THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT LOYD VIOLATED THE WARRENS' POST-MORTEM RIGHTS OF PUBLICITY.

Having granted summary judgment to the Plaintiffs on Counts I and V, the Court now turns to Count VII, Violation of Common Law Right of Publicity, and concludes that the Plaintiffs are entitled to summary judgment on that claim, as well.  The parties stipulate, see JSR at 3, and the Court agrees, that Connecticut State law governs the Plaintiffs' right-of-publicity claim.  The Second Circuit, interpreting Connecticut State right-of-publicity law in In re Jackson, states: "The Restatement provides that '[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.'"  In re Jackson, 972 F.3d at 38 (quoting Restatement (Second) of Torts § 652C).  As discussed above, the Court interprets Connecticut State right-of-publicity law to recognize a post-mortem right of publicity.  See Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. at 190 (quoting State ex. Rel Elvis Presley Intern. Memorial Found. V. Crowell, 733 S.W. 2d at 97-99 (internal citations omitted

in Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.)).  Further, as discussed above, the

Court concludes that J. Spera is the owner of the Warrens' post-mortem rights of publicity, subject

to any rights New Line acquired in the Option Contract.  Accordingly, having established that J.

Spera owns the Warrens' post-mortem rights of publicity, the Court turns its analysis to whether

Loyd violated those rights.

Given that the Plaintiffs prevail at summary judgment on the trademark and copyright

claims, the Court concludes on similar grounds that the Plaintiffs are entitled to summary judgment

on the right-of-publicity claim, as well.  First, as discussed above, there is no genuine dispute of

material fact that

> Loyd has sold Warren IP in various media through accounts on several
> ecommerce platforms.  See Plaintiffs' MSJ ¶¶ 28-29, at 9-10 (asserting this fact).
> Specifically, Loyd has sold content derived from the Seekers of the Supernatural
> series "in the form of downloadable media, paperback books, recordings, MP3s,
> and scripts of the recordings." Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact).
> Between 2017-2020, Loyd sold thousands of copies of the Warren IP products via
> the websites CDBaby.com, BookBaby.com, and Apple Books.  See Plaintiffs' MSJ
> ¶ 29, at 10 (asserting this fact).  Loyd sells these products "for less than $1 per copy
> on average."  Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact).

Factual Background, supra at 23-24 (footnotes omitted).  The sale of these products necessarily

implicates the use of the Warrens' rights of publicity, whether through use of their names -- as

included in the ED AND LORRAINE WARREN mark -- or through their likenesses, whether

depicted in printed material or on film.  See In re Jackson, 972 F.3d at 38 (quoting Restatement

(Second) of Torts § 652C).  Loyd's sale of Warren IP items constitutes "the appropriation and use

of the plaintiff's name or likeness to advertise the defendant's business or product, or for some

similar commercial purpose."  Restatement (Second) of Torts § 652C.  E. Warren gave Loyd VHS

tapes of the Seekers of the Supernatural series and asked her to facilitate airing it on a New York

public-access cable-television channel, Manhattan Neighborhood Network.   See Factual

Background, <u>supra</u> at 22 (citing Plaintiffs' MSJ ¶ 18, at 7 (asserting that Loyd testified to this fact in the Loyd Depo.); Loyd Depo. at 84:9-21 (Loyd)).   That permission is limited in scope, and is not an unlimited license to profit from the Warrens' names and likenesses.   <u>See</u> <u>McCarthy on Publicity</u> § 10:18 (2d ed.)("A 'nonexclusive license' is merely permission to use the licensor's identity within the area and scope defined by the license.").   It is undisputed in the summary judgment record that the Warrens did not give Loyd exclusive rights to use their names or likenesses for commercial purposes.   <u>See</u> Factual Background, <u>supra</u> at 22 (citing Plaintiffs' MSJ ¶ 47, at 13 (asserting this fact)).   Accordingly, the Court concludes that Loyd appropriated the Warrens' post-mortem rights of publicity and awards summary judgment to the Plaintiffs on Count VII.

## V.   THE COURT GRANTS THE PLAINTIFFS' FINAL JUDGMENT MOTION, AWARDING THE PLAINTIFFS THE RELIEF THEY SEEK, DISMISSING THE REMAINING CLAIMS WITHOUT PREJUDICE, AND DISPOSING OF THE <u>CASE</u>.

Having granted summary judgment to the Plaintiffs on the three claims on which they moved -- Count I, Unfair Competition Under the Lanham Act, 15 U.S.C. § 1125(a)(1)(a); Count V, Copyright Infringement, 17 U.S.C. §§ 501-13; and Count VII, Violation of Common Law Right of Publicity -- the Court now considers, and grants, their Final Judgment Motion.   Although Loyd's MSJ moves for summary judgment on the remaining seven of the Plaintiffs' claims, the Court addresses the Final Judgment Motion before Loyd's summary judgment arguments on the Plaintiffs' other seven claims, because the Plaintiffs "request an order voluntarily dismissing their remaining claims without prejudice," if the Court's grants the Final Judgment Motion.   Final Judgment Motion at 2.   The Final Judgment Motion requests: (i) an entry of final judgment against Loyd on the three claims on which the Plaintiffs prevail at summary judgment; and (ii) injunctive relief, statutory damages, and attorneys' fees and costs.   <u>See</u> Final Judgment Motion at 2-17.   The

Court concludes that the Plaintiffs -- having prevailed at summary judgment on the three claims on which they move -- are entitled to the relief they seek in the Final Judgment Motion, subject to certain alterations to comply with the Supreme Court's recent holding in <u>Abitron</u>.  Accordingly, the Court grants the Final Judgment Motion.

The Court summarizes the relevant procedural history before explaining its reasoning behind its decision to grant the Final Judgment Motion.  The Plaintiffs do not include their requests for relief in the Plaintiffs' MSJ.  Instead, after the Court granted summary judgment to the Plaintiffs on Counts I, V, and VII, and denied Loyd's MSJ in its entirety on March 29, 2022, <u>see</u> Summary Judgment Order at 12-13, the Plaintiffs filed the Final Judgment Motion on September 1, 2022, <u>see</u> Final Judgment Motion at 1.  In the Final Judgment Motion, the Plaintiffs request that the Court enter Final Judgment against Loyd on Count I (trademark infringement), Count V (copyright infringement), and Count VII (violation of rights of publicity).  <u>See</u> Final Judgment Motion at 17. The Final Judgment Motion, as reflected in its Proposed FJ, requests that the Court issue a permanent, worldwide injunction: (i) ordering Loyd to stop infringing the <u>Seekers of the Supernatural</u> copyright, cancel her copyright registrations for <u>Seekers of the Supernatural</u>, and cease to possess her copies of <u>Seekers of the Supernatural</u> series; (ii) ordering Loyd to stop infringing the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL marks, cancel her international registrations of the marks, and cease to possess items bearing the marks; and (iii) ordering Loyd to stop using the E. Warren and L. Warren's names or likenesses for commercial purposes.[112]  <u>See</u> Proposed FJ ¶¶ 1-3, at 2-6.  Additionally, the Plaintiffs request

---

[112]In addition, the Plaintiffs request that the Court require Loyd to file a status report within thirty days of the final judgment's entry addressing her compliance with the permanent injunction. <u>See</u> Proposed FJ ¶ 3, at 5.

that the Court, pursuant to 15 U.S.C. § 1119, order the USPTO to cancel or deny Loyd's

registrations for the ED AND LORRAINE WARREN and SEEKERS OF THE

SUPERNATURAL marks.  See Proposed FJ at 5.  Finally, the Plaintiffs request an award of

$150,000.00 in statutory damages under 17 U.S.C. § 504, as well as fees and costs under 15 U.S.C.

§ 1117 and 17 U.S.C. § 505.  See Proposed FJ at 4.  The Final Judgment Motion states:

> If the Court were to grant Plaintiffs a permanent injunction and damages (and
> attorneys' fees) on these claims, Plaintiffs can obtain most of the relief they are
> seeking in this case without the need to proceed to trial on their remaining claims.
> Accordingly, if the Court grants this relief, Plaintiffs further request an order
> voluntarily dismissing their remaining claims without prejudice.  Plaintiffs are
> concurrently moving for default judgment against the remaining defendants.

Final Judgment Motion at 2 (footnotes omitted).[113]

The Court held a hearing on the Final Judgment Motion and Default Judgment Motion on

November 8, 2022.  See November 8 Clerk's Minutes at 1.  Loyd did not attend the November 8,

2022, hearing.  See November 8 Clerk's Minutes at 1-2.  Nevertheless, the Court indicated that it

would include in the November 8 Clerk's Minutes that, if Loyd wanted "to say anything further

on [the Final Judgment Motion and Default Judgment Motion,] then we'll try to provide her an

opportunity to do so."   Draft Transcript of Hearing at 7:25-8-3 (taken November 8,

---

[113]Concurrent with the Final Judgment Motion, the Plaintiffs filed the Default Judgment
Motion, in which they request a default judgment against Defendants Metagalaxtic, LLC;
Omnimedia, LLC; Cohen Goldberg & Smith; and Seekers of the Supernatural.  See Default
Judgment Motion at 11.  In connection with the Default Judgment Motion, the Plaintiffs similar
relief to what have requested against Loyd: (i) a permanent injunction; (ii) statutory damages in
the amount of $150,000 for willful copyright infringement pursuant to 17 U.S.C. § 504; and
(iii) fees and costs under 15 U.S.C. § 1117.  See Default Judgment Motion at 4-11.  The Court
granted the Default Judgment Motion on November 8, 2022, and provided the Plaintiffs the relief
that they requested against the defaulted Defendants.  See Defaulting Defendants FJ at 2-3.

2022)("November 8 Tr.")(Court).[114]  See November 8 Clerk's Minutes at 2.  Noting that the Final Judgment Motion was unopposed as of the November 8, 2022, hearing, the Court invited the Plaintiffs to submit a proposed order, noting that the Court would "finish up the [summary judgment] opinion and . . . probably won't enter the order until I get done with the opinion and issue it.  And then[,] before I issue it, I'll look at it and make sure I'm comfortable with the form of order given."  November 8 Tr. at 19:3-9 (Court).  The Plaintiffs confirmed that they already had submitted a proposed final judgment against Loyd.  See November 8 Tr. at 19:13-15 (McCue).

The Clerk's Minutes filed after the November 8, 2022, hearing alerted Loyd that, despite her not appearing in the hearing or filing a response to the Final Judgment Motion and Default Judgment Motion, the Court offered an additional opportunity to present her arguments: "**Court:** Observes that Ms. Loyd did not respond to Motions noticed for instant hearing, notes these motions may not be opposed.  Will proceed with argument, and include in minutes that if Ms. Loyd wishes to say anything further, Court will try to afford opportunity for her to do so."  November 8 Clerk's Minutes at 2.  After the November 8, 2022, Loyd filed two new motions -- the Second MTD and the Third MTD[115] -- but did not file a response to the Final Judgment Motion.  By the time Loyd sent her Final Judgment Opposition to the Court's proposed text box instead of filing it, nearly three weeks had elapsed from the November 8, 2022, hearing.  See Email from B. Loyd to Proposed Text Box (dated November 25, 2022), filed August 15, 2023 (Doc. 154-1).  As

---

[114]The Court's citations to the hearing's transcript refers to the court reporter's original, unedited versions.  Any final transcript may contain slightly different page and/or line numbers.

[115]The Court treats Loyd's MSJ as Loyd's first motion to dismiss, as it is styled, "Pre-Trial Motion Summary Judgment or Dismiss," and which includes a request under rule 12(b)(6) of the Federal Rules of Civil Procedure to "dismiss with prejudice the entirety of Plaintiffs Count Copyright Infringement on the grounds that they are barred by the statute of limitations."  Loyd MSJ at 1, 14.

previously discussed, the Final Judgment Opposition is a procedural oddity, given that Loyd used the Plaintiffs' Proposed FJ as a base and altered its text to make her arguments in opposition to the Final Judgment Motion.  See Final Judgment Opposition at 1-6.  Despite these irregularities and that Loyd never filed the Final Judgment Opposition herself in spite of her privileges to do so and knowledge of how to do so, in light of Loyd's pro se status, the Court treats the Final Judgment Opposition as Loyd's response to the Final Judgment Motion.  See Hall v. Bellmon, 935 F.2d at 1110.  The Court's analysis proceeds on the understanding that, as a pro se litigant's work product, Loyd's Final Judgment Opposition is not to be held to the standard of a filing an attorney has drafted.  See Hall v. Bellmon, 935 F.2d at 1110.  The Court also proceeds on the understanding that it is not to "assume the role of advocate for the pro se litigant."  See Hall v. Bellmon, 935 F.2d at 1110.

Loyd's Final Judgment Opposition does not respond in a meaningful way to the remedies-focused Final Judgment Motion and instead appears to be a summary of her arguments raised at various points in this case, conveyed in the form of a proposed final judgment.  See Final Judgment Opposition at 1-6.  Repeatedly, Loyd denies ownership and registration of various pieces of intellectual property at issue in the case and claims to have canceled other registrations.  See Final Judgment Opposition at 2-5.  Conspicuously absent from the Final Judgment Opposition is an attempt to deal substantively with the Plaintiffs' arguments that they are entitled to the relief they seek.  Despite these deficiencies, the Court reads Loyd's Final Judgment Opposition liberally and considers her arguments as it evaluates the Final Judgment Motion.

**A.     THE PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION FOR ON THE BASIS OF THEIR SUCCESSFUL SUMMARY JUDGMENT CLAIMS IN ORDER TO DETER CONTINUING VIOLATIONS BY LOYD.**

The Court concludes that the Plaintiffs are entitled to the permanent injunction they seek,

as the Proposed FJ reflects.  See Proposed FJ at 2-5.  As the Plaintiffs note correctly, the Lanham
Act and Copyright Act both authorize the granting of injunctions as a remedy, the former
"according to the principles of equity and upon such terms as the court may deem reasonable, to
prevent the violation of any right of the registrant of a mark," 15 U.S.C. § 1116(a), and the latter
"on such terms as [the court] may deem reasonable to prevent or restrain infringement of a
copyright," 17 U.S.C. § 502(a).  Further, the Plaintiffs are correct to state that injunctive relief is
an appropriate remedy for a right-of-publicity violation.  See Final Judgment Motion at 3 (citing
McCarthy on Publicity § 11:22 (2d ed.)); McCarthy on Trademarks and Unfair Competition § 30:1
(5th ed.)("[A] permanent injunction is the usual and normal remedy once trademark infringement
has been found in a final judgment.").  Accordingly, the three claims on which the Plaintiffs prevail
at summary judgment provide three routes to injunctive relief.

> **1.    The Plaintiffs Demonstrate Their Entitlement to Injunctive Relief to
> Deter Future Infringement of the Warren IP.**

To receive a permanent injunction, the Plaintiffs must demonstrate: "(1) actual success on
the merits; (2) irreparable harm unless the injunction is issued; (3) considering the balance of
hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public
interest would not be disserved by a permanent injunction."  Viacom Int'l Inc. v. Baca, No. CIV
18-0112 JCH/KRS, 2018 WL 6003539, at *5 (D.N.M. November 15, 2018)(Herrera, J.)(quoting
Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 822 (10th Cir. 2007)).  Given that the
Plaintiffs prevail at summary judgment, the Plaintiffs satisfy the first factor.  The Court's analysis
of the second through fourth factors follows.

The Court concludes that the Plaintiffs satisfy the second injunctive relief factor.  As to
irreparable harm and an injunction's necessity, the Court credits the Plaintiffs' citation to Viacom
Int'l v. Baca as support for the proposition that ""[i]njunctive relief is the remedy of choice for

trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by the defendant's continuing infringement."'" Final Judgment Motion at 3 (quoting Viacom Int'l Inc. v. Baca, 2018 WL 6003539, at *5 (quoting Audi AG v. D'Amato, 469 F.3d 534, 550-51 (6th Cir. 2006)(quoting Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir. 1988)))). The Plaintiffs are correct to note that, under the Lanham Act, "[a] plaintiff seeking any such injunction shall be entitled to a presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction," 15 U.S.C. § 116(a), and that the Tenth Circuit understands the Copyright Act to "recognize a presumption of injury at the preliminary injunction stage once a copyright infringement plaintiff has demonstrated a likelihood of success on the merits," Country Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280, 1288-89 (10th Cir. 1996). Loyd falls far short of rebutting these presumptions. The Court also agrees with the Plaintiffs' arguments that, "as with other intellectual property rights, infringement of the Warrens' rights of publicity is likely to cause irreparable injury." Final Judgment Motion at 4-5. Given Loyd's conduct that resulted in and prolonged this litigation, the Court views a permanent injunction as necessary to deter a threat of continuing infringement. On these multiple grounds, the Court concludes that the Plaintiffs will remain at risk of irreparable harm unless an injunction is issued. See Viacom Int'l Inc. v. Baca, 2018 WL 6003539, at *5 (quoting Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d at 822).

Third, the Court concludes that the balance of hardships between the parties justifies a remedy in equity. See Viacom Int'l Inc. v. Baca, 2018 WL 6003539, at *5 (quoting Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d at 822). As the Plaintiffs rightly maintain, Loyd has no legal right to the Plaintiffs' intellectual property. See Final Judgment Motion at 5. As in Viacom Int'l Inc. v. Baca, "[t]he threatened injury to Plaintiff[]s['] goodwill caused by Defendants'

infringing and unlawful acts outweighs any injury an injunction may cause Defendants," and the "Defendants' open and intentional appropriation of Plaintiff's marks and copyrights causes minimal harm to Defendants who have no legal right to the marks and who have been repeatedly warned of the infringing unlawful conduct."  2018 WL 6003539, at *6 (citing Gen. Motors Corp. v. Urban Gorilla, L.L.C., 500 F.3d 1222, 1229 (10th Cir. 2007)).  Accordingly, the Court concludes that the Plaintiffs satisfy the balance-of-hardships factor.

Fourth, the Court concludes that the public interest favors an injunction's entry.  See Viacom Int'l Inc. v. Baca, 2018 WL 6003539, at *5 (quoting Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d at 822).  "The public has an interest in the maintenance of product quality and not being misled or confused."  Viacom Int'l Inc. v. Baca, 2018 WL 6003539, at *6 (citing Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 193 (1985)).  Here, the public is entitled to know that the Warren products it purchases are genuine.

## 2. The Court Will Limit the Injunction's Scope to the United States in Light of the Supreme Court's Recent Holding in Abitron.

Having concluded that the Plaintiffs are entitled to injunctive relief, the Court examines the Plaintiffs' proposed injunction and concludes that the relief it orders is "reasonable[] to prevent the violation of any right of the registrant of a mark" under the Lanham Act, 15 U.S.C. § 1116(a), and "to prevent or restrain infringement of a copyright," under the Copyright Act, 17 U.S.C. § 502(a), but that its international provisions must be eliminated in light of the Supreme Court's recent holding in  Abitron.  In Abitron, which the Supreme Court decided on June 29, 2023 -- after the parties' briefing on the Proposed FJ -- the Honorable Samuel A. Alito, Jr., Associate Justice of the Supreme Court of the United States, for a unanimous Supreme Court, concludes that 15 U.S.C. §§ 1114(a)(1) and 1125(a)(1), the latter being the Lanham Act statute under which the Plaintiffs prevailed at summary judgment, "are not extraterritorial and . . . extend only to claims where the

claimed infringing use in commerce is domestic." Abitron, 143 S.Ct. at 2527.  In so holding, the

Supreme Court resolved a Circuit split by vacating the Tenth Circuit's judgment in Hetronic Int'l,

Inc. v. Hetronic Germany GmbH, 10 F.4th 1016 (10th Cir. 2021)("Hetronic"), and remanding that

case for further proceedings.  The Tenth Circuit has not yet issued an opinion on remand.  The

Plaintiffs cited Hetronic in their Final Judgment Motion to support their entitlement to a worldwide

injunction, noting that, in Hetronic, the "Tenth Circuit held that 'when the defendant is an

American citizen, courts may conclude that the Lanham Act reaches that defendant's

extraterritorial conduct even when the effect on U.S. commerce is not substantial.[']"  Final

Judgment Motion at 6 (citing Hetronic, 10 F.4th at 1036).  Following Abitron, the Court lacks the

power to grant the Plaintiffs a worldwide injunction to deter Lanham Act violations.

Abitron resolved a Circuit split regarding the Lanham Act's extraterritorial application,

rejecting, in a unanimous decision, the Tenth Circuit's view that the Lanham Act can apply

extraterritorially if certain conditions are met.  See 143 S.Ct. at 2527.  In Hetronic, to determine

whether the Lanham Act applies extraterritorially under the facts of that case, the Tenth Circuit

applied a three-part test, the first step of which is determining whether any of the defendants are

American citizens.  See Hetronic, 10 F.4th at 1042.  Under the Tenth Circuit's pre-Abitron

framework, had any of the defendants been American citizens, the inquiry would have ended there,

and the Lanham Act would have applied extraterritorially, without the need to proceed to steps

two and three: "show[ing] that Defendant's foreign infringing conduct had a substantial effect on

U.S. commerce," and showing that extraterritorial application of the Lanham Act would not

"conflict with trademark rights under another country's laws."  Hetronic, 10 F.4th at 1042.  In

Hetronic, however, the defendants were not United States citizens.  See 10 F.4th at 1042.  Under

the pre-Abitron test the Tenth Circuit applied in Hetronic, a United States citizen like Loyd who

infringed trademarks outside of the United States would be subject to the Lanham Act.  See Hetronic, 10 F.4th at 1042.  Under that framework, the Court would be less hesitant to enjoin Loyd internationally than it is now, under Abitron.

Abitron indicates that the Supreme Court disapproves of using the Lanham Act to enjoin a United States citizen's trademark infringement in foreign jurisdictions, even when the injunction is entered in a case centered primarily on infringement in the United States.  While Abitron is distinguishable from this case because it involves non-United States citizens infringing trademarks abroad, the Court has no sound reason to believe the Supreme Court would have decided that case differently if its facts more closely resembled this case.  See 143 S.Ct. at 2527.  Among other things, the Supreme Court "put aside" Steele v. Bulova Watch Co., 344 U.S. 280 (1952), a case that applied the Lanham Act extraterritorially to a United States citizen who infringed trademarks in the United States and Mexico as "narrow and factbound," and predating the "two-step framework" that guides the analysis in Abitron.[116]  Abitron, 143 S.Ct. 2530-31.  Further, given

---

[116]The "two-step framework" for determining whether a statute applies extraterritorially derives from a 2016 Supreme Court case, RJR Nabisco, Inc. v. European Community, 579 U.S. 325 (2016).  Abitron, 143 S.Ct. at 2528.  The Supreme Court in Abitron describes the framework as follows:

> Applying the presumption against extraterritoriality involves "a two-step framework."  [*RJR Nabisco, Inc. v. European Community*, 579 U.S.] at 337, 136 S.Ct. 2090.  At step one, we determine whether a provision is extraterritorial, and that determination turns on whether "Congress has affirmatively and unmistakably instructed that" the provision at issue should "apply to foreign conduct."  *Id.*, at 335, 337, 136 S.Ct. 2090; accord, *Kiobel* [*v. Royal Dutch Petroleum Co.*], 569 U.S. at 117, 133 S.Ct. 1659 (asking whether Congress "intends federal law to apply to conduct occurring abroad"); *Nestlé USA, Inc. v. Doe*, 593 U.S. ----, ----, 141 S.Ct. 1931-1936, 210 L.Ed.2d 207 (2021).  If Congress has provided an unmistakable instruction that the provision is extraterritorial, then claims alleging exclusively foreign conduct may proceed, subject to "the limits Congress has (or has not)

<u>Abitron</u>'s focus on whether the Lanham Act applies to trademark infringement outside the United States, and its conclusion that it does not, the Supreme Court does discuss whether courts are empowered to grant an injunction that applies extraterritorially in response to infringement that occurred in large part in the United States. Even so, the Court's reading of <u>Abitron</u> suggests that the Supreme Court would disapprove of issuing a worldwide injunction in this case. If the Lanham Act does not apply extraterritorially, it would be discordant for it to permit enjoining activity abroad, even in a case in which an American citizen's underlying infringement occurred in the United States. <u>Abitron</u> devotes considerable attention to discussing the pitfalls of extraterritoriality, including "'international discord,'" <u>Abitron</u>, 143 S.Ct. at 2533 (quoting <u>Kiobel v. Royal Dutch Petroleum Co.</u>, 569 U.S. 108, 119 (2013)), and highlights the "European Commission gravely warn[ing] . . . against applying the Lanham Act 'to *acts of infringement* occurring . . . in the European Union' and outside the United States," 143 S.Ct. at 2543 (citing Brief for European Commission on Behalf of the European Union as *Amicus Curiae* 4 (emphasis in <u>Abitron</u>, but not Brief for European Commission on Behalf of the European Union as *Amicus Curiae* 4)). Given <u>Abitron</u>'s invocation of the Supreme Court's "longstanding admonition that 'United States law governs domestically but does not rule the world,'" the Court anticipates further

---

imposed on the statute's foreign application." *RJR Nabisco*, 579 U.S. at 337-338, 136 S.Ct. 2090.

      If a provision is not extraterritorial, we move to step two, which resolves whether the suit seeks a (permissible) domestic or (impermissible) foreign application of the provision. To make that determination, courts must start by identifying the "'"focus" or congressional concern'" underlying the provision at issue. *Id.*, at 336, 136 S.Ct. 2090. "The focus of a statute is the 'object of its solicitude,' which can include the conduct it 'seeks to "regulate,"' as well as the parties and interests it 'seeks to "protect"' or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. ----, ----, 138 S.Ct. 2129, 2136, 201 L.Ed.2d 584 (2018) (alterations omitted).

<u>Abitron</u>, 143 S.Ct. at 2528 (footnote omitted).

case law curtailing or eliminating the extraterritorial application of statutes in the intellectual property and other contexts.  The Court, accordingly, proceeds with caution in regard to the Proposed FJ's scope.

The Court concludes that, to enter the Proposed FJ, it would be prudent to first eliminate its international provisions in light of Abitron, particularly given that the Court expects additional case law paring back extraterritoriality.  Even without Abitron, the worldwide scope of the injunction would be too broad, particularly given that the summary judgment record is sparse as to where the Plaintiffs sell Warren IP abroad.  See Hetronic, 10 F.4th at 1046 ("[T]he court's injunction extends not only to countries in which Hetronic currently sells its products, but to every country in the world.  The Lanham Act -- the statute on which the district court relied -- cannot support such a broad injunction here.").  International provisions aside, however, the Court considers the proposed injunction "reasonable[] to prevent the violation of any right of the registrant of a mark" under the Lanham Act, 15 U.S.C. § 1116(a), and "to prevent or restrain infringement of a copyright," under the Copyright Act, 17 U.S.C. § 502(a).  Accordingly, to preserve the present form of the Proposed FJ to the greatest extent possible in light of Abitron, the Court makes the following alterations: (i) changing the scope of the injunction on trademark infringement from "anywhere in the world" to the United States in Proposed FJ ¶ 2, at 4[117]; and (ii) eliminating the provision ordering Loyd to cancel her infringing foreign trademark

---

[117]Accordingly, the relevant trademark provision will read: "Directly or indirectly infringing the ED AND LORRAINE WARREN and SEEKERS OF THE SUPERNATURAL trademarks or any mark that is confusingly similar thereto in any manner in the United States, including but not limited to, utilizing the marks in domain names and filing for, maintaining, or enforcing any trademark registration for the marks . . . ."  Compare with Proposed FJ at 4.

registrations in Proposed FJ ¶ 2, at 4.[118]   To impose reasonable geographic scope and for consistency's sake, the Court will limit the scope of the injunction's copyright[119] and rights-of-publicity[120] provisions to the United States.  With those changes, the Court is satisfied that the Proposed FJ will be sufficient to deter further violations of the Plaintiffs' intellectual property rights without running afoul of controlling case law.

B.   **THE PLAINTIFFS ARE ENTITLED TO $150,000.00 IN STATUTORY DAMAGES FOR LOYD'S WILLFUL INFRINGEMENT OF THE COPYRIGHT ACT.**

The Court concludes that the Plaintiffs are entitled to $150,000.00 in statutory damages under the Copyright Act, because this case is an egregious one in which "infringement was committed willfully."   17 U.S.C. § 504(c)(2).   Courts in this District have made awards of $150,000.00 in statutory damages under the Copyright Act for willful violations.  See, e.g., Relios, Inc. v. Genesis, Inc., No. CIV-08-345 JCH/WDS, 2008 WL 11450515, at *3-4 (D.N.M. Oct. 9,

---

[118]This alteration entails deleting the following sentence and the list of foreign trademark registrations that follows it: "Furthermore, Defendant Loyd is hereby ordered to cancel the following registrations that she has obtained and maintained in other jurisdictions within thirty (30) days of the date of this Order and take whatever steps are required to ensure cancellation of such registrations."  Compare with Proposed FJ at 4.

[119]Accordingly, the relevant copyright provision will read:

Directly or indirectly infringing, or causing, enabling, facilitating, encouraging, promoting and inducing or participating in the infringement of, copyrights in the Seekers of the Supernatural television series (as defined in ECF No. 81 at 5), including but not limited to reproducing, preparing derivative works of, distributing of, filing copyright applications, maintaining copyright registrations, or enforcing copyright registrations covering the Seekers of the Supernatural television series, in the United States . . . .

Compare with Proposed FJ at 3.

[120]Accordingly, the relevant rights of publicity provision will read: "Directly or indirectly using the Ed Warren or Lorraine Warren names or likenesses for any commercial purposes in the United States."  Compare with Proposed FJ at 5.

2008)(Herrera, J.); <u>Kabana, Inc. v. Best Opal, Inc.</u>, No. CIV 05-1101 WJ/LCS (D.N.M. April 26, 2006)(Johnson, J.), <u>vacated for lack of personal jurisdiction by</u> CIV 05-1101 WJ/LCS (D.N.M. February 2, 2007).

> In evaluating the appropriate award, the Court considers various factors, including the number of works infringed, expenses saved and profits earned by Defendant, revenues lost by Plaintiff, the deterrent effect that an award would have on Defendant and third parties, Defendant's state of mind and the conduct and attitude of the parties, and the cooperation of Defendant in providing evidence concerning the value of infringing material.

<u>Relios, Inc. v. Genesis, Inc.</u>, 2008 WL 11450515, at *1.  The Court notes the Plaintiffs' acknowledgement that "[t]his case involves one copyrighted work for the Seekers of the Supernatural Television Series," and that "they have never sold or licensed the series, so they are not claiming any lost revenue to date," and concludes that these factors weigh against a large statutory damages award.  Final Judgment Motion at 12.  The relatively small dollar figure in this case, given that Loyd sold the Warren products "for less than $1 per copy on average," further weighs against a large statutory damages award.[121]  <u>See</u> Factual Background, <u>supra</u> at 24 (quoting Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact)).  The Court, however, concludes that the remaining factors -- specifically, the "deterrent effect that an award would have on Defendant and third parties, Defendant's state of mind and the conduct and attitude of the parties, and the cooperation of Defendant in providing evidence concerning the value of infringing material" -- justify a statutory damages award of $150,000.00.  <u>See</u> <u>Relios, Inc. v. Genesis, Inc.</u>, 2008 WL 11450515,

---

[121]While it is undisputed that, between 2017 and 2020, Loyd sold thousands of copies of the Warren IP products via the websites CDBaby.com, BookBaby.com, and Apple Books, the summary judgment record provides evidence of a range of how many thousands of copies Loyd sold, which creates a range for the value of Loyd's profits.  <u>See</u> Factual Background, <u>supra</u> at 24 (citing Plaintiffs' MSJ ¶ 29, at 10 (asserting this fact)); <u>id.</u> <u>supra</u> at 25 n.54 ("The Plaintiffs tally Loyd's reported sales as "around 5,400" units, <u>see</u> Plaintiffs' MSJ ¶ 29, at 10, but the Court tallies the numbers that Loyd provides and arrives at a number about a third higher, around 7,200 units sold, Loyd's Interrogatory Responses No. 11, at 6.").

at *1.  The Court concurs with the Plaintiffs that "the blatant nature of Ms. Loyd's conduct," and the "willful infringement of Plaintiffs' copyright and the bad faith manner in which Ms. Loyd has engaged in this case," warrant a significant award.  Final Judgment Motion at 12.  Loyd, in the Loyd Depo., testifies that she filed an intent-to-use trademark application for the ED AND LORRAINE WARREN mark,

> [b]ecause I don't know what's going to happen here.  If the judge decides to cancel this trademark, just go back and file again with the -- and see what happens.  So I put it there as intent to use.

> I don't know what's going to happen with this.  It's sort of like I don't care what the judge decides to do.  If he wants to cancel, cancel away.  But that's why I filed the intent to use.

Loyd Depo. at 161:21-162:4 (Loyd).  The Court takes Loyd at her word.  That Loyd "do[es not] care what the judge decides to do" in regard to the ED AND LORRAINE WARREN mark, particularly given her history of willful disregard for the Plaintiffs' intellectual property rights, indicates that continued infringement of the Warren IP, including the Seekers of the Supernatural copyright, is likely in the absence of a significant statutory damages award.  Loyd Depo. at 162:2-3 (Loyd).  The Court considers a $150,000.00 statutory damages award to be necessary to stop Loyd from abusing the Warren IP in the future and to deter others who might be tempted to implement a similar scheme to Loyd's.  Accordingly, the Court grants the Plaintiffs their requested $150,000.00 in statutory damages under the Copyright Act.

### C.     THE COURT GRANTS THE PLAINTIFFS THEIR FEES AND COSTS, BECAUSE LOYD CONSENTS TO THEIR AWARD IN HER FINAL JUDGMENT OPPOSITION AND, IN ANY EVENT, THE NATURE OF LOYD'S INFRINGEMENT JUSTIFIES THE AWARD.

Finally, the Court turns to the Plaintiffs' request for their attorneys' fees and costs under the Lanham Act and the Copyright Act, and grants their request in full, because Loyd consents to the award of fees and costs in her Final Judgment Opposition, and, in any event, the nature of

Loyd's infringement justifies the award.  Loyd's Final Judgment Opposition contains the following provision regarding fees and costs, which is identical to that in the Plaintiffs' Proposed Final Judgment: "Pursuant to 15 U.S.C. § 1117 and 17 U.S.C. § 505, the Court hereby awards Plaintiffs their fees and costs.  Plaintiffs shall file their motion for fees and costs within 30 days of this Order."  Final Judgment Opposition at 6 (citing D.N.M.LR-Civ. 54.1-54.5).  As previously discussed, Loyd used the Plaintiffs' Proposed Final Judgment as a base for her Final Judgment Opposition, and, in places, removed or altered items the Plaintiffs want the Court to order.  For example, Loyd changes the Plaintiffs' proposed "the Court hereby enters statutory damages against Defendant Loyd for $150,000" to "the Court hereby enters statutory damages against Defendant Loyd for $0."  Compare Proposed Final Judgment at 4, with Final Judgment Opposition at 4.  By contrast, Loyd left the Plaintiffs' proposed fees and costs provision unchanged.  See Final Judgment Opposition at 6.  Accordingly, Loyd consents to the full award of fees and costs that the Plaintiffs seek.

Moreover, even if Loyd had not consented to the award of fees and costs, the remedies provisions of the Lanham Act and Copyright Act would still justify their award to the Plaintiffs.  This litigation presents an "exceptional" case under the Lanham Act, which entitles the Plaintiffs to an award of attorneys' fees.  15 U.S.C. § 1117.  The factual thicket this case presents at summary judgment reveals Loyd's infringement of the Warren's trademarks to be "malicious, fraudulent, deliberate, or willful," especially given her dogged claims of entitlement to the Warren IP in the absence of genuine evidence to that point.  United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1232 (10th Cir. 2000).  Loyd's deposition testimony that "[i]t's sort of like I don't care what the judge decides to do" about the adjudication of the Plaintiffs' trademark claims betrays her willful disregard for the Plaintiffs' intellectual property rights.  Loyd Depo. at 162:2-3

(Loyd).  Further, the factors the Supreme Court considers in granting fees and costs under the Copyright Act -- "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence" -- support an award of fees and costs to the Plaintiffs.  Fogerty v. Fantasy, Inc., 510 U.S. 517, 535 n.19 (1994)(quoting Lieb v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986)).  Specifically, the lack of factual evidence or legal grounds for Loyd's claims of entitlement to the Warren IP and a compelling need for deterrence in light of Loyd's conduct justifies the award of fees and costs.  In summary, the Court grants the Plaintiffs' request for attorneys' fees and costs under the Lanham Act and Copyright Act, because Loyd consents to it, but also emphasizes that the facts of this case indicate that the Plaintiffs would be entitled to the award even if Loyd had stated her opposition.

> **D.   THE COURT ENTERS THE PROPOSED FINAL JUDGMENT, SUBJECT TO ALTERATIONS TO THE INJUNCTION'S SCOPE, THEREBY GRANTING THE RELIEF THE PLAINTIFFS SEEK, DISMISSING THE REMAINING CLAIMS WITHOUT PREJUDICE, AND DISPOSING OF THIS CASE.**

The Court has reviewed in detail the parties' briefing, as well as the Plaintiffs' Proposed FJ, and concludes that it will enter the Proposed FJ, subject to the alterations to the injunction previously discussed.  In addition to granting the relief the Plaintiffs seek, the Proposed FJ, pursuant to rule 41(a)(2) of the Federal Rules of Civil Procedure, dismisses without prejudice the following remaining claims: Count II, Cancelation of Federal Trademark Registration under the Lanham Act, 15 U.S.C. § 1064; Counts III and IV, Cybersquatting under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(c); Count VI, Cancellation of Copyright Registrations; Count VIII, Common Law Trademark Infringement; Count IX, Common Law Unfair Competition; and Count X, Tortious Interference with Prospective Economic Advantage.  See Proposed FJ at 5.

With the Plaintiffs having prevailed at summary judgment on Counts I, V, and VII, and the Court dismissing Counts II, III, IV, VI, VIII, IX, and X without prejudice, the Court denies Loyd's MSJ, and will enter separately Final Judgment against Loyd, which, in combination with the Defaulting Defendants FJ, will dispose of this case.

**IT IS ORDERED** that: (i) the Plaintiffs' Emergency Motion to Compel Deposition, filed May 19, 2021 (Doc. 48), is granted in part and denied in part; (ii) the Plaintiffs' Motion for Partial Summary Judgment and Supporting Memorandum of Points and Authorities, August 6, 2021 (Doc. 81), is granted; (iii) the Plaintiffs' Motion for Entry of Final Judgment and for an Award of Injunctive Relief, Damages, and Attorneys' Fees, and Motion to Voluntarily Dismiss Plaintiffs' Remaining Claims, filed September 1, 2022 (Doc. 134), is granted; (iv) judgment is entered for the Plaintiffs and against the Defendants on Counts I, V, and VII; (v) Counts II, III, IV, VI, VIII, IX, and X are dismissed without prejudice; (vi) Defendant Bea Loyd's Pretrial Motion Summary Judgment or Dismiss, filed August 17, 2021 (Doc. 91), is denied; (vii) Loyd's Motion to Dismiss, filed November 14, 2022 (Doc. 143), is denied; (viii) Loyd's Motion to Dismiss Defendants Not Served with Summons and Complaint, filed November 21, 2022 (Doc. 145), is denied; and the Court will enter Final Judgment separately.

_____
UNITED STATES DISTRICT JUDGE

*Counsel and parties*:

Michael J. McCue
Ross L. Crown
Meng Zhong
Lewis Roca Rothgerber Christie LLP
Las Vegas, Nevada

> *Attorneys for the Plaintiffs*

Bea Loyd
Sheridan, Wyoming

> *Defendant pro se*